JUDGE STANTON

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPACE COAST CREDIT UNION, as successor in interest to EASTERN FINANCIAL FLORIDA CREDIT UNION;<br><br>Plaintiff,<br><br>-vs.-<br><br>BARCLAYS CAPITAL INC.; BARCLAYS BANK PLC; STATE STREET GLOBAL ADVISORS; STATE STREET BANK AND TRUST COMPANY, and STATE STREET CORPORATION,<br><br>Defendants. | Civil Action No. **11 CIV 2802**<br><br>**COMPLAINT**<br><br>RECEIVED<br>APR 26 2011<br>U.S.D.C. S.D.N.Y.<br>CASHIERS<br><br>**JURY TRIAL DEMANDED** |



**TABLE OF CONTENTS**

**Page No.**

INDEX OF TABLES, CHARTS, GRAPHICS AND EXHIBITS . . . . . . . . . . . . . . . . . . . . . . .  vii

SUMMARY OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    Primary Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.      Barclays Capital Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.      State Street Global Advisors, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . 12

        3.      Barclays Bank plc . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        4.      BarCap and BBPLC ("Barclays") Participated in a Concerted Scheme and Common Course of Conduct to Create and Profit from Markov . . . 13

    C.    Secondary Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.    Relevant Non-Party: Markov CDO I, Ltd. . . . . . . . . . . . . . . . . . . . . . . . 14

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.       BACKGROUND INFORMATION CONCERNING CDOs . . . . . . . . . . . . . . . . . . . . 16

    A.    CDOs and CDO Collateral Managers . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.      CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.      The Commonly Represented and Commonly Understood Role and Importance of the CDO Manager . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.    CDO Collateral:  Subprime RMBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        1.      The "Tranching" of Subprime Mortgage Risk

i

    into Subprime RMBS Tranches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  2. Tranche Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

 C. CDOs: Mezzanine CDOs and High Grade CDOs . . . . . . . . . . . . . . . . . . . . . . . 31

  1. Mezzanine CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

  2. Mezzanine CDOs and Markov . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  3. High Grade CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

  4. The Basis of CDO Tranche Structure and Tranche Ratings . . . . . . . . . 37

  5. CDO Mis-Structuring and Mis-Rating . . . . . . . . . . . . . . . . . . . . . . . . . 38

 D. Synthetic CDOs and Cash CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

 E. The Particular, Structural Conflict of Interest in Synthetic CDOs
  and Its Defusal By Appointment of an Independent Collateral Manager . . . . . . 43

 F. Recent Public Discovery in and After April 2010
  that Many Synthetic CDOs Had Secretly Been Built to Fail . . . . . . . . . . . . . . . 44

II. DEFENDANTS' PRIOR CDO-RELATED MISCONDUCT
 PROVIDES FURTHER EVIDENCE OF SCIENTER . . . . . . . . . . . . . . . . . . . . . . . . . 47

 A. Barclays Collateralized a Prior Synthetic CDO – Corvus –
  With Assets Barclays Believed Would Fail, Including
  Bespoke Toxic Assets of Barclays' Own Design . . . . . . . . . . . . . . . . . . . . . . . 48

 B. SSGA's Falsely-Represented Role as Collateral Manager
  for the Carina CDO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III. BEHIND THREE LAYERS OF DECEPTION, BARCLAYS CREATED
 AND OPERATED MARKOV AS A BUILT-TO-FAIL VEHICLE
 THROUGH WHICH TO CONDUCT A DISGUISED SHORT BET
 *AGAINST* THE LOWEST TRANCHES OF NONPRIME MORTGAGE RISK . . . . . . 56

 A. Markov's Basic Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

 B. The First Layer of Deception: Barclays Possessed and Employed
  Effective Control Over the Selection of Markov's Collateral . . . . . . . . . . . . . . 60

ii

1.      The Specific Collateral Included in Markov . . . . . . . . . . . . . . . . . . . . . . 61

2.      The Particular and Extreme Structure Devised
        (and Fully Exploited) by Barclays for Markov . . . . . . . . . . . . . . . . . . . . 61

3.      A Recent and Comprehensive Analysis of CDO Collateral
        Demonstrates that CDO Underwriters Exercised Control
        Over CDO Collateral Portfolios, and Explains How They Did So . . . . . 64

4.      To Posit that SSGA Selected Markov's Collateral
        Leads to *Reductio ad Absurdum* and Cannot Be Squared
        with Defendants' Actions Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        a.      Barclays Stood to Gain by Filling Markov's Reference Portfolio
                Not Merely with Risk, but with *Disguised* Risk . . . . . . . . . . . . . 68

        b.      Markov's Collateral Portfolio Contradicted SSGA's
                Self-Stated "Philosophy" of CDO Collateral Management . . . . . 69

        c.      The Markov Chain CDOs Demonstrate that Markov's
                Mezzanine CDO Exposures Were Not Selected
                for Their Credit Quality, But for Their Lack of Quality . . . . . . . 69

        d.      The Only Possible Interest that SSGA Had in Selecting
                Markov's Mezzanine CDO Collateral Was One That
                SSGA Itself *Refused* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

        e.      SSGA's Refusal to Invest in Markov's Equity Tranche
                Is Impossible to Square with the Assertion that
                SSGA Selected Markov's Collateral . . . . . . . . . . . . . . . . . . . . . . . 72

C.      The Second Layer of Deception: By Filling Markov
        with Tranches from *Mezzanine* CDOs, Barclays
        Used Markov To Create and Effect a Disguised
        Proprietary Trading Short Bet Against the Lowest,
        Riskiest Tranche of Nonprime Mortgage Risk –
        the BBB-rated RMBS Tranche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

D.      The Third Layer of Deception: The Markov Chain . . . . . . . . . . . . . . . . . . . 78

        1.      Identifying the Markov Chain CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . 79

        2.      Explaining the Markov Chain CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . 80

3. Understanding *How* Defendants Designed the Markov Chain CDOs to Fail Rather than Succeed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

4. The Markov Chain CDOs' Dual Deception . . . . . . . . . . . . . . . . . . . . . . . 87

E. Barclays' Design of Markov Calibrated Barclays' Disguised Bets with Markov's Structure in a Manner that Allowed Barclays Maximum Profits While Offsetting All Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

1. Barclays Sized its Disguised Negative Bets to Take Full Advantage of Markov's Ability to Pay Them . . . . . . . . . . 88

2. Barclays Selected Higher-Rated *Cash* Collateral But Lower-Rated *Synthetic* Collateral, so as to Enhance Both Barclays' Short Bets and Markov's Ability to Pay Barclays its Winnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

3. Barclays' Structuring of Markov Led to the Elimination of All Risk to Barclays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

4. Markov's Flexibility as a Proprietary Trading Vehicle Allowed Barclays to Further Modify the Nature, Direction and Extent of its Bets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS . . . . 94

A. Defendants BarCap and SSGA Falsely Represented That An Independent Third-Party Collateral Manager – SSGA – Would Select Markov's Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

B. BarCap's and SSGA's Materially False and Misleading Representations Concerning How, and on What Bases, SSGA Would Evaluate and Select Markov's Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

C. BarCap's Misleading Representation Concerning its "Consent" As To the Collateral Portfolio Purportedly Selected by the SSGA . . . . . . . . . 102

D. BarCap's Misleading Representations Concerning the Credit Ratings of Markov's Collateral and of Markov's Tranched Notes Made Markov Appear Far Safer Than Barclays Knew it to Be . . . . . . . . . . . . 106

1. BarCap's Representations Concerning Collateral Credit Ratings . . . . . 107

2. BarCap's Representations Concerning the Credit Ratings

of Markov's Tranched Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

E.      BarCap's Misleading Representations Concerning the Purported
        AAA Ratings of the Markov Chain Collateral  . . . . . . . . . . . . . . . . . . . . . . . . . 113

F.      BarCap's Misleading Representations That Markov
        Was a "High Grade" CDO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

G.      BarCap's Misleading Representations Concerning The Superiority of
        or Advantage Provided By Markov's Mostly Synthetic Collateral . . . . . . . . . 121

H.      BarCap's Misleading Representations Concerning Markov's Safety,
        Structural Protections from Collateral Losses, and Projected Performance:
        BarCap Used Mild Collateral Default and "Loss Upon Default"
        Assumptions in "Modeling" Markov's Performance and Resilience,
        When BarCap Itself Understood that Collateral Defaults and Loss
        Upon Default Would be Severe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

V.      RELIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

A.      Plaintiff Evaluated Potential CDO Investments and Made CDO Investment
        Decisions on the Basis of a Formal "Analytical Review" . . . . . . . . . . . . . . . . 126

B.      Plaintiff Relied on Defendants' False and Misleading Statements  . . . . . . . . . 127

        1.      Plaintiff Relied on Defendants' False and Misleading Statements
                Concerning Who Was Selecting Markov's Collateral Assets,
                and on What Bases Collateral Selection Would Be Made . . . . . . . . . . 128

        2.      Plaintiff Relied on Defendants' Misleading Representations
                Concerning Markov's Collateral and its Quality, Including the
                Credit Ratings of the Collateral, the AAA ratings of the
                Markov Chain Collateral, and its "High Grade" Nature  . . . . . . . . . . . 129

        3.      Plaintiff Relied on Defendants' Misleading Representations
                Concerning Markov Tranche Credit Ratings . . . . . . . . . . . . . . . . . . . . . 130

        4.      Plaintiff Relied on Defendants' Misleading Representations
                Concerning The Safety, Structural Protections from Collateral Losses,
                and Projected Performance of Markov's Tranched Notes . . . . . . . . . . 130

VI.     THE INJURY CAUSED BY DEFENDANTS' MISCONDUCT . . . . . . . . . . . . . . . . 132

CAUSES OF ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

## Index of Tables, Charts, Graphics and Exhibits

Chart 1: Average 2006 Subprime RMBS Tranche Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Chart 2: Mezzanine CDO Risk, Collateral and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Chart 3: High Grade CDO Risk, Collateral and Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Table 1:  Markov's Collateralization by Tranches from Other CDOs . . . . . . . . . . . . . . . . . . . . 75

Table 2: The Markov Chain CDOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Table 3: The Markov Chain CDOs Were the Riskiest of All Markov's Other-CDO Collateral . 85

Exhibit A        (Glossary) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit A

Exhibit B        (Jesse Eisinger and Jake Bernstein, "The Magnetar Trade:
                 How One Hedge Fund Helped Keep the Bubble Going,"
                 *Propublica*, April 9, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit B

Exhibit C        (May 11, 2010 letter from Jonathan Pickhardt to the Honorable
                 Bernard J. Fried in *Cooperatieve Centrale Raiffeisen-Boerenleenbank,
                 B.A. v. Merrill Lynch & Co., Inc*., Index No. 601832/09 (Supreme Court
                 of State of New York, County of New York)) . . . . . . . . . . . . . . . . . . . . . . Exhibit C

Exhibit D        (Jesse Eisinger and Jake Bernstein, "Banks' Self-Dealing
                 Supercharged Financial Crisis", *Propublica*, August 26, 2010 ) . . . . . . . Exhibit D

## SUMMARY OF THE ACTION

1.      This action concerns a large international bank swindling a Florida credit union by creating and selling an investment that was mirror opposite of what it purported to be.  The investment, a collateralized debt obligation ("CDO") named Markov CDO I ("Markov"), was built to fail and marketed through lies.  Plaintiff, and all other investors in Markov, lost 100% of their investment, exactly what Defendants, who received that cash, intended.

2.      Plaintiff complains of two basic matters, which boil down to what Defendants said about Markov and what Defendants did in and through Markov. Defendants created and disseminated offering documents that contained  four material misrepresentations concerning Markov, misleading the Plaintiff as to: (a) who selected the collateral assets referenced in Markov; (b) the bases and methods used to select those collateral assets; (c) the credit quality of those assets; and (d) the protections Markov's structure was supposed to provide against losses experienced by the collateral assets.  Defendants' marketing efforts reinforced those misrepresentations.

3.      Under cover of such misrepresentations, Defendants created in Markov a CDO nearly the opposite of the one represented.  Unknown to its investors, Markov was a CDO that was built to fail rather than to succeed because within Markov was a rigged bet in the form of a credit default swap (insurance policy) that would pay the Defendants if the riskiest collateral assets referenced by Markov failed.  What appeared to be solid AAA-rated assets were actually junk quality securities selected by the Defendants because they were the most likely to fail and trigger the swap payments. The $400 million Barclays raised through sales of Markov notes to Plaintiff and other investors was reserved to pay off Barclays when Markov's referenced collateral inevitably failed.

4.      The details of this Complaint are complex – and in its course, the Court will become familiar, if it is not already, with subprime residential mortgage-backed securities (subprime

RMBS), mezzanine collateralized debt obligations (mezzanine CDOs), and even bespoke unfunded synthetic single-tranche CDOs (a glossary is provided as Exhibit A). But at bottom, this is the story of a bank that when faced with losses from subprime related investments, resorted to deception.

## INTRODUCTION

5.      Allegations concerning Plaintiff's own acts are based on personal knowledge. All other allegations are based on the investigation of Plaintiff's counsel, which included *inter alia* review and analysis of: (a) offering and marketing documents created and used by Defendants in connection with their marketing and sale of Markov CDO I ("Markov"); (b) Markov's collateral portfolio; (c) the collateral, tranche structures and offering/marketing documents for (i) Barclays' prior collateralized debt obligations ("CDOs"), and (ii) other CDOs whose tranches collateralized Markov; (d) pleadings and evidentiary material filed in other CDO-related legal proceedings initiated by regulators and private litigants; (e) Congressional hearings and investigations concerning CDOs, and documents made public in connection with such hearings and investigations; (f) newspaper, magazine, and other periodical articles relating to CDOs; and (g) other matters of public record. Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiff believes that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

6.      The remainder of the Complaint is organized in the following manner.

(a)      Section I *infra* provides background information on CDOs to allow for comprehension of the matters alleged herein. Detailed therein are: (1) CDOs and CDO collateral managers (Section I.A); (2) CDOs' primary form of collateral assets, subprime RMBS, and the exact

way that underlying subprime mortgage risk was channeled to differently-rated subprime RMBS tranches (Section I.B); (3) the distinction between Mezzanine CDOs (collateralized by portfolios of BBB-rated collateral – largely, subprime RMBS BBB-rated tranches) and High Grade CDOs (collateralized by portfolios of higher-rated A-, AA- and AAA-rated collateral) (Section I.C); (4) synthetic CDOs (Section I.D); (5) the crucial and  transformative role played by an independent CDO collateral manager in synthetic CDOs (Section I.E); and (6) lastly, recent revelations in and after April 2010 revealing that dozens of synthetic CDOs had, under cover of the same sorts of misrepresentations detailed here, secretly been built to fail (Section I.F).

(b)     Section II *infra* details Defendants' misconduct in prior CDOs that they created and/or managed: Barclays' Corvus CDO; SSGA's Carina CDO.  Defendants' misconduct in connection with Markov matches, exactly, their prior misconduct.

(c)     Section III *infra* details Defendants' true intention for and operation of Markov as a disguised proprietary trading vehicle, and the triply-disguised, rigged bet that Defendants created for themselves through Markov.

(d)     Section IV *infra* details the material misrepresentations and omissions through which Defendants offered and sold investments in Markov to Plaintiff and other Markov investors.

(e)     Section V *infra* details Plaintiff's reasonable and actual reliance on Defendants' misrepresentations and omissions.

(f)     Section VI *infra* details Plaintiff's resulting loss.

(g)     The Abacus 2007-AC1 CDO ("Abacus"), created by Goldman Sachs & Co. ("Goldman")  is discussed throughout because it is materially similar to Markov.  Defendants' operation and misrepresentation of Markov here is largely  identical to Goldman's operation and

misrepresentation of its now-infamous, built-to-fail Abacus CDO.  Shortly after the SEC filed a complaint charging Goldman with fraud in connection with Abacus in April 2010, Goldman settled the matter for $550 million.  *See SEC v. Goldman Sachs & Co*., 10-cv-3229 (BSJ) (S.D.N.Y.).

7.      The remainder of this Introduction overviews the misrepresentations and misconduct complained of and detailed herein.

8.      First and most simply, Defendants represented that Defendant SSGA would select the collateral to be included in Markov's $2 billion collateral portfolio.  This representation was false.  In truth, Barclays, rather than SSGA, controlled Markov's operative collateral selection.

9.      In *synthetic* CDO transactions,[1] the CDO's credit default swap counterparty – the counterparty that goes "short" the asset portfolio so that the CDO goes "long" – is the bank that "arranges" (creates, structures and underwrites) the CDO.  This was not a secret in Markov or any other synthetic CDO.  It was custom.  The structural conflict of interests is obvious.  Were the

---

[1]      In *synthetic* CDOs, the assets constituting the CDO's collateral portfolio are not actually purchased, but instead "referenced" through an underlying credit default swap through which the CDO effectively "insures" the full value of the referenced assets.  As a result, the CDO (and through it, CDO note investors) possesses a "long" exposure to the referenced assets, and in effect "insures" the full value of those assets.  In exchange, the CDO receives regular payments, akin to insurance premiums, made by CDO's counterparty. Should the referenced assets decline, the CDO must "swap", to its credit default swap counterparty, payments in the amount of such decline (in effect, insurance proceeds). The counterparty to the underlying credit default swap thus possesses a "short" interest with respect to the referenced assets.

Credit default swaps are often analogized to insurance: a "protection buyer" (the insured)  pays regular fixed payments (insurance premiums) to a  "protection seller" (the insurer), receiving in return the right to receive contingent payments (insurance proceeds) in the amount of losses experienced by whatever was "referenced" in the credit default swap (the insured property). Unlike insurance, there is no requirement of "insurable interest" to enter into a credit default swap. A useful way to envision matters: the credit default swap functions like a movie projector, and the "reference entities" specified in the credit default swap act as the film running through the projector. Through such projection, an "image" of a real portfolio is projected against a screen.  The counterparties to the credit default swap then watch what happens to that portfolio.

creating bank in charge of selecting the asset portfolio referenced in the credit default swap, the bank could profit substantially by selecting collateral chosen for its likelihood to *fail* rather than to succeed.  Indeed, Barclays, as detailed in Section II *infra*, did exactly this in its Corvus CDO. Should such chosen assets fail, the CDO would have to "swap" funds to the bank – and the funds used by the CDO for that purpose were the funds invested in the CDO by CDO note investors.

10.     Precisely to avoid this sort of "nightmare" scenario, CDOs generally and synthetic CDOs particularly were appointed with an independent "collateral manager": a third-party asset management firm tasked with collateral selection.

11.     Defendants' representation that SSGA would serve as Markov's collateral manager and as the selector of Markov's collateral portfolio was, therefore, crucial to investors' understanding of Markov.  It meant that Markov's collateral assets would be selected for their promise to perform, rather than their likelihood to fail, and that Barclays' role as credit default swap counterparty was a disinterested one taken merely to facilitate CDO creation.  This representation was, however, false.  In truth, Barclays possessed effective control over Markov's collateral selection, and secretly used such control to service Barclays' interest in its short interest in Markov's collateral.  Exactly the same state of affairs was operative in Goldman's Abacus CDO.  Abacus was falsely represented to have a third party collateral manager, ACA Management LLC, when Abacus' collateral was in fact selected by another party – one with a short interest respecting such collateral.

12.     Second and relatedly, Defendants further represented that SSGA would select Markov's collateral through rigorous application of analysis and expertise so as to select the most promising collateral.  This representation was false.  In truth, another party selected Markov's collateral, and on the opposite basis. (Just as in Abacus). Barclays: (1) not only selected Markov's

5

collateral through application of its expertise so as to select the *least* promising collateral – *i.e.*, collateral Barclays believed likely to fail, but (2) did so in a manner designed to *disguise the risk of that adversely-selected collateral*.

13. Third, Barclays misrepresented the credit quality (or, conversely, the credit risk) of Markov's collateral. Defendants held out Markov as "*High Grade*" CDO: a CDO collateralized by highly-rated assets bearing single-, double- or triple-A credit ratings. High Grade CDOs are distinguished from *Mezzanine* CDOs, whose collateral portfolios consist of riskier, lower-rated assets bearing BBB credit ratings.

14. As detailed herein, the disguised bet that Barclays effected through Markov was *against BBB-rated subprime RMBS tranches* (like those collateralizing Mezzanine CDOs). Barclays understood that the BBB-rated RMBS tranches were certain to fail. Barclays could not, however, bet against BBB-rated subprime RMBS tranches through Markov, because as a "High Grade" CDO, Markov could not have exposure to BBB-rated collateral. Barclays' solution was to *disguise* its bet against BBB-rated *RMBS* tranches by placing that bet against AAA-rated tranches of Mezzanine *CDOs* (collateralized by portfolios of BBB-rated subprime RMBS).

15. How Mezzanine CDO tranches earned (flawed) AAA credit ratings, when they were collateralized entirely by BBB-rated collateral is detailed further herein. Of importance here is that Barclays' bet against Mezzanine CDOs was predicated on Barclays' *disbelief* in Mezzanine CDO credit ratings. Barclays knew that, despite Mezzanine CDO tranche ratings of AA or even AAA, the risk was something else entirely: the risk of the BBB-rated *RMBS* tranches (which Barclays likewise understood to be far riskier than their BBB ratings indicated).

16. Even though Markov was a "High Grade" CDO, Defendants' Markov scheme was

really about betting against Mezzanine CDOs and Mezzanine CDO risk (which was BBB-rated RMBS risk). The facts here leave no doubt there was clear intent to create a very large short bet through Markov against Mezzanine CDO risk.

17.    Defendants were *extraordinarily* determined to stuff Markov with Mezzanine CDO risk. First, Barclays wrote into Markov a "CDO bucket" provision that allowed up to 35% of Markov's $2 billion of collateral to consist of tranches from *other* CDOs. This was the *highest* such bucket in any Barclays CDO during at least the prior three years. Barclays then used its control over Markov's collateral selection to take full advantage of this provision so as to: (1) fill Markov's "CDO bucket" to the brim (2) with, *specifically*, tranches from *Mezzanine* CDOs. Of the $655 million of total collateral exposure placed in Markov to tranches from other CDOs, $635 million – or a stunning 97% – came from Mezzanine CDOs. Yet more stunning: *of the $550 million of CDO tranches referenced in Markov's underlying credit default swap (i.e., the assets that Barclays was betting against), all $550 million, or a full 100%, were from Mezzanine CDOs*.

18.    Second, and most stunning of all, Barclays was so intent on Mezzanine CDO failure that it custom-built $300 million of *built-to-fail* Mezzanine CDOs – termed by Defendants the "Markov Chain CDOs" – that Barclays, through Markov, could then bet against. More than 50% of the $550 million of CDOs that Barclays was betting against, through Markov, were *bespoke* CDOs that Barclays itself had built specifically to be put into Markov. These Markov Chain CDOs *were custom-built by Defendants to have two faces: at the same time that they appeared to be the safest of all of Markov's collateral by virtue of AAA ratings, they in fact were the riskiest of all of Markov's collateral*. This latter face was unknown to all except Defendants: as "bespoke" CDOs, no public information concerning the Markov Chain CDOs existed except for their credit ratings.

These custom-built two-faced Markov Chain CDOs thus most perfectly served Barclay's double purpose in Markov: to embed in Markov a rigged bet, and to disguise that bet.  They encapsulate in miniature everything that Markov was secretly intended by Barclays to be.

19.    The above facts lay to rest any notions of chance and instead evince deliberate – indeed, malevolent – design.  That design was Barclays'.  As detailed at various points throughout, any attempt to claim that SSGA constructed Markov's collateral portfolio leads to *reductio ad absurdum*.  Clearly,  Markov's uniquely high exposure to other CDOs was not SSGA's doing.  To the contrary, a key plank of SSGA's CDO management philosophy, as SSGA itself proclaimed, was to "[m]anage portfolios that do not rely on. . . [e]xcessive CDO buckets."  SSGA's dissatisfaction with Markov is evident in the fact that SSGA – in marked departure from SSGA's own prior practice and from industry-wide custom – voted with its feet and refused to make any investment in Markov's equity tranche.  Such investments signaled a collateral manager's faith in the portfolio it had (purportedly) constructed.  SSGA evidently had no faith in Markov.

20.    The fourth and final category of misrepresentation concerned the purported protection Markov's tranche structure offered against collateral losses.  Plaintiff purchased an AA-rated tranche of Markov notes. The AA rating allegedly reflected substantial protection from collateral losses, provided by yet more junior tranches which would first absorb any losses. Collateral defaults and losses rising to a level that would impact Markov's AA tranche  was represented by defendants to be a remote and unlikely event because Markov was a "High Grade" CDO prohibited from taking on risk rated below "A".  To structure Markov, Barclays calculated the "expected" losses for Markov's collateral, which included $635 million of Mezzanine CDO tranches, to be minimal – and structured Markov's tranches to place them at various removes from such minimal "expected"

losses.[2]  Barclays, however, knew Markov's tranche structure and rating was unjustified: Barclays itself expected very high rates of collateral default and loss (and, indeed, was betting on it). Barclays therefore knew that: (1) each of Markov's tranches was insufficiently removed from expected collateral losses to merit the rating assigned to it; or (2) conversely stated, the rating of each tranche was false because the tranche had not been placed at requisite distance from expected collateral loss.

21.    At bottom, Barclays made a bet with Markov where the Markov CDO would pay Barclays if Mezzanine CDOs defaulted (which would occur when BBB-rated RMBS tranches defaulted).  However, knowing that they would default was only half the equation.  The other half was that Markov needed money to pay the bet.  Hidden in Markov's portfolio was an astonishing and highly incriminating pattern to further that end.  Markov was a "hybrid" CDO: part cash collateral (10%), part synthetic collateral (90%). Barclays designed Markov's collateral portfolio to hold *lower-rated* assets synthetically to increase Barclays' chances of winning its bets against those assets, while holding *higher-rated* cash assets that would better preserve their value when they would need to be sold in order to raise funds to swap to Barclays to cover losses on the lower-rated synthetic assets.  Put more simply, Barclays chose riskier synthetic assets so as to win its bet against them, and chose safer cash assets to ensure that its bet would actually pay off.

22.    Barclays' synthetic CDO operations are currently under investigation by United States securities markets regulators, including the Financial Industry Regulatory Authority:

A Financial Industry Regulatory Authority investigation of abuses in

---

[2]    Although the math is complex the essential allegation is simple: at the same time that Barclays understood Mezzanine CDO tranche credit ratings to be false, Barclays structured Markov as if the those credit ratings were true.

mortgage-linked investments has focused on the activities of Morgan Stanley, **Barclays PLC** and Credit Suisse Group AG, a person with direct knowledge of the matter said.

**The brokerage regulator has sought information on so-called synthetic collateralized debt obligations the firms created**, according to the person, who declined to be identified because the inquiry is confidential. **FINRA has concentrated on whether the banks became mired in a conflict of interest by betting that their own CDOs, tied to home loans, would lose value**.

**The probe has also focused on the firms' sales practices and on how they picked the mortgage bonds that underpinned the investments**, the person said.[3] (Emphasis added.)

### PARTIES

A.    **Plaintiff**

23.    Plaintiff Space Coast Credit Union ("SCCU") is a Florida state-chartered credit union operating under Charter Number 181, with its principal place of business located at 8045 Wickham Road, Melbourne, Brevard County, Florida 32940-7920.

24.    On or about June 23, 2009, the State of Florida's Office of Financial Regulation issued an emergency order authorizing the merger of Eastern Financial Florida Credit Union ("Eastern Financial") into SCCU.  On or about June 30, 2009, Eastern Financial was merged into SCCU and obtained the assets and liabilities of Eastern Financial.  Eastern Financial Florida Credit Union was a Florida state-chartered credit union operating under Charter Number 669, with its principal place of business located at 3700 Lakeside Drive, Miramar, Broward County, Florida.  On or about June 12, 2007, Eastern Financial purchased from Defendant BarCap – Markov's creator,

---

[3]    *See* Joshua Gallu, "Finra Said to Probe Morgan Stanley, Credit Suisse, Barclays," *Bloomberg*, July 24, 2010.

arranger and underwriter – $10 million par value of AA-rated, Class B notes issued by Markov CDO I , at a purchase price of 94.2364% of par value, and was damaged thereby.

### B. Primary Defendants

#### 1. Barclays Capital Inc.

25.     Defendant Barclays Capital Inc. ("BarCap") is a corporation duly organized under the laws of Delaware, with principal offices located at 200 Park Avenue, New York, New York 10166.

26.     BarCap created, arranged, structured and underwrote Markov, acted as a initial purchaser of Markov's notes, and marketed and placed Markov's notes in the United States with United States investors, including Plaintiff.  In and through these roles, BarCap was Markov's "primary mover".  Markov's Offering Circular, prepared by BarCap, advised investors that should they wish to "obtain any additional information [they] may consider necessary in making an informed investment decision", the party with such information was BarCap:

> Requests for such additional information can be directed to BCI [*i.e.*, the Offering Circular's acronym for BarCap] at its principal offices at 200 Park Avenue, New York, New York 10166, Attention: CDO/Structured Funds Group (Offering Circular, p. 200).

27.     In connection with its creation, structuring, underwriting and sale of Markov, BarCap (together with Defendant SSGA, as detailed below) prepared and disseminated to Plaintiff and other investors, certain informational materials concerning Markov, including (a) a "pitchbook" dated March 2007 (the "Pitchbook"); and (b) an "offering circular" dated May 22, 2007 (the "Offering Circular").  The Pitchbook's first sentence stated: "This document has been prepared by Barclays Capital . . ." (Pitchbook, p. 2).  The Pitchbook further stated that BarCap "accepts responsibility for the distribution of this document in the United States" (*id*. at 3).

11

28.     The Pitchbook and the Offering Circular are referred to collectively hereinafter as the "Offering Documents."   The Offering Documents prepared and disseminated by BarCap (and SSGA) contained material misrepresentations and omissions, and materially misleading statements, concerning Markov, as detailed herein.  In addition to the misstatements contained in the Offering Documents, BarCap made further misstatements to Plaintiff in direct, private communications concerning Markov, as detailed herein.

### 2.     State Street Global Advisors, Inc.

29.     Defendant State Street Global Advisors, Inc. ("SSGA"), a registered investment adviser under the Investment Advisers Act of 1940, is a corporation duly organized under the laws of Delaware, with its principal place of business located at One Lincoln Street, Boston, Massachusetts 02111.   SSGA operates as the asset management division of Defendant State Street Bank and Trust Company, owned by Defendant State Street Corporation.

30.     SSGA was the purported "Collateral Manager" for Markov, and, as detailed herein, the Offering Documents prominently so represented.

31.     SSGA, together with BarCap, co-authored the Offering Documents.   As detailed herein, the SSGA-authored sections of the Offering Documents contained misrepresentations concerning SSGA's purported collateral manager role in Markov and extensive misrepresentations concerning the bases and methods that SSGA would purportedly use to select Markov's collateral.

### 3.     Barclays Bank plc

32.     Defendant Barclays Bank plc ("BBPLC") is   a  public limited company duly organized under the laws of England and Wales under number 1026167, with principal offices located at 1 Churchill Place, London, E14 5HP and with United States offices at 200 Park Avenue,

12

New York, New York 10166.

33.     BBPLC controls BarCap and, through it, conducts investment banking operations in the United States.  BBPLC and BarCap share a common United States address (200 Park Avenue, New York, NY 10166).  BarCap's financial results are consolidated into and reported as part of BBPLC's financial results.

34.     BBPLC, acting in concert with BarCap to create, operate and profit from Markov, occupied three roles in connection with Markov:  (a) first, BBPLC, together with BarCap, arranged and underwrote Markov, and marketed and placed Markov notes inside the United States; BBPLC outside the U.S. (*see* Offering Circular, cover page); (b) second, BBPLC was counterparty to Markov in Markov's underlying credit default swap; and (c) third, BBPLC provided "warehouse" financing and services under a "warehousing" agreement, pursuant to which BBPLC assembled and held Markov's collateral assets until Markov's closing (when the collateral was transferred to Markov).

### 4.     BarCap and BBPLC ("Barclays") Participated in a Concerted Scheme and Common Course of Conduct to Create and Profit from Markov

35.     In the transaction at issue in this Complaint, BarCap and BBPLC worked together in a concerted scheme and common course of conduct to create, arrange, structure, underwrite, market, sell and profit from Markov.  BarCap and BBPLC each played certain discrete, yet coordinated, roles in furtherance of their common and concerted scheme.  Defendants BarCap and BBPLC are at times herein referred to collectively as "Barclays" – mirroring operative facts as to their coordinated conduct here, as well as Defendants' own usage in the Offering Circular (which often employed the term "Barclays" to refer indiscriminately to BarCap or BBPLC or other of their affiliates).  At all times, Barclays' activities in connection with Markov were coordinated in the

13

principal New York offices shared by BarCap and BBPLC.  Where appropriate, Defendants BarCap and BBPLC are referred to individually where necessary to specify the acts or conduct of the particular entity.

### C.    Secondary Defendants

36.    Defendant State Street Bank and Trust Company ("SSBTC") is a bank duly organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at  One Lincoln Street, Boston, Massachusetts 02111.  SSBTC's asset management arm is SSGA.  SSBTC is a wholly-owned subsidiary of State Street Corporation, a publicly-registered financial holding company.

37.    Defendant State Street Corporation ("State Street") is a corporation duly organized under the laws of the Commonwealth of Massachusetts, with its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.  State Street is a publicly-registered financial holding company for SSBTC, whose asset management arm is SSGA.

38.    SSBTC and State Street were at all relevant times controlling persons of SSGA within the meaning of Section 20(a) of the Securities Exchange Act of 1934.  SSGA represented one of State Street's two primary "lines of business", namely, "Investment Management", and SSGA's senior management reported to State Street's officers and senior management.  During the relevant time period, SSGA's President and Chief Executive Officer, William Hunt, was also employed as Vice Chairman of State Street.  Any acts attributed to SSGA were caused and/or influenced by SSBTC and State Street by virtue of their domination and control thereof.

### D.    Relevant Non-Party: Markov CDO I, Ltd.

39.    Markov CDO I, Ltd. (the "Markov SPV") was an exempted company with limited

14

liability incorporated on March 2, 2007 under the Companies Law (2004 Revision) of the Cayman Islands, with a registered office formerly located at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.  Markov SPV was ordered into liquidation on or about January 22, 2008 by the holder of Markov's super senior tranche, representing the "Controlling Class" of Markov notes, which such holder, according to the Offering Circular, was Barclays.

40.    The Markov SPV, like every other CDO, was a brain-dead special purpose vehicle ("SPV") established by its creator bank (here, Barclays) to serve as an empty conduit through which the Markov CDO transaction could be effected on a bankruptcy-remote, tax-free basis.  Markov's Offering Circular stated that the Markov SPV had "been established as a special purpose vehicle for the purpose of the issuance of the Notes" (Offering Circular, 182),  that its activities were "limited to" acquiring the collateral portfolio and issuing the tranched notes backed by that collateral portfolio (*id*.), and that Markov SPV had "no employees, prior operating history or prior business" (*id*.).  All of Markov SPV's few permissible activities were sub-contracted out to other parties: they were not and could not have been performed by Markov SPV, as it had no employees.  Selection of the collateral portfolio, for example, was not done by Markov SPV but, purportedly, by SSGA, as Markov's collateral manager. The structuring of Markov SPV – in essence, the set of auto-pilot rules governing exactly how "money-in" cashflows generated by its collateral would be redirected as "money-out" cashflows to various subcontractors (the Collateral Manager, a trustee, an administrator, etc.) and to tranched note investors –  and of the set of tranched notes issued and sold in Markov's name, was done by BarCap.  Underwriting, marketing and sale of the notes was done by BarCap and BBPLC.  Authorship of the Pitchbook and the Offering Circular was done by BarCap

(except for certain discrete sections, as detailed above, authored by SSGA).

41.     Markov SPV, in short, did nothing.  Through it, Defendants did everything here complained of.

## JURISDICTION AND VENUE

42.     The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(B).

43.     Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in New York.

44.     BarCap's creation and structuring of Markov, and authorship of Markov's Offering Documents, occurred in New York.

45.     Governing law and venue provisions in Markov's controlling documents:

        (a)     provide that the notes at issue here "will be governed by, and construed in accordance with, the laws of the State of New York" (Offering Circular, 114); and

        (b)     "submit irrevocably" to the jurisdiction of the courts of the State of New York and the courts of the United States of America in the State of New York (in each case sitting in the County of New York) for the purposes of hearing and determining any suit, action or proceedings or settling any disputes arising out of or in connection with" the notes at issue here (*id*.).

46.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of national securities markets.

## I.     BACKGROUND INFORMATION CONCERNING CDOs

47.     Section I provides background information on CDOs to aid basic understanding and

allow comprehension of more esoteric schemes that Defendants operated and disguised in Markov.

48.     Section I.A *infra* provides a brief introduction to CDOs and CDO collateral managers.  Section I.B *infra* details the nature, logic, characteristics and structure of CDOs' primary collateral: subprime mortgage-backed securities ("subprime RMBS").  Understanding the precise way in which the tranche structure of subprime RMBS (1) captured discrete "slices" of subprime mortgage risk, and then (2) channeled them to various CDOs (Section I.C *infra*) is crucial for understanding Barclays' scheme in Markov.

49.     Section I.C *infra* details the distinction between Mezzanine CDOs and High Grade CDOs, which invested respectively in lower-rated and higher-rated tranches of subprime RMBS, and were therefore exposed to different segments of subprime mortgage risk.  Understanding this distinction allows for initial comprehension of the disguised bet Defendants hid in Markov, as noted in Section I.C.2 and alleged in detail in Section III *infra*.  Section I.C also explains how CDO tranche structures and tranche credit ratings flowed from three factors – the default, loss severity and correlation risks of their subprime RMBS collateral assets (Section I.C.4) – and how and why such CDO tranche structures and credit ratings were false or misleading (Section I.C.5).

50.     Section I.D *infra* overviews the structure and mechanics of "cash" CDOs and "synthetic" CDOs, and Section I.E *infra* explains the heightened necessity for independent collateral management in synthetic CDOs.

51.     Finally, Section I.F *infra* recounts public discovery in and after April 2010 that many synthetic CDOs had secretly – under cover of false representations concerning the party responsible for collateral selection and the basis on which such collateral would be selected – been built to fail.

A.     **CDOs and CDO Collateral Managers**

1.     **CDOs**

52.     CDOs are special purpose vehicles set up by banks to (1) acquire a portfolio of collateral and (2) issue a new series of notes (also called CDOs) backed by that collateral portfolio. As in a mutual fund, the value of the notes issued by the CDO (akin to mutual fund shares) depends on the value of the collateral portfolio (the specific investments made by the mutual fund).

53.     Unlike a mutual fund, the notes issued by a CDO are issued not as equal interests in the portfolio (as are mutual fund shares), but as a set of several discrete senior/subordinated *tranches* bearing unequal, senior/subordinated claims on the collateral and its cashflows.   A detailed explanation of the exact "how's and why's" of tranching is provided in Section I.B *infra*: the primary assets in CDO collateral portfolios were themselves tranched notes (subprime RMBS) collateralized by pools of subprime mortgages, and Section I.B details exactly how the underlying mortgage risks were channeled into discrete subprime RMBS tranches. . . whose subordinate tranches CDOs then invested in.

54.     The purpose and end result of such tranching is straightforward: (1) cash (interest and principal) from the entire collateral portfolio flowed down the tranche structure from top to bottom (as in a waterfall); meaning, conversely, that (2) defaults and losses suffered by the collateral portfolio flowed up the tranche structure from bottom to top (as in a flood).   The most junior tranche, for example, was paid last and bore losses first.   Precisely because it bore such first losses from the collateral portfolio, it protected the tranche above it from that amount of collateral losses – and those two tranches in turn protected the next more senior tranche from a larger amount of initial collateral losses, etc.   Thus, each more senior tranche was progressively farther removed from potential

18

underlying collateral losses.  Because such more senior tranches were by this means safer (the underlying collateral could suffer losses without these tranches suffering any loss), they could garner higher credit ratings – and, by virtue of such safety and credit ratings, were assigned lower interest coupons.  More junior tranches, progressively less removed from loss, bore increased risk, lower credit ratings and higher interest coupons.  As later detailed, the mathematics behind such tranche structuring were applied to create tranche structures that removed each given tranche sufficiently from underlying potential collateral losses to merit a given credit rating associated with such remove.

55.    The end result was a CDO asset/liability capital structure that operated as depicted in the diagram below (NOT to scale: accurately-scaled diagrams are provided further herein):

## CDO Basic Structure

| CDO Assets | CDO Liabilities (Tranched Notes Backed by Assets) | CDO Cash/Loss Mechanics |
|---|---|---|

**CDO Assets**  **CDO Liabilities (Tranched Notes Backed by Assets)**  **CDO Cash/Loss Mechanics**

**Portfolio of Collateral Assets**

**"A" Tranche**

Credit Rating - AAA
Coupon - Very Low

**"B" Tranche**

Credit Rating - AA
Coupon - Low

**"C Tranche"**

Credit Rating - BBB
Coupon - Medium

**"Equity" Tranche**

Credit Rating - unrated
Coupon - High

**Cash ▼**
**(principal and interest) from Underlying Collateral Portfolio flows in a waterfall first to Tranche A, then B, then C, then Equity**

**Losses ▲**
**from the Underlying Collateral Portfolio flood up the tranche structure starting with the Equity Tranche...**

### 2. The Commonly Represented and Commonly Understood Role and Importance of the CDO Manager

56. CDOs generally, and Markov here, were appointed with a "Collateral Manager" whose represented and understood role was to select the CDO's collateral portfolio. Here, Markov's Offering Documents identified SSGA as the collateral manager and represented that SSGA would select Markov's collateral portfolio.

57. Because the performance of a CDO's notes depended on the performance of the

20

CDO's collateral, and because the CDO's collateral was purportedly selected by the CDO's collateral manager, the CDO collateral manager was generally understood to be the most important factor in both CDO performance and in investment decisions concerning CDO notes.  As BarCap's own guide to CDOs (*The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations*) stated:

> The underlying collateral is managed by an asset manager who generally has demonstrated experience in managing the asset classes mandated by the transaction. **The asset manager, who often has broad discretion to purchase and trade collateral, plays a key role in each CDO transaction** (*id*. at 1).
>
> *****
>
> **The asset manager is by far the most important participant in any CDO transaction**. . . [T]he asset manager is responsible for managing the SPV's portfolio of assets . . (*id*. at 22).
>
> *****
>
> **The Role of the Asset Manager**
>
> **An asset manager's role is integral to the success of any cash flow CDO transaction.  The asset manager enjoys considerable flexibility and discretion, and its decisions directly impact the performance of CDO liabilities and equity. Therefore, the success of each transaction depends to a great extent on the skills and experience of the asset manager.**
>
> **A CDO asset manager's responsibilities generally include:**
>
> > 1.  **Selecting assets for the initial portfolio and subsequent re-investments**. . . (*id*. at 35) (emphasis added).

58.     CDO structure was understood to align the CDO collateral manager's interests with those of CDO note investors, for at least three reasons detailed below.

59.     First and most simply, the management fees paid to the collateral manager were (1) generated from the cashflow performance of the CDO's collateral assets (purportedly selected by the collateral manager) and (2) were subordinated to the claims on those cashflows of CDO note

21

investors.  As a result, CDO collateral assets had to perform well enough, and generate sufficient cash flow, to satisfy obligations owed to CDO note investors (namely, payment of promised coupons on the CDO notes), *before* the CDO collateral manager would be paid from such cashflows. Therefore, if the assets selected by the CDO collateral manager defaulted (and thus ceased paying interest), any shortfall in funds available to the CDO would first affect the CDO collateral manager's fees before resulting in shortfalls on promised payments to CDO note investors.  This was understood to motivate the CDO manager to select assets that would continue to perform, which thereby benefitted CDO note investors.  Typically, collateral manager annual fees ran between 10 and 20 basis points of the collateral under management: $1-$2 million for a $1 billion CDO.

60.     Second, of greater consequence generally and here, it was customary for CDO collateral managers to make a substantial investment in the lowest tranche of the CDO they managed – the equity tranche – which was at first and greatest risk of principal loss upon poor collateral selection or performance.  Such equity tranche investment was understood by CDO note investors as form of "eating your own cooking", and demonstrated collateral manager faith in the collateral it purportedly selected.  Were collateral performance poor it would be the collateral manager's principal that would be at first and greatest risk.

61.     Third and lastly, it was not altruism that motivated collateral managers to make customary and substantial equity tranche investments, but rather opportunity.  Although collateral managers could earn steady management fees from CDOs, the real opportunity and the purported impetus for CDOs in the first place – what BarCap referred to as the "raison d'etre" of CDOs (*The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations*, at 10) – was the opportunity to earn outsized, highly-leveraged returns through equity tranche investment.

22

62.     Because CDO collateral portfolios contained relatively high-yielding assets, and because through tranching most of a CDO's issued notes could receive high credit ratings and therefore offer low yields, CDOs generated more cashflow from their asset portfolios than they had to pay out to CDO note investors.  This mismatch between "money in" and "money out" – referred to as "excess spread" – was directed to equity tranche investors.   In a typical $1 billion CDO with a $50 million equity tranche, equity tranche investors putting up only $50 million were earning "excess spread" generated by the *entire* $1 billion portfolio – thus, their earning power was "leveraged" on a 20-to-1 basis.  Typically excess spread amounted to 1% or more per year on the entire portfolio, or $10 million per year on a $1 billion portfolio.  As this $10 million was funneled only to equity tranche investors, such equity investors would receive annual returns of $10 million on their $50 million investment, constituting a 20% annual return.

63.     While equity tranche investments thus offered the potential for outsize returns, such returns would be jeopardized by poor collateral performance: should collateral assets default, they would cease generating cashflow, thereby decreasing the CDO's ability to generate excess spread. Likewise, as the equity tranche was the most junior tranche, poor collateral performance would result in principal losses that would accrue first to the equity tranche.

64.     Therefore, in light of such risk/return profile, a collateral manager's equity tranche investment was viewed as an affirmation of the collateral purportedly selected by the collateral manager and of its continued performance.  Indeed, as BarCap represented, CDOs were commonly motivated by collateral managers themselves, who believed in their abilities to select CDO collateral portfolios capable of generating such leveraged equity tranche returns for the equity tranche investments they were intent on making:

23

The raison d'être of most arbitrage cash flow CDO transactions is the spread differential between the rate of interest earned on the underlying assets and rate of interest paid on the CDO investment-grade liabilities. It is this differential that generates the leveraged returns for the CDO's equity investors. (*The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations*, at 10; *see also id*. at 25, 35, 40-41).

65.     This point is emphasized here because, as detailed herein, SSGA's actions with respect to Markov diverged from this norm.  *SSGA refused to make any equity tranche investment at all in Markov*.  As alleged herein, SSGA's refusal to make such investment leads to a *reductio ad absurdum* if one asserts Markov's collateral was selected by SSGA.  Had SSGA actually selected Markov's collateral, the whole purpose of its collateral selection would be to construct a portfolio offering SSGA an attractive excess spread/equity tranche opportunity.  But SSGA *declined* to take that opportunity in Markov, signaling its disbelief in Markov's collateral portfolio.  Why would SSGA renounce a collateral portfolio it had purportedly constructed for the very purpose of generating an excess spread/equity tranche investment opportunity?  Why would SSGA decline what was supposed to be the whole point and ultimate end of SSGA's work of collateral selection?

66.     The only way out of this paradox is to understand that SSGA rejected equity tranche investment, and by extension the collateral portfolio backing it, because SSGA had not in fact constructed that portfolio.  Indeed, as alleged in Section II.B *infra*: (1) the only other recent instance in which SSGA declined to make an equity tranche investment in a CDO it managed was in connection with the Carina CDO it purportedly managed; and (2) just as in Markov, SSGA's represented collateral manager role in Carina was false: another party, with an adverse interest in the collateral (it would profit were the collateral to fail) secretly selected Carina's collateral.  In short, in each case – Markov here, and Carina before it – SSGA declined to make an equity tranche

24

investment because (1) it had not actually selected the underlying collateral portfolio, and (2) it understood that the collateral portfolio had been designed for failure rather than success.

**B.    CDO Collateral:  Subprime RMBS**

    **1.    The "Tranching" of Subprime Mortgage Risk into Subprime RMBS Tranches**

67.    Between 2005 and 2007, most nonprime mortgages were originated for use in nonprime residential mortgage securitizations, where they served as the collateral assets for nonprime residential mortgage-backed securities ("nonprime RMBS").  The performance of nonprime RMBS depended on the performance of the pool of nonprime mortgages underlying them.

68.    Nonprime RMBS were not issued as equal interests in the underlying assets (the pool of nonprime mortgages), but rather as a set of discrete, unequal tranches representing senior/subordinated rights to interest and principal cashflows issuing from the mortgage pool.  Cash from the entire underlying asset pool flowed down the tranches from top to bottom; conversely, losses from the entire underlying asset pool flowed up the tranches from bottom to top.[4]  In essence, more junior tranches served to remove more senior tranches from underlying collateral losses, as the more junior tranches stood first in line for such losses.  Consequently, more senior tranches could garner higher credit ratings (and therefore offered lower coupons), while more junior tranches

---

[4]    The goal of tranched securitization was "credit transformation": to generate ABS of higher credit quality (and higher credit ratings) than the actual pool of underlying assets.  Senior ABS tranches received protection against certain amounts of underlying asset losses by, as detailed below, the presence of more junior tranches which first absorbed any underlying asset losses.  This made such senior tranches safer than the underlying assets themselves: even as the underlying assets began to experience losses, senior tranches would remain untouched by such losses.  The matter can be illustrated through an extreme hypothetical: a $100 pool of underlying assets, serving as the basis for two tranches backed by those assets – a $1 senior tranche and a $99 junior tranche.  In this structure, the underlying $100 of assets could lose up to 99% of their value while leaving the senior tranche untouched by loss (because the first $99 of loss was allocated to the junior tranche).

garnered progressively lower credit ratings (but were provided with higher coupons) reflecting their increased proximity to collateral loss risk.

69.     How and why are explained below, and the "what" – the resulting nonprime RMBS tranche structure – is presented in clear and full detail.  This serves a double purpose here: (1) to make clear exactly how subprime risk was channeled into RMBS tranches, and exactly what risks the differently-rated RMBS tranches were exposed to; and (2) to make clear certain consequential differences between Mezzanine CDOs and High Grade CDOs, which themselves were collateralized by different levels of RMBS tranches.

70.     Tranche structures, and the credit ratings garnered by each tranche, derived from a calculation of the "expected loss" of the pool of underlying assets.  A concrete example illustrates:

(a)     In a typical subprime RMBS securitization, a bank would assemble a pool of $1 billion of subprime mortgages to serve as the basis for $1 billion of tranched subprime RMBS.

(b)     The bank, using models discussed below, evaluated the risk characteristics of those mortgages and modeled their performance through a variety of economic scenarios in order to determine the "expected loss" that the $1 billion pool of mortgages  would experience.

(c)     Tranche structure and tranche ratings flowed from this "expected loss" calculation.  As each credit rating (e.g., AAA, AA, etc.) is associated with a statistical likelihood of default or loss, the goal of tranching was to create tranches at sufficient removes from loss to merit given credit ratings.

(d)     For example, if the expected loss of the $1 billion mortgage pool was $50 million, then the first goal of tranching would be to create a senior tranche sufficiently removed from such expected losses to garner the highest possible credit rating: AAA. If the statistical standard for

26

AAA ratings demanded, in effect, that AAA-rated securities be impervious to losses *four times greater* than expected (*i.e.*, $200 million), then the $1 billion tranched securitization could feature (1) an $800 million AAA-rated tranche at the top, protected (2) by $200 million of more junior tranches underneath it, which could absorb up to $200 million in collateral losses.

(e)     This process was repeated at each lower rating level (*e.g.*, AA, A, etc.).  For example, if the AA standard was to withstand losses three times greater than expected, then the remaining $200 million tranches below the AAA tranche could be split into: (1) a $50 million AA-rated tranche, and (2) $150 million of more junior tranches, which would protect the AA-rated tranche from up to $150 million (three times the $50 million expected loss) of collateral losses.

(f)     Finally, at the bottom would stand an unrated "first loss" or "equity" tranche, without any subordinate tranche protection from expected losses.  Although such equity tranches were exposed to substantial risk of principal loss, they also promised substantial potential overall returns due to a securitization feature known as "excess spread" (*see* Section I.A.2 *supra*).

71.     Most CDO market participants understood nonprime RMBS generally to look much like the CDO structure depicted in Section I.A.1 *supra*.  However, Barclays and other banks involved in the structuring and underwriting of RMBS securitizations possessed superior knowledge: (1) as to the precise structure of RMBS securitizations; and (2) as to certain of the underlying assumptions on whose basis both RMBS tranche structure and ratings depended.  Specifically, Barclays and other like banks knew that RMBS in fact and most precisely looked like this:

27

# CHART 1:
## Subprime RMBS Tranche Structure (2006 Vintage Average)



**Pooled Mortgages**

**COLLATERAL POOL OF NONPRIME MORTGAGES**

If mortgage losses reach this high, they impair High Grade CDOs

Mezzanine CDO risk

**RMBS Tranches**

**AAA Tranches 20%-100%**

AA+
AA
AA-
A+
A
A-
BBB+

**Equity Tranche 0% - 5%**

Excess Spread 3%

**Explanation**

1   The left-most column shows a pool of nonprime mortgages (*e.g.*, $1 billion) collected together to serve as collateral for an RMBS securitization.

2   The right column depicts the **to-scale** tranche structure of the average RMBS securitization. Each RMBS tranche rated between BBB- and AA+ is shown in different color.

3   Losses in the underlying mortgage pool flow UP the tranche structure, from bottom to top.

4   Losses reach the BBB- tranche when losses in the underlying mortgage pool reach 8% -- having exhausted the initial protection provided by (1) the equity tranche (the bottom 5% of the RMBS), and (2) the additional 3% buffer provided by excess spread.

5   Each further 1%-2% rise in aggregate underlying mortgage pool losses then suffices cause a further RMBS tranche 100% principal loss (*e.g.*, when mortgage losses rise from 8% to 9%, the BBB- RMBS tranches suffers 100% loss).

AA+ Tranche 2.5%
AA Tranche 2%
AA- Tranche 2%

**collateral for HIGH GRADE CDOs**

A+ Tranche 2%
A Tranche 1.5%
A- Tranche 1.5%

BBB+ Tranche 1.5%
BBB Tranche 1%
BBB- Tranche 1%

**collateral for MEZZANINE CDOs**

Equity Tranche 5%

72.     Highlighted in the above, accurately-scaled depiction of nonprime RMBS are the set of tranches (1) above the "first loss" or "equity" tranche (constituting the bottom-most 5% of the RMBS structure) and (2) below the AAA-rated tranches (the top-most 80% of the RMBS structure). These "middle" RMBS tranches (actually located close to the bottom of the RMBS totem pole) – the set of nine very thin tranches with ratings between BBB- and AA+ (collectively constituting the 15% of the RMBS structure above the equity tranche and below the AAA tranches) – were as further detailed in Section I.C *infra*, the RMBS tranches that collateralized CDOs.

73.     As the above graphic demonstrates, each RMBS tranche was exposed to a discrete "slice" of aggregate mortgage loss risk.  The lowest BBB-rated tranche, the BBB-, was protected against aggregate underlying mortgage losses of approximately 5% by the yet-more-junior equity tranche, and from up to 3% more aggregate losses by excess spread.  Should aggregate losses in the underlying mortgage pool rise to 8%, the BBB- tranche would stand at the brink of loss.  A further small rise in underlying mortgage pool losses, from 8% to 9%, would suffice to cause 100% losses to the BBB- tranche, and bring the BBB tranche to the brink of loss, etc.

74.     As Section I.C *infra*, makes clear, vintage 2006-2007 Mezzanine CDOs were collateralized in near-entirety by BBB-/BBB nonprime RMBS tranches.  Therefore, stunningly, a relatively small rise in overall mortgage losses above the baseline level of "expected losses" – along the order of losses rising from 5% to 8%-9% – would cause approximately half of Mezzanine CDO collateral (BBB- RMBS tranches) to become worthless, which in turn would cause all Mezzanine CDO tranches from unrated equity at bottom to AAA-rated tranches – to become worthless as well.

75.     High Grade CDOs, as further discussed in Section I.C *infra*, were collateralized not by BBB-rated RMBS tranches, but by portfolios of higher-rated A, AA and AAA-rated RMBS

tranches. They therefore could remain untouched even as Mezzanine CDOs (dependent on the BBB RMBS tranches) suffered substantial and/or total losses.

### 2.    Tranche Terminology

76.    As tranche structure channels discrete, specific levels of aggregate underlying asset losses to various tranches, each tranche's risk exposure can be detailed with substantial specificity.

77.    A tranche's "**attachment point**" is the point at which underlying collateral losses begin to impair that tranche. As a given tranche is protected from a certain amount of collateral losses equal to the value of the more junior tranches standing between it and such collateral losses, the "attachment point" of a given tranche is equal to sum total of more junior tranches beneath it. For example, in a $1 billion securitization, a tranche protected by $100 million of more junior tranches has an attachment point of 10%. Underlying collateral losses would have to exceed 10% (fully impairing all more junior tranches) before the tranche in question would suffer loss.

78.    A tranche's "**detachment point**" is the point at which underlying collateral losses cause 100% tranche losses. To continue the above example, if in a $1 billion securitization where tranche in question is (1) protected by $100 million of more junior tranches, and (2) was itself issued in a total sum of $50 million, then (3) as discussed above, the tranche attachment point will be 10% and (4) the tranche detachment point will be 15%. When aggregate loss levels rise to $100 million (10% of the total), the tranche starts taking losses, and should aggregate loss levels rise a further $50 million (to 15% of the total), the $50 million tranche will suffer complete loss.

79.    A tranche's "**thickness**" describes the size of the tranche when compared with the size of the entire securitization (and is also, simply, the difference between attachment point and detachment point). Continuing the above example, a $50 million tranche of a $1 billion

securitization would have a thickness of 5%, consistent with its attachment point of 10% and detachment point of 15%.

80.     Tranche thickness has certain non-obvious but important risk consequences. Where attachment point indicates how far away a given tranche is from its *first dollar of loss*, tranche thickness has consequences for *loss severity*. A thin tranche, constituting just 1% of a securitization, can quickly swing from 100% principal preservation to 100% principal losses: aggregate portfolio losses just have to rise 1% above the attachment point. A thicker tranche at the same attachment point, however, would suffer losses more slowly. For example, a tranche constituting 5% of the securitization would, were it placed at the same location as the 1% tranche, suffer only a 20% loss should aggregate portfolio losses rise 1% above the attachment point.

### C.    CDOs: Mezzanine CDOs and High Grade CDOs

81.     The single most basic distinction between various kinds of CDOs is the distinction between Mezzanine CDOs and High Grade CDOs. Mezzanine CDOs invest in portfolios of riskier lower-rated assets, High Grade CDOs invest in portfolios of safer, higher-rated assets. Mezzanine CDOs are collateralized by portfolios of BBB-rated assets, and feature average portfolio-wide collateral credit ratings between BBB- and BBB. High Grade CDOs are collateralized by portfolios of collateral assets with A, AA and AAA ratings, and feature average portfolio-wide collateral credit ratings of between AA- and A+.

82.     During 2005-2007, the collateral portfolios of ABS CDOs, both Mezzanine and High Grade, became increasingly concentrated in nonprime RMBS tranches: during 2006 and 2007, most such CDOs contained in excess of 75% of their collateral in the form of nonprime RMBS tranches.

83.     As detailed below, this made Mezzanine CDOs (Section I.C.1 *infra*) and High Grade

31

CDOs (Section I.C.2 *infra*) into writ-large versions of the nonprime RMBS tranches on which they were based (BBB-rated RMBS tranches for Mezzanine CDOs; A, AA and AAA-rated RMBS tranches for High Grade CDOs). *Put more simply, the assets collateralizing Mezzanine CDOs were all exposed to exactly the same risk: the risk that pools of securitized nonprime mortgages would suffer losses of between 8%-10% (the risk represented by BBB-rated RMBS tranches).* Likewise, High Grade CDOs were exposed to the same risk source (securitized nonprime mortgages) though only at greater risk severity (should such losses rise, for example, to between 12%-20%).

84.    As explained in Section I.C.3 *infra*, such CDOs, on the basis of (1) their portfolios of such similarly-rated RMBS tranches and (2) certain highly consequential CDO modeling assumptions, issued a new round of tranched securities (also called CDOs) from unrated equity tranches at the bottom to AAA-rated tranches at the top.

### 1.    Mezzanine CDOs

85.    The graphic below depicts the flow of subprime risk (1) from nonprime mortgages to RMBS securitizations, and (2) from the BBB-rated tranches of nonprime RMBS to Mezzanine CDO securitizations. The purpose is to show that Mezzanine CDOs were exposed to a relatively low, very specific and very thin "slice" of risk: namely, the risk of aggregate losses in pools of securitized nonprime mortgages reaching 8%-10%. Should such losses rise merely to 9%, nearly half of Mezzanine CDO collateral would become worthless (the BBB- RMBS tranches), and, with it, *all Mezzanine CDO tranches, including AAA-rated tranches*, except for the super senior tranche.

# Mezzanine CDO Collateral, Risk and Structure

| MORTGAGE | RMBS TRANCHE | CDO Collateral | CDO Tranche | Specifics |
|---|---|---|---|---|
| Pooled Mortgages | RMBS Securitization | New Pool of Collateral for Mezzanine CDO | Mezzanine CDO Tranches Backed by that Collateral | Tranche Location Specifics |

**COLLATERAL POOL OF NONPRIME MORTGAGES**

AAA Tranches 20%-100%

~24% of Mezzanine CDO collateral are other BBB-rated collateral (CMBS, other ABS, etc.)

~38% of Mezzanine CDO collateral are BBB RMBS tranches from dozens of RMBS securitizations

Super Senior Tranche — 30% - 70%

~38% of Mezzanine CDO collateral are BBB- RMBS tranches from dozens of RMBS securitizations

AA+
AA
AA-
A+
A
A-
BBB+

**Equity Tranche 0% - 5%**

Excess Spread 3%

(junior) AAA Tranche — 20% - 30%

AA Tranche — 15% - 20%

A Tranche — 9% - 15%

BBB Tranche — 5% - 9%

Equity Tranche — 0% - 5%

Excess Spread 1.5%

**Should mortgage losses rise to 8%-10%: (1) BBB RMBS tranches would suffer 100% losses, causing even AAA Mezzanine CDO tranches 100% loss.**

### 2.    Mezzanine CDOs and Markov

86.    This channeling of relatively low levels of subprime mortgage risk through RMBS to even highly-rated Mezzanine CDO tranches is highly relevant to Defendants' operation of Markov and the disguised bet that Defendants placed in Markov.  These matters are detailed in Section III *infra* and summarized below.

87.    Theoretically, Mezzanine CDO risk (*i.e*., BBB-rated RMBS tranche risk) should be irrelevant to Markov, which was a purported High Grade CDO.  *Mezzanine CDO risk, after all, was exactly what Markov ostensibly avoided as  a High Grade CDO.*

88.    But, as detailed in Section III *infra*, Barclays: (1) structured Markov to allow Markov not merely to invest in *RMBS* tranches, but to invest an extremely large amount of its collateral portfolio (up to 35%) in tranches of *other* CDOs; (2) controlled Markov's collateral selection to take full advantage of this loophole so that $655 million of Markov's collateral portfolio were tranches from *other* CDOs; (3) controlled Markov's collateral selection to take the overwhelming majority of such exposure *synthetically*, through selecting $550 million of CDO tranches for inclusion in the $1.8 billion collateral portfolio referenced in the credit default swap underling Markov; and  (4) *focused selection of such other-CDO collateral entirely on tranches from Mezzanine CDOs.  Of the $550 million of other-CDO tranches referenced in the credit default swap between Barclays and Markov underlying the Markov CDO, all $550 million were tranches from Mezzanine CDOs.*

89.    This was Barclays' disguised bet, as detailed in Section III *infra*.  Under double cover of high Mezzanine CDO tranche credit ratings and a purportedly independent collateral manager ostensibly tasked with collateral selection, Barclays inserted into Markov an enormous $550 million disguised bet on the very risk Markov was thought to have avoided as High Grade CDO: the risks

of BBB-rated nonprime RMBS tranches.

90.     That *every single CDO tranche* referenced in Markov's credit default swap portfolio was, without exception, a *Mezzanine* CDO tranche, precludes any notion that such single-minded focus on Mezzanine CDOs was a matter of chance.  To the contrary, it could have only been by design.  Such design was in no way necessary:  credit default swap technology operated without real-world collateral supply limits,  any asset whatsoever could  be referenced at the mere stroke of a pen.

91.     Such design could not have been innocent, as Mezzanine CDOs were *a priori* riskier than High Grade CDOs. That such design was in fact malevolent is evidenced by the fact that, no matter that normal Mezzanine CDOs already represented extreme risk of failure and total loss, Barclays went to the further trouble of fabricating twelve *new, bespoke* Mezzanine CDOs – the Markov Chain CDOs, as detailed in Section III.D *infra* – that (1) were *even riskier* than normal Mezzanine CDOs (a risk hidden under their misleading AAA ratings, which made them appear the safest of all of Markov's collateral), and (2) were referenced, each in a notional amount of $25 million and thus in sum totaling $300 million, in Markov's credit default swap reference portfolio.

### 3.     High Grade CDOs

92.     The graphic below depicts the channeling of nonprime mortgage risk to nonprime RMBS and, through RMBS tranches, to High Grade CDOs.  The purpose is to make clear that High Grade CDOs, though likewise concentrated in nonprime RMBS collateral, were exposed to a *different and more remote* "slice" of nonprime mortgage losses than Mezzanine CDOs.

# High Grade CDO Risk, Collateral, and Structure
## (Structure Represented is Markov's)



High Grade CDOs are collateralized by A-AAA rated assets more distanced from underlying mortgage losses, and thus escape BBB-rated RMBS risk

93.     Not only were the attachment points of High Grade-eligible RMBS tranches farther removed from underlying mortgage losses, but such tranches were also thicker than the extremely thin BBB-rated RMBS tranches, so that even should losses mount to levels where they threatened High Grade CDO collateral (A, AA and AAA RMBS tranches), losses would be less quick or severe.

94.     Plaintiff, in Markov, bought a highly-rated tranche (Markov's AA-rated tranche) of a purported High Grade CDO collateralized by highly-rated collateral.  As detailed in Sections IV-V *infra*, Plaintiff believed this to be a doubly conservative investment, based (1) on the diversification provided by a portfolio of highly-rated investments; and (2) on the further protection against collateral losses provided by Markov's CDO structure, whose more junior tranches protected Markov's AA-rated tranche from initial collateral portfolio losses.

### 4.     The Basis of CDO Tranche Structure and Tranche Ratings

95.     Structuring CDOs into rated tranches follows the same principle as RMBS tranching: each tranche must be placed at sufficient remove from the collateral portfolio's "expected loss" to merit a particular credit rating.  The means of calculating such "expected loss" for CDOs depend on three key variables: (1) the default rate of the collateral assets (*i.e.*, the chance that an asset will default); (2) the severity of loss upon default, also referred to conversely as the "recovery rate" (*i.e.*, the resulting principal loss should default occur); and (3) the *correlation* between the assets (the degree to which assets are exposed to the same risks, so that were one to default another would be more or less likely to default as well).

96.     The first two of these variables flow directly from an asset's credit rating (a higher-rated asset is less likely to default than a lower-rated one, and, upon default, a higher-rated asset is

likely to suffer lesser principal loss than a lower-rated asset).  Thus, calculation of CDO collateral portfolio expected losses, and therefore CDO tranche structure and ratings, flowed from: (1) the credit ratings of the collateral assets (each credit rating corresponding with a given default rate and loss severity rate); and (2) the correlation between the collateral assets.

97.     The specific details of such CDO rating models were the particular province of the rating agencies and of a handful of large, CDO-creating banks such as Barclays, who used these models on a regular basis to structure their CDOs into tranches that were then presented to the rating agencies for credit rating confirmation.  As a result, banks such as Barclays necessarily understood: (1) the exact assumptions concerning rates of default and loss severity upon default used to assess variously-rated RMBS and CDO tranches (*e.g.*, a BBB-rated RMBS tranche could be modeled with a 10% chance of default and a 40% loss upon default); (2) the exact assumptions concerning asset correlation (generally, the operative modeling assumption during 2006 and early 2007 was that RMBS assets had a 0.3 correlation with each other); and (3) the effect of such assumptions on the resulting CDO tranche structures and tranche ratings.

### 5.     CDO Mis-Structuring and Mis-Rating

98.     In late 2006 and early 2007, banks such as Barclays were among the first to understand that both bases of CDO tranche structures and tranche ratings – RMBS credit ratings and correlation assumptions – were no longer accurate.  The matter was clearest for Mezzanine CDOs.

99.     Record levels of subprime mortgage defaults, coupled with nationwide declining housing prices led banks such as Barclays to understand real-world subprime mortgage losses would exceed the originally-calculated "expected losses" for subprime RMBS securitizations (which had been calculated through on the basis of boom-time assumptions concerning housing price

appreciation, rates of mortgage default, and mortgage loss upon default).

100.   First at risk in the wave of rising subprime mortgage losses were the BBB-rated RMBS tranches.  Such tranches, not far removed from "expected losses" under rosy structuring assumptions, were likely to be breached by losses given real emerging real world conditions – which is the same as stating that their risk of default was much greater than the default risk assigned to them in CDO modeling.

101.   Of greater significance was loss severity.  As prior accurately-scaled graphics make clear, the particular structure of RMBS securitizations had created extremely "thin" BBB-rated tranches, so that a 1% rise in aggregate mortgage losses would suffice to cause such tranches to flip from 100% principal return to 100% principal loss.  The very thin-ness of these tranches made them less of an "analogue" risk (*i.e.*, a range of loss outcomes from 0%-100%) and more of a "digital" risk (either 100% principal return or 100% principal loss, with very little chance of anything in between).  Given emerging real-world conditions, it was likely not merely that the BBB-rated tranches would default *but that, upon default, they would lose everything: 100% loss severity.*  This loss severity was far, far higher than the loss severity assumptions used to structure CDOs into rated tranches.

102.   Of perhaps greatest significance was correlation.  Each RMBS securitization was based on thousands, and sometimes tens of thousands, of pooled mortgages, which thus mitigated idiosyncratic risks associated with any individual mortgage (unique circumstances that could cause one mortgage unexpectedly to default, such as accidental death of a family's primary breadwinner), and was further diversified geographically to mitigate the risk of regional downturns.  Thus, within each RMBS securitization, idiosyncratic risk and regional risk were vanquished through diversification.  However, on another level, each RMBS securitization was – especially at the level

39

of rated tranches – effectively identical to each other one.  Anything that could cause aggregate mortgage losses in one RMBS securitization to rise to a level of 6%-8%, where they would threaten the BBB-rated RMBS tranches, would not be a matter idiosyncratic to one RMBS securitization (such losses would be too large to be idiosyncratic), but rather something *systemic*, which would affect other RMBS securitizations in exactly the same manner.

103.    Therefore, RMBS securitizations generally and their BBB-rated tranches specifically were not, in fact, lightly correlated as per CDO modeling assumptions (0.3 correlation), but almost completely correlated (1.0 correlation).  Put most simply, BBB-rated RMBS tranches would either all pull through, or all fail.  And given their thinness, failure was likely to result in 100% loss.

104.    It was precisely such understanding – that BBB-rated RMBS tranches were poised for correlated defaults and 100% losses – that undergirded the $550 million disguised bet (through Mezzanine CDOs) against such BBB-rated RMBS tranches that Barclays hid in and effected through Markov.

### D.    Synthetic CDOs and Cash CDOs

105.    Where a "cash" CDO achieves its collateral portfolio exposure by purchasing actual, or "cash", RMBS tranches, a synthetic CDO can achieve exposure to an identical collateral portfolio, without purchasing anything, by entering into a credit default swap referencing such a portfolio.  How this works is set forth briefly below.

106.    A cash CDO is straightforward.  To assemble a $1 billion collateral portfolio (100 RMBS tranches of $10 million each) that will back the CDO's $1 billion of tranched securities, the CDO has to raise $1 billion (from the sale of its tranched securities) for use in purchasing its collateral assets.  The interest thrown off by those collateral assets will fund the promised coupons

on the CDO's tranched notes, and the principal invested in those collateral assets will fund the return

of principal to investors upon maturity of the notes.  Should the collateral assets default and suffer

losses, note principal will be impaired in a like amount, starting with the lowest tranche of notes.

107.    A synthetic CDO achieves somewhat the same ends, but by different means and

mechanics.  In effect, investors in a synthetic CDO earn money from the CDO receiving insurance

(credit default swap) premiums from the arranging bank (Barclays).    The CDO insures against

losses in identified (or "referenced") securities that are not held by the CDO. The synthetic CDO

thus does not actually purchase the assets referenced in the collateral portfolio: instead, the synthetic

CDO's asset is merely the insurance contract (the credit default swap).   Under that contract, the

CDO acts as a protection seller, and as such promises to stand ready to reimburse its counterparty

(the protection buyer - Barclays) in case of losses in the referenced notional portfolio.  Therefore,

the synthetic CDO, just like the cash CDO, is exposed to risk of collateral portfolio losses.

108.    Investors in synthetic CDO notes, just as in cash CDO notes, are exposed to collateral

portfolio losses.  In a cash CDO, investors suffer losses as the cash collateral assets (in which their

principal has been stored) default and/or decline in value: liquidation of the portfolio will generate

insufficient proceeds to return full principal to investors.  In a synthetic CDO, investors suffer losses

as the principal they have invested in the CDO – which the CDO holds in a reserve account – is used

by the CDO to make credit protection payments to its credit default swap counterparty for notional

losses in the reference portfolio.  The synthetic CDO then has insufficient fund remaining to provide

full principal return to investors in its tranched notes.  Just as in cash CDOs, collateral portfolio

losses in synthetic CDOs accrue first against the most junior tranche, and, as they rise, against more

senior tranches in turn.

109.     Where the cash CDO collects the interest generated by its collateral portfolio to fund the interest payments to investors in its tranched notes, the synthetic CDO packages: (1) the credit protection payments paid to it by its counterparty, and (2) interest from the above-mentioned reserve account (in which investor principal is stored), to fund the interest payments to investors in its tranched notes.  The credit default swap is thus, like cash collateral, a cash-generating asset:  the CDO is paid for its provision of protection, and these payments form one part of the CDO's ability to fund interest payments to investors.

110.     Unlike a cash CDO, a synthetic CDO does not have to raise $1 billion up front to gain exposure to its $1 billion collateral portfolio.  Instead, a synthetic CDO typically issues two sets of notes: (1) a set of  "funded" tranches, from unrated equity to AAA, to raise a set amount of up-front funds that the CDO can hold in its reserve account and call on for initial credit protection payment payouts; and (2) an "unfunded" super senior tranche (in essence, a "no money down" promise from another party to provide the CDO with whatever further funds it may need should collateral portfolio losses exhaust the CDO's up-front funding in the reserve account).  For example, a $1 billion synthetic CDO could issue: (1) $300 million of funded tranches through the sale of equity to AAA tranches (generating $300 million in funds to be held in its reserve account, where such funds (a) generate interest [paid out to CDO investors] and (b) secure the first $300 million in potential losses in the reference portfolio); and (2) an unfunded $700 million super senior tranche (securing any contingent obligations of the CDO to provide credit protection payments or more than $300 million).

111.     Although the interior plumbing of a synthetic CDO can be counter-intuitive, the full details are here unnecessary.  Synthetic CDOs were designed, using different means, to look like and act like cash CDOs, and investors in both CDOs were at like tranched risk should assets in the

underlying collateral portfolio (whether cash or synthetic) decline in value.

112.    A useful way to envision a synthetic CDO is as follows: the credit default swap functions much like a movie projector, and the "reference portfolio" specified in the credit default swap acts as the film running through the credit default swap projector.  Through such projection, an "image" of a real portfolio is projected against a screen.  The counterparties to the credit default swap then watch what happens to that portfolio.  The contract between them makes the consequences of what happens on the screen real.

**E.    The Particular, Structural Conflict of Interest in Synthetic CDOs and Its Defusal By Appointment of an Independent Collateral Manager**

113.    Due to the nature of credit default swaps, a synthetic CDO can introduce opposing interests into CDO formation and collateralization.  In every credit default swap, one counterparty is "long" the referenced risk (by agreeing to assume it for a fee), while another counterparty is "short" the referenced risk (by, in effect, taking out an insurance policy on it).

114.    As the short counterparty to the credit default swap underlying a synthetic CDO was customarily the bank arranging the CDO, were the bank to select the swap's reference portfolio, the bank could find it in its interest to include in the portfolio the worst possible reference entities (so as to profit from their failure).

115.    Therefore, the presence of an independent collateral manager is of *redoubled* importance in the context of a synthetic CDO transaction.  Theoretically, by determining the contents of the reference portfolio, the collateral manager (1) not only precludes the creator bank's ability to *pursue* its short interest in the collateral, but also (2) defuses the bank's *interest* in its short interest.  As the short interest that the bank ends up with, by virtue of the CDO transaction, is not the short interest that the bank would have necessarily selected for itself, it has less interest in that

43

interest.  The bank's role is therefore reduced to one of a neutral market maker or middleman: it enters into the credit default swap to effect the CDO transaction, it ends up with a short interest as a byproduct, and then, typically, it sells off that byproduct short interest into the market to other investors.

### F.   Recent Public Discovery in and After April 2010 that Many Synthetic CDOs Had Secretly Been Built to Fail

116.   Sizable investor losses from vintage 2006-2007 CDOs were, for a long time, rivaled perhaps only by such CDOs' complexity and opacity – which acted to forestall litigation in connection with such losses.  Matters changed in April 2010, when two events began to make clear that many vintage 2006-2007 CDOs had, secretly, been built to fail.

117.   The first of these April 2010 events was the securities fraud suit brought by the Securities and Exchange Commission ("SEC") against Goldman in connection with the now-notorious $2 billion synthetic Mezzanine CDO known as Abacus 2007-AC1.  *See SEC v. Goldman Sachs & Co.*, 10-cv-3229 (BSJ) (S.D.N.Y. April 15, 2010).  The essence of the Abacus fraud was simple.  In pitchbooks and offering circulars distributed to potential Abacus investors, Goldman represented: (1) that Abacus' $2 billion collateral portfolio would be selected by Abacus' ostensible third-party collateral manager, ACA Management LLC ("ACA"); and (2) that ACA would use its expertise to assemble a collateral portfolio best likely to succeed.  Both representations were false.  In truth, Abacus' $2 billion of collateral was selected neither by the party represented nor on the basis represented.  Instead, Abacus' $2 billion collateral portfolio was largely selected by another party (the hedge fund manager Paulson & Co., Inc. ["Paulson]), and *on the very opposite basis* (the use of expertise to assemble a collateral portfolio most likely to fail).  Paulson and Goldman constructed Abacus to be built-to-fail, on the basis of adversely-selected collateral chosen for its

44

promise of failure, in order to allow Paulson not to bet on Abacus but to bet *against* it.  Abacus, the exact opposite of what it was represented to be, failed utterly, and Paulson's near-$1 billion bet against Abacus succeeded completely.  Goldman settled the SEC's securities fraud suit, three months after its filing, for $550 million.  Abacus and Goldman have since come to serve in public discourse as the epicenter of CDO-related fraud.

118.    The second of these April 2010 events revealed that Abacus and Goldman were not alone, and that substantively-identical but much larger CDO frauds had in fact occurred in connection with 2006-2007 vintage CDOs.  One week *prior* to the SEC's filing of securities fraud charges relating to Abacus, investigative reporting revealed a near-identical but far greater CDO fraud: another hedge fund, Magnetar Capital ("Magnetar), working with many different banks and under the false facade of many different CDO collateral managers, had in fact created a series of at least twenty-six (26) built to fail CDOs just like Abacus, totaling a stunning $36.7 billion.   *See* Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going,", *Propublica*, April 9, 2010 (attached as Exhibit B hereto).[5] Each of these Magnetar CDOs was named after a different stellar constellation (thus, the "Constellation CDOs").

119.    Just as in Abacus, the collateral portfolios underlying these Constellation CDOs were determined in large part *not* by the party represented to be in charge of such determination – the Constellation CDOs' erstwhile collateral managers – but, instead, and undisclosed, by another party altogether: Magnetar.  Just as in Abacus, the collateral was selected not for its likelihood to succeed,

---

[5]       Available at:
http://www.propublica.org/article/all-the-magnetar-trade-how-one-hedge-fund-helped-keep-the-housing-bubble .

but to fail.  Just as in Abacus, this adverse selection of collateral was secretly pursued to rig the resulting Constellation CDOs for failure, so as to rig Magnetar's bets *against* these CDOs and/or their underling collateral.  Just as in Abacus, these Constellation CDOs were the exact opposite of what they were represented to be, and, just like Abacus, they succeeded in their secret purpose and failed utterly.

120.    Following these events, CDO fraud has emerged as a focus for both regulators and private litigants.  For example:

(a)    The SEC is now investigating Magnetar and the Constellation CDOs specifically, as well as 2006-2007 vintage CDOs more generally.  *See* Kara Scannell, "SEC Steps Up Probe of Crisis Deals By Fund", *Wall Street Journal*, June 19, 2010.

(b)    On March 3, 2011, the chief of the Securities and Commodities Fraud Task Force of U.S. Attorney's office for the Southern District of New York asserted that his office will spend 2011 investigating CDO fraud, identifying such fraud as "an enforcement priority".  *See* David Evans and David Glovin, "CDO/CDS Fraud Probes to be 2011 Priority, Prosecutor Says", *Bloomberg*, March 3, 2011.  Mr Garcia asserted that his office would not be deterred by CDO complexity and was "bringing in people with expertise in these areas." *Id.*

(c)    Multiple fraud suits commenced after April 2010 are now proceeding in this District and in New York state courts by Constellation CDO and Goldman CDO investors.[6]

---

[6]    *See*, *e.g.*: *Loreley Financing No. 7 (Jersey) Limited et al. v. Credit Agricole Corporate and Investment Bank*, No.  650673/2010 (N.Y. Supr. N.Y. County) ($70 million investment in three Constellation CDOs); *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Merrill Lynch & Co.*, No. 601832/2009 (N.Y. Supr. N.Y. County) ($60 million investment in one Constellation CDO); *Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc.*, No. 10-cv-4537 (BSJ) (S.D.N.Y.) ($80 million investment in Goldman's Timberwolf CDO); *Heungkuk Life Insurance Co., Limited v. The Goldman Sachs Group, Inc.*, 2011-cv-1856 (S.D.N.Y.) ($47 million

121.    The Markov CDO at issue here is a more sophisticated, complex and deceptive variant of the above-discussed Abacus and Constellation CDOs.  As in the Abacus and Constellation CDOs, Markov was represented – in marketing and offering documents created and distributed Defendants: (1) to have an independent collateral manager, SSGA, selecting the assets in Markov's portfolio; and (2) to be built to succeed by the collateral manager, who would use its expertise (described at length in the offering documents) to assemble a collateral portfolio best likely to succeed.   As in the Abacus and Constellation CDOs, Defendants' representations in these offering documents were materially false and/or misleading. As in the Abacus and Constellation CDOs, Markov's collateral portfolio was determined in substantial part by another party than represented, and on the opposite basis than represented.

122.    Where Markov first differs from Abacus and the Constellation CDOs is that the party using Markov to establish a short bet, and selecting Markov's collateral portfolio on a built-to-fail basis, was not an external hedge fund such as Paulson or Magnetar, *but rather Barclays itself*.  As detailed herein, Barclays used its expertise to fill Markov with collateral (1) that Barclays expected to fail, and (2) that, through Markov, Barclays was betting against.

## II.    DEFENDANTS' PRIOR CDO-RELATED MISCONDUCT PROVIDES FURTHER EVIDENCE OF SCIENTER

123.    The misconduct alleged herein with respect to Markov was not without precedent for Barclays or SSGA.  As detailed below, both Barclays and SSGA had done the same thing before, in connection with prior CDOs they respectively created and managed.  Barclays' and SSGA' prior

---

investment in Goldman's Timberwolf CDO); *Dodona I, LLC v. Goldman Sachs & Co.*, No. 10-cv-7497 (S.D.N.Y.) ($4 million of investments in two Goldman CDOs – Hudson Mezzanine Funding 2006-1 and Hudson Mezzanine Funding 2006-2).

*identical* misconduct, as detailed below, serves as further evidence of Barclays' and SSGA's like misconduct in connection with Markov.

A.   **Barclays Collateralized a Prior Synthetic CDO – Corvus – With Assets Barclays Believed Would Fail, Including Bespoke Toxic Assets of Barclays' Own Design**

124.   Barclays' misconduct with respect to Markov echoes near-identical misconduct in connection with another synthetic CDO Barclays created in late 2000: the Corvus CDO.[7]

125.   The $950 million Corvus CDO was created and managed by Barclays personnel in New York, and tranches of Corvus were sold *inter alia* by Barclays Capital personnel in London to various investors, some of whom threatened and some of whom actually pursued legal action against Barclays. Such investors included the European Bank for Reconstruction and Development (which reportedly settled privately with Barclays without filing suit), Hamburgische Landesbank (which made investments of $420 million in Corvus and another Barclays CDO named Nerva), and Landesbank Schleswig-Holstein (which purchased $151 million of Corvus). The latter two Landesbanks later became part of HSH Nordbank, which in 2004 filed suit against Barclays over

---

[7]   Plaintiff's account of the Corvus CDO is taken from contemporary media accounts, including *inter alia*: "Russian Doll: a Lawsuit May Shed Light on Some Complex Deals," *Economist*, September 23, 2004; Nils Pratley, "Barclays Denies 'Fleecing' Clients," *The Guardian*, October 2, 2004; Michael Harrison, "Barclays Faces Call for City Inquiry over German Bank's Losses," *The Independent*, October 22, 2004; Jeremy Carter, "HSH Docs Allege Barclays Eroded USD 200M From CDO Deals," *Derivatives Week*, October 25, 2004; Michael Harrison, "Barclays Suffers Derivatives Case Setback," *The Independent*, December 18, 2004; Julia Kollewe and Michael Harrison, "Barclays 'Hit for up to $250m' in Deal to End Derivatives Case," *The Independent*, February 15, 2005; Mark Gilbert, "Barclays Opens Up a Pandora's Box of Derivatives," *Bloomberg*, February 18, 2005; Caroline Merrell, "Barclays Pays up in Derivative Dispute," The Times, February 25, 2005.

Barclays' actions with respect to Corvus.  The suit was settled shortly before trial proceedings were set to commence on February 21, 2005.

126.    Like Markov, Corvus was a synthetic CDO based on collateral referenced through credit default swaps.  As in Markov, Barclays was the "short" counterparty in those credit default swaps, and the CDO itself was the "long" counterparty: Barclays paid credit protection payments to Corvus with respect to the reference entities specified in the credit default swaps, and Corvus in return stood ready to make payments to Barclays if the reference entities fell in value, in the amount of any such declines.  Investors who purchased Corvus' tranched notes stepped into Corvus' shoes as the "long" counterparty: the money raised from such investors (through the sale of Corvus notes) was the source of Corvus' funds to make any requisite payments to Barclays.

127.    In Corvus, however, Barclays also operated as Corvus' collateral manager: *Barclays was not only "short" Corvus' collateral (i.e., it had a pecuniary interest in the failure of that collateral), but was also in charge of selecting that collateral.*  As manager, Barclays could sell parts of Corvus' original portfolio and purchase new collateral to take its place.  As the court hearing the Corvus case would later hold, this created a conflict of interest between Barclays' own short interests in Corvus' collateral and Barclays' duties as collateral manager on behalf of Corvus investors.

128.    Operative facts indicate that Barclays succumbed to this conflict.  As Corvus' collateral manager, Barclays filled Corvus with assets that Barclays thought likely to fail, including many assets that Barclays had itself built to fail – most notably, tranches from other bespoke CDOs that Barclays had created, which were so risky that the only purchasers of such tranches were other CDOs that Barclays already managed, like Corvus.

49

129.     This is exactly what Barclays did in Markov, as detailed in Section III *infra* – despite the fact that Defendants represented that Markov would be managed by an independent third-party collateral manager, SSGA.  Barclays was not only "short" most of Markov's collateral portfolio ($1.8 billion of Markov's $2 billion), but secretly exerted control over the determination of Markov's collateral portfolio.  Barclays used such control: (1) to fill Markov with $550 million of Mezzanine CDO assets that appeared safe on paper but which Barclays believed would fail; chiefly by (2) filling Markov with $300 million of bespoke Mezzanine CDO tranches that Barclays (a) had designed to fail, rather than to succeed, and (b) had built specifically for purchase by Markov (which Barclays controlled), rather than selling to wider investors in the broader markets.

130.     *By virtue of Defendants' misrepresentations here concerning Markov, what happened in Corvus did not seem possible in Markov.* Because BarCap and SSGA represented Markov to be managed by an independent third party, SSGA, Markov did not appear to present the conflict of interests that Corvus did.  Though Barclays would be "short" the collateral, the collateral would not be selected by Barclays, but by SSGA.

131.     What happened in Corvus?  During the nine months following its creation in December 2000, Barclays acted as collateral manager to replace as much as 90% of Corvus' original collateral with new and *worse* assets.  Such new assets included: (1) large exposures to bonds of distressed telecommunications companies such as Global Crossing, Lucent and Marconi (companies, and an industry, then crashing); (2) exposures to the sovereign debt of nations then experiencing fiscal crises (such as Argentina); and (3) in the weeks following September 11, 2001, asset-backed securities backed by pools of securitized aircraft leases.

50

132.    In each case, Barclays operated Corvus so that Corvus took exposure to such assets at their full par price, even as market prices for such assets were often already substantially devalued.  In essence, Barclays was purchasing such assets at discounted market prices and then selling them to Corvus at full price, reaping substantial trading profits through its control of Corvus.

133.    Most importantly, however, Barclays directed Corvus to invest in the junior tranches of numerous other synthetic CDOs of Barclays' own creation, themselves based on unusually risky synthetic collateral portfolios of Barclays' own choosing.  The junior tranches of these CDOs were at greater risk of loss from such collateral portfolios, and, as junior tranches, provided protection against loss to the more senior tranches of such CDOs.  While Barclays marketed the senior tranches of these CDOs to the wider market, it did not do so with the junior tranches: in effect, they were too risky to be sold.  Instead, Barclays sold these junior tranches directly to *other CDOs it controlled, such as Corvus* – and, again, at full price.  The press referred to these interlocking CDOs as the "Russian Dolls" – opening one up revealed another, which when opened up revealed another, etc.:

> Barclays invested [Corvus] in another Barclays issue called Taunton, which invested in a Barclays issue named Flavius, which itself invested in Barclays notes called Savannah II, which bought part of two more issues, Dorset and Tullas, from (you guessed it) Barclays.[8]

134.    In sum, instead of managing the Corvus portfolio for Corvus' investors' benefit, Barclays used the portfolio as a dumping ground both for self-originated, risk-laden assets Barclays could not sell and for similarly toxic assets it bought cheaply in the market.  Barclays thus, at Corvus' expense, manufactured trading gains on the front end while, on the back end, securing

---

[8]        *See* Mark Gilbert, "Barclays Opens Up a Pandora's Box of Derivatives," *Bloomberg*, February 18, 2005.

profitable "short" positions through credit default swaps whose pay-offs to Barclays would be made with Corvus' investors' principal (thereby impairing their Corvus notes).

135.    Internal documents from HSH, reflecting on Barclays' use and abuse of Corvus and other CDOs, summarized matters thus:

> We have to consider that the CDO system was created to either dump assets from Barclays' balance sheet into its customers' portfolios or to make huge profits at the expense of its investors.[9]

136.    After HSH filed suit in late 2004, Barclays in pre-trial proceedings insisted that it had acted permissibly under the terms of its contract as Corvus' collateral manager.  On or about December 17, 2004, the court disagreed, finding that Barclays had a wider duty of care to Corvus investors and had a obligation to act in good faith as opposed to merely observing the strict terms of the contract.[10]  Barclays privately settled the matter on or about February 14, 2005, one week before its scheduled February 21, 2005 trial.

### B.    SSGA's Falsely-Represented Role as Collateral Manager for the Carina CDO

137.    Just as Barclays' actions with respect to Markov have near-exact antecedent in Barclays' prior CDO activities, so do SSGA's.

138.    SSGA served as the ostensible "collateral manager" for a November 2006 synthetic Mezzanine CDO named Carina CDO – one of the aforementioned misrepresented and built-to-fail Constellation CDOs (*see* Section I.F *supra*).  Just as in Markov, SSGA was not the party that actually selected Carina's collateral.  Instead, SSGA secretly ceded that role in Carina to a hedge

---

[9]    *See* Jeremy Carter, "HSH Docs Allege Barclays Eroded USD 200M From CDO Deals," *Derivatives Week*, October 25, 2004.

[10]    *See* Michael Harrison, "Barclays Suffers Derivatives Case Setback," *The Independent*, December 18, 2004.

fund, Magnetar Capital ("Magnetar") that wished to construct CDOs so as to bet against them. Magnetar made a big business of building built-to-fail CDOs – 26 so far identified, totaling more than $36 billion –  primarily by selecting collateral assets it believed most likely to fail.  To the outside world, however, Magnetar's CDOs (not known as Magnetar's CDOs, as Magnetar involvement was omitted) seemed to have been built to succeed: each was appointed with a collateral manager, and each was marketed and sold with representations that the underlying collateral had been selected by the collateral manager on the basis of its relative quality.

139.    Mutually-reinforcing accounts by participants in multiple Constellation CDOs demonstrate how Magnetar pushed for the inclusion of riskier collateral – and got its way:

> But **people involved in Magnetar's deals say the hedge fund took a different tack, pushing for riskier bonds to go inside its CDOs. Doing that would make it more likely that Magnetar's bets against the CDO would pay off.**
> *****
> Magnetar completed its first deal in May 2006. In what became a habit, it named the CDO after a constellation . . .
> *****
> Between the end of September and the middle of December 2006, Magnetar had a hand in spawning at least 15 CDOs, worth an estimated $23 billion. Among the banks involved with those deals were Citigroup, Lehman Brothers and Merrill Lynch.
>
> **E-mails obtained by ProPublica from that time suggest Magnetar's clout. The firm was involved at the start of deals and pushed for riskier bonds to be included**.
> *****
> As part of the big business Magnetar was doing in the fall of 2006, the hedge fund put together a CDO with Lehman Brothers named for the constellation Libra.  **John Mawe, a banker who worked on Libra, remembers that "there was a back-and-forth fight" about the assets between the bank's CDO manager and Magnetar, with the hedge fund pushing for riskier assets** . . .
> *****
> . . . in early 2007 -- Magnetar and JPMorgan banged out a deal. Unlike the earlier CDOs Magnetar helped create, this one wasn't

named after a constellation. Instead, the deal was called "Squared," after the term for a CDO that was made up of other CDOs. Squared was filled in part with other CDOs Magnetar had helped create.

According to a person familiar with how the deal came together, Magnetar committed to purchase $10 million worth of Squared's equity. Magnetar's purchase allowed JPMorgan to create and sell a $1.1 billion CDO. **As it had on previous deals, Magnetar pushed the bankers to select riskier bonds. "They really cared about it," said the person involved in the deal. "They wouldn't pull punches. It was always going to be crappier."**

**The hedge fund requested that Squared have slices from many Magnetar CDOs, including Auriga, Carina, Libra, Pyxis and Virgo. They all went into the deal** . . .[11]

140.   Indeed, recently-released evidence from investor litigation over another Constellation CDO, Norma CDO, establishes beyond dispute that erstwhile collateral managers were mere fronts behind which Magnetar directed collateral selection.  *See* May 11, 2010 letter from Jonathan Pickhardt to the Honorable Bernard J. Fried, recently made public by the Financial Crisis Inquiry Commission (and attached as Exhibit C hereto).[12]  Correspondence in that litigation describes internal documents evidencing how Magnetar – rather than NIR, Norma's purported collateral manager – controlled collateral portfolio selection *ab initio* ("James Prusko of Magnetar: 'Here is the first batch of protection purchases I'm planning for NIR.'") (Ex. C at 1-2), how Magnetar entered into trades for over $600 million of Norma's collateral without any involvement from NIR (*id*. at 2), and how, amazingly, any collateral selection made by NIR was subject to Magnetar veto

---

[11]   *See* Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going,", *Propublica*, April 9, 2010 (attached as Exhibit B hereto).

[12]   Available at:
http://c0181567.cdn1.cloudfiles.rackspacecloud.com/2010-05-11%20Letter%20from%20Raboba nk's%20Counsel%20to%20Judge%20Fried%20of%20Supreme%20Court%20of%20NY.pdf

(*id.*).

141.    Given its understanding of what Magnetar was doing with the Constellation CDOs, SSGA was initially "skeptical" about working in Magnetar's Constellation CDO program, and was concerned about "reputational risk" that could result.   Yet SSGA ultimately put aside such skepticism and concern, and participated as "collateral manager" for Carina:

> **The State Street managers were "highly skeptical" of doing a deal with Magnetar, according to one participant. "State Street wanted their deals to do well,"** said the participant, and with Magnetar, there was "a lot of reputational risk to be concerned about."
>
> Hoping to close the deal, Magnetar's master salesman Jim Prusko drove up from his home in the New York suburbs to State Street's headquarters in Boston, to mollify executives in the management team. After the meeting, the deal went forward. As one banker explained, "there were other managers who were dying to do this deal" and get the millions in fees. (*Id.*) (Emphasis added.)

142.    Carina is now infamous as the first ABS CDO to be forced into liquidation.  Carina's liquidation occurred in early November 2007, almost exactly one year after Carina's birth.  It was followed soon after by Markov.  The SEC is now investigating the Constellation CDOs.

143.    SSGA's actions and role in Carina are almost exactly the same as in Markov.  As in Carina, SSGA in Markov ceded control over collateral selection to another party whose interest lay in the CDO failing, not succeeding.  The only difference was that in Carina that party, the true collateral manager, was an undisclosed hedge fund, while in Markov that party was Barclays itself, the CDO's own creator, arranger and underwriter.

144.    One further commonality links SSGA's actions in Carina and Markov.  Normally, CDO managers invested in the "equity" tranche of the CDOs they managed, thereby "putting their money where their mouth was" and signaling confidence that the collateral assets they selected

would perform well.  SSGA – contrary not only to custom, but to its own history of making such equity tranche investments in CDOs it managed –  did not make any investment in the equity tranches of Carina or Markov.  SSGA's refusal to take the traditional equity investment in connection with Markov, which it purportedly managed, evidences SSGA's awareness that Markov, like Carina (in which SSGA also refused to make any equity investment), was being set up to fail.

### III. BEHIND THREE LAYERS OF DECEPTION, BARCLAYS CREATED AND OPERATED MARKOV AS A BUILT-TO-FAIL VEHICLE THROUGH WHICH TO CONDUCT A DISGUISED SHORT BET *AGAINST* THE LOWEST TRANCHES OF NONPRIME MORTGAGE RISK

145.    Section III.A below explains Markov's basic structure, mechanics and logic.  Markov investors would suffer losses: (1) as the reference entities specified in Markov's credit default swap portfolio suffered losses, which (2) obligated Markov to make payments equal to those losses (3) to Barclays (4) using the principal raised from Markov investors through purchasing Markov's notes, thereby (5) impairing those notes in like amount.  Put more succinctly, because through Markov Barclays was short and Markov investors were long Markov's portfolio risk, Markov investors' loss was Barclays' gain.

146.    Sections III.B-D below explain the three layers of deception employed by Defendants to disguise that they had created and operated Markov so as to be built to fail, and, in failing, to benefit Defendants at the expense of Plaintiff and other Markov investors.  The first two layers of deception (Sections III.B-C) were common to those employed by other built-to-fail CDOs such as Abacus and the Constellation CDOs.  The third (Section III.D) was a sophisticated and highly deceptive twist employed by Barclays alone.  The result was as Barclays intended: Markov quickly failed, and Plaintiff and other Markov investors suffered 100% losses as the money they invested in Markov was swapped dollar-for-dollar to Barclays, rendering their Markov notes worthless.

147.    Lastly, Section III.E demonstrates how Barclays calibrated its disguised bets – through the Mezzanine CDOs and the Markov Chain CDOs – with Markov's basic structure, in order to provide Barclays with maximum profit and offset all risk.

**A.    Markov's Basic Structure**

148.    Markov was nominally a $2 billion CDO with "exposure" to a $2 billion collateral portfolio:  $200 million of cash collateral and $1.8 billion of synthetic collateral referenced by credit default swap.  Were Markov a Cash CDO, Markov would need to raise $2 billion from selling $2 billion of notes, in order to purchase its $2 billion of actual collateral assets.  But because Markov was a "hybrid" – and indeed, mostly synthetic CDO (90% synthetic, 10% cash) – Markov did not need to raise $2 billion up front to achieve its $2 billion collateral exposure.  In fact, Markov raised only $400 million from selling $400 million of tranched notes to investors, including Plaintiff.  The logic behind this is presented below, in order to detail *inter alia*: exactly how Markov worked, exactly what the $400 million of tranched notes represented, and exactly what the $400 million raised by investors was used for.

149.    First, in return for issuing to investors $400 million of tranched notes,  Markov received from Markov investors $400 million in cash.  Second, $200 million of these funds were used to purchase the 10% portion of Markov's collateral that existed in cash form (10% of Markov's $2 billion of collateral exposure, or $200 million).  Third, the remaining $200 million was deposited into a reserve account that would serve Markov as the *initial* source of funding for its contingent obligations under the credit default swap with Barclays to provide Barclays with protection on a $1.8 billion portfolio of "referenced" collateral.

57

150. Precisely because its credit default swap obligation of up to $1.8 billion (if all $1.8 billion of reference entities all lost 100%) was *contingent*, Markov did not need to raise $1.8 billion "up front" from selling $1.8 billion notes to investors. Rather, Markov needed only: (1) raise a smaller amount of "up front" funding to as to serve as credible counterparty to $1.8 billion of contingent obligations; and (2) secure a *promise* to provide further funding should such further funding be necessary. As already detailed, Markov's "up front" funding was $400 million – of which (1) $200 million was transferred to the reserve account, and (2) $200 million was invested in cash collateral – raised from the sale of "funded" Markov notes to investors.

151. Markov's $400 million of funded notes thus represented exposure to the first $400 million of payments that Markov might need to make to Barclays under its $1.8 billion credit default swap. The $200 million of in the cash account would be used to make such payments first. Markov could also liquidate the $200 million of cash collateral to raise further funding, if necessary.

152. In sum, the $400 million of "funded" notes issued by Markov were "hostage" to Markov's first $400 million of credit default swap payments to Barclays – or, in other words, the first $400 million of losses in Markov's reference portfolio. As reference entities in the $1.8 billion synthetic portfolio defaulted and suffered losses, each dollar swapped to Barclays would result in a dollar of impairment to those funded tranche notes (now being robbed of funds), starting at the most junior tranche. As reference entity losses grew, impairment would climb up the tranche structure in like amount. Should reference entity losses reach $400 million, Markov's cash and cash collateral would be fully exhausted (*i.e.*, swapped to Barclays), leaving nothing left to secure Markov's $400 million of "funded" notes – which would now have no funds backing them.

153.    But what if reference entity losses rose above the level of Markov's initial funding: *i.e.*, above $400 million?  Markov would then owe its counterparty (Barclays) further amounts, but had no funds to make such payments.  In that scenario, Markov could draw upon the provider of the promise to provide Markov with further funding:  a promise embodied in Markov's "unfunded" $1.6 billion super senior tranche.  The super senior tranche holder needed invest no money up front, but agreed to fund Markov as needed (up to $1.6 billion) to pay off whatever losses Markov experienced above $400 million.

154.    The super senior tranche holder was none other than Barclay itself.  If losses in Markov grew larger than $400 million, Barclays, by virtue of its super senior tranche obligation, would have to "fund" such *supra*-$400 million losses.  As such losses could reach $1.6 billion, Barclays was on the hook for as much as $1.6 billion of losses.  *But Barclays was on both sides of the transaction at this point.  Should Markov losses climb above $400 million, Barclays would be providing Markov with funding. . . which Markov would use to pay Barclays.*[13]  The transaction would become a "wash":  Barclays would not lose money and would not gain money, but just circulate money from itself through Markov back to itself.

155.    Further consequences of this structure are discussed in Section III.E *supra*.  The essence should be clear now.  Through Markov, Barclays constructed a $1.8 billion short position for itself, the first $400 million of whose payoff was provided by investors such as Plaintiff who purchased Markov's $400 million of funded notes.  Any further Markov losses would neither benefit

---

[13]    As further discussed herein, Barclays had substantial flexibility with respect to how exactly to operate Markov to execute several possible trading strategies.  This flexibility arose from Barclays' options with respect to retaining or selling: (1) portions of its $1.8 billion short position on Markov's collateral; and/or (2) portions of its $1.6 billion super senor long position.

nor harm Barclays, as Barclays had offsetting positions (long and short) the remainder of the way.

**B.   The First Layer of Deception: Barclays Possessed and Employed Effective Control Over the Selection of Markov's Collateral**

156.   Barclays' $1.8 billion structural interest in Markov's collateral's failure is precisely why Markov required – and, ostensibly, was appointed with – an independent, third-party collateral manager charged with collateral selection.  In the absence of such an independent collateral asset selector, Barclays could fill the collateral portfolio with collateral assets chosen to best suit Barclays (short) interest: *i.e.*, collateral that Barclays believed would fail.

157.   Therefore, to market Markov as a legitimate investment vehicle and distinguish it from a rigged bet, it was necessary to hold out Markov as a CDO whose collateral selection would *not* be made by Barclays, but instead by an independent third-party collateral manager.  Defendants arranged and marketed Markov in just such a manner: as a vehicle whose collateral would ostensibly be selected by SSGA.  These representations, however, were false.

158.   In truth Barclays possessed effective control over the selection of Markov's collateral.  Barclays used such control to fill Markov with hundreds of millions of dollars worth of collateral that served its own (short) interest: collateral that Barclays believed would fail.  The failure of such collateral would mean that Markov would be obligated to "swap" to Barclays a sum of cash equaling the decline in the collateral's value.  The funds for such swap payments to Barclays were Plaintiff's and other Markov investors' principal.  The evacuation of such principal from Markov to Barclays would leave Markov's tranched notes impaired and/or worthless, depending on how much was swapped to Barclays.

159.   Thus, by filling Markov with collateral assets that Barclays believed would fail, Barclays sought to ensure that the "short" bet it had constructed through Markov paid off – and such

payoff necessarily entailed Plaintiff's and other Markov investors' substantial and/or total losses.

160.    That Barclays possessed and employed effective control over selection of Markov's collateral is evidenced by multiple matters detailed below.

### 1.    The Specific Collateral Included in Markov

161.    First, examination of the actual contents of Markov's collateral portfolio – detailed in Sections III.C-D *infra* –  evinces Barclays' hand in shaping it.

162.    A specific $550 million subset of that collateral – namely, the $550 million of junior tranches of Mezzanine CDOs referenced in Markov's underlying credit default swap (Section III.C *infra*), including $300 million of junior tranches from bespoke Mezzanine CDOs created by Barclays itself in a manner that made them the riskiest of all of Markov's collateral assets (Section III.D *infra*) – served Barclays' interest (assets likely to fail, and therefor occasion credit default swap payments to Barclays in the amount of such failure) while simultaneously disguising it (under cover of high credit ratings).

163.    As detailed below, such high concentration of other-CDO collateral: (a) was written into Markov's structure by Barclays (Section III.B.2 *infra*); (b) was unusually high (Section III.B.2 *infra*); (c) contradicted to SSGA's stated CDO management philosophy, a key plank of which, per SSGA itself, was not to rely on such "excessive . . . CDO buckets" when managing the collateral portfolios of CDOs (Section III.B.4.b *infra*); and (d) cannot be attributed to SSGA, given SSGA's actions here, without leading to *reductio ad absurdum* (Section III.B.4 *infra*).

### 2.    The Particular and Extreme Structure Devised (and Fully Exploited) by Barclays for Markov

164.    Second, examination of the particular structural constraints for Markov's collateral portfolio – structural constraints devised by Barclays, as Markov's structurer – evidence that

Barclays structured Markov in a manner that allowed Barclays the necessary loophole through which to conduct a disguised "short" bet against the lowest, riskiest tranche of nonprime mortgage risk: the BBB-rated RMBS tranche.

165.    Markov was purportedly a "High Grade" CDO, meaning that its collateral assets: (1) could only be securities rated A, AA or AAA; and (2) could not include any BBB-rated securities. Thus, Markov could not actually include as collateral any BBB-rated RMBS tranches.

166.    However, in devising the structural constraints governing Markov's collateral portfolio, Barclays gave Markov an unusual and extreme structure.  Specifically, Barclays inserted a structural proviso that allowed up to 35% of Markov's collateral portfolio to consist not of *RMBS* tranches, but of tranches from other *CDOs* (in industry parlance, a "35% CDO  bucket").

167.    The allowance Barclays granted to Markov to invest in other tranches of other CDOs was greater than any prior allowance Barclays had granted to the other ABS CDOs it created between 2005 and 2007.[14]  It was this (extreme) structural proviso that allowed Barclays the loophole to make its disguised "short" bet against BBB-rated RMBS.  Having structured Markov so that as much as 35% of its $2 billion of collateral (*i.e*., $700 million) could be junior tranches from other CDOs, Barclays then caused Markov to be filled to its structural brim with exactly such collateral: $655 million of junior tranches from other CDOs (all identified at Table 1 in Section III.C *infra*).

---

[14]    One further CDO – Pampelonne CDO II, which closed on March 6, 2007 – was also structured by Barclays with such a 35% CDO bucket.

168.    Stunningly, *of the $655 million of tranches from other CDOs that served as Markov collateral, $635 million – or 97% – came from Mezzanine CDOs*.[15]   Of this $635 million, $550 million was referenced in Markov's underlying credit default swap, in which Barclays was the "short" counterparty: and all $550 million these referenced CDO tranches were without exception from Mezzanine CDOs.

169.    As Barclays and a few other sophisticated market participants understood, a bet against the higher-rated tranches of Mezzanine *CDOs* was in effect a disguised bet against BBB-rated *RMBS* tranches.  Mezzanine CDO tranches seemed safer due to their higher credit ratings, but the risk was the same.  These Mezzanine CDOs were collateralized in effective entirety by portfolios of BBB-rated RMBS tranches:  should BBB-rated RMBS tranches fail, Mezzanine CDO collateral would lose almost all value, rendering Mezzanine CDOs' tranched notes backed by that collateral worthless from top to bottom – including even AAA-rated Mezzanine CDO tranches.

170.    Having created this extreme structural loophole – that 35% of Markov's assets could consist of CDO tranches with AA or AAA credit ratings – Barclays then drove a freight train through it, carrying $550 million of bets against such Mezzanine CDO tranches, all of which rested on BBB-rated RMBS risk.  This was Barclays' purpose all along.

---

[15]    Indeed, the single exception to this rule – a $20 million tranche from a High Grade CDO named Pampelonne CDO II ("Pampelonne") – only further proves it.  Barclays itself had created Pampelonne, and used Markov to offload certain of Pampelonne's junior tranches that it could not otherwise sell (and did not wish itself to retain).  More specifically, Barclays used $20 million of the cash raised from Plaintiff and other Markov investors to cause Markov to purchase $20 million of notes issued by Pampelonne. Incredibly, Barclays likewise used Pampelonne to offload $20 million of Markov's junior tranches that it could not otherwise sell (and, likewise, had no wish to retain).

### 3. A Recent and Comprehensive Analysis of CDO Collateral Demonstrates that CDO Underwriters Exercised Control Over CDO Collateral Portfolios, and Explains How They Did So

171.    Third, recent news and analysis evidence that the hijacking of CDO collateral portfolios by parties other than the ones represented to be in charge of them was in fact widespread during 2006-2007.

172.    As a preliminary matter, the Abacus and Constellation CDO matters (Section I.F *supra*) reveal that it was by no means rare for ostensible collateral managers *not* to be in charge of collateral selection.  In at least 27 separate instances (Abacus and the 26 Constellation CDOs), the represented collateral managers were not the parties responsible for actual collateral selection.

173.    More recent analysis suggests this was endemic in the CDO industry in late 2006 and 2007.  Recent analysis of hundreds of CDOs created during late 2006 and 2007 demonstrates that CDO-creating banks such as Barclays exerted control over the collateral selected for the CDOs they created and used such control to benefit themselves in what became "one of the greatest episodes of self-dealing in financial history."  *See* Jesse Eisinger and Jake Bernstein, "Banks' Self-Dealing Supercharged Financial Crisis", *Propublica*, August 26, 2010 (attached as Exhibit D  hereto).[16]

174.    As "real" investors began withdrawing from the CDO market in late 2006 and 2007, banks attempted to keep the market going – or offload all-but-unsellable assets that they had created but had no wish to retain – by having new CDOs serve as buyers for the banks' warehouses of old CDOs.  *To operate such a scheme, however, banks needed to be able to control the new CDOs' purchasing decisions*:

---

[16]    Available at: http://www.propublica.org/article/banks-self-dealing-super-charged-financial-crisis.

Over the last two years of the housing bubble, Wall Street bankers perpetrated one of the greatest episodes of self-dealing in financial history.

Faced with increasing difficulty in selling the mortgage-backed securities that had been among their most lucrative products, the banks hit on a solution that preserved their quarterly earnings and huge bonuses:

They created fake demand.

*****

As the housing boom began to slow in mid-2006, investors became skittish about the riskier parts of those investments. So the banks created -- and ultimately provided most of the money for -- new CDOs. Those new CDOs bought the hard-to-sell pieces of the original CDOs. The result was a daisy chain that solved one problem but created another: Each new CDO had its own risky pieces. Banks created yet other CDOs to buy those.

*****

**There were supposed to be protections against this sort of abuse. While banks provided the blueprint for the CDOs and marketed them, they typically selected independent managers who chose the specific bonds to go inside them. The managers had a legal obligation to do what was best for the CDO**. They . . . were supposed to serve as a bulwark against self-dealing by the banks, which had the fullest understanding of the complex and lightly regulated mortgage bonds.

**It rarely worked out that way**. (*Id.*) (Emphasis added.)

175.   CDO industry participants explained how banks were able to seize effective control over the new CDOs' collateral selection so as to accomplish such self-dealing in practice: beginning in late 2006, banks such as Barclays began to exercise "veto power" over the collateral selections proposed by CDO collateral managers so as to veto other-CDO collateral selections from CDOs *not* created by the same bank:

**According to numerous bankers, managers and investors, banks rarely wielded that veto until late 2006, after which it became common** . . .

65

> **"I would go to Merrill and tell them that I wanted to buy, say, a Citi bond," recalls a CDO manager. "They would say 'no.' I would suggest a UBS bond, they would say 'no.' Eventually, you got the joke."** Managers could choose assets to put into their CDOs but they had to come from Merrill CDOs.  One rival investment banker says Merrill treated CDO managers the way Henry Ford treated his Model T customers: You can have any color you want, as long as it's black. (*Id.*)

176.    Banks used their control over lucrative CDO collateral management assignments to pressure collateral managers to acquiesce to banks' collateral selection demands: if collateral managers insisted upon maintaining independence and control over collateral selection, banks "froze out" such stubborn collateral managers from further CDO collateral management assignments.  As a result, collateral managers became reduced, as one CDO banker put it, to "indentured slaves":

> Merrill exercised its leverage over the managers. A strong relationship with Merrill could be the difference between a business that thrived and one that didn't. The more deals the banks gave a manager, the more money the manager got paid.
>
> As the head of Merrill's CDO business, [Chris] Ricciardi also wooed managers with golf outings and dinners. One Merrill executive summed up the overall arrangement: "I'm going to make you rich. You just have to be my bitch."
>
> But not all managers went for it.
>
> **An executive from Trainer Wortham, a CDO manager, recalls a 2005 conversation with Ricciardi. "I wasn't going to buy other CDOs. Chris said: 'You don't get it. You have got to buy other guys' CDOs to get your deal done. That's how it works.'"  When the manager refused, Ricciardi told him, "'That's it. You are not going to get another deal done.'" Trainer Wortham largely withdrew from the market, concerned about the practice and the overheated prices for CDOs.**

*****

Once, Merrill's Ken Margolis pushed a manager to buy a CDO slice

66

for a Merrill-produced CDO called Port Jackson that was completed in the beginning of 2007: "'You don't have to buy the deal but you are crazy if you don't because of your business,'" an executive at the management firm recalls Margolis telling him. "'We have a big pipeline and only so many more mandates to give you.' You got the message." **In other words: Take our stuff and we'll send you more business. If not, forget it.**

*****

**"All the managers complained about it," recalls O'Driscoll, the former Credit Suisse banker who competed with other investment banks to put deals together and market them. But "they were indentured slaves."** . . .

Other big CDO-producing banks quickly adopted the practice. (*Id.*) (Emphasis added.)

177.    Barclays in fact possessed veto power over Markov's collateral, and used such power to ensure that the structural loophole it had created for Markov (Section III.B.2 *supra*) was fully exploited to serve Barclays' (short) interest in Markov.  Barclays used this power to ensure that Markov was: (1) filled to near-maximum structural capacity (*i.e.*, 35%) with tranches from *other* CDOs; (2) that such other-CDO tranches came from *Mezzanine* CDOs (97% of Markov's $655 million of other-CDO collateral were tranches from Mezzanine CDOs); and (3) that $300 million of such other-CDO tranches came from bespoke CDOs that Barclays had itself created and had booby-trapped so as to be most likely to fail.

### 4.    To Posit that SSGA Selected Markov's Collateral Leads to *Reductio ad Absurdum* and Cannot Be Squared with Defendants' Actions Here

178.    Indisputable here is a clear intent with respect to Markov's portfolio: put plainly, to stuff it with as much Mezzanine CDO risk as possible.  First, Markov's guidelines allowed its portfolio to take an unusually high amount of other CDOs as collateral.  Second, actual collateral selection operated to take full advantage of this proviso and stuff Markov to the allowable brim with

other CDO tranches.  Third, more specifically still, Markov was stuffed with *Mezzanine* CDOs: 97% of all of Markov's CDO collateral was Mezzanine CDOs, and 100% of the $550 million of CDO collateral referenced in the underlying credit default swap was from Mezzanine CDOs.

179.    That all $550 million of the CDO tranches referenced in the credit default swap portfolio underlying Markov were tranches from *Mezzanine* CDOs bespeaks a clear and indisputable *intent* to reference *Mezzanine* CDOs specifically.  The only way such intent can be explained here is that that intent was Barclays' rather than SSGA's:  any attempt to attribute matters to SSGA lapses into *reductio ad absurdum*.

> ### a.    Barclays Stood to Gain by Filling Markov's Reference Portfolio Not Merely with Risk, but with *Disguised* Risk

180.    Most obviously, Barclays stood to gain to the extent that the portfolio referenced in Markov's underlying credit default swap (where Barclays was the "short" counterparty) contained entities that would fail.

181.    Markov's portfolio – especially its below-detailed Mezzanine CDO concentration – not only served that end, but simultaneously disguised it under high credit ratings.  This disguise yet further served Barclays' interests: Barclays could more easily market Markov to investors such as Plaintiff  – and thereby gain the funds that the disguised bet would deliver – on the basis of the high credit ratings of Markov's "High Grade" collateral.  Barclays made this bet precisely because it did *not* believe in those credit ratings: Barclays was not betting against Mezzanine CDOs so much as it was betting *through* them against their underlying portfolios of BBB-rated RMBS tranches. Barclays' understanding  that BBB-rated RMBS tranches were poised for correlated defaults and 100% losses undergirded the $550 million disguised bet (through Mezzanine CDOs) against such BBB-rated RMBS tranches that Barclays hid in and effected through Markov.

**b.** **Markov's Collateral Portfolio Contradicted SSGA's Self-Stated "Philosophy" of CDO Collateral Management**

182.   SSGA stated in Markov's Pitchbook that a key plank of SSGA's CDO collateral management "philosophy" was to:

> **Manage portfolios that do not rely on credit or interest rate structural elements such as . . . Excessive CDO buckets** (Pitchbook, at 29) (emphasis added).

183.   Markov's collateral portfolio ran counter to SSGA's above-stated CDO collateral management philosophy. Markov had been structured by Barclays to *allow* for up to 35% of its collateral to consist of tranches from other CDOs – *i.e.*, Markov had a 35% CDO bucket.  To emphasize: this structuring by Barclays *merely allowed* Markov to take a 35% collateral exposure to other CDOs, but *did not mandate that Markov in fact do so*.

184.   Thus, were SSGA truly in charge of Markov, SSGA – following its own stated CDO collateral management philosophy – would have selected a portfolio for Markov that did not "rely on" an "excessive CDO bucket."  Put simply, SSGA would not of its own accord collateralize Markov by large amounts of *other* CDOs.  Yet what actually occurred in Markov was the exact opposite.  Markov's "excessive CDO bucket" was not disregarded and left empty, but instead was filled to the structural brim.  The hand responsible was Barclays'.

**c.** **The Markov Chain CDOs Demonstrate that Markov's Mezzanine CDO Exposures Were Not Selected for Their Credit Quality, But for Their Lack of Quality**

185.   Furthermore, were one to assume, notwithstanding all the above, that SSGA here chose to act against its CDO collateral management philosophy and selected of its own accord a large proportion of other-CDO collateral for Markov, such "assumption" cannot account for what happened here.

186.    Unlike Barclays, SSGA did not have a structural short interest in Markov's collateral, and to the contrary had a long interest, aligned with Markov investors, insofar as SSGA's collateral management fees depended on continued collateral performance. Presumably, were SSGA the true selector of Markov's other-CDO collateral, it would have selected such other-CDO collateral from a belief that such collateral was creditworthy and would perform well.

187.    But the matter of the Markov Chain CDOs, mentioned throughout and detailed at Section III.D *infra*, demonstrates that that belief was *not* the one driving Markov's actual collateral selection.  Of the $550 million of Mezzanine CDO tranche exposures referenced in Markov's underlying credit default swap, $300 million arose from the Markov Chain CDOs.  As detailed herein, these Markov Chain CDOs were fabricated by Defendants' own hands in a manner that made those CDOs *even riskier than all other Mezzanine CDOs*.

188.    As Markov's portfolio was built largely by credit default swap, any extant assets could be gained for Markov by the mere stroke of a pen: writing their names in as reference entities in the credit default swap's reference portfolio.  The selector of Markov's collateral had hundreds of other already-created Mezzanine CDOs (and, for that matter, High Grade CDOs) to choose from. Yet this universe of already-available assets was largely rejected, in favor of $300 million of new bespoke CDOs – the Markov Chain CDOs – that Defendants *not only built from scratch but  built to be riskier than anything else available*.

189.    Were SSGA selecting collateral for Markov in good faith, the Markov Chain CDOs would have been wholly unnecessary.  With far less trouble, SSGA could simply have referenced already-created, safer Mezzanine CDOs.  That Defendants went to the extra effort of creating not just new CDOs, but riskier ones, demonstrates that such exposures were desired in Markov not for

70

their quality, but for their risk.

      **d.**    **The Only Possible Interest that SSGA Had in Selecting Markov's Mezzanine CDO Collateral Was One That SSGA Itself *Refused***

190.    As Markov's Mezzanine CDO collateral was not chosen for quality but for risk, one could posit – lastly – that SSGA selected it to further its own interests, as explained below, if not those of other CDO investors.  Yet the facts here again establish that this was not what occurred.

191.    It was long custom (as alleged above in Section I.A *supra*) for CDO managers to make a substantial investment of the equity tranche of the CDOs they managed.  CDO collateral managers did this not from altruism, but from self-interest: the CDO's "excess spread" belonged solely to equity tranche investors, who thus could earn leveraged returns from the CDO's entire portfolio (*id.*).  Indeed, as BarCap itself explained, the "raison d'etre" for collateral managers to involve themselves in CDO transactions was the opportunity to create a large portfolio, invest in the small equity tranche, and earn the excess spread generated by the whole portfolio but accruing in leveraged fashion just to the equity tranche (*see The Barclays Capital Guide to Cash FlowCollateralized Debt Obligations*, at 10).

192.    As riskier assets were generally higher-yielding ones, the riskier a CDO's collateral, the higher the  "excess spread" generated.  Therefore, one could posit that SSGA selected risky collateral for Markov because it wanted to create a higher-yielding equity tranche for itself.

193.    But this explanation too fails, because *SSGA refused to make any investment at all in Markov's equity tranche*.  Thus, to the extent that selecting riskier collateral could be said to be in SSGA's theoretical interest, it cannot have been SSGA's motive here – and cannot explain portfolio selection here – as SSGA made no equity tranche investment.

**e.     SSGA's Refusal to Invest in Markov's Equity Tranche Is Impossible to Square with the Assertion that SSGA Selected Markov's Collateral**

194.     Lastly, the idea that SSGA selected Markov's heavy exposure to Mezzanine CDOs leads to a final *reductio ad absurdum*.

195.     Per BarCap, the "raison d'etre" for collateral managers to involve themselves in CDO transactions was the equity tranche/excess spread opportunity from the portfolio the collateral manager created.  Thus, were the choice of $550 million of Mezzanine CDOs SSGA's, it would presumably have been motivated by SSGA's belief that such assets would perform well and bolster Markov's performance.   Had SSGA believed that Markov would perform well and that its Mezzanine CDO exposures would pose no problem, then SSGA would have – as collateral managers normally did – taken the opportunity to invest in Markov's equity tranche and earn leveraged excess spread returns.  *But this is exactly what SSGA refused to do – SSGA refused to make the customary equity tranche investment in the CDO it purportedly managed.  This refusal indicates not SSGA's belief in Markov's collateral and collateral performance, but the opposite*: *SSGA's belief that nothing good would come of it.*

196.     It is impossible, therefore, to square the idea that SSGA selected the collateral (and specifically, the $550 million Mezzanine CDO exposure) with SSGA's disbelief in that very collateral.  Why would SSGA go to the trouble of creating a $2 billion CDO portfolio, whose "raison d'etre" per BarCap was to allow the collateral manager to enjoy leveraged excess spread through an equity tranche investment, only to forego that very "raison d'etre"?  Put another way, why would SSGA select collateral that denied SSGA the foremost opportunity that CDOs offered it?

197.     Had SSGA truly been in charge of collateral selection, SSGA could have *and would*

72

*have* taken the opportunity to construct a portfolio that would allow SSGA to feel comfortable making an equity tranche investment. Yet Markov's portfolio did not allow SSGA such comfort.

198.    The only way out of these absurdities is to understand that SSGA did not in fact select Markov's collateral portfolio.

C.    **The Second Layer of Deception: By Filling Markov with Tranches from *Mezzanine* CDOs, Barclays Used Markov To Create and Effect a Disguised Proprietary Trading Short Bet Against the Lowest, Riskiest Tranche of Nonprime Mortgage Risk – the BBB-rated RMBS Tranche**

199.    As Markov was held out as a "High Grade" CDO, Markov could not contain collateral with BBB-credit ratings (or enter into credit default swaps referencing such collateral): the collateral for High Grade CDOs such as Markov had to be rated at least single-A.  For this reason, it was thought to be in the very nature of High Grade CDOs that they had avoided the risks to which Mezzanine CDOs were exposed: namely, BBB-rated RMBS tranches.

200.    Yet Barclays: (1) having structured Markov as a "hybrid" (mostly synthetic) CDO that would enter into a $1.8 billion of credit default swap in which Barclays would occupy the "short" position; (2) and having structured Markov with the largest "CDO bucket" of all its CDOs; (3) used its effective control over Markov's collateral selection to further Barclay's own short interest with respect to that collateral; by (4) filling the "High Grade" Markov CDO, to maximum structural capacity, with the very BBB-rated RMBS risks it was thought to have avoided; albeit (5) in *disguised* form as highly-rated tranches of Mezzanine CDOs (backed by portfolios of BBB-rated RMBS tranches).

201.    Table 1 on the following page provides details concerning each and every one of the CDO tranches that collateralized Markov.  As Table 1 first shows, Markov's 35% CDO bucket was in fact filled near to brim: Markov could hold a maximum of $700 million of other CDOs (*i.e*, 35%

of $2 billion), and in fact held $655 million of other CDOs (32.75%).  More striking still, as Table 1 shows, *of this $655 million of other-CDO tranches collateralizing Markov, $635 million, or 97%, were tranches from Mezzanine CDOs*.

202.    These objective facts, and particularly the last – 97% of the CDOs included in Markov being *Mezzanine* CDOs – put to rest any notion that Markov's collateral portfolio was the result of chance.  All the more so given the unlimited flexibility afforded by credit default swaps to select any collateral whatsoever.  As Defendants themselves noted in Markov's Pitchbook and even proclaimed as one of Markov's "advantages," the use of credit default swaps as collateral allowed infinite choice in selecting collateral – one merely had to write a credit default swap, which could freely reference any amount of any extant security the world over.

203.    Clearly, there was a design.  The design was to stuff into Markov as much Mezzanine CDO exposure as possible.

# TABLE 1
# The $655 Million of *Other* CDOs
# Inside Markov

| CDO | Type of CDO | Tranche | Amount | Form | Rating | Creator | Closing Date |
|---|---|---|---|---|---|---|---|
| **Mezzanine CDO Exposure via Credit Default Swap** | | | | | | | |
| BFC Silverton CDO | Mezzanine | C | $20,000,000 | CDS | Aa2 | Barclays | 10/31/2006 |
| Camber 6 plc | Mezzanine | C | $20,000,000 | CDS | Aa2 | Barclays | 6/28/2006 |
| Camber 7 plc | Mezzanine | B | $10,000,000 | CDS | Aa2 | Goldman | 2/28/2007 |
| Cetus ABS CDO 2006-2 | Mezzanine | A2 | $20,000,000 | CDS | Aa2 | Citigroup | 9/27/2006 |
| Cetus ABS CDO 2006-4 | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | Citigroup | 11/15/2006 |
| Cetus ABS CDO 2006-4 | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | Citigroup | 11/15/2006 |
| Dutch Hill Funding I | Mezzanine | B | $20,000,000 | CDS | Aa2 | Deutsche | 12/22/2005 |
| Montauk Point CDO II | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | UBS | 6/7/2006 |
| Montauk Point CDO II | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | UBS | 6/7/2006 |
| Mystic Point CDO | Mezzanine | B | $20,000,000 | CDS | Aa2 | B of A | 12/21/2006 |
| Pine Mountain CDO | Mezzanine | B | $20,000,000 | CDS | Aa2 | Deutsche | 11/8/2005 |
| Stack 2006-1 | Mezzanine | 3 | $20,000,000 | CDS | Aa2 | Morgan | 7/27/2006 |
| Topanga CDO | Mezzanine | A2 | $20,000,000 | CDS | Aa2 | Citigroup | 1/18/2006 |
| Tourmaline CDO II | Mezzanine | C | $20,000,000 | CDS | Aa2 | Barclays | 3/30/2006 |
| Vertical Virgo 2006-1 | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | UBS | 10/31/2006 |
| Vertical Virgo 2006-1 | Mezzanine | A2 | $10,000,000 | CDS | Aa2 | UBS | 10/31/2006 |
| MARKOV CHAIN IA | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IB | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IC | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIA | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIB | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIC | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIIA | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIIB | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IIIC | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IVA | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IVB | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| MARKOV CHAIN IVC | Mezzanine | n/a | $25,000,000 | CDS | Aaa | Barclays | 5/4/2007 |
| **SUBTOTAL -- CDS of MEZZANINE CDO** | | | **$550,000,000** | | | | |
| | | | | | | | |
| **Mezzanine CDO Exposure via Cash Purchase of Actual Securities** | | | | | | | |
| ACA ABS 2007-1 | Mezzanine | A1J | $10,000,000 | Cash | Aaa | RBS | 3/8/2007 |
| Camber 7 plc | Mezzanine | B | $10,000,000 | Cash | Aa2 | Goldman | 2/28/2007 |
| Cairn Mezz ABS CDO II | Mezzanine | A2B | $25,000,000 | Cash | Aaa | RBS | 11/9/2006 |
| Cairn Mezz ABS CDO III | Mezzanine | A2B | $20,000,000 | Cash | Aaa | RBS | 3/29/2007 |
| Vertical ABS CDO 2007-1 | Mezzanine | A1J | $20,000,000 | Cash | Aaa | UBS | 4/10/2007 |
| **SUBTOTAL -- Cash MEZZANINE CDO** | | | **$85,000,000** | | | | |
| | | | | | | | |
| **High Grade CDO Exposure via Cash Purchase of Actual Securities** | | | | | | | |
| Pampelonne CDO II | High Grade | A2 | $20,000,000 | Cash | Aaa | Barclays | 3/6/2007 |
| **SUBTOTAL -- Cash High Grade CDO** | | | **$20,000,000** | | | | |
| | | | | | | | |
| **TOTAL EXPOSURE TO OTHER CDOs** | | | **$655,000,000** | | | | |

204.     That that design was Barclays' is made all the more clear[17] when one considers what purpose, and whose purpose, such design served.  As Markov was built largely on the basis of a $1.8 billion of credit default swap in which Barclays occupied the "short" position, whatever collateral Markov would have exposure to through such swaps was collateral that Barclays would simultaneously have a short interest in.

205.     Barclays piled Mezzanine CDO exposure into Markov because Barclays was most interested in betting against it.  As Table 1 on the previous page also shows, of the $655 million of Mezzanine CDO tranches to which Markov was exposed, $550 million of such exposure was achieved through credit default swap with Barclays – and all such credit default swap exposures to other-CDO collateral were, without a single exception, to tranches from Mezzanine CDOs.  By filling Markov with exposure to such collateral, Barclays was simultaneously building a $550 million short position with respect to it.[18]

---

[17]     There are only three possible candidates: Markov, SSGA, and Barclays.  Markov could not have been the responsible party: it was a "brain dead" special purpose vehicle, with no employees of its own, formed by Barclays for the limited purpose of effecting a CDO transaction (Markov Offering Circular, at 182).  Collateral decisions were not made *by* Markov, but *for* Markov – purportedly, by its collateral manager SSGA.  All evidence suggests that SSGA was not the responsible party either (*see* Section III.B.4 *supra*).

[18]     Table 1 shows one more remarkable pattern, further detailed in Section III.E.2 *infra*.  All the Mezzanine CDO tranches referenced by CDS were AA-rated tranches (apart from the Markov Chain CDOs, discussed in their own right in Section III.D *infra*), while CDO tranches purchased in *cash* form were almost all *higher-rated*, AAA tranches.  The same pattern holds 100% of the time with respect to Markov's RMBS collateral: synthetic RMBS collateral (*i.e.*, collateral Barclays was shorting) was 100% A-rated tranches; cash RMBS collateral, however, was 100% higher-rated AA tranches.  Why the disparity?  By shorting lower-rated collateral, Barclays increased the likelihood it would win its bets.  By purchasing higher-rated cash collateral, Barclays increased the likelihood that it would get *paid* for winning.  To pay Barclays' winnings, Markov would need to liquidate its cash collateral: the higher-rated it was, the better chance it had of preserving its value.

76

206.    Underlying Barclays' bet against highly-rated Mezzanine CDO tranches was the same insight that motivated Paulson's and Magnetar's earlier bets against similar and even more senior Mezzanine CDO tranches: Mezzanine CDO tranche ratings were completely wrong. Mezzanine CDOs were backed almost entirely by portfolios of BBB-rated RMBS.  Should mortgage losses rise, these BBB-rated RMBS tranches would be the first to sink, and – because such tranches were so thin – would likely suffer 100% principal losses.  This would cause near-total losses for Mezzanine CDOs, and the substantial and/or total impairment of even highly-rated Mezzanine CDO tranches.  Betting against Mezzanine CDO tranches, even AA- and AAA-rated such tranches, was the same as betting against BBB-rated RMBS tranches.  In fact, it was *better*, because such bets could be had cheaper.  As the amount of money required to secure credit default swap protection was to large extent a function of the reference entity's credit rating, it was cheaper to secure protection with respect to an AA-rated Mezzanine CDO tranche than with respect to a BBB-rated RMBS tranche.

207.    However, there was an intricate and important structural difference in the manner the bets were effected.  All three – Paulson, Magnetar and Barclays – created new built-to-fail CDOs, backed by collateral that they had selected precisely because they believed it likely to fail.  But where Paulson and Magnetar's short bets were "external" to the CDO they created, Barclays' short bets were hidden inside the Markov CDO created, and indeed formed its very basis.  Specifically, Paulson and Magnetar (1) created new Mezzanine CDOs that they filled with collateral expected to fail, so as to (2) then place bets against these new Mezzanine CDOs.

208.    Barclays, on the other hand, created a new "High Grade" CDO, and filled with it collateral expected to fail (Mezzanine CDO tranches).  *But Barclays did not bet against the CDO*

*it had created.  Rather, Barclay's short bets were hidden inside Markov*.  They were Markov's very collateral.

209.    Thus, in Markov, Barclays had also built a built-to-fail CDO.  Not so as to bet against it, but rather so as to bet in disguised fashion *through* it, against its purported highly-rated "High Grade" collateral.

### D.    The Third Layer of Deception: The Markov Chain

210.    The single most important element in Defendants' strategy was Defendants' creation of the "Markov Chain" CDOs: twelve *bespoke* synthetic single-tranche Mezzanine CDOs.  Barclays included a $25 million notional amount of each of the twelve Markov Chain CDOs, for a total of $300 million, in Markov's credit default swap portfolio.

211.    As detailed below, Defendants: (1) built the Markov Chain CDOs specifically for use in Markov; (2) built the Markov Chain CDOs so that they were designed to fail, rather than succeed; and (3) caused Markov to enter into credit default swaps with Barclays referencing a $300 million notional amount of such built-to-fail Markov Chain CDOs, in which Markov operated as the protection seller and Barclays as the protection buyer.  Should the Markov Chain CDOs fail – and, as detailed below, Defendants built them so that they would be the *first* of Markov's assets to fail – Markov would be obligated to pay Barclays $300 million.  Markov's payment of $300 million to Barclays would cause Markov $300 million of losses, which losses would render Markov's junior-most $300 million of tranches worthless.

212.    To put it most simply: Defendants created $300 million of rigged bets that existed on paper only (the Markov Chain CDOs), and caused Markov to "fund" those bets by taking their losing side with the $400 million of funds that Defendants raised through the sale of Markov's

tranched notes to Plaintiff and other investors.  Defendants' winning those bets necessarily entailed

complete or near-complete losses for Plaintiff and other Markov investors.

### 1.    Identifying the Markov Chain CDOs

213.    Included as synthetic collateral in Markov (*i.e.*, collateral referenced through a credit

default swap) were the twelve Markov Chain CDOs below (*see also* Table 1 *supra*), each in a $25

million (notional) amount and totaling $300 million:

**TABLE 2**
**THE MARKOV CHAIN CDOs**

| Name | (Notional) Amount | Cash/CDS |
|------|-------------------|----------|
| Markov Chain I A | $25,000,000 | CDS |
| Markov Chain I B | $25,000,000 | CDS |
| Markov Chain I C | $25,000,000 | CDS |
| Markov Chain II A | $25,000,000 | CDS |
| Markov Chain II B | $25,000,000 | CDS |
| Markov Chain II C | $25,000,000 | CDS |
| Markov Chain III A | $25,000,000 | CDS |
| Markov Chain III B | $25,000,000 | CDS |
| Markov Chain IIII C | $25,000,000 | CDS |
| Markov Chain IV A | $25,000,000 | CDS |
| Markov Chain IV B | $25,000,000 | CDS |
| Markov Chain IV C | $25,000,000 | CDS |
| TOTAL Markov Chain | $300,000,000 | CDS |

214.    As detailed below, the Markov Chain CDOs were *bespoke* CDOs: private transactions between counterparties.  These CDOs had no CUSIP numbers, and there was, and is, almost no publicly-available information concerning these CDOs, their structure, and their collateral.

### 2.    Explaining the Markov Chain CDOs

215.    Although summary requires one short sentence – each of the Markov Chain CDOs was an unfunded, bespoke, static, synthetic single-tranche Mezzanine CDO created by Barclays and SSGA – fuller explanation is provided below.

216.    First, each of the Markov Chain CDOs was a *Mezzanine* CDO – *i.e*., a CDO collateralized by an underlying (synthetic) portfolio of *BBB-rated* nonprime *RMBS* tranches. Barclays and SSGA jointly determined the specific contents of a single collateral portfolio that underlay each and all of the Markov Chain CDOs.

217.    Second, each of the Markov Chain CDOs was a *Synthetic* CDO.  Specifically, the underlying collateral was not actual RMBS securities (which would have required purchasing), but instead a credit default swap referencing a portfolio of RMBS securities (which merely required signing a credit default swap contract).  This credit default swap, and the synthetic portfolio of BBB-rated RMBS tranches it referenced, was entered into between Barclays and SSGA.

218.    Third, each of the Markov Chain CDOs was a *Static* CDO.  This meant that its underlying synthetic portfolio of reference entities, determined by Barclays and SSGA, was fixed forever, or "static," and could not be changed in any way.

219.    Fourth, each of the Markov Chain CDOs was an *unfunded* CDO.  An "unfunded" CDO raises no "up front" funds at all through the sale of tranched notes.[19]  Rather, it exists merely as a signed credit default swap contract.  The credit default swap obliges the credit protection purchaser to make regular fixed payments to secure protection against the contingent referenced risk, and can require the credit protection seller to later "fund" substantial contingent payments should referenced risk materialize.  This sort of "no money down" CDO was only practicable between large financial institutions, such as Barclays and SSGA.

220.    Fifth, each of the Markov Chain CDOs was a *single-tranche* CDO.[20]  A single-tranche CDO uses credit default swap technology to carve out one specific tranche of capital structure risk (and therefore is only possible in synthetic CDOs).  This is accomplished by writing into the credit default swap: (1) not only the portfolio of reference entities (*e.g.*, 100 BBB-rated RMBS tranches in a notional amount of $10 million each, totaling $1 billion); but (2) *one specific tranche of risk with respect to that portfolio* (*e.g.*, a "7%-10%" tranche, meaning a tranche (a) protected by imaginary more junior tranches from the first 7% of aggregate portfolio losses, and (b) that would be fully written down should portfolio losses rise above 10%).

---

[19]    Normally, cash CDOs must "fund" themselves entirely: if a cash CDO is based on $1 billion of collateral, the CDO must sell $1 billion of notes so as to raise the funds to purchase that $1 billion of collateral.  Normally, synthetic CDOs are "partially funded": a $1 billion synthetic CDO need not raise $1 billion to enter into credit default swaps referencing $1 billion of collateral, but normally it must raise some fraction thereof (20%-30%, or $200-$300 million) to serve as a source of at least initial funds with which to make good on its contingent obligations with respect to its $1 billion of risk exposure.

[20]    Normally, publicly-offered CDOs issue funded or unfunded tranches that cover the entirety of their capital structure.  For example, a $1 billion cash CDO will issue $1 billion of funded tranches, and a $1 billion synthetic CDO will issue $300 million of funded tranches and a $700 million unfunded super senior tranche.

221.    In plain language, the "bet" embodied in such a synthetic single-tranche CDO requires a double leap of imagination.  First, the counterparties must imagine a $1 billion portfolio (*e.g.*, made up of 100 RMBS tranches worth $10 million each).  Second, the counterparties must imagine a specific slice of contingent risk within that portfolio:  for example, that aggregate losses in the jointly-imagined portfolio reach 7%-10%.  Then two counterparties, having so imagined, then can make a credit default swap bet on that single tranche.

222.    As further detailed below, Barclays and SSGA specified the single tranche of risk over which the Markov Chain CDOs' fate hung.  Because this is all "imaginary" or synthetic, a tranche can be specified however the counterparties wish.  It can be low (*e.g.*, its lower bound at 3%) or high (*e.g.*, its lower bound at 30%) , thick (*e.g.*, its lower bound at 3% and its upper bound at 30%) or thin (*e.g.*, its lower bound at 3% and its upper bound at 4%).  The precise definition of a tranche – how low or high, how thick or thin – directly and materially defines its degree of risk. Obviously, a low tranche is less protected from collateral losses than a high tranche.  Additionally, a thin tranche suffers severe or total loss more quickly than a thicker one (*e.g.*, a 3%-4% tranche will suffer 100% losses even as aggregate portfolio losses rise merely 1% (from 3%-4%), whereas a 3%-7% tranche will suffer 25% losses upon the same 1% rise in aggregate portfolio losses).

223.    Sixth and lastly, the Markov Chain CDOs were *bespoke* CDOs.  A bespoke CDO (almost always a synthetic single-tranche CDO) is a CDO that was created specifically for one or a few investors (who purchase notes linked to that specific single tranche).  It has little or no public existence: it is a private deal between the CDO-creating bank and its CDO-investing customer(s). In theory, through bargaining, these counterparties create a bespoke portfolio of reference entities and then a bespoke risk tranche to be carved from that portfolio.

### 3. Understanding *How* Defendants Designed the Markov Chain CDOs to Fail Rather than Succeed

224. The Markov Chain CDOs were entirely the creation of Barclays and SSGA. Barclays and SSGA determined their common portfolio of reference entities (BBB-rated nonprime RMBS tranches) and determined the precise location and size of the single tranches of risk implicated in each of the Markov Chain CDOs.

225. However, as CDOs are one of the most opaque segments of the securities markets and as bespoke CDOs (as even more private transactions) are more opaque still, full details as to the Markov Chain CDOs are not available.

226. What is known, however, is sufficient to demonstrate that Defendants designed the Markov Chain CDOs for failure, rather than for success.

227. First, each and all of the Markov Chain CDOs were Mezzanine CDOs, collateralized (synthetically) by portfolios of BBB-rated nonprime RMBS. The contents of these portfolios were determined by SSGA and Barclays. Thus, as per Section III.C *supra*, they fulfilled Barclay's basic intention in Markov: to conduct a disguised bet against the lowest RMBS risks (BBB-rated RMBS tranches) through betting against Mezzanine CDO tranches.

228. Second, as detailed in the remainder of this section below, the Markov Chain CDOs best fulfilled Barclays' intent: even though they bore the highest credit ratings of all of Markov's collateral, they in fact were – and were constructed by Defendants to be – the riskiest of all of Markov's collateral.

229. Partial details about the dimensions of the Markov Chain CDO's single tranches are also known. The four Markov Chain instruments with an "A" suffix (*i.e.*, Markov Chain IA, IIA, IIIA, and IVA) had an "attachment point" of 16%, meaning that they would begin to suffer losses

when aggregate portfolio losses reached 16%. The four "B" Markov Chain instruments started taking losses sooner: when underlying portfolio losses reached 14%. The four "C" Markov Chain instruments started taking losses sooner still: when underlying portfolio losses reached 12%. Thus, on average, the Markov Chain CDOs started experiencing losses when aggregate losses in their underlying (synthetic) collateral portfolios reached 14%.

230. *This made the Markov Chain Mezzanine CDOs the riskiest CDOs, by far, of those included in Markov's collateral*, as Table 3 on the following page demonstrates.

231. Plaintiff examined the structure of all the Mezzanine CDOs included as collateral in Markov, to determine: (1) the attachment points of each CDO's AAA-rated tranche; and (2) the attachment points of the specific tranche from each CDO selected for inclusion in Markov's collateral portfolio (some were AAA-rated tranches, others AA-rated tranches). The results are summarized in Table 3.

232. As Table 3 shows, when comparing apples to apples (AAA tranches to AAA tranches), *the Markov Chain CDOs were structured to be far riskier than all the other Mezzanine CDOs collateralizing Markov*. Whereas the AAA-rated Markov tranches had average attachment points of 14% (*i.e.*, they would begin experiencing loss should aggregate losses in their underlying portfolio reach 14%), the equivalent AAA-rated tranches in the other Mezzanine CDOs had an average attachment point of 23.86% (*i.e.*, they would begin experiencing loss should aggregate losses in their underlying portfolios reach 23.86%).

233. Put simply, *the Markov Chain CDOs were far less protected against underlying collateral losses than all the other Mezzanine CDOs included as Markov collateral.*

84

# TABLE 3
# The Markov Chain CDOs Were the Riskiest
## of All Markov's CDOs

| CDO | Tranche | Rating | AAA Attachment Point in CDO | Attachment Point of Specific Tranche Used as Markov Collateral | Amount Included in Markov |
|---|---|---|---|---|---|
| **MARKOV CHAIN CDOs** | | | | | |
| MARKOV CHAIN IA | n/a | Aaa | 16.00% | 16.00% | $25,000,000 |
| MARKOV CHAIN IB | n/a | Aaa | 14.00% | 14.00% | $25,000,000 |
| MARKOV CHAIN IC | n/a | Aaa | 12.00% | 12.00% | $25,000,000 |
| MARKOV CHAIN IIA | n/a | Aaa | 16.00% | 16.00% | $25,000,000 |
| MARKOV CHAIN IIB | n/a | Aaa | 14.00% | 14.00% | $25,000,000 |
| MARKOV CHAIN IIC | n/a | Aaa | 12.00% | 12.00% | $25,000,000 |
| MARKOV CHAIN IIIA | n/a | Aaa | 16.00% | 16.00% | $25,000,000 |
| MARKOV CHAIN IIIB | n/a | Aaa | 14.00% | 14.00% | $25,000,000 |
| MARKOV CHAIN IIIC | n/a | Aaa | 12.00% | 12.00% | $25,000,000 |
| MARKOV CHAIN IVA | n/a | Aaa | 16.00% | 16.00% | $25,000,000 |
| MARKOV CHAIN IVB | n/a | Aaa | 14.00% | 14.00% | $25,000,000 |
| MARKOV CHAIN IVC | n/a | Aaa | 12.00% | 12.00% | $25,000,000 |
| **AVERAGE -- MARKOV CHAIN MEZZANINE CDOS** | | | **14.00%** | **14.00%** | $300,000,000 |
| | | | | | |
| **ALL OTHER CDOs** | | | | | |
| ACA ABS 2007-1 | A1J | Aaa | 29.67% | 29.67% | $10,000,000 |
| BFC Silverton CDO | C | Aa2 | 20.00% | 13.06% | $20,000,000 |
| Camber 6 plc | C | Aa2 | 25.07% | 11.07% | $20,000,000 |
| Camber 7 plc | B | Aa2 | 25.56% | 16.67% | $10,000,000 |
| Camber 7 plc | B | Aa2 | 25.56% | 16.67% | $10,000,000 |
| Cetus ABS CDO 2006-2 | A2 | Aa2 | 20.00% | 15.00% | $20,000,000 |
| Cetus ABS CDO 2006-4 | A2 | Aa2 | 20.00% | 15.00% | $10,000,000 |
| Cetus ABS CDO 2006-4 | A2 | Aa2 | 20.00% | 15.00% | $10,000,000 |
| Cairn Mezz ABS CDO II | A2B | Aaa | 20.00% | 20.00% | $25,000,000 |
| Cairn Mezz ABS CDO III | A2B | Aaa | 22.50% | 22.50% | $20,000,000 |
| Dutch Hill Funding I | B | Aa2 | 27.50% | 17.00% | $20,000,000 |
| Montauk Point CDO II | A2 | Aa2 | 25.00% | 15.20% | $10,000,000 |
| Montauk Point CDO II | A2 | Aa2 | 25.00% | 15.20% | $10,000,000 |
| Mystic Point CDO | B | Aa2 | 21.40% | 15.00% | $20,000,000 |
| Pine Mountain CDO | B | Aa2 | 31.25% | 24.25% | $20,000,000 |
| Stack 2006-1 | 3 | Aa2 | 24.00% | 14.00% | $20,000,000 |
| Topanga CDO | A2 | Aa2 | 24.00% | 14.00% | $20,000,000 |
| Tourmaline CDO II | C | Aa2 | 20.00% | 11.00% | $20,000,000 |
| Vertical ABS CDO 2007-1 | A1J | Aaa | 26.67% | 26.67% | $20,000,000 |
| Vertical Virgo 2006-1 | A2 | Aa2 | 24.00% | 15.00% | $10,000,000 |
| Vertical Virgo 2006-1 | A2 | Aa2 | 24.00% | 15.00% | $10,000,000 |
| Pampelonne CDO II | A2 | Aaa | HG CDO | HG CDO | $20,000,000 |
| **AVERAGE - NON-MARKOV CHAIN MEZZANINE CDOS** | | | **23.86%** | **17.00%** | $355,000,000 |

85

234.   Even when comparing apples to oranges – namely, the AAA-rated Markov Chain CDO single tranches to the *specific* tranches from the other Mezzanine CDOs included in Markov (most of which were more junior AA-rated tranches) – *the AAA-rated Markov Chain CDOs were still riskier. Where the Markov Chain CDOs' average attachment points were 14%, the average attachment of all the other specific Mezzanine CDO tranches (most of which had lower credit ratings than the AAA-rated Markov CDOs) was still higher: 17%.*

235.   Indeed, even when comparing the attachment points of the AAA-rated Markov Chain CDOs to the attachment points of just the specific *AA-rated* tranches from other Mezzanine CDOs collateralizing Markov, *the AAA-rated Markov Chain CDO tranches were still riskier than their lower-rated brethren.*  Where the AAA-rated Markov Chain CDO tranches started taking losses at 14% on average, the actual lower-rated AA tranches from other Mezzanine CDOs collateralizing Markov started taking losses on average at 15.18%.

236.   In short, the Markov Chain CDOs that Barclays and SSGA constructed were demonstrably the riskiest of all of the Mezzanine CDOs collateralizing Markov.  The Markov Chain CDOs had substantially less protection from underlying collateral losses (14%) than did the equivalently-rated AAA tranches from the other Mezzanine CDOs (23.86%).  Incredibly, the AAA-rated Markov Chain CDOs even had less protection from loss (14%) than the specific, lower-rated AA tranches used as Markov collateral from other Mezzanine CDOs (15.18%).[21]

_____

[21]   Also remarkable: even as the Markov Chain instruments were created by Defendants to be *less* protected against underlying collateral losses than other Mezzanine CDOs, the late date of their creation (April-May 2007) meant that Defendants knew *more* about the severe risks posed by the underlying collateral (BBB-rated RMBS tranches).  Given the late date of their creation, theoretically, the Markov Chain instruments should have featured *more* protection against better-understood collateral losses (as compared with older Mezzanine CDOs created during 2006).  Instead, they featured less.

### 4.    The Markov Chain CDOs' Dual Deception

237.    As demonstrated above, the Markov Chain CDOs were the riskiest of all the CDOs included as Markov collateral, because they were least removed from underlying collateral portfolio losses.  Yet the Markov Chain CDOs bore the highest credit ratings of all: AAA.

238.    The result was that at the very same time the Markov Chain CDOs made Markov's collateral portfolio appear even safer, they actually made it riskier.

239.    By virtue of these Markov Chain CDOs and their highest credit rating, Markov appeared safer than many High Grade CDOs:  25% of Markov's overall collateral was rated AAA. Yet 60% of Markov's AAA-rated collateral were the misleading and misrepresented Markov Chain CDOs (*i.e.*, 15% of Markov's total collateral).  Thus, most of Markov's AAA-rated collateral was a misleading illusion, and the further margin of safety that the Markov Chain CDOs' high ratings seemingly added to Markov's portfolio as a whole was also misleading.

240.    Although the Markov Chain CDOs bore the highest credit ratings possible and the constituted the majority of the collateral in Markov with such highest credit ratings, in truth the Markov Chain CDOs were among the riskiest instruments in Markov.  Defendants knew them to be so, as Defendants themselves had constructed them, for use in Markov, as instruments that simultaneously most furthered Barclays' bets while best disguising those bets.

### E.    Barclays' Design of Markov Calibrated Barclays' Disguised Bets with Markov's Structure in a Manner that Allowed Barclays Maximum Profits While Offsetting All Risk

241.    As detailed below, Markov in reality was intended and operated by Barclays as a sophisticated proprietary trading vehicle.  Barclays' precise calibration of Markov's structure to the disguised bets Barclays operated through Markov: (1) allowed Barclays maximum profit  under a

variety of scenarios (Section III.E.1-2 *infra*), while (2) eliminating all risk to Barclays (Section III.E.2 *infra*).

242.     Markov's $2 billion of collateral exposure was achieved through the purchase of $200 million of cash collateral and through signing a credit default swap exposing Markov to a $1.8 billion synthetic collateral portfolio (via Markov's provision of credit protection to Barclays with respect to it).  The credit default swap referenced: (1) $550 million of disguised bets against BBB-rated RMBS risk, namely (a) $300 million of Markov Chain CDO tranches, and (b) $250 million of other Mezzanine CDO tranches; and (2) $1.25 billion of A- and AA-rated RMBS tranches.

243.     Against Markov's $2 billion of collateral exposures, Markov had issued: (1) $400 million of "funded" tranches to Plaintiff and other investors, representing the equity through AAA-rated tranches; and (2) an "unfunded" $1.6 billion super senior tranche to Barclays.  The $400 million of funded tranches, which raised $400 million of principal from Plaintiff and Markov investors, were junior to Barclays' super senior tranche.  Thus, these $400 million of Markov's funded tranches were slated to absorb the first $400 million of losses from Markov's $2 billion collateral portfolio.  Should collateral losses, exceed $400 million, Barclays' ownership of the super senior tranche meant that it was on the hook for any further collateral losses above $400 million – i.*e*., up to $1.6 billion of further losses after $400 million of initial losses.

244.     Barclays sized its bets and its disguised bets in Markov to take full advantage of this structure, in three fundamental ways.

### 1.     Barclays Sized its Disguised Negative Bets to Take Full Advantage of Markov's Ability to Pay Them

245.     First, Barclays' disguised bets against the lowest and riskiest RMBS tranches – through referencing $300 million of Markov Chain CDO tranches and a further $250 million of

other Mezzanine CDO tranches – were calibrated by Barclays to take full advantage of Markov's external up-front funding: the $400 million raised through the sale of $400 million of tranched, funded Markov notes to Plaintiff and other Markov investors.

246.   Of that $400 million raised from the sale of Markov notes, $200 million was used to purchase Markov's $200 million of cash collateral, and the other $200 million was retained within a dedicated account to serve as the initial source of funds should Markov be required to make any credit protection payments with respect to the $1.8 billion of collateral referenced in Markov's underlying credit default swap.  Thus, initially, Markov had $200 million in cash and the option to liquidate a further $200 million of cash collateral to raise further funds for making good on its further credit default swap obligations.

247.   Given this structure, Barclays' bet could develop in several ways, all to Barclays' advantage.  First, the riskiest Markov Chain CDOs could suffer first and partial losses, requiring Markov to make payments on partial losses with respect to its $300 million of exposure to Markov Chain CDOs.  This was within Markov's up-front funding capability.  Second, both the Markov Chain CDOs and the other Mezzanine CDOs could suffer partial losses, requiring Markov to make payments on partial losses with respect to its $550 million of exposure to Mezzanine CDOs.  This was also within Markov's up-front funding capabiliy.  Third, the Markov Chain CDOs could suffer total losses and the other Mezzanine CDOs partial losses.  In this event, Markov's up-front funding capability would be stretched to their maximum.

248.   In short, Barclays had sized its disguised negative bets so as to be within Markov's ability to fund them with the cash raised from external investors such as Plaintiff.  Barclays thus ensured itself varying payoffs in a number of scenarios.

      2.    **Barclays Selected Higher-Rated *Cash* Collateral But Lower-Rated *Synthetic* Collateral, so as to Enhance Both Barclays' Short Bets and Markov's Ability to Pay Barclays its Winnings**

249.    Second, there is another remarkable and 100% consistent pattern in Markov's collateral portfolio, based on the distinction between Markov's $200 million of cash collateral and $1.8 billion of synthetic collateral. With respect to both RMBS tranches and CDO tranches, Markov took *synthetic* exposure to *lower*-rated tranches (giving Barclays a better short) and took *cash* exposures to *higher*-rated tranches (giving Markov better ability to liquidate such collateral to raise funds to pay off Barclays' short bets).

250.    As Table 1 *supra* details, Markov had total exposure to other CDOs of $655 million, of which $105 million consisted of actual CDO tranches and $550 million of credit default swap references to CDO tranches (with Barclays as the short party). The Markov Chain CDOs aside (whose AAA ratings, as detailed in Section III.D *supra* concealed the fact that they were actually the riskiest of all of Markov's exposures), all the CDO tranches referenced synthetically had AA ratings. However, almost all the CDO tranches purchased in cash form had a higher rating: AAA. Of the six such cash CDO tranches totaling $105 million, five, totaling $80 million, were rated AAA.

251.    The same pattern holds 100% of the time with respect to Markov's $1.345 billion of RMBS collateral, of which $95 million existed in cash form and $1.25 billion in synthetic form (with Barclays as the short party). *All $1.25 billion of the synthetic RMBS collateral were RMBS tranches with single-A ratings. But all $95 million of the cash RMBS collateral were RMBS tranches with higher, double-A (AA) ratings*.

252.    Why did Barclays structure the portfolio with such a divide between the credit rating

levels of Markov's cash assets (higher) and its synthetic assets (lower)?  The answer is plain. Selecting lower-rated assets as synthetic collateral enhanced the likelihood that Barclays would win its short bets.  Selecting higher-rated assets as cash collateral enhanced the likelihood that such assets could be liquidated for sums of cash that Markov would need to use to pay its credit default swap obligations to Barclays (on similar but lower-rated collateral).

> **3.** **Barclays' Structuring of Markov Led to the Elimination of All Risk to Barclays**

253.    Third, Barclays' calibration of Markov's structure with its own disguised bets operated to *relieve Barclays of any risk*.

254.    This is best illuminated with an example, escalating the severity of the scenarios discussed above.  Barclays had contracted with Markov so that Barclays secured Markov's protection with respect to $550 million of Mezzanine CDO tranches (and $1.25 billion of further RMBS A- and AA-rated tranches).  Yet Markov had only $400 million maximum of up-front funding.  What if all $550 million of Mezzanine CDO tranches lost all their value, obligating Markov to make payments of $550 million?  Or, worst, what if nonprime mortgage losses were sufficiently severe not only to erase the value of BBB-rated RMBS tranches (and thus all Mezzanine CDO tranches) but thereafter continued to climb into the ranks of the A- and AA-rated RMBS tranches (to which Markov had a further $1.25 billion of credit exposure)?

255.    If Markov's collateral losses rose above $400 million, then Barclays would have to begin to "fund" its "unfunded" super senior tranche, handing to Markov every further dollar Markov needed to make under its credit default swap obligations.  Under these more severe scenarios, Barclays' super senior tranche liabilities and losses could climb into the hundred of millions of dollars, and even above $1 billion.

256.    However, and this is the crux of the matter, Markov would take those dollars it received from Barclays *and send them right back to Barclays – as Barclays was the short party in Markov's underlying credit default swap.*

257.    In short, Barclays had put itself on both sides of the transaction: (1) as super senior tranche holder, Barclays would have to fund Markov's credit default swap payments should losses exceed $400 million; but (2) as the short party to that very credit default swap, Barclays immediately received such funds back from Markov.

258.    Thus, any losses suffered by Markov's collateral in an amount above $400 million were a "wash": Barclays was only on the hook to itself.

### 4.    Markov's Flexibility as a Proprietary Trading Vehicle Allowed Barclays to Further Modify the Nature, Direction and Extent of its Bets

259.    The above description of Markov's structure shows Markov as of the day of its creation, with Barclays (1) short $1.8 billion via Markov's credit default swap and (2) long  up to $1.6 billion of Markov's *supra*-$400-million-losses via liability for Markov's super senior tranche. As created, this guaranteed $400 million of profit with no risk.  However, as briefly noted below, Barclays could subsequently operate or trade the long and short positions it gained through Markov to alter Barclays' initial balance of risk and seek greater profit.

260.    For example, Barclays could try to offload super senior tranche liability to another party.  This would have the effect of increasing Barclays' credit default swap winnings in a severe collateral loss scenario: the new holder of the super senior tranche would have to fund Markov's obligations to make credit default swap payments as such payments rose above $400 million, and those payments would be routed through Markov to Barclays.  Thus, instead of being a "wash" trade between Barclays and itself, the super senior tranche losses would now belong to a third party, and

those losses would in fact be Barclays' gains.

261. Alternatively, Barclays could also have subsequently acted to sell off – at a profit – some of the $1.8 billion of credit protection that it gained from Markov. The effect would be that another party instead of Barclays would become the "short" party with respect to some of the collateral: Barclays would sell to the third party the credit protection that Markov sold to Barclays, leaving Barclays as a mere middleman (with a fee or profit).

262. For example, Barclays could have operated Markov as "long/short" arbitrage trade with respect to the RMBS capital structure. In this scenario, Barclays, believing the BBB-rated RMBS tranches would fail, would keep its credit default swap protection with respect to its disguised bets against that tranche: namely, the $300 million of Markov Chain CDOs and further $250 million of other Mezzanine CDO tranches. Simultaneously, if Barclays believed that higher-rated RMBS tranches would survive, Barclays could resell credit protection with respect to some or all of Markov's remaining collateral: namely, $1.25 billion of A and AA-rated RMBS tranches. In this trade structure, the payments Barclays would receive from its sale of credit protection with respect to $1.25 billion of A- and AA-rated RMBS tranches could in fact help "fund" the payments Barclays had to make on the credit protection payments it was making on $550 million of Mezzanine CDO collateral.

263. Thus, by going "long" on a larger notional amount of higher-rated RMBS tranches, Barclays could obtain discounted or free credit protection on the smaller amount (Mezzanine CDOs backed by the) lower-rated RMBS tranches. However, this strategy would then expose Barclays to up to $1.25 billion of risk posed by A- and AA-rated RMBS tranches. If those tranches also suffered losses, then Barclays would have to make up to $1.25 billion of payments to its counterparties.

264.    Such a trade would thus imbalance Barclays' originally-balanced position through Markov.  Barclays, through its ownership of the super senior tranche, would still have to fund any losses Markov suffered above $400 million, but would no longer be the "short" counterparty with respect to much of the risk ($1.25 billion of A- and AA-rated RMBS tranches).  If those securities suffered losses, Barclays would still have to fund Markov, which would then repay Barclays, which Barclays would then have to pass along to the new buyer of credit protection – meaning that Barclays would now be the party exposed to these losses.

## IV.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

265.     In connection with their creation of Markov and sale of Markov notes, Defendants BarCap and SSGA drafted, created, prepared and disseminated to potential Markov investors:

      (a)    a "pitchbook" dated March 2007 (the "Pitchbook"); and

      (b)    an "offering circular" dated May 22, 2007 (the "Offering Circular").

266.    The Pitchbook and the Offering Circular are referred to collectively hereinafter as the "Offering Documents."    The Offering Documents contained numerous representations concerning Markov, Defendants' roles in Markov, Markov's collateral, who would chose that collateral and on what bases such collateral selections would be made, the quality of that collateral, and the protection Markov' structure would provide to shield Markov's tranched notes from collateral losses.  As detailed below, such representations were materially false and/or misleading.

### A.    Defendants BarCap and SSGA Falsely Represented That An Independent Third-Party Collateral Manager – SSGA – Would Select Markov's Collateral

267.    BarCap and SSGA represented in the Offering Documents that SSGA, as Markov's erstwhile collateral manager, would select the assets for Markov's $2 billion collateral portfolio.

268.    The Pitchbook's cover stated that Markov was a "Hybrid Synthetic / Cash High-

Grade Structured Product CDO transaction managed by: STATE STREET GLOBAL ADVISORS"
(Pitchbook, cover page).  The Pitchbook's "Executive Summary" represented that "State Street
Global Advisors. . . will act as collateral manager for Markov" (*id*. at 5).   The Pitchbook's "Markov
CDO - Transaction Summary" page identified SSGA as Markov's collateral manager (*id*. at 8), as
did the Pitchbook's  "Structural Overview" chart, which visually depicted Markov's structure and
how Barclays and SSGA fit into it (*id*. at 16).

269.   Further, as detailed below in Section IV.B, much of the Pitchbook was given over
to SSGA-authored representations concerning SSGA itself, including *inter alia* SSGA's record and
expertise in CDO collateral management and the processes and methods SSGA employed to
evaluate collateral and make collateral selections (*id*. at 22-49, 54-60).

270.   Markov's Offering Circular made the substantively identical SSGA-authored
representations.  The Offering Circular's cover page displayed SSGA's logo and stated that "State
Street Global Advisors, a division of State Street Bank and Trust Company, will act as collateral
manager (in such capacity, the "Collateral Manager") for the Issuer's portfolio." (Offering Circular,
cover page).  The Offering Circular's initial "Summary" pages, in a subsection titled "Key Parties,"
identified SSGA as the collateral manager (*id*. at 3), as did the Offering Circular's back cover (*id*.,
back cover).  The Offering Circular included a specifically-defined term: "Collateral Manager",
whose provided definition was "'Collateral Manager' means State Street Global Advisors, a division
of State Street Bank and Trust Company ("SsgA")."   (*Id*. at 263).

271.    The Offering Circular further made clear that SSGA, in its capacity as Markov's
collateral manager, in fact selected Markov's $2 billion of collateral:

> On or prior to the Closing Date, the Issuer is expected to have
> Acquired, or have entered into binding agreements to Acquire, a

95

portfolio of Collateral Assets selected by the Collateral Manager . . . (*id*. at 21).

*****

The Collateral Manager is authorized under the Collateral Management Agreement and the Indenture to select and manage the Issuer's Collateral . . . (*id*. at 53).

*****

The Collateral Assets to be Acquired by the Issuer were selected by the Collateral Manager subject to the consent of the Warehouse Provider prior to the Closing Date. (*Id*. at 123).

*****

The Collateral Manager expects that, by the Closing Date, the Issuer will have Acquired, or will have entered into binding agreements to Acquire, a portfolio of Collateral Assets selected by the Collateral Manager . . . (*id*. at 167).

272.    The Offering Circular represented that SSGA's performance in this task was material to Markov's investors, because Markov's performance would depend on the performance of Markov's collateral and thus would be "highly dependent on the financial and managerial experience of certain individuals associated with the Collateral Manager":

. . . the performance of the Collateral Assets and Eligible Investments depends heavily on the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets and Eligible Investments. As a result, the Issuer will be highly dependent on the financial and managerial experience of certain individuals associated with the Collateral Manager. (*Id*. at 48).

273.    Additionally, as in the Pitchbook, a specific SSGA-authored section of the Offering Circular was given over to representations concerning SSGA itself, including *inter alia* SSGA's record and expertise in CDO collateral management and the processes and methods SSGA employed to evaluate collateral and make collateral selections (*id*. at 171-75).

274.    The above-detailed representations were materially false and misleading.

275.    In truth, Markov's collateral portfolio was determined to significant extent by Barclays. Markov existed for Barclays as a tremendously sophisticated and flexible instrument

96

through which Barclays could execute proprietary trading strategies whose success would necessarily entail the failure of Markov's tranched notes.  To create and effect these strategies, Barclays caused Markov to provide Barclays with $1.8 billion of credit protection with respect to nonprime RMBS and CDO tranches.  To ensure these strategies' success, Barclays caused Markov to provide Barclays with $550 million of credit protection with respect to the junior tranches of Mezzanine CDOs, themselves collateralized by portfolios of the lowest, riskiest BBB-rated RMBS tranches.  $300 million of these Mezzanine CDO exposures – the Markov Chain CDOs – were bespoke single-tranche synthetic CDOs that Barclays had fabricated for this very use in Markov.

276.    In sum, Defendants BarCap and SSGA represented in the Offering Documents that SSGA would select Markov's collateral, and these representations were materially false.  In truth, Barclays possessed and used effective control over the collateral selection process, and over SSGA.  Barclays employed such control to assure that Markov fulfilled Barclay's intent in creating it, namely: (1) the creation of a $1.8 billion short position with respect to nonprime RMBS and CDO tranches; and (2) most specifically, the creation of a $550 million short position with respect the lowest, riskiest tranche of nonprime mortgage risk, the BBB RMBS tranche, by referencing $550 million of Mezzanine CDO tranches from Mezzanine CDO securitizations collateralized by portfolios of such BBB-rated RMBS tranches.

### B.    BarCap's and SSGA's Materially False and Misleading Representations Concerning How, and on What Bases, SSGA Would Evaluate and Select Markov's Collateral

277.    Defendants BarCap and SSGA both compounded and concealed the Offering Documents' above-alleged falsity (*i.e.*, that SSGA would select Markov's collateral assets) through extensive *further* representations in the Offering Documents purporting to describe *exactly how and*

*on what bases* SSGA would evaluate and select Markov's collateral assets. These representations were authored by SSGA and disseminated in the Offering Documents prepared by Barclays.

278.   The largest section of the Markov Pitchbook was devoted to SSGA's "Structured Products Investment Process" (Pitchbook at 32-49),  and described the rigorous and sophisticated processes purportedly used by SSGA to evaluate potential collateral, to select specific  collateral, and to monitor such collateral for "early detection of negative collateral performance" (*id*. at 32-49).

279.   As described in the Pitchbook, SSGA's collateral evaluation and selection process was divisible into four steps (*id*. at 33), the first two of which concerned SSGA's analysis of broader macroeconomic factors and of the collateral portfolio as a whole.  SSGA's macroeconomic considerations (step one) purportedly allowed SSGA to "determine" which structured product sectors constituted the best "relative value" (*id*. at 33-34).  In step two, SSGA applied these macroeconomic views to the portfolio at hand and the specific portfolio guidelines set forth in the CDO's governing documents (*id*.).  This allowed SSGA to "identify portfolio opportunities" by taking advantage of "relative value among alternative ABS/RMBS/CMBS security types," and further enhance portfolios through consideration of "diversity" and "credit quality." (*id*. at 33-34).

280.   The Pitchbook's most specific representations concerning SSGA's purported collateral evaluation and investment processes were made in the Pitchbook's description of the third step in SSGA's investment process: actual, specific "security selection." The Pitchbook described, at length (*id*. at 35-49), how SSGA subjected individual securities to rigorous scrutiny, down to the smallest details, in order to arrive at its specific investment decisions for collateral.

281.   First, SSGA conducted "due diligence" on the mortgage originators and servicers of the mortgages underlying the RMBS securitizations it considered, in order to evaluate *inter alia*

98

mortgage "underwriting standards" (*id.* at 35-36, 44). Such due diligence included "in-depth analysis of management, financial condition, technology, staffing and loss-mitigation efforts" (*id.* at 44). Second, SSGA scrutinized the risk characteristics of the individual mortgages underlying each of these RMBS securitizations (*id.* at 35, 37), including: borrower FICO scores, the level of borrower income verification, LTV and CLTV ratios (and thus the presence of "silent second" or "piggyback" mortgages, the mortgage originator, the loan purpose (*e.g.*, primary residence, investment property, etc.) (*id.* at 35, 37-41). Indeed, SSGA maintained a database of such information with respect to each RMBS securitization for use, as discussed below, in quantitative analysis and modeling (*id.* at 42). Using this detailed information, SSGA then dug deeper by matching such mortgage risk characteristics against relevant regional, state and local (metropolitan statistical area, or "MSA") economic dynamics, such as unemployment rates and housing price appreciation rates (*id.* at 35, 37-41).

282. This precise and minute consideration of mortgage risks in their local mortgage market environments allowed SSGA to analyze and "model" underlying mortgage performance so as to "predict" both the level and timing of "defaults on each loan pool" underlying RMBS securitizations, establish the expected "loss severity" upon default, and thereby model the cashflow performance of the mortgages underlying the RMBS securitization (*id.* at 35, 42-43). SSGA could then project these cashflows through the RMBS securitization structures to model the performance and specific RMBS tranches (*ibid.*) and evaluate the relative extent to which any given RMBS structure provided lesser or greater protection against expected cashflow shortfalls (*ibid.*).

283. Finally, SSGA subjected this modeling of RMBS performance to twenty-one (21) different stress scenarios to further evaluate the quality and resiliency of such collateral (*id.* at 35,

43).  Such scenario modeling allowed SSGA to weed out collateral of lesser credit quality: in order to even qualify for potential selection as collateral, a given RMBS tranche had prove resilient to all eleven (11) of SSGA's base case scenarios (*ibid*).

284.    Connectedly, SSGA maintained what it called its "Fixed Income Surveillance Database" (or "FISD") – an "internally developed, proprietary web-based surveillance platform" gathering relevant data, analytics, and modeling capabilities from providers including Intex, Bloomberg, Trepp and the credit rating agencies (*id*. at 44).  SSGA used its FISD both to monitor and evaluate the performance and risks of RMBS and CDO tranches (*ibid*.).  Through FISD, SSGA could monitor the historical performance of the collateral underlying such RMBS and CDO securitizations, and could apply further analytics – at the level of the entire securitization, or at the level of a specific tranche – to identify deals or tranches headed for trouble (as SSGA put it, such methods "allow for early detection of negative collateral performance") (*ibid*.).  FISD also allowed SSGA to conduct "updated stress testing based on current collateral characteristics" so as to provide SSGA with better information of when a given tranche was headed for default and/or loss (*ibid*.).

285.    The Pitchbook further represented the vast amount of resources and expertise that SSGA, as the world's largest asset manager, could bring to bear in acting as Markov's collateral manager (*id*. at 23-27, 54-60), as well as the successes enjoyed by SSGA's "CDO Platform" and the successful performance of prior SSGA-managed CDOs (*id*. at 29-31).

286.    Markov's Offering Circular used fewer and more general words, but provided a similar picture – a "disciplined [] investment process . . . designed to ensure that appropriate due diligence is conducted prior to any security purchase" so as to thereby "control risk":

Investment Strategy

General Overview of Investment Strategy
SSgA's fixed income process is designed to produce consistent returns. SSgA's guiding philosophy has not changed since the inception of the philosophy in 1987: focus on sectors where pricing inefficiencies create alternative sources of return. The flexibility inherent in that philosophy has allowed SSgA to adapt to a fixed income landscape that has changed dramatically since 1987.

Asset Management Style
**SSgA pursues an asset management style that is disciplined and seeks to control risk**. An investment process is established that seeks to provide an efficient process to identify and execute potential structured product investment opportunities. **The investment process addresses not only the front-end analysis and purchase decisions, but also the on going surveillance of the portfolio. This process is designed to ensure that appropriate due diligence is conducted prior to any security purchase**, and appropriate monitoring of security performance is conducted on a regular basis for as long as the security remains in the portfolio. (Offering Circular at 171-72) (emphasis added).

287.    These extensive further representations, detailing the purported rigor and quality of the methods and analyses that SSGA would employ, were doubly false and misleading.

(a)    First, they were false and misleading in and of themselves. The represented methods and analyses were not the ones whose application resulted *inter alia* in Markov's provision of credit protection to Barclays with respect to $550 million of junior tranches from Mezzanine CDOs. Instead, as alleged above, a different and much simpler set of evaluation and selection criteria were applied (namely, consideration of which assets were likely to fail) by an altogether different party (Barclays, who wished to take a short position with respect to such assets).

(b)    Second, they were also misleading insofar as they provided seeming corroboration to a more fundamental fiction: namely, that SSGA controlled the selection of Markov's collateral, when, in truth, Barclays did.

288.    Such representations were material. As the tranched notes issued by a CDO are

backed by the CDO's collateral portfolio, the performance of such collateral will determine the performance of the CDO's notes.  The performance of the collateral manager, however, will determine that of the CDO's collateral.  Therefore, underlying CDO performance was collateral manager skill and diligence in selecting collateral.  This was merely axiomatic:

> . . . CDO managers played a crucial role. CDOs were so complex that even buyers had a hard time seeing exactly what was in them -- making a neutral third party that much more essential.

> "When you're investing in a CDO you are very much putting your faith in the manager," says Peter Nowell, a former London-based investor for the Royal Bank of Scotland. "The manager is choosing all the bonds that go into the CDO." [22]

289.     Confirming the perceived importance of the collateral manager, nearly half of Markov's Pitchbook was devoted to representations concerning SSGA and its purported collateral management methods (see Pitchbook at 22-49, 54-60).

### C.     BarCap's Misleading Representation Concerning its "Consent" As To the Collateral Portfolio Purportedly Selected by the SSGA

290.     In the Offering Circular, BarCap represented:

> The Collateral Assets to be Acquired by the Issuer were selected by the Collateral Manager subject to the consent of the Warehouse Provider.  (Offering Circular, 123 and also 53).

291.     The Offering Circular defined the "Warehouse Provider" as "Barclays" (id. at 303).

292.     This representation was literally true but doubly misleading.  It omitted the nature, use and valence of the "consent" Barclays granted (and refused to grant) in connection with Markov's collateralization.

---

[22]     See Jesse Eisinger and Jake Bernstein, "Banks' Self-Dealing Supercharged Financial Crisis", Propublica, August 26, 2010.

293.    First, in the context in which it was made, the representation made it appear as if Markov's collateral had received two-fold ratification, first from SSGA and then, confirming SSGA's initial judgment, from Barclays.  What was communicated was that two sophisticated financial institutions had approved of all of the assets in question as worthy ones.

294.    ***But this was the opposite of what was in fact occurring.  Barclays was wielding its "consent" not to screen for and ratify trusty assets that would conserve Plaintiff's and other Markov note investors' principal, but to screen such assets out***.  Barclays granted "consent" to bad assets, not to good ones; assets meant to drain Plaintiff's and other Markov investors' principal through swap to Barclays rather than conserve it.

295.    Second, the representation materially misled, and/or omitted material information, as to the real dynamic of collateral selection for Markov.  Again, in the context in which it was made, Barclay's "consent" seemed to be immaterial, innocuous or positive for Markov investors.

296.    The contrary truth was that Barclays wielded such requisite "consent" as a club so as to seize effective control over Markov's collateral portfolio and bend it, in disguised fashion, to serve its (short) interests, which were adverse to Plaintiff's and other Markov investors' (long) interests.  By wielding its "consent" in such fashion, Barclays caused Markov's collateral: (1) to include an extremely high amount of tranches from other CDOs ($655 million), which directly countered SSGA's self-stated CDO collateral management philosophy; and (2) more specifically, to include in the credit default swap reference portfolio $550 million of CDO tranches, *all of which were from Mezzanine CDOs*.  Barclays' purpose and goal through such application of "consent" was to gain for itself the disguised short bet – through Mezzanine CDOs against BBB-rated subprime RMBS –  that Barclays was sure it would win.

297.    Therefore, Barclays "consent" in Markov was not a passing or immaterial matter, but the crux of Barclay's scheme and the most important factor in Markov's fate.

298.    The aforementioned Propublica exposé (*see* Section III.B.3 *supra*; attached hereto as Exhibit D) describes, based on the accounts of numerous bankers and CDO collateral managers, exactly how CDO-creating banks, beginning in late 2006, wielded such "consent" to seize secret control over CDO collateral portfolios and thereby " perpetrate[] one of the greatest episodes of self dealing in financial history".  For example, one CDO manager recalled how, in working on Merrill Lynch CDOs, he would quickly learn from Merrill's withholding of "consent" exactly what Merrill demanded be in the CDO (in this instance, CDO tranches from other Merrill CDOs, to remove such exposures from Merrill's books):

> "I would go to Merrill and tell them that I wanted to buy, say, a Citi bond," recalls a CDO manager. "They would say 'no.'  I would suggest a UBS bond, they would say 'no.'  Eventually, you got the joke." Managers could choose assets to put into their CDOs but they had to come from Merrill CDOs.  One rival investment banker says Merrill treated CDO managers the way Henry Ford treated his Model T customers: You can have any color you want, as long as it's black.

299.    Multiple bankers and CDO managers recalled how banks forced CDO managers to either (1) consent to such targeted, self-interested application of bank "consent", or (2) forego further CDO collateral management assignments:

> Merrill exercised its leverage over the managers. A strong relationship with Merrill could be the difference between a business that thrived and one that didn't. The more deals the banks gave a manager, the more money the manager got paid.
>
> . . . One Merrill executive summed up the overall arrangement: "I'm going to make you rich. You just have to be my bitch."
>
> But not all managers went for it.

An executive from Trainer Wortham, a CDO manager, recalls a 2005 conversation with Ricciardi. "I wasn't going to buy other CDOs. Chris said: 'You don't get it. You have got to buy other guys' CDOs to get your deal done. That's how it works.'"  When the manager refused, Ricciardi told him, "'That's it. You are not going to get another deal done.'" Trainer Wortham largely withdrew from the market, concerned about the practice and the overheated prices for CDOs.

*****

Once, Merrill's Ken Margolis pushed a manager to buy a CDO slice for a Merrill-produced CDO called Port Jackson that was completed in the beginning of 2007: "'You don't have to buy the deal but you are crazy if you don't because of your business,'" an executive at the management firm recalls Margolis telling him. "'We have a big pipeline and only so many more mandates to give you.' You got the message."  In other words: Take our stuff and we'll send you more business. If not, forget it.

300.   Credit Suisse CDO banker Fiachra O'Driscoll recalled how "all the managers complained about it" but were forced to submit to banks' hijacking of collateral portfolios through such "consent." Per Mr O'Driscoll, the CDO managers had been reduced to "indentured slaves."

301.   Likewise, internal Goldman Sachs documents made public through government investigations reveal how Goldman's actions in its Timberwolf CDO replicate, exactly, Barclays' actions here.  Like the $2 billion Markov, Timberwolf was $1 billion synthetic CDO, meaning that its creation would provide Goldman with a $1 billion short position on Timberwolf's collateral portfolio.  Akin to Markov, Timberwolf, as a CDO-Squared (a CDO collateralized entirely by other CDO tranches) was collateralized by a credit default swap referencing $1 billion of tranches from other CDOs.   Although Timberwolf was ostensibly appointed with an independent collateral manager, Greywolf, internal Goldman documents established that "Goldman is approving every asset" in Timberwolf, and that such control over Timberwolf's assets was one of the primary "Reasons to Pursue" the transaction.

105

302.     Goldman's use of Timberwolf to construct the short position it wanted, given its understanding of the flow of subprime mortgage losses through RMBS to CDOs, is a near-exact parallel of Barclays' design and understanding with respect to Markov.  Further internal Goldman documents from senior Goldman executives termed Timberwolf – which, like Markov, was fabricated  to drain CDO note investor principal rather than serve or conserve it – "one shitty deal" and recalled Timberwolf's birth as "a day that will live in infamy".  Currently, two investor suits are now proceeding in this District against Goldman by Timberwolf CDO investors, with claims substantially identical to those here.

303.     Lastly and to reiterate, although the above "color" from the CDO market provides support for allegations here, the prior conduct of both BarCap and SSGA detailed in Section II *infra* further provides further support still. As detailed therein, SSGA was no  stranger to the "consent" game, having secretly abdicated collateral management of its Carina CDO to an undisclosed third party hedge fund, Magnetar, intent on creating Carina as one of its series of built-to-fail Constellation CDOs.  Likewise, as Barclays' Corvus scandal demonstrates, Barclays was no stranger to using its control of synthetic CDOs to fill their reference portfolios with toxic trash, so as to benefit Barclays' short interest in that collateral at the direct expense of CDO note investors' interests.

**D.     BarCap's Misleading Representations Concerning the Credit Ratings of Markov's Collateral and of Markov's Tranched Notes Made Markov Appear Far Safer Than Barclays Knew it to Be**

304.     Barclays used materially false and misleading credit ratings to materially mislead Plaintiff and other investors in two-fold manner: (1) as to the safety/quality of Markov's collateral; and (2) as to the safety/quality of Markov's tranched notes backed by that collateral.

305. To the former, BarCap represented throughout Markov's Offering Documents that Markov would be collateralized by portfolios of assets with credit ratings of single-, double- and even triple-A credit ratings, and that the average portfolio-wide credit rating would be between single- and double-A.  To the latter, BarCap represented that Markov's tranched notes, including the AA-rated tranche purchased by Plaintiff, were, through Markov's structure, adequately removed from expected collateral losses to merit their given credit ratings.  The latter representation was in large part a function of the former.  Because the collateral's high credit ratings purportedly indicated their safety (more precisely, their low probability of default and subsequent loss), "expected losses" from such collateral were low, meaning that the CDO tranche structure did not have to provide large amounts of subordination to protect any given tranche from such "expected losses."

306. These representations, further detailed below, were materially misleading.

### 1.    BarCap's Representations Concerning Collateral Credit Ratings

307. The Markov Pitchbook represented that the average credit rating over Markov's entire portfolio would be between AA- and A+, and that no assets in the portfolio would be rated lower than A- (Pitchbook, at 9-10).

308. The Markov Offering Circular made substantively-identical, but more technically-detailed, representations in lengthy sections describing, *inter alia*, the operative guidelines determining collateral portfolio construction (including guidelines related to credit ratings), numerous further guidelines setting limits on various kinds of assets bearing various credit ratings, and numerous further guidelines based on portfolio-wide credit ratings (Markov Offering Circular at 124-28, 145-52).

309. For example, the Markov Offering Circular represented that none of Markov's

107

collateral assets would be rated less than A-/A3:

> Each Collateral Asset Acquired by the Issuer . . . must meet the
> following eligibility criteria (collectively, the "Eligibility Criteria")
> . . .
>
> *****
>
> (2)     the Collateral Asset has a Moody's Rating of at least
> "A3" and an S&P Rating of at least "A-" (*id*. at 124).

310.    Likewise, the Markov Offering Circular represented that the portfolio's "Weighted Average Rating Factor"– a mathematical translation of credit ratings into numbers, for use calculations – would not exceed 62 (indicating average ratings between AA - and A+) (*id*. at 146).

311.    The above-detailed representations concerning collateral credit ratings were materially misleading, for the reasons detailed in Sections III.C-D *supra* and summarized below.

312.    *Barclays real motivation in Markov was not based in belief in credit ratings, but in disbelief in credit ratings*.  Barclays understood that Mezzanine CDO tranches' high credit ratings were illusory: underneath each Mezzanine CDO was a portfolio comprised in near entirety by BBB-rated RMBS tranches, most of which Barclays understood to be headed for default and total or near-total loss.  It was this understanding that led Barclays to construct Markov as a mostly *synthetic* CDO (*i.e*., one that would allow Barclays a "short" position on the referenced collateral), and to populate Markov's reference portfolio so heavily with $550 million of referenced Mezzanine CDO tranches (that Barclays, through Markov, was now betting against).

313.    Barclays therefore knew that the above-detailed representations concerning the credit ratings of Markov's collateral were materially false and/or misleading.  More precisely, Barclays knew that the credit ratings of the Markov's $635 million of Mezzanine CDO junior tranche exposures falsely reflected the risks of that collateral, yet Barclays nevertheless represented Markov – and the purported safety of its collateral and tranche structures – through those very credit ratings.

108

314.     For avoidance of doubt: the representations concerning such assets' credit ratings were literally true: the assets indeed then bore the adverted ratings.  It was Barclays' use of credit ratings in representing Markov and its purported safety, when Barclays knew that such ratings vastly understated the risks of the collateral, that was materially misleading.  Such representations had the materially misleading effect of conveying that Markov, as a result of its highly-rated collateral, was far safer than it in fact was and than Barclays knew it to be.

## 2.     BarCap's Representations Concerning the Credit Ratings of Markov's Tranched Notes

315.     Markov's Offering Documents represented that highly-rated Markov tranches (such as the AA-rated tranche that Plaintiff purchased) could be structured at relatively low remove from collateral losses (*e.g.*, the AA-rated tranche purchased by Plaintiff was protected by more junior tranches amounting to 4.0% of the securitization).  Such high tranche credit ratings at such low removes from collateral loss were materially false and misleading.  As detailed below, they were purportedly justified by – and, in fact, *derived from* – the high credit ratings of the collateral (which Barclays knew to be false).

316.     The Markov Pitchbook provided representations concerning Markov's tranche structure and ratings (Pitchbook at 8).  For example, with respect to the Class B Markov notes purchased by Plaintiff, Defendants represented that, despite having little junior tranche subordination to protect it from underlying collateral losses (specifically, $80 million of more junior tranches, amounting to only 4.0% of the securitization), the Class B notes merited an AA credit rating (*id.*).

317.     Markov's Offering Circular contained identical representations concerning Markov' tranche structure and tranche ratings (Offering Circular at ii, 1, 122).

318.     The credit ratings assigned to these tranches were highly material.  Bespeaking this materiality, the issuance of the CDO's tranches was conditioned on those tranches garnering the ratings represented in the Offering Documents for them.  In the event they did not (termed a "Ratings Confirmation Failure"), Markov would obligated to undertake a "Mandatory Early Redemption" and use its available funds to repurchase in order of seniority Markov's tranches (*id.* at 91-92, 122).

319.     These representations concerning tranche credit ratings and tranche structure were materially misleading, for reasons detailed in Sections III.C-D *supra* and reiterated below.

320.     Barclays knew that CDO tranche structures and the credit ratings of each of those tranches were derived, in ratings models, primarily from: (1) the credit ratings of the collateral ; and (2) historical rates of default and loss with respect to like collateral bearing like credit ratings. Barclays also knew that the credit ratings of the collateral – and, especially, the $635 million of highly-rated Mezzanine CDO tranches to which Markov was exposed – were materially false and misleading, and no longer described the severe risks of default and total loss facing these tranches. Therefore, Barclays well understood that by employing (misleading and no-longer-accurate) credit ratings of such collateral to structure Markov into rated tranches, both Markov's tranche structure and tranche ratings would be materially false and misleading.[23]

---

[23]     Although the math can get complex, the principle is intuitive and straightforward. Riskier assets are more likely to suffer losses.  Therefore, the riskier the assets in the collateral portfolio, the larger the "expected losses" from that portfolio.  The larger the "expected losses," the more credit protection (*i.e.*, the larger amount of more junior tranches) necessary to remove a given tranche a sufficient distance from that "expected loss" to merit a given credit rating.  By using no-longer-accurate collateral credit ratings as the indicator of asset risk, Barclays generated a low "expected loss" – from which tranches were placed at sufficient removes to garner their credit ratings.  But no matter the "expected loss" generated from using collateral credit ratings, Barclays knew the actual loss would be much, much greater – and therefore knew that each tranche in the

321.    More precisely, credit ratings operated in CDO models to signify historical rates of default, and loss upon default, of like collateral at like ratings levels. For example an AA-rated CDO tranche was associated with historical default rate of "X", and of loss upon default of "Y". Historical rates of default and loss for such securities were, until 2007, relatively low. Therefore, collateral credit ratings "predicted" low rates of default and loss (which in turn meant that a CDO backed by such collateral need provide minimal protection against such low "expected" losses).

322.    This, however, was exactly the *opposite* of what Barclays understood by early 2007: such collateral – and the junior tranches of Mezzanine CDOs especially – were headed for extremely high levels of default and, upon default, total or near-total loss. *Indeed, Barclays' real motivation in Markov was not based in belief in credit ratings, but in disbelief in credit ratings.* Barclays understood that Mezzanine CDO tranches' high credit ratings were illusory: underneath each Mezzanine CDO was a portfolio comprised in near entirety by BBB-rated RMBS tranches, most of which were headed for default and total or near-total loss. It was this understanding that led Barclays to construct Markov as a synthetic CDO (*i.e.*, one that would allow Barclays a "short" position on the referenced collateral) and to populate Markov's reference portfolio so heavily with $550 million of referenced Mezzanine CDO tranches (that Barclays was now betting against).

323.    By using collateral credit ratings it knew to vastly understate the actual risk of the collateral, Barclays constructed a CDO, Markov, whose tranches and ratings seemed justified on paper, but which Barclays itself knew were not justified in substance.

324.    Concretely, Barclays knew that a tranche structured with junior tranche protection amounting to only 4.0% of the total collateral did not merit an AA credit rating, given the collateral

---

CDOs did not exist at the remove from loss that its credit rating represented.

(more than 25% of which was Mezzanine CDO junior tranches).  Conversely stated, Barclays knew that an AA-rated tranche, were it to represent a truly AA-rated risk, needed far more credit protection than the 4.0% provided in Markov.  Housed within Markov was $550 million of synthetic Mezzanine CDO collateral (constituting more than 25% of total collateral exposure).  A mere 10% loss from that Mezzanine CDO collateral (*i.e.*, aggregate collateral losses of 2.5%) would bring Markov's AA-rated tranche to the brink of principal loss.  A 20% loss from that same subset of collateral (*i.e.*, aggregate collateral losses of 5.0%)  would cause Markov's AA-rated tranche to suffer 25% principal loss.    Should Mezzanine CDO juniors suffer 30% losses (*i.e.*, aggregate collateral losses of 7.5%), Markov's AA-rated tranche would suffer 100% principal loss.

325.    In short, Barclays knew that, in the face of Markov's substantial exposure to $550 million of Mezzanine CDO junior tranches,  a tranche with credit protection of only 4.0% did not represent an AA credit risk (and that all other rated Markov tranches were in the same position).  Barclays thus knew that Markov's tranche credit ratings were materially false and misleading.  They did not communicate what they were thought to communicate (*e.g.*, an AA level of risk), and what they did communicate (*e.g.*, an AA level or risk) was not true.

326.    Stated conversely, Barclays knew,  in the face of such immense amounts of toxic collateral, that Markov's AA-rated tranche required far more protection from collateral losses than the 4.0% provided (and that all other rated Markov tranches were in the same position).  Barclays thus knew that Markov's tranche structure was materially misleading.  It did not communicate what it was thought to communicate (*e.g.*, adequate remove from loss to merit an AA risk), and what it did communicate (*e.g.*, adequate remove from loss to merit an AA rating) was not true.

E.    **BarCap's Misleading Representations Concerning the Purported AAA Ratings of the Markov Chain Collateral**

327.    Defendants represented that the $300 million of Markov Chain CDO (detailed in Section III.D *supra*) tranche exposures, constituting 15% of Markov's total collateral exposures, bore the highest possible credit rating: AAA.[24]  There is no higher or safer credit rating than AAA. Representations that 15% of Markov's collateral, or $300 million of Markov's collateral exposures, were AAA-rated instruments made these instruments appear extremely safe, and made Markov's portfolio as a whole appear safer.

328.    These representations as to the Markov Chain instruments' AAA credit ratings, and by extension as to the safety of Markov's collateral and Markov's tranched notes, were materially false and misleading, for three reasons detailed below.

329.    *First, as Plaintiff understands it, the Markov Chain instruments' credit ratings were not in fact AAA.*  Standard and Poors ("S&P") did not in fact rate them AAA, but rather AAA***srb*** (emphasis added).  As detailed below, the "srb" suffix appended to S&P's rating, as S&P itself explains, indicates that the rating is *not based solely on the inherent creditworthiness of the instrument, but rather on the creditworthiness of the counterparty who serves as the buyer of credit protection*.  Put more simply, although a given instrument itself could be extremely risky, and not,

---

[24]    Although neither the Pitchbook nor the Offering Circular made explicit reference to the Markov Chain CDOs, both referred obliquely to them and to their AAA ratings, using general terms such as "Static ABS CDOs" (Pitchbook at 9),  "Portfolio Tranche CDO Security" (Offering Circular at 127, 151, 292) and "Portfolio CDS Asset"  (Offering Circular at 127, 151, 292). The Markov Pitchbook represented *inter alia* that 15% of Markov's collateral would consist of AAA-rated "Static ABS CDOs" – *i.e.*, the Markov Chain CDOs (Pitchbook at 9).  The Markov Offering Circular represented: (1) that the maximum amount of Portfolio Tranche CDO Securities that could be included as Markov's collateral was $300 million, or 15% of Markov's total (Offering Circular at 127); and (2) that any Portfolio Tranche CDO Security used as Markov collateral would have to bear AAA credit ratings (*id*. at 151).

in and of itself, an AAA-rated risk, if the institution paying credit protection premiums with respect to that instrument was certainly capable of paying such premia, as was Barclays or SSGA, then it could still merit an AAA*srb* rating.  In short, an AAAsrb risk does not measure the risk of the instrument itself and alone, but the risk that the protection buyer in the instrument will be able to continue making requisite periodic protection payments.

330.    On September 15, 2006, S&P issued a report explaining the difference between its normal credit ratings and a new set of "swap risk" credit ratings bearing suffixes such as "srb," "srp" and "srs" (*see* Standard & Poors, Credit FAQ: Swap Risk Ratings Introduced For Synthetic CDO And Credit Derivative Transactions, September 15, 2006).[25]  As S&P explained, these new credit ratings would be applied to "synthetic CDO[s] . . . structured in an unfunded form, as a credit default swap between two parties."  This is exactly what the Markov Chain CDOs were.

331.    As S&P explained,"[s]wap risk ratings will have qualifiers that indicate the type of risk that Standard & Poor's was asked to assess to distinguish them from traditional debt ratings." (*id*.).  The "srp" suffix – indicating "swap risk – portfolio" – was akin to S&P's normal credit ratings: it assessed only the risk represented by the tranched portfolio referenced in the swap.  In short, it considered merely the creditworthiness of the instrument in and of itself.

332.    The "srb" suffix, however, indicating "swap risk – buyer," was a swap risk rating that considered not only the inherent risk of the instrument at issue in the swap, but the risk posed by "the buyer of protection under the swap transaction." (*Id*.).  The risk posed by a credit protection buyer is straightforward: that he or she will default on his obligations under the swap to pay the

---

[25]     Available at:
http://www2.standardandpoors.com/portal/site/sp/en/ap/page.article/3,1,1,0,1145841047881.html.

regular, contracted-for credit protection payments.  Where the credit protection buyer is a large financial institution such as Barclays or SSGA, as in the Markov Chain CDOs, such risk is nonexistent:  hence an "AAAsrb" rating for the Markov Chain CDOs.

333.   S&P's explanation of the distinctive risks being measured and indicated by its "swap risk ratings" and its "srb" and other prefixes is below.

> **Swap risk ratings will have qualifiers that indicate the type of risk that Standard & Poor's was asked to assess to distinguish them from traditional debt ratings**.  For example, a swap rating that is displayed as 'AAAsrp' indicates that the 'AAA' rating is a swap risk rating based solely on an analysis of the creditworthiness of the reference portfolio.  An "srp" ("sr" for swap risk and "p" for portfolio) rating does not take into consideration the creditworthiness of the counterparties to the transaction.
>
> What does a swap risk rating address?
> All swap risk ratings take into consideration the creditworthiness of the reference portfolio. The swap risk rating designations are outlined below.
>
> ·      Portfolio ("srp" suffix) ratings only take into consideration the creditworthiness of the reference portfolio of the credit default swap;
>
> ·      **Single counterparty-protection buyer ("srb" suffix) ratings take into consideration the creditworthiness of the reference portfolio and the buyer of protection under the swap transaction**; and. . .
>
> *****
>
> A portfolio swap risk rating does not address any counterparty risk (including risk of periodic payments). **Swap risk ratings for single counterparty addresses the counterparty risk of one of the counterparties to the swap transaction**.
>
> *****
>
> How does a swap risk rating differ from a rating issued for credit-linked notes and other types of debt instruments?
> **There are two key differences between a swap risk rating and traditional debt instrument ratings. Swap risk ratings do not address the creditworthiness of an issuer or issue, rather the**

115

**likelihood of termination of the swap** based on the parameters evaluated: the portfolio and, if applicable, one of the counterparties. Swap risk ratings apply to unfunded transactions. For example, a swap risk rating portfolio ("srp") by itself does not address the likelihood of a swap termination because of either counterparty risk. Conversely, **a swap risk rating single counterparty ("spb" or "srs") addresses portfolio risk as well as the respective buyer or seller counterparty to the swap transaction**.

334.    Second, the Markov Chain CDOs' AAA ratings were further misleading, as Barclays well knew, because each of the twelve Markov Chain CDOs was merely a single tranche of risk constructed from a synthetic portfolio of BBB-rated RMBS tranches. Put simply, the Markov Chain CDOs were synthetic single-tranche *Mezzanine* CDOs. Barclays knew that Mezzanine CDO junior tranche ratings were all materially false and misleading; indeed, Markov was predicated on Barclays' understanding of that fact. Markov allowed Barclays to make an ingenious and disguised short bet against the lower, thinner tranches of nonprime mortgage risk – the BBB RMBS tranches – by entering into credit default swaps with Markov referencing $550 million of junior tranches from Mezzanine CDOs (backed by portfolios of such BBB RMBS tranches).

335.    *Third, as detailed in Section III.D supra, the Markov Chain CDOs were even riskier than other Mezzanine CDO tranches with AAA ratings, because they had substantially less protection from underlying collateral losses.* The four Markov Chain CDOs with an "A" suffix (*i.e.*, Markov Chain IA, IIA, IIIA, and IVA) began to become impaired when aggregate losses in their underlying collateral BBB-rated RMBS portfolios reached 16%. The "B" Markov Chain CDOs started taking losses sooner: when underlying portfolio losses reached 14%. The "C" Markov Chain CDOs started taking losses sooner still: when underlying portfolio losses reached 12%.

336.    This left all the Markov Chain CDOs far less distanced from underlying collateral losses than were the AAA-rated tranches of typical Mezzanine CDOs. For example, Cetus ABS

CDO 2006-2 and Cetus ABS CDO 2006-4 – two other Mezzanine CDOs, $40 million of whose tranches were referenced in Markov – were structured so that their AAA-rated tranches had junior tranche subordination of 20% (meaning they would start incurring losses one aggregate portfolio losses reached 20%). Thus, even as the "C" Markov Chain CDOs started taking losses at 12%, the "B" Markov Chain CDOs at 14%, and the "A" Markov Chain CDOs at 16%, most other Mezzanine CDO AAA tranches would remain untouched until losses exceeded 20%.

337.    More remarkable still: even as the Markov Chain CDOs were created by Barclays to be less protected against underlying collateral losses than other Mezzanine CDOs, the late date of their creation (April-May 2007) meant that Barclays knew more about the severe risks posed by the underlying collateral (BBB-rated RMBS tranches). Given the late date of their creation, theoretically, the Markov Chain CDOs should have featured *more* protection against better-understood collateral losses (as compared with older Mezzanine CDOs created during 2006). Instead, they featured less. For example, both of the above-discussed Cetus Mezzanine CDOs, both of which were created during the latter half of 2006, featured AAA tranches protected against collateral losses of 20%. Yet the Markov Chain CDOs created by Barclays many months later, after BBB-rated RMBS tranches were understood to be at severe risk and after their market prices had substantially declined, provided less protection against loss: 12%-16%.

338.    In sum, Markov appeared safer than many High Grade CDOs in part because 25% of its collateral was rated AAA. Yet 60% of Markov's AAA-rated collateral were the misleading and misrepresented Markov Chain CDOs (*i.e.*, 15% of Markov's total collateral). Thus, most of Markov's AAA-rated collateral was a misleading illusion, and the further margin of safety that the Markov Chain CDOs' high ratings added to Markov's portfolio as a whole was also misleading.

117

339.   Although the Markov Chain CDOs bore the highest credit ratings possible and constituted the majority of the collateral in Markov with such highest credit ratings, in truth the Markov Chain CDOs were Markov's riskiest instruments.  Barclays knew them to be so, as Barclays itself had constructed them, for use in Markov, as instruments Barclays wished to bet against.

**F.   BarCap's Misleading Representations That Markov Was a "High Grade" CDO**

340.   Barclays held out Markov as a "High Grade" CDO.

341.   Markov's Pitchbook represented that Markov was a High Grade CDO, including on its cover and its "Executive Summary/Transaction Highlights" page (Pitchbook at cover page, 5). Further details in the Pitchbook as to the credit ratings of Markov's collateral (no securities with less than A-/A3 credit ratings, average portfolio-wide credit ratings between AA- and A+) indicated the same (*see* Section IV.D *supra*).

342.   The Markov Offering Circular made substantively identical representations concerning Markov's collateral portfolio and its credit quality (Offering Circular at 146). The Offering Circular's stated definition of "ABS CDO High Grade Securities" – essentially, CDOs collateralized by assets with credit ratings of A-/A3 or higher – likewise indicated that Markov was a High Grade CDO, and likewise distinguished such CDOs from Mezzanine CDOs (*id*. at 230).

343.   These representations were materially false and/or misleading, for three reasons.

344.   First, as already detailed, Barclays was aware that the credit ratings that conferred the technical appearance of "High Grade" status on Markov's collateral were materially false and misleading, particularly so with respect to highly-rated tranches from Mezzanine CDOs (themselves based on portfolios of BBB-rated RMBS).  Barclays knew such Mezzanine CDO tranches were not "High Grade" collateral, no matter their credit ratings.  Indeed, Barclays included such collateral in

118

Markov not because Barclays expected it to be safely removed from loss (as purportedly indicated by its high credit ratings), but because Barclays understood that it would be swamped by loss (despite its high credit ratings).

345.     Second, for all practical purposes, from the perspective of all investors who purchased the $400 million of tranched notes issued by Markov (from equity all the way through the AAA-rated tranches), Markov was a *de facto* Mezzanine CDO.  As already demonstrated, Markov's $2 billion collateral portfolio had been stuffed with approximately $635 million of junior tranches from *Mezzanine* CDOs, including $85 million of actual such securities and $550 million of synthetic exposure through credit default swap (all identified in Section III.C *supra*).  Markov's performance was thus materially dependent upon the performance of its substantial Mezzanine CDO collateral assets.  The $635 million of Mezzanine CDO junior tranche collateral in Markov, including the $550 million of such tranches referenced through credit default swap, would lose most or all value as the BBB- RMBS tranches lost theirs.  This would trigger Markov's obligation to make as much as $550 million of protection payments to Barclays.  The source for the first $400 million of such payments was the $400 million of principal that Plaintiff and other Markov investors had paid to purchase Markov's tranched notes.  Such payments to Barclays would leave Markov's tranched notes with nothing left to secure them, thus rendering them worthless.

346.     In a nutshell, Markov's losses from its credit default swap referencing $550 million of Mezzanine CDO tranches sufficed, by themselves, to render Markov's junior tranches – the $400 million of tranched notes, which stood "first in line" for collateral losses – worthless.  Thus, all $400 million of the tranched Markov notes purchased by Plaintiff and other investors were entirely dependent on, and suffered complete and total losses because of, this very Mezzanine CDO

119

collateral (and the BBB-rated RMBS collateral underlying those Mezzanine CDOs).

347.    The fate of the tranche in which Plaintiff invested was determined entirely by the performance of the lowest investment-grade RMBS tranche, the BBB-RMBS tranche – exactly what Plaintiff sought to avoid by investing in purported "High Grade" CDOs.

348.    For this reason, Markov's purported "High Grade" quality and its purported collateralization by collateral bearing single-A and double-A credit ratings, was a misleading smokescreen.   Because Barclays had filled Markov with *Mezzanine* CDO junior tranches – themselves collateralized by and wholly dependent upon BBB- and BBB-rated RMBS collateral – Barclays exposed Markov investors, including Plaintiff, to Mezzanine CDO collateral and Mezzanine CDO losses on Mezzanine CDO timing.

349.    Third, Barclays' and SSGA's contemporaneous, private actions and intentions with respect to Markov emptied their use of "High Grade" terminology of all meaning and rendered such terminology misleading.

350.    Barclays did not believe Markov to be "High Grade" in any matter of substance, but only in appearance.   In substance, Barclays was intending and using Markov as a sophisticated proprietary trading vehicle to effect a secret and disguised  "long/short" strategy with respect to RMBS capital structure.   Barclays structured Markov's tranching and collateral in a manner that allowed it to place its primary short bet – a disguised short bet against BBB-rated RMBS tranches, via $550 million of Mezzanine CDO tranches referenced through credit default swaps – funded by the sale of $400 million of Markov's junior tranche notes to Plaintiff and other investors.   Should this short bet work,  Plaintiff's and other investors' principal would be transferred to Barclays and enrich Barclays by as much as $400 million, Markov's junior tranches would become worthless, and

Barclay's super senior tranche exposure to Markov would be all but untouched.

351.    SSGA likewise did not believe Markov's "High Grade" moniker.  SSGA itself had

boasted that its preferred CDO management style was one that avoided "excessive CDO buckets"

(Pitchbook, at 29).  Yet Markov featured one of the largest such buckets available for "High Grade"

CDOs (35%), and was made by Barclays to fill that bucket near to brimming with junior tranches

of Mezzanine CDOs ($635 million, or 32% of Markov's total collateral).  For this reason among

others, SSGA did not invest any principal in Markov's equity tranche.  It was customary and typical

for CDO collateral managers to make such investments, signaling faith in the collateral they had

chosen by putting "skin in the game" and investing in the tranche that stood first in line for collateral

losses.  In its past management of CDOs, SSGA had in fact made such investments: for example,

in the Diogenes I CDO that closed on November 4, 2005, SSGA purchased 49% of the equity

tranche, and in the Pascal CDO that closed on August 4, 2005, SSGA purchased 26% of the lowest

rated tranche (BBB).

### G.    BarCap's Misleading Representations Concerning The Superiority of or Advantage Provided By Markov's Mostly Synthetic Collateral

352.    In the Markov Pitchbook, BarCap made materially misleading statements concerning

the purported superiority of structuring matters so that Markov's collateral was 90% synthetic (*i.e.*,

exposure created by credit default swap).

353.    In the very first bullet point of the very first substantive page of the Pitchbook, the

"Executive Summary", BarCap represented that "[c]ertain benefits of the structure are . . .

[f]lexibility to purchase unfunded synthetic assets. . ." (Pitchbook, at 5).  The Pitchbook later

amplified this representation in a slide titled "Certain Structural Advantages", which listed as one

of Markov's advantages "[t]he use of CDS Assets enables SSgA to design a portfolio from a broader collateral than available in cash" (*id.* at 21).

354.    These representations – to the effect that using synthetic collateral would allow for better selection of collateral and for better collateral to be selected – were materially misleading.

355.    Barclays was not using synthetic collateral to allow Markov to be collateralized by superior securities that were not available in cash form, but, to the contrary, to expose Markov and Markov's investors, including Plaintiff, to *inferior* collateral (particularly, junior tranches of Mezzanine CDOs) that Barclays wished to bet against.

**H.    BarCap's Misleading Representations Concerning Markov's Safety, Structural Protections from Collateral Losses, and Projected Performance: BarCap Used Mild Collateral Default and "Loss Upon Default" Assumptions in "Modeling" Markov's Performance and Resilience, When BarCap Itself Understood that Collateral Defaults and Loss Upon Default Would be Severe**

356.    Lastly, BarCap made further representations directly to Plaintiff in connection with BarCap's attempt to sell Markov tranches to Plaintiff. *Inter alia*, BarCap provided Plaintiff with statistical analyses and models purporting to demonstrate Markov's safety and its ability to withstand collateral losses.

357.    The analysis provided by BarCap purported to show: (1) the degree of collateral asset defaults that would be required for investors in Markov's tranches (specifically, the Class B tranche) to fail to receive the full promised yield; and (2) the degree of collateral asset defaults that would be required for Markov Class B tranche investors to experience principal loss.

358.    Specifically, with respect to the Class B tranche purchased by Plaintiff, BarCap represented that Markov's Class B tranche could withstand cumulative collateral defaults within Markov of 20%-25% before suffering  principal loss.

359. These representations were materially misleading. They depended on BarCap's use of two highly consequential assumptions concerning (1) the loss that a collateral asset would experience upon default; and (2) the timing of collateral defaults. The specific assumptions that BarCap used to model these factors were themselves misleading, because they contradicted BarCap's own and decidedly more negative views concerning both loss upon default and the timing of default (which undergirded BarCap's decision to use Markov as a vehicle through which Barclays could "short" such collateral on a massive scale).

360. The first of these assumptions – loss upon default – is the more straightforward matter. The assumption that BarCap used for the modeling and statistical analysis it provided was that, upon default, a collateral asset would suffer a loss of only 25% (or stated conversely, that it would experience a recovery of 75%). For example, if a $20 million CDO tranche collateralizing Markov defaulted, the actual loss would only by 25%, or $5.0 million.

361. By using such low loss upon default assumptions, BarCap made matters appear as if Markov, and the specific tranche purchased by Plaintiff, were impervious to higher levels of default than they in fact were. This explains much of the reason why BarCap's analyses purportedly demonstrated that, although the Markov tranche purchased by Plaintiff had junior tranche credit protection amounting to a mere 4.0% of Markov's collateral portfolio, the tranche could nevertheless withstand cumulative collateral defaults *exceeding 20%* without suffering principal loss. By operation of this assumption, even if 20% of the collateral asset portfolio defaulted, those defaults would only causes losses at a 25% rate – meaning that principal losses would not be 20%, but a far more manageable 5%.

362. At the time BarCap employed such loss upon default assumptions, BarCap's own

123

views about actual loss upon default were decidedly more negative with respect to junior tranches of Mezzanine CDOs – $635 million of which collateralized Markov, $550 million of which Barclays was short.

363. The second of these assumptions – the timing of defaults – is slightly more complex, but was misleading for the same reason (BarCap believed otherwise) and with the same effect (it made Markov seem more impervious than it in fact was).

364. The timing of defaults matters because, in addition to the credit protection provided by junior tranches, CDOs also generated "excess spread" (typically, in an annual amount between 1% and 2% of total collateral), representing the difference between (1) the cashflow generated by a CDO's collateral assets, and (2) the CDOs' obligations to pay promised interest to investors in its tranched notes. In a nutshell, CDOs took in more money than they had to pay out (assuming that the collateral continued to perform, as opposed to defaulting and thereby ceasing to generate cashflow). This constantly-generated "excess spread" provided a further initial bulwark against collateral losses. To simplify somewhat, it was collected in a constantly-renewed reservoir fund (up to a certain point, after which it would be "released" to equity tranche investors), which could be used to "mop up" collateral losses before any such collateral losses forced impairment of the CDO's actual tranches.

365. The timing of defaults can affect CDO outcomes in substantial part because of the way it interacts with this excess spread. For example, under the assumptions that BarCap used in the modeling it provided, defaults occurred at a constant (and low) rate. This meant that much of the losses upon default (themselves artificially reduced by low loss upon default assumptions) could be "mopped up" each year by excess spread, without causing any impairment to the tranched notes.

124

366.   By using such an assumption, BarCap made it appear as if Markov's Class B tranche could withstand a high rate of cumulative collateral default before suffering any loss.

367.   To return to specifics: even though the Markov tranche purchased by Plaintiff had junior tranche credit protection amounting to a mere 4.0% of the collateral portfolio, BarCap's statistical modeling and analysis represented that those tranches could withstand cumulative collateral defaults *exceeding 20%* without suffering principal loss.  As already detailed, the assumption that loss upon default would only be 25% meant that cumulative collateral defaults of 20% would produce actual losses of amounting to only 5% of collateral.  While a cumulative loss in an amount equal to 5% of collateral would seem at first glance to partially swamp a tranche such as Plaintiff's (which had junior tranche credit protection of 4%), the assumption of a constant default rate meant that much of this 5% of losses would in fact be "mopped up" by constantly-renewed excess spread, rather than cause CDO tranche impairment.

368.   However, if defaults do not occur at constant and low rates, but arrive in "lumpier" fashion (*e.g.*, a bunch all at once), such defaults can overwhelm available excess spread and cause losses to pierce into a CDO's tranches.  Perhaps more importantly, the worst scenario for a CDO is for defaults to occur in lumpy fashion *close to the CDO's inception – i.e.*, before the CDO has had several years to build up a reservoir of excess spread.  In this case, the CDO is not only *not* protected by pooled excess spread (which doesn't yet exist in substantial quantities), but also loses its ability to generate such excess spread (because such defaults impair the cashflow generated by the collateral assets on a going-forwards basis).

369.   In truth, BarCap did not expect that defaults in Markov's collateral portfolio would be low and constant, but rather that they would be high and imminent, especially with respect to the

$550 million of junior Mezzanine CDO tranches that Barclays, through Markov, was shorting. Barclays was shorting such collateral *precisely because* it expected defaults and losses to be high.

370.    Thus, as explained above, BarCap's use of these assumptions made Markov and its Class B tranche appear to be substantially impervious to conceivable loss.

371.    This, and the assumptions used to produce it, were materially misleading.  In truth, BarCap was itself expecting Mezzanine CDO junior tranches, constituting $635 million of Markov's collateral exposures, to experience extremely high rates of default and loss.  The losses that BarCap expected, and through Markov was betting on to the tune of $550 million (with respect to Mezzanine CDO junior tranches alone), would easily suffice to overwhelm Markov's minimal structural protections (4% tranche subordination) and cause Markov's Class B tranche 100% losses.

## V.    RELIANCE

372.    Plaintiff reasonably and actually relied on BarCap's and SSGA's above-detailed representations and misrepresentations in the Offering Documents and in further communications made between BarCap and Plaintiff.

### A.    Plaintiff Evaluated Potential CDO Investments and Made CDO Investment Decisions on the Basis of a Formal "Analytical Review"

373.    In connection with evaluating potential investments in CDOs, including Markov, and in making actual investment decisions, including the decision to invest in Markov, Plaintiff operated its own standard investment protocol: the "Analytical Review."

374.    The Analytical Reviews conducted by Plaintiff in connection with its CDO investments required Plaintiff to scrutinize *inter alia*: (a) the CDO's collateral;  (b) the CDO's structure, and the structural protections the CDO afforded against collateral losses; and (c) the CDO's collateral manager.

375.    Plaintiff's Analytical Review for Markov featured this tripartite structure, preceded by a brief introduction presenting certain basic "facts" about Markov, the Markov tranche in question and Plaintiff's investment recommendation:

(a)    The first section of the Analytical Review was devoted to analysis of Markov's collateral;

(b)    The second section of the Analytical Review was devoted to analyses of the Markov's structure and how that structure would operate to shield the Markov's AA-rated tranche from collateral losses.

(c)    The third section of the Analytical Review scrutinized Markov's collateral manager SSGA, assessing *inter alia* the historical performance of SSGA's other CDOs, the resources and expertise that SSGA could bring to bear, and methods used by SSGA in evaluating and selecting collateral assets.

## B.    Plaintiff Relied on Defendants' False and Misleading Statements

376.    In conducting the Analytical Review through which it evaluated CDO investments and made its investment decisions – *i.e.*, in its evaluation of and decision to invest in Markov's Class B notes – Plaintiff relied on Defendants' above-detailed misrepresentations and misleading statements.

377.    Indeed, many of the complained-of misrepresentations and misleading statements were re-iterated *by Plaintiff* in the Analytical Reviews that Plaintiff constructed.  Reliance is thereby directly – and visibly – established.

127

1.   **Plaintiff Relied on Defendants' False and Misleading Statements Concerning Who Was Selecting Markov's Collateral Assets, and on What Bases Collateral Selection Would Be Made**

378.   Plaintiff relied on Defendants' representations that SSGA would serve as Markov's collateral manager, as well as on Defendants' associated misrepresentations and misleading statements regarding the processes, rigor and expertise that SSGA would apply in evaluating and selecting collateral for Markov.

379.   First, in the brief introduction of its Analytical Review for Markov, setting forth the most salient facts with respect to an investment in Markov, Plaintiff reiterated Defendants' representations that Markov would be managed by SSGA.

380.   Indeed, Plaintiff's Analytical Review made no mention at all of Barclays. It makes clear that Plaintiff believed that the impact of Barclays' actions on Markov's performance would be limited to the structure of the CDO.

381.   Second, that Plaintiff believed that Markov's collateral selection would be determined by SSGA is further supported by the section of Plaintiff's Analytical Review devoted to scrutinizing SSGA, the performance of other CDOs SSGA managed, and the resources, processes, rigor and expertise that SSGA would apply in evaluating and selecting collateral for Markov.

382.   In the section of Plaintiff's Analytical Review devoted to scrutinizing SSGA, Plaintiff analyzed the resources and expertise possessed by SSGA, identified other CDOs managed by SSGA and reviewed their historical performance.  In the same section, Plaintiff also analyzed certain of the purported methods and bases upon which SSGA would evaluate and select collateral. In so doing, Plaintiff relied on and even re-iterated certain of Defendants' complained-of misrepresentations.  For example, Plaintiff re-iterated Defendants' statements – alleged herein to

have been materially misleading (*see* Section IV.C *infra*) – concerning, *inter alia*, SSGA's: (1) scrutiny of mortgage originators and mortgage underwriting standards; (2) SSGA's mortgage modeling, based on numerous mortgage risk characteristics, to predict both the timing and amount of defaults, and the losses upon defaults; (3) SSGA's cashflow modeling of such collateral performance through RMBS securitizations to assess specific tranche risk; and (4) SSGA's further stress testing of such potential collateral selections to determine whether they held up.

383.    In sum, Plaintiff plainly believed that Markov's collateral would be selected by an independent collateral manager – SSGA – and that Barclays would play no role at all in such collateral determination.

> ### 2.    Plaintiff Relied on Defendants' Misleading Representations Concerning Markov's Collateral and its Quality, Including the Credit Ratings of the Collateral, the AAA ratings of the Markov Chain Collateral, and its "High Grade" Nature

384.    The first main section of Plaintiff's Analytical Review focused on CDO collateral.

385.    Plaintiff's Analytical Review for Markov, in reviewing Markov's collateral,  re-iterated Defendants' representations to the effect that Markov would be based on a portfolio of highly-rated collateral:  specifically, Defendants' representations that Markov's collateral portfolio would have average portfolio-wide credit ratings between Aa3/A1 (AA-/A+).

386.    Plaintiff's Analytical Review also re-iterated that the 15% of Markov's collateral consisting of "Static ABS CDOs" – *i.e.*, the Markov Chain CDOs – had AAA credit ratings.

387.    Plaintiff's Analytical Review also re-iterated, as Defendants had represented, that the "Collateral Type" of Markov was "High Grade."

388.    Additionally and as further discussed in Section V.B.4 *infra*, the second main section of Plaintiff's Analytical Review also focused on Markov's collateral in modeling how Markov's

structure would protect against potential collateral losses.  In  modeling such potential collateral losses, the primary input was the credit rating of the collateral.  Plaintiff relied on these credit ratings to evaluate both the losses that Markov's collateral could suffer and Markov's structural ability to shield Markov tranches from such collateral losses.  As already detailed, Barclays was aware that such credit ratings and the historical rates of default and loss associated with them were materially misleading: Barclays understood that – in sharp contrast to recent history – rates of default for junior RMBS and Mezzanine CDO tranches would be extreme and that losses upon default would be large.

### 3. Plaintiff Relied on Defendants' Misleading Representations Concerning Markov Tranche Credit Ratings

389.    The single first "fact" noted in Plaintiff's Analytical Review for Markov was the high AA credit rating of Markov's Class B tranche, as represented by Defendants.  Additionally and as discussed in greater detail in the following section, the second main section of Plaintiff's Analytical Review also focused on this tranche's credit rating, in modeling the degree to which Markov's structure would protect against potential collateral losses.

### 4. Plaintiff Relied on Defendants' Misleading Representations Concerning The Safety, Structural Protections from Collateral Losses, and Projected Performance of Markov's Tranched Notes

390.    As detailed above at Section IV.H *supra*, Defendants provided Plaintiff with statistical modeling that (1) projected performance of Markov's collateral assets in order to (2) represent the extent to which the specific tranche in question (Markov's Class B tranche) would be protected by Markov's structure from collateral losses.  Put more simply: Defendants provided sophisticated analyses purporting to demonstrate that Markov's Class B tranche was very safe (*id.*): indeed, these analyses represented that the tranche in question would not lose a single dollar of principal even if more than 20% of Markov's collateral defaulted (*id.*).

391.    Plaintiff not only relied on these analyses, but re-iterated them *twice* in its Analytical Review for Markov: first, *in the Analytical Review's brief introductory section, where re-iteration of this purported safety was presented in bold type and constituted strong justification for deciding to invest in Markov's Class B tranche*; and, second, at much greater length and detail in the second main section of the Analytical Review, devoted to focusing on Markov's structure and the ability of that structure to withstand collateral losses.

392.    The second section of Plaintiff's Analytical review, the longest and most detailed, involved closer scrutiny of Markov's collateral, modeling of Markov's collateral's performance, and modeling of Markov's structure to determine to what extent Markov's Class B tranche would be protected from underlying collateral losses.   All this modeling relied on the misleading credit ratings, both for Markov's collateral and for Markov's tranches, that Defendants provided.

393.    For example, Plaintiff further assessed Markov's collateral by type (*e.g.*, nonprime RMBS) and by credit rating (*e.g.*, AA), looking to historical rates of default and loss upon default for evaluation of the collateral performance.   These historical rates of default were minimal at all credit ratings levels (*i.e.*, approaching 0.0%), and the severity of loss upon default was likewise minimal.   Barclays, however, knew that the historical performance of such assets with such credit ratings no longer bore any relation to the imminent high rates of default and loss upon which Barclay's bets *against* this collateral were founded.

394.    Likewise, in assessing the ability of Markov's structure to provide protection against collateral losses, Plaintiff re-iterated the misleading analyses that Defendants had provided, which themselves depended on crucial but false/misleading assumptions (detailed in Section IV.H *supra*). These assessments purported in misleading fashion to show that Markov's Class B tranche would

still "break even" even if more than 20% of its collateral defaulted.

395.    Plaintiff relied on this analysis to determine that Markov's Class B tranche was not merely a safe and conservative investment that merited its AA credit rating, but in fact an *investment that substantially exceeded even AAA-rating safety levels*.  For example, Plaintiff's Analytical Review noted that the relevant tranches could withstand collateral default rates of up to 20%, which was not only far more than required for an AA credit rating given the CDOs' collateral (5.75%) but even far more than required for an AAA credit rating given such collateral (7.53%).

396.    In short, based on Defendants' representations, Plaintiff believed that the AA-rated Markov tranche was *even safer* than its credit rating indicated – and even safer than securities with AAA credit ratings.

## VI.    THE INJURY CAUSED BY DEFENDANTS' MISCONDUCT

397.    Markov, collateralized by credit default swap referencing $550 million of Mezzanine CDO junior tranches that Barclay wished to bet against, very quickly suffered hundreds of millions of dollars of collateral losses.  These collateral losses caused the tranche in which Plaintiff invested – Markov's Class B tranche – to suffer 100% principal losses.  Indeed, Markov's losses, most severely from its Mezzanine CDO exposures, were large enough to render all $400 million of Markov's funded tranched notes, including even Markov's AAA-rated Class A-1, A-2 and A-3 tranches, devoid of all value.

398.    On November 16, 2007, just over six months after Markov's May 1, 2007 closing, Markov suffered an "event of default."  On January 22, 2008, Barclays, exercising certain control rights it had over Markov, directed that Markov liquidate the collateral capable of being sold and return proceeds to Markov investors in order of tranche seniority.  The  proceeds of Markov's

collateral liquidation did not suffice to repay full principal to Markov's super senior tranche holder(s), and thus all of Markov's junior tranches – the $400 million of tranched notes – received none of these proceeds and suffered 100% losses.

399.    Defendants' above-detailed unlawful conduct directly and proximately caused damage to Plaintiff in connection with Plaintiff's purchase of Markov's Class B tranche, and Plaintiff's damage was a foreseeable result of that conduct.

400.    By using Markov as a structure though which Barclays could amass a large, disguised "short" bet against the lowest, riskiest tranche of subprime risk – the BBB-rated RMBS tranches – Defendants thereby transferred to Markov hundreds of millions of dollars of losses.   By misrepresenting Markov, Defendants further transferred those losses through Markov to Markov's investors, thereby "funding" Defendants' rigged bet.  The principal invested by Plaintiff and all other investors in Markov's tranched notes was "swapped" to Barclays through the credit default swap bet that Barclays had caused Markov to take, thereby causing 100% loss to Plaintiff and all other investors in Markov's tranched notes.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of The Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder
### (Against BarCap and SSGA)

401.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

402.    BarCap and SSGA carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive Plaintiff and Markov investors as alleged herein; and (ii) cause Plaintiff to purchase or otherwise invest in the misrepresented, built to fail Markov CDO. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

403.    BarCap and SSGA (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon acquirers of the Markov CDO, in an effort to sell designed to fail investments in violation of Section 10(b) of the Exchange Act and Rule 10b-5. BarCap and SSGA and their parent corporations are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

404.    BarCap and SSGA individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the purpose of the CDO, the CDO's collateral selection process, the independence of the CDO's collateral manager, the nature and quality of the CDO's collateral, and the risk of investing in the CDO, as specified herein.

405.    BarCap and SSGA employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Markov's quality, safety and value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Markov's purpose, collateral, risk and value not misleading.

406.    BarCap and SSGA had actual knowledge of the misrepresentations and omissions

of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true purpose of the Markov CDO, the lack of independence of the collateral manager, the actual bases and methods for the selection of collateral, the quality and creditworthiness of the collateral, and the ersatz credit ratings attached to Markov's tranches. As demonstrated by Defendants' actions, if they did not have actual knowledge of the misrepresentations and omissions alleged, Defendants were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

407.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of Markov CDO tranches was, at any price, artificial. In ignorance of the fact that the Markov CDO was toxic product designed to fail, and relying directly or indirectly on the false and misleading statements made by Defendants, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the relevant period preceeding the sale, Plaintiff acquired a CDO that was built to fail, and did in fact fail, losing all its value and Plaintiff's entire investment.

408.   At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff known the truth regarding why the CDO was created, how it was created, who really controlled the collateral selection, how collateral was selected, and how and why credit ratings attached to its underlying collateral and its tranches were

false, Plaintiff would not have purchased the Markov CDO.

409.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

410.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its acquisition of the Markov CDO.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**(Against Barclays Bank PLC; State Street Bank & Trust Company;**
**and State Street Corporation)**

411.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

412.   The controlling person liability of the parent corporation Defendants – Barclays Bank PLC, State Street Bank & Trust Company and State Street Corporation – arises from the following facts: (i) the parent corporation Defendants owned and controlled the entities that disseminated false and misleading information to Plaintiff; (ii) each of the parent corporation Defendants, by virtue of their structure, responsibilities and activities, was privy to and participated in the creation, development and marketing of the Markov CDO; and (iii) each of the parent corporation Defendants was aware of their subsidiaries' dissemination of information to Plaintiff and other investors which they knew was, or recklessly disregarded whether it was, materially false and misleading.

413.   Barclays Bank PLC ("BBPLC") owns its subsidiary BarCap, controlling BarCap within the meaning of Section 20(a) of the Exchange Act as alleged herein. Through its controlled BarCap subsidiary, BBPLC conducts investment banking operations in the United States. BBPLC and Barcap share a common United States address (200 Park Avenue, New York, NY 10166) and

common officers. BarCap's financial results are consolidated into and reported as part of BBPLC's financial results.

414.    Defendant BBPLC had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  Defendant BBPLC had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BarCap, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  BBPLC was aware or directly participated in a continuous course of conduct to conceal adverse material information about the purpose of the CDO, the CDO's collateral selection process, the independence of the collateral manager, the nature of the collateral and the risk of investing in the CDO.

415.    Defendant BBPLC participated directly with BarCap in the creation, arranging, marketing and sale of the Markov CDO.  BBPLC aided Markov's creation by warehousing Markov's collateral and by entering into a $1.8 billion of credit default swap through which: (1) Markov was effected; and (2) BBPLC profited from the disguised bet that BBPLC and BarCap had hidden in Markov.  BBPLC then sought to "fund" this bet by marketing Markov notes outside the United States to non-U.S. investors, while BarCap marketed Markov notes inside the United States to U.S. investors.  The funds raised by BarCap and BBPLC through the sale of Markov's tranched notes to Plaintiff and other investors were the funds that made Barclays' hidden bet actually pay off.

416.    Defendants State Street Bank & Trust Company (SSBTC) and State Street Corporation, control SSGA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  SSBTC owns and controls SSGA, which acts as SSBTC's asset management arm.  In turn, SSBTC is a wholly-owned subsidiary of State Street Corporation, a publicly-registered financial

holding company.  All entities share a common address (One Lincoln Street, Boston, Massachusetts 02111) and officers.  Both SSBTC and State Street Corporation own and control SSGA.

417.    Defendants SSBTC and State Street Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making of SSGA, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Defendants SSBTC and State Street Corporation were aware or directly participated in a continuous course of conduct to conceal adverse material information about the purpose of the CDO, the CDO's collateral selection process, the independence of the collateral manager, the nature of the collateral and the risk of investing in the CDO.

418.    As set forth above, BarCap and SSGA each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their ownership and control of BarCap and SSGA, Defendants BBPLC, SSBTC and State Street Corporation are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its acquisition of the Markov CDO.

## COUNT III
### Fraud in the Inducement
### (Against BarCap and SSGA)

419.    Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs as though they were fully set forth herein.

420.    In connection with their creation of Markov and issuance and sale of Markov notes, Defendants BarCap and SSGA drafted, created, prepared and disseminated to potential Markov investors:

      (a)      a "pitchbook" dated March 2007 (the "Pitchbook"); and

(b)       an "offering circular" dated May 22, 2007 (the "Offering Circular").

(The Pitchbook and the Offering Circular are referred to hereinafter as the "Offering Documents.").

421.    Defendants BarCap and SSGA made material misrepresentations in the Offering Documents, which contained numerous representations concerning Markov, Defendants' purported roles in Markov, Markov's collateral, who would chose that collateral and on what bases such collateral selections would be made, and the protection Markov's structure would provide to shield Markov's tranched notes from collateral losses.  These misrepresentations include but are not limited to the following:

(a)       BarCap falsely represented that an independent third-party collateral manager – SSGA – would select Markov's collateral;

(b)       BarCap made materially false and misleading representations concerning how, and on what bases, SSGA would evaluate and select collateral for Markov;

(c)       BarCap made misleading representations concerning the credit ratings of Markov's collateral and of Markov's tranched notes, making Markov appear far safer than BarCap knew it to be;

(d)       BarCap made misleading representations concerning the purported AAA ratings of the Markov Chain collateral;

(e)       BarCap made misleading representations that the Markov was a "High Grade" CDO;

(f)       BarCap made misleading representations concerning the superiority of or advantage provided by Markov's mostly synthetic collateral;

(g)       BarCap made misleading representations concerning Markov's safety,

139

structural protections from collateral losses and resilience to such losses, at a time when BarCap itself understood that collateral defaults and loss upon default would be severe;

(h)     BarCap also directed emails and verbal communications that were consistent with and affirmed the misrepresentations contained in the Offering Documents to the Plaintiff prior to the Plaintiff's purchases;

(i)     SSGA falsely represented that an independent third-party collateral manager – SSGA – would select Markov's collateral; and

(j)     SSGA made materially false and misleading representations concerning how, and on what bases, SSGA would evaluate and select Markov's collateral.

422.     SSGA and BarCap knew their statements  were false and misleading, or at a minimum were reckless in not knowing that the statements were not true when they were made. Defendants made these false and misleading statements with the intent and expectation that Plaintiff would rely upon them. Defendants' conduct was willful, malicious, reckless and without regard to Plaintiff.

423.     Plaintiff believed Defendants' misrepresentations to be true and justifiably acted in reliance upon them.  Without these false and misleading representations, Plaintiff would not have agreed to make its investment in Markov.

424.     As a direct,  proximate and foreseeable result of Defendants' conduct, Plaintiff was damaged in an amount to be determined at trial.  Plaintiff is entitled to punitive damages.

## COUNT IV
### Fraudulent Concealment
### (Against BarCap and SSGA)

425.     Plaintiff repeats and realleges the foregoing allegations in each of the preceding

paragraphs as though they were fully set forth herein.

426.    Defendants had a duty to disclose the material information that the products they created and sold to the Plaintiff were designed and disguised to be the opposite of what they appeared (highly rated securities designed to succeed), and in fact had been designed in disguised fashion to fail.

427.    In fact, in Markov, Plaintiff was not investing in a bona fide High Grade CDO collateralized by High Grade collateral, but purchasing securities in a vehicle designed by Defendants as a disguised way for  BarCap and BBPLC to short the lowest and riskiest tranche of nonprime mortgage risk (BBB-rated RMBS tranches).  Only Defendants, because they designed and disguised the products, could know that the Markov product they sold the Plaintiff was designed to fail and, thereby, allow BarCap and BPPLC to profit from Barclays' short bet with funds derived from deceiving Plaintiff.  Defendants used their superior knowledge of essential facts to create and market an investment that disguised its nature and purpose.

428.    In connection with their creation of Markov and issuance and sale of Markov notes, Defendants drafted, created, prepared and disseminated to potential Markov investors:

(a)    a "pitchbook" dated March 2007 (the "Pitchbook"); and

(b)    an "offering circular" dated May 22, 2007 (the "Offering Circular").

(The Pitchbook and the Offering Circular are referred to collectively as the "Offering Documents.").

429.    Defendants BarCap and SSGA made material misrepresentations in the Offering Documents, which contained numerous representations concerning Markov, Defendants' purported roles in Markov, Markov's collateral, who would chose that collateral and on what bases such collateral selections would be made, and the protection Markov's structure would provide to shield

Markov's tranched notes from collateral losses.  These misrepresentations include but are not limited to the following:

(a)     BarCap falsely represented that an independent third-party collateral manager – SSGA – would select Markov's collateral;

(b)     BarCap made materially false and misleading representations concerning how, and on what bases, SSGA would evaluate and select collateral for Markov;

(c)     BarCap made misleading representations concerning the credit ratings of Markov's collateral and of Markov's tranched notes, making Markov appear far safer than BarCap knew it to be;

(d)     BarCap made misleading representations concerning the purported AAA ratings of the Markov Chain collateral;

(e)     BarCap made misleading representations that the Markov was a "High Grade" CDO;

(f)     BarCap made misleading representations concerning the superiority of or advantage provided by Markov's mostly synthetic collateral;

(g)     BarCap made misleading representations concerning Markov's safety, structural protections from collateral losses and resilience to such losses, at a time when BarCap itself understood that collateral defaults and loss upon default would be severe;

(h)     BarCap also directed emails and verbal communications that were consistent with and affirmed the misrepresentations contained in the Offering Documents to the Plaintiff prior to the Plaintiff's purchases;

(i)     SSGA falsely represented that an independent third-party collateral manager

142

– SSGA – would select Markov's collateral; and

(j)     SSGA made materially false and misleading representations concerning how, and on what bases, SSGA would evaluate and select Markov's collateral.

430.    Defendants knew their statements were false and misleading, or at a minimum were reckless in not knowing that the statements were not true when they were made.  Defendants made these false and misleading statements with the intent and expectation that Plaintiff would rely upon them. Defendants' conduct was willful, malicious, reckless and without regard to Plaintiff.

431.    Plaintiff believed Defendants' misrepresentations to be true and justifiably acted in reliance upon them.  Without these false and misleading representations the Plaintiff would not have agreed to make its investment in Markov.

432.    As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiff was damaged in an amount to be determined at trial.  Plaintiff is entitled to punitive damages.

## COUNT V
## Aiding & Abetting Fraud
## (Against SSGA)

433.    Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs as though they were fully set forth herein.

434.    As described above, SSGA provided substantial assistance to advance the fraud described herein.  SSGA aided and abetted BarCap in its fraudulent misrepresentations made to Plaintiff, as described herein, including by agreeing to participate in Markov as Markov's ersatz collateral manager.

435.     SSGA had knowledge of the fraud described herein and intentionally assisted in its commission.  As Markov's purported collateral manager, SSGA was necessarily aware that it had

143

substantially abdicated its represented role in favor of Barclays, which used its control over Markov's collateral selection to insert into Markov its disguised bet through Mezzanine CDO tranches to Mezzanine CDO collateral: the BBB-rated subprime RMBS tranches.  Moreover, SSGA participated with Barclays in the creation of the most misleading of those Mezzanine CDOs – the Markov Chain CDOs.

436.    Because of its position as collateral manager for the Markov CDO, SSGA had superior knowledge of the true quality and value of Markov's collateral portfolio, and superior knowledge as an expert concerning the actual risk of default for the assets in the portfolio. SSGA possessed knowledge that the Plaintiff did not have reasonable access to, and Plaintiff, therefore, could not verify the representations made by the Defendants.

437.    Without SSGA's assistance the fraud could not have occurred. Because SSGA was held out as the party responsible for selection of Markov's collateral, Barclay's effective control over Markov's collateral and Markov was misrepresented and disguised, as was Barclays' ability to use Markov as a disguised proprietary trading vehicle through which  to short the very collateral marketed as High Grade and highly rated when presented to Plaintiff.  SSGA's role in Markov, and thus Markov itself, was misrepresented to Plaintiff.

438.    SSGA's actions as aider and abetter of the fraud is the direct,  proximate and foreseeable cause of damages to the Plaintiff.

439.    SSGA is liable to the Plaintiff for the damages caused by Defendants' unlawful conduct in an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## COUNT VI
## Aiding & Abetting Fraud
## (Against BarCap)

440.    Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs as though they were fully set forth herein

441.    As described above, BarCap  provided substantial assistance to advance the fraud described herein.  BarCap aided and abetted SSGA's fraudulent statements concerning its purported role as collateral manager and how and what bases SSGA selected collateral in Markov.

442.    BarCap had knowledge of the fraud described herein and intentionally assisted in its commission.

443.    BarCap's actions as aider and abetter of the fraud is the direct,  proximate and foreseeable cause of damages to the Plaintiff.

444.    BarCap is liable to the Plaintiff for the damages caused by Defendants' unlawful conduct in an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## COUNT VII
## Negligent Misrepresentation
## (Against SSGA)

445.    Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs, except as to the paragraphs that allege scienter, as though they were fully set forth herein.

446.    Because of its position as collateral manager for the Markov CDO, SSGA had superior access to information and knowledge as to who had been responsible for selecting such collateral, the true quality and value of the collateral portfolio, and superior access to information and knowledge as an expert concerning the actual risk of default for the assets in the portfolio.

145

SSGA also should have known that Plaintiff did not have reasonable access to and, therefore, could not verify the representations made by the Defendants.

447.     SSGA incorrectly represented that it was an independent third-party collateral manager, who would perform its collateral management duties independent of Barclays' interests and in the interests of the Plaintiff and other Markov investors.

448.     SSGA made materially inaccurate representations concerning how, and on what bases, SSGA would evaluate and select Markov's collateral.

449.     SSGA was at a minimum negligent in not knowing that the statements were not true when they were made.  SSGA made these inaccurate statements with the intent and expectation that Plaintiff would rely upon them in evaluating a Markov investment.

450.     Plaintiff believed Defendants' misrepresentations to be true and justifiably acted in reliance upon them.  Plaintiff believed Defendant SSGA was performing its duties independent of Barclays' interests and in the interests Plaintiff and other Markov investors.  Without these false and misleading representations Plaintiff would not have agreed to make its Markov investment.

451.     Defendants are liable to the Plaintiff for the damages caused by Defendants' unlawful conduct in an amount to be determined at trial.

## COUNT VIII
## Breach of Fiduciary Duty
## (Against SSGA)

452.     Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraphs, except as to the paragraphs that allege scienter, as though they were fully set forth herein.

453.     SSGA's exercise of discretion, as the Markov CDO's purportedly independent

collateral manager, gave rise to fiduciary duties obligating SSGA to put Plaintiff's interests ahead of its own.  As collateral manager, SSGA was charged with selecting collateral assets for the Markov CDO based on the criteria in stated in Markov's indenture and in the Offering Documents, and per SSGA's experience and discretion.

454.     SSGA's superior expertise and knowledge of the collateral assets in Markov, the process used in selecting those assets, and the reasons it selected those assets, gave rise to a fiduciary duty to disclose material information to the Plaintiff.  As collateral manager, SSGA had essential and unique knowledge that the Plaintiff did not have reasonable access to.  Plaintiff did not have reasonable access to the same information to verify SSGA's representations which, unbeknownst to the Plaintiff at the time, were partial, compromised, ambiguous, false, and incomplete.

455.     As a result of its superior expertise, knowledge, purported mission and discretionary power, SSGA occupied a position of trust and influence, and Plaintiff reposed trust and confidence in SSGA.

456.     SSGA breached its fiduciary duties to Plaintiff in multiple respects.  It misrepresented among other things:

(a)     that an independent third-party collateral manager – SSGA – would select Markov's collateral; and

(b)     how, and on what bases, SSGA would evaluate and select Markov's collateral.

457.     SSGA breached its fiduciary duties in failing to disclose material information, including, among other things, that:

(a)     SSGA was not independent;

(b)     that in performing its duties it was placing the interests of BarCap before that of Plaintiff, and accommodating BarCap' interest in creating a disguised and rigged bet against high risk mortgage-backed securities; and

(c)     that in performing its duties, accommodating BarCap's interest was paramount in its performance.

458.    As a direct, proximate and foreseeable result of SSGA's breach of its fiduciary duty, Plaintiff has been damaged by an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## COUNT IX
## Aiding and Abetting Breach of Fiduciary Duty
## (Against BarCap)

459.    Plaintiff repeats and realleges the foregoing allegations in each of the preceding paragraph,  except as to the paragraphs that allege scienter, as though they were fully set forth herein.

460.    BarCap had actual knowledge of the facts, described directly above and throughout the complaint, that are pled in connection with SSGA's breaches of fiduciary duty.

461.    As described above, BarCap knowingly and substantially assisted in SSGA's breaches of fiduciary duty owed to the Plaintiff.

462.    Accordingly, as a direct, proximate and foreseeable result of BarCap' conduct, the Plaintiff has been damaged by an amount to be determined at trial.  Plaintiff is also entitled to punitive damages.

## COUNT X
## Breach of Contract Harming a Third Party
## (Against SSGA )

463.    Plaintiff repeats and realleges the foregoing allegations in the preceding paragraphs as though they were fully set forth herein.

464.    Markov and SSGA entered into a contract wherein SSGA agreed to select collateral for Barclays' Markov CDO in a manner proscribed in the contract between the parties and for the benefit of investors in Markov.

465.    As described *supra*, the collateral management agreement (contract) between SSGA and Markov for the benefit of Markov investors is described in the Offering Documents as ensuring that SSGA would use certain bases and methods for collateral selection that would benefit the investors.

466.    The bases and methods of collateral selection in the agreement were not followed by SSGA, the contract was breached, and as a result Plaintiff suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

(a)    Damages in an amount to be determined at trial;

(b)    An award of reasonable attorneys' fees;

(c)    All costs of the proceedings herein, along with pre and post judgment interest;

(d)    Punitive damages; and

(e)    Such other relief the court deems just und proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 26, 2011

**KIRBY MCINERNEY LLP**

By:

Ira Press
David Bishop
Kirby McInerney LLP
825 Third Avenue
New York, NY 10022
212 317-2300
212 751-2540
ipress@kmllp.com
dbishop@kmllp.com

*Plaintiff's Counsel*

150

# EXHIBIT A

**GLOSSARY**

| Term | Definition and Further Explanation |
|---|---|
| **Abacus** | Abacus 2007-AC1.  A **Built-to-Fail Synthetic Mezzanine CDO** created by Goldman Sachs.  Although **Pitchbooks** and **Offering Circulars** represented that Abacus's **Collateral Manager** would be ACA, in fact many of the **Reference Entities** in Abacus' **Collateral Portfolio** were selected by an undisclosed third party -- hedge funds managed by John Paulson ("Paulson").  Paulson (1) selected **Reference Entities** on the basis of their likelihood to fail, and then (2) bet against the CDO collateralized by such adversely-selected **Reference Entities**. |
| **Attachment Point** | The level of aggregate losses experienced by a CDO **Collateral Portfolio** sufficient to cause a given CDO tranche its first dollar of principal loss.  For example, in a CDO with a $1 billion **Collateral Portfolio**, a tranche protected from the first $100 million of **Collateral Portfolio** losses by more junior tranches (which first absorb those losses) has an Attachment Point of 10%. |
| **BarCap** | Barclays Capital Inc., the creator, arranger and structurer of Markov. |
| **Barclays** | Refers collectively to **BarCap** and **BBPLC**. |
| **BBPLC** | Barclays Bank PLC.  Parent and controlling entity of **BarCap**, which is a wholly-owned subsidiary of BBPLC.  To facilitate, effect and create Markov, BBPLC (1) underwrote and placed Markov's Funded Tranches ouside the United States, (2) warehoused Markov Collateral Portfolio assets until Markov's closing date, and (3) served as the short counterparty in Markov's **Underlying Credit Default Swap**. |
| **Bespoke CDO** | A bespoke CDO (almost always a **Synthetic Single Tranche CDO**) is a CDO whose **Collateral Portfolio** and **Single Tranche** features (**Attachment Point** and **Detachment Point**) are -- in theory -- negotiated by the end investor for whom the CDO is purportedly being created.  Such a CDO is "bespoke" because its **Collateral Portfolio Reference Entities** and its **Single Tranche** have been customized by or for the investor.  The **Markov Chain CDOs** were **Bespoke Single Tranche CDOs**. |
| **Built to Fail CDO** | A **Built to Fail CDO** is a CDO, almost always a **Synthetic  Mezzanine CDO**, whose collateral selection was motivated by the collateral's expected failure, rather than its expected success.  As **Synthetic CDOs** were based on **Underlying Credit Default Swaps**, the short party to that swap stood to benefit as, and to the extent, that the referenced collateral (the **Reference Entities**) failed.  Prominent **Built to Fail CDOs** include **Abacus** and the **Constellation CDOs** (all of which were **Synthetic Mezzanine CDOs**). |
| **Carina CDO** | A November 2006 **Synthetic Mezzanine CDO** for which **SSGA** purportedly served as **Collateral Manager**.  As one of a series of **Built-to-Fail CDOs** now known as the **Constellation CDOs**, however, Carina's **Collateral Portfolio** was not chosen solely by **SSGA**, but by an undisclosed third party -- Magnetar.  Magnetar (1) secretly caused the **Constellation CDOs** to be collateralized by assets chosen for their likelihood to fail, rather than to succeed, and then (2) bet against the resulting CDOs through credit default swaps. |

1

**GLOSSARY**

| | |
|---|---|
| **Cash CDO** | A CDO whose **Collateral Portfolio** consists of actual (*i .e* ., 'cash') collateral assets, as opposed to a **Synthetic CDO** whose collateral is "referenced" via credit default swap.  For example, a $1 billion Cash CDO could be based on a **Collateral Portfolio** of 100 different collateral assets (**Nonprime RMBS Tranches**), each in a $10 million par amount. |
| **CDO** | Collateralized Debt Obligation.  Each CDO, akin to a mutual fund, invests in a portfolio of collateral assets (the **Collateral Portfolio**), and (2) issues a set of new securities (**Tranches**) collateralized by that **Collateral Portfolio**.  As in a mutual fund, the peformance of the **Collateral Portfolio** will determine the value and performance of the securities collateralized by the **Collateral Portfolio** (the mutual fund shares, the CDO **Tranches**).  Unlike a mutual fund, the securities issued by a CDO are not all equal shares, but rather discrete sets of senior/subordinated notes (each such set known as a **Tranche**) bearing senior/subordinated claims on the **Collateral Portfolio**'s cashflows (interest and principal).  Cash (principal and interest) from the entire **Collateral Portfolio** flows down the Tranches in a waterfall, from most senior to most junior.  Conversely, **Collateral Portfolio** losses rise up the **Tranches** in a flood, starting with the most junior **Tranche**. Senior **Tranches,** first in line for principal and interest and last in line for losses experienced by the **Collateral Portfolio, are thus safer, and garner higher higher credit ratings.  Each more junior tranche, progressively less removed from Collateral Portfolio losses, is riskier and receives progressively lower credit ratings.** |
| **CDO Bucket** | The amount of a CDO's **Collateral Portfolio**, in percentage terms (e.g., 5%, 35%), that can consist of *other*  CDOs.  Markov had a **CDO Bucket** of 35%, which Defendants filled near to the brim with other CDOs, and, more particularly, with tranches from **Mezzanine CDOs**. |
| **Collateral Manager** | An independent third-party asset manager, with expertise in the assets eligible for inclusion in a CDO **Collateral Portfolio**, tasked with responsibility for selecting the specific collateral assets or **Reference Entities** to be included in the CDO's **Collateral Portfolio**.  **SSGA** was represented to be Markov's **Collateral Manager**. |

**GLOSSARY**

| | |
|---|---|
| **Collateral Portfolio** | The portfolio of collateral assets, ostensibly chosen by the **Collateral Manager**, upon which the CDO's performance will depend (akin to the portfolio of stocks held by a mutual fund and selected by the mutual fund manager).  In a **Cash CDO**, the portfolio of collateral assets, such as **Nonprime RMBS Tranches**, are purchased directly.  Cashflow from those assets funds the CDO's ability to pay promised interest on the **CDO Tranches**; while losses suffered by those assets will cause principal losses to **CDO Tranches**.  In a **Synthetic CDO**, the **Collateral Portfolio** exposure is gained not by purchasing those assets, but by entry into an **Underlying Credit Default Swap** that references a portfolio of **Reference Entities**.  Credit protection payments collected by the CDO (for insuring the portfolio of **Reference Entities**) fund the CDO's provision of interest to the **CDO Tranches**; while **Reference Entity** losses will cause principal losses to **CDO Tranches**. |
| **Constellation CDOs** | A series of approximately 26 **Built to Fail CDO**s -- most of which were **Synthetic Mezzanine CDOs** -- named after various stars, constellations or celestial bodies.  Although most of these CDOs were represented to have various third-party **Collateral Managers**, the **Reference Entities** and **Collateral Portfolios** were in fact secretly determined by an undisclosed hedge fund -- Magnetar.  Magnetar (1) secretly caused the Constellation CDOs to be collateralized by assets chosen for their likelihood to fail, rather than to succeed, and then (2) bet against the resulting CDOs through credit default swaps. |
| **Correlation** | The degree to which assets in a given portfolio will perform similarly or dissimilarly, expressed as a fraction between 0 and 1 (or percentage between 0% and 100%).  0 **Correlation** means that assets were entirely uncorrelated: that the performance of one asset (*e .g .*, oil futures) is entirely independent of the performance of another (*e .g .*, telecommunications bonds).  100% **Correlation** means that two assets (*e .g .*, two different **Nonprime RMBS Tranches**) will perform exactly the same, because they are exposed to the same risks (*e .g .*, declining mortgage quality, declining housing prices, rising mortgage delinquency and default rates, etc.). |
| **Corvus CDO** | A **Synthetic CDO** created by Barclays in which Barclays occupied two conflicting roles:  (1) short counterparty to the **Underlying Credit Default Swap**; and (2) **Collateral Manager**.  Succumbing to its (short) interests under the former of these roles, Barclays used its power under the latter of these roles to select **Reference Entities** for Corvus' **Collateral Portfolio**.  The choices Barclays made as **Collateral Manager** evidenced that Barclays was selecting assets that Barclays believed would fail, so as to profit from shorting them through the **Underlying Credit Default Swap**.  As Barclays would later do in Markov, Barclays caused **Corvus** to insure **Bespoke Built to Fail CDOs** that Barclays had itself created. |

**GLOSSARY**

| | |
|---|---|
| **Credit Default Swap** | A contract, akin to insurance, between a **Protection Buyer** (the insured) and a **Protection Seller** (the insurer) with respect to the risk posed by a given security (the **Reference Entity**, akin to the insured property) in a given amount (the **Notional Amount**, akin to the assessed value of the insured property).  For example, the Reference Entity of a given credit default swap could be a specific **Nonprime RMBS Tranche** in a **Notional Amount** of $10 million.  Under the terms of contract, the **Protection Buyer** pays the **Protection Seller** fixed, regular payments (akin to insurance premiums) to secure the Protection Seller's provision of insurance against **Reference Entity** losses.  The **Protection Seller** thereby earns income from its provision of insurance, but is exposed to the risk of **Reference Entity** losses up to the **Notional Amount.**  A credit default swap can concern one specific **Reference Entity** (a "single name" swap) or a portfolio of **Reference Entities**.  A **Synthetic CDO** is based on an **Underlying Credit Default Swap** with respect to a portfolio of **Reference Entities,** for which the **Synthetic CDO** serves as **Protection Seller** (insurer) and the arranging bank as **Protection Buyer**. |
| **Detachment Point** | The level of aggregate losses experienced by a CDO **Collateral Portfolio** sufficient to cause a given CDO tranche to suffer 100% principal loss.  For example, a tranche with an Attachment Point of 10% and a Detachment Point of 15% (1) starts suffering losses when **Collateral Portfolio** losses rise to 10%, and (2) suffers a complete loss when **Collateral Portfolio** losses reach 15%. |
| **Equity Tranche** | The lowest tranche in a CDO, also referred to as the "Equity Tranche" or the "first loss" tranche.  Because the equity tranche was not protected from **Collateral Portfolio** losses by any more junior **Tranches, Collateral Portfolio** losses first accrue against the equity tranche.  To compensate for this risk, **Equity Tranche** investors earned leveraged returns on the **Excess Spread** generated by the overall CDO.  Customarily, **Collateral Managers** invested in the **Equity Tranches** of the CDOs they managed in order (1) to take advantage of the **Excess Spread** opportunity, and (2) to demonstrate faith in the performance of the **Collateral Portfolio** they selected. |

**GLOSSARY**

| | |
|---|---|
| **Excess Spread** | **Excess Spread** is the difference between (1) the money the CDO must pay out to investors in its **Tranches;** and (2) the money the CDO takes in from its **Collateral Portfolio** (or, in a **Synthetic CDO**, the insurance payments the **Synthetic CDO** receives for insuring the portfolio of **Reference Entities**). Typically, Excess Spread amounts to 1%-2% per annum (*e .g* ., the CDO earns 7% per annum from its **Collateral Portfolio,** but pays out an average of 5.5% to **Tranche** investors).  Such **Excess Spread** flows to **Equity Tranche** investors. Because the **Equity Tranche** often constitutes 5% or less of the entire CDO (*e .g* ., $50 million in a $1 billion CDO), the **Excess Spread** received by **Equity Tranche** investors is *leveraged* :  **Equity Tranche** investors put up just 5% of a CDO's money, but earn **Excess Spread** generated by the entire CDO's portfolio. For example, having put up 5% of a CDO's funds ($50 million), **Equity Tranche** investors receive a 1%-2% return on the *entire*  $1 billion CDO portfolio per year (e.*g* ., $10-$20 million), yielding annual **Equity Tranche** returns of 20%-40% (e.g., $10-$20 million per year of **Excess Spread** accruing to the $50 million **Equity Tranche**). |
| **Expected Loss** | A calculation of losses that the **Collateral Portfolio** underlying a CDO (or RMBS) might suffer.  In CDOs, the Expected Loss was a function of  (1) the assets' credit ratings (each associated with a given **Probability of Default** and **Loss Upon Default**), and (2) the assets' **Correlation**.  Once the Collateral Portfolio's **Expected Loss** was calculated, the CDO **Tranche Structure** was devised by the arranging bank to place each **Tranche** at sufficient remove from that **Expected Loss** to garner a given credit rating.  Thus, **CDO Tranche Structure** and CDO **Tranche** credit ratings were a function of the **Expected Loss** associated with the **Collateral Portfolio**. |
| **Funded Tranche** | As was normally the case, a tranche purchased with up-front cash.  **Cash CDOs** featured only Funded Tranches, **Synthetic CDOs** could feature both **Funded Tranches** and **Unfunded Tranches**.  Markov had $400 million of **Funded Tranches**, whose sale raised $400 million in funds, junior to Markov's $1.6 billion **Unfunded Super Senior Tranche**. These funds would be used by Markov to make any initial, requisite payments -- up to $400 million -- to the short counterparty in Markov's **Underlying Credit Default Swap**.  Thus, the funds raised by Markov's sale of $400 million of Funded Tranches were used to insure Barclays (the short party in Markov's **Underlying Credit Default Swap**) with respect to the first $400 million of losses suffered by the **Reference Entities** in Markov's $1.8 billion **Collateral Portfolio**. |
| **High Grade CDO** | A CDO whose **Collateral Portfolio** consists of A, AA, and AAA-rated assets or **Reference Entit**ies, with average portfolio-wide ratings of between AA- and A+. |

**GLOSSARY**

| | |
|---|---|
| **Hybrid CDO** | A CDO whose **Collateral Portfolio** exists partly in Cash CDO form and partly in Synthetic CDO form. Markov was a **Hybrid CDO** with a $2 billion **Collateral Portfolio**: $200 million of **Collateral Portfolio** assets in 'cash' form; and $1.8 billion of **Collateral Portfolio** assets in 'synthetic' form through an **Underlying Credit Default Swap** with Barclays referencing such assets. |
| **Loss Severity Upon Default** | The loss a given asset suffers upon default (from 0% to 100%). Lower-rated assets have higher loss severity, and higher-rated assets have lower loss severity. |
| **Markov CDO I** | The empty shell set up and employed by Defendants to effect the Markov CDO and Defendants' Markov scheme. Markov CDO I had neither employees nor offices nor any operations other than: (1) entering into the **Underlying Credit Default Swap** with Barclays; and (2) issuing **Funded and Unfunded Tranches** to investors. All operations were contracted out to other parties, such as Barclays, SSGA, etc. |
| **Markov Chain CDOs** | A set of twelve **Bespoke, Unfunded, Single-Tranche Synthetic Mezzanine CDOs** created by **Barclays** and **SSGA**. As **Synthetic Mezzanine CDOs**, they were based on **Underlying Credit Default Swaps** whose **Reference Entities** were BBB-rated **Nonprime RMBS Tranches**. Although their single tranches bore the highest possible credit ratings (AAA), these tranches were in fact riskier than all other CDO tranches included as **Reference Entities** in **Markov's Underlying Credit Default Swap**. Defendants custom built the **Markov Chain CDOs** for the two-faced purpose of (1) appearing to be the safest of all of Markov's collateral, while simultaneously (2) in fact being the riskiest of all of Markov's collateral. |
| **Markov Investor Losses** | Markov Investor Losses were occasioned by defaults and losses experienced by the **Reference Entities** identified in Markov's **Underlying Credit Default Swap**. As such **Reference Entities** failed and suffered losses, Markov swapped funds equivalent to such losses to Barclays. As such funds were swapped to Barclays, Markov's **Funded Tranches** were written down in like amounts, starting with the most junior tranche. |
| **Markov's Disguised Short Bet** | The essential Disguised Short Bet in Markov was the bet, through highly-rated **Mezzanine CDO Tranches**, against low-rated (BBB and BBB-) **Nonprime RMBS Tranches**. By betting against (highly-rated) **Mezzanine CDO Tranches**, Barclays was in fact betting against their BBB-rated collateral -- which Barclays could not bet against directly through Markov because of Markov's "**High Grade**" nature. This bet was triply disguised: (1) first, under the fiction that **SSGA** rather than Barclays chose Markov's collateral; (2) second, under cover of high **Mezzanine CDO Tranche** credit ratings; and (3) third, by the two-faced **Markov Chain CDOs**, which appeared to be Markov's safest collateral while in fact being its riskiest. |

**GLOSSARY**

| | |
|---|---|
| **Markov's Funding** | **Markov's Funding** refers to the $400 million of up-front cash that Markov received from the sale of Markov's $400 million of **Funded Tranches**.  These funds were held for use to pay Barclays:  $200 million of these funds were held in a reserve account that Markov could use to make credit default swap payments to Barclays as **Reference Entities** failed.  The remaining $200 million was used to purchase highly-rated cash collateral assets, which could be liquidated to provide further funds for further credit default swap payments to Barclays.  As **Markov's Funding** was used by Markov to make such payments to Barclays, Markov's **Funded Tranches** suffered losses.  In sum, Markov's **Funded Tranches** were hostage to the first $400 million in losses suffered by the $1.8 billion of **Reference Entities** in Markov's **Underlying Credit Default Swap**. |
| **Markov's Payout to Defendants** | **Markov's Payout to Defendants** was the use of Markov's use of Markov investors' principal (used to purchase Markov's **Funded Tranches**) to make swap payments to Barclays, pursuant to Markov's **Underlying Credit Default Swap**, as **Reference Entities** identified in the **Underlying Credit Default Swap** failed and suffered losses.  More simply, **Markov's Payout to Defendants**:  (1) was conditioned upon the failure, rather than success, of Markov's referenced collateral; and (2) was "funded" by Markov investors' principal, which was held in Markov and swapped to Barclays. |
| **Markov's Underlying Credit Default Swap** | Markov's **Underlying Credit Default Swap** was a Credit Default Swap between Barclays (as **Protection Buyer**) and Markov (as **Protection Seller**) with respect to a $1.8 billion **Notional Amount** portfolio of **Reference Entities** -- which portfolio, as detailed herein, was loaded with $550 million of **Mezzanine CDOs**, including $300 million of the **Markov Chain CDOs**.  As **Reference Entities** failed and suffered losses, Markov would have to swap funds to Barclays in the amount of such losses.  The funds used by Markov to do so were the funds raised by the sale of Markov's **Funded Tranches** to Markov investors.  In sum, through Markov's Underlying Credit Default Swap, Markov insured Barclays against **Reference Entity** losses with funds raised from Markov investors. |
| **Mezzanine CDO** | A CDO whose **Collateral Portfolio** consists primarily or wholly of BBB-rated assets or **Reference Entities**, with average portfolio-wide ratings of between BBB and BBB-. |
| **Nonprime RMBS** | RMBS backed by subprime, Alt-A or so-called "midprime" mortgages.  **Tranches** from **Nonprime RMBS** were the principal type of asset included in **CDO Collateral Portfolios**.  BBB-rated **Nonprime RMBS tranches** formed the **Collateral Portfolios** for **Mezzanine CDOs**.  **High Grade CDOs** were collateralized by higher-rated (A, AA and AAA)  **Nonprime RMBS Tranches**. |

**GLOSSARY**

| | |
|---|---|
| **Notional Amount** | In a **Credit Default Swap**, the amount of credit protection (or insurance) contracted for with respect to a given **Reference Entity**.  For example, if the **Reference Entity** is a BBB-rated **Nonprime RMBS Tranche**, the **Credit Default Swap** would specify a given **Notional Amount** of that tranche:  *e.g.*, $5 million, or $10 million, or $50 million. |
| **Offering Circular** | A more detailed disclosure document concerning all aspects of a CDO provided to potential CDO investors. |
| **Pitchbook** | Marketing materials typically provided in connection with CDO creation, arrangement, underwriting and sale.  Authored by the **CDO Arranger** and the CDO **Collateral Manager**, Pitchbooks typically describe the CDO **Collateral Portfolio**, the CDO **Tranche Structure**, and the CDO **Collateral Manager**'s management methods and record. |
| **Probability of Default** | The likelihood that a given asset would default.  Lower-rated assets have higher likelihood of default, and higher-rated assets have lower likelihood of default. |
| **Protection Buyer** | In a **Credit Default Swap**, the party that purchases credit protection (*i.e.*, insurance) against the risk of **Reference Entity** default.   The **Protection Buyer** makes regular credit protection payments (*i.e.*, insurance payments) to the **Protection Seller** (the insurer) secure such protection from the **Protection Seller**.  In a **Synthetic CDO**, the **Protection Buyer** is the bank arranger, who enters into the **Underlying Credit Default Swap** with the **Synthetic CDO**, which is the **Protection Seller**.  Thus, the **Synthetic CDO** receives regular credit protection payments, in return for which it "insures" losses suffered by the **Reference Entities** in the **Collateral Portfolio**. |
| **Protection Seller** | In a **Credit Default Swap**, the party that sells credit protection (*i.e.*, insurance) against the risk of **Reference Entity** default.   The **Protection Seller receives** regular credit protection payments (*i.e.*, insurance payments) from the **Protection Buyer** (the insured) in exchange for providing such protection to the **Protection Buyer.**  In a **Synthetic CDO**, the **Protection Seller** is the **Synthetic CDO**, who enters into the **Underlying Credit Default Swap** with the arranging bank, which is the **Protection Buyer.**  Thus, the **Synthetic CDO** receives regular credit protection payments, in return for which it "insures" losses suffered by the **Reference Entities** in the **Collateral Portfolio**. |
| **Reference Entity** | A **Reference Entity** is the credit/risk "referenced" in a given credit default swap.  A **Reference Entity** default forces the **Protection Seller** to swap funds to the **Protection Buyer**.  **Credit default Swaps** can refer to a "single name" **Reference Entity** (*i.e.*, one specific fixed income security) or to a portfolio of **Reference Entities** (*i.e.*, a collection of multiple securities).  In a **Synthetic CDO**, the **Underlying Credit Default Swap** references a portfolio of **Reference Entities.** |

**GLOSSARY**

| | |
|---|---|
| **RMBS** | Residential Mortgage-Backed Security.  RMBS assets were a pool of residential mortgages, and RMBS liabilities were a set of senior/subordinated tranched notes collateralized by the mortgage pool.  Cash (repayment of principal and payment of interest) flowed from the collateral pool to the tranched notes starting with the most senior tranche and then flowing down to the most junior.  Conversely, mortgage losses flowed up the tranche structure, starting with the most junior tranches.  As a result, senior tranches, protected from initial mortgage losses by more junior tranches, earned higher credit ratings, while more junior tranches received progressively lower credit ratings. |
| **Single Tranche CDO** | A particular variant of **Synthetic CDOs** in which the CDO issues, instead of the normal full set of **Tranches** covering the full range of the **Collateral Portfolio** risk (from 0% loss to 100% loss), a single **Tranche** representing one discrete segment of **Collateral Portfolio** risk defined by a specific **Attachment Point** and **Detachment Point**.  For example, a Synthetic Single Tranche CDO could reference a $1 billion **Collateral Portfolio** and issue Notes linked to a tranche of **Collateral Portfolio** risk with an **Attachment Point** of 7% and **Detachment Point** of 10%.  Should aggregate **Collateral Portfolio** losses remain below 7%, the tranche (and note principal) would remain unscathed.  Should losses rise above 7%, the tranche would begin to be written down (and principal lost -- or, rather, lost because it was swapped to the counterparty to the **Underlying Credit Default Swap**).  Should aggregate losses rise to 10%, the tranche would suffer complete impairment, and all principal would be lost (because swapped in entirety to the credit default swap counterparty). |
| **SSBTC** | State Street Bank and Trust Company.  Parent and controlling entity of **SSGA,** which is a wholly-owned subsidiary of SSBTC. |
| **SSGA** | State Street Global Advisers, the represented **Collateral Manager** of Markov. |
| **State Street** | State Street Corporation.  Parent and controlling entity of **SSBTC,** which is a wholly-owned subsidiary of State Street. |

| | |
|---|---|
| **Super Senior Tranche** | The seniormost tranche in a CDO, senior to even the normal AAA-rated tranche. In Synthetic CDOs, the Super Senior Tranche was often issued as an **Unfunded Tranche**.  Should aggregate **Collateral Portfolio** losses rise to levels that exhausted the up-front funds raised through sale of **Funded Tranches**, the Super Senior Tranche holder would then be required to "fund" the Super Senior Tranche -- i.e., to transfer funds to the CDO -- to allow the CDO to make any further payments to the short counterparty under the **Underlying Credit Default Swap**.  For example, **Markov** featured $400 million of **Funded Tranches** and a $1.6 billion **Unfunded Super Senior Tranche**.  Should aggregate **Reference Entity** losses in Markov's $1.8 billion **Underlying Credit Default Swap** rise above $400 million (exhausting the $400 million of funds initially raised through Markov's sale of **Funded Tranches**), the holder of the **Unfunded Super Senior Tranche** would have to provide Markov with funds to make any further payments pursuant to the **Underlying Credit Default Swap**. |
| **Synthetic CDO** | A Synthetic CDO is based on an **Underlying Credit Default Swap** through which "synthetic" exposure to a **Collateral Portfolio** of **Reference Entities** is manufactured.  The end result is that the Synthetic CDO, and investors in it, act as insurers against default of **Reference Entities** included in the **Collateral Portfolio**.  As **Reference Entities** default and suffer losses, the **Synthetic CDO** "insures" its **Credit Default Swap** counterparty by seizing investors' principal in an amount equal to such notional losses and "swapping" it to the **Credit Default Swap** counterparty.  Specifically, the CDO functions as **Protection Seller**, and the arranging bank as **Protection Buyer**, with respect to the portfolio of **Reference Entities** referenced in the **Underlying Credit Default Swap**.  Because it sells credit protection on the portfolio of Reference Entities, the Synthetic CDO earns income from doing so -- the credit protection payments it receives -- in amounts equivalent to those a **Cash CDO** would receive from directly investing in the actual assets.  These are used to fund the promised coupons to **CDO Tranche** investors.  Should Reference Entities default and suffer losses, the Synthetic CDO must "swap" to its counterparty (the arranging bank) an amount of funds equal to such nominal losses.  The funds available to the **Synthetic CDO** for making such payments are the funds invested in it by investors in its **Funded Tranches**, which become impaired and written down as such swaps take place.  Thus, as in a cash CDO, **Collateral Portfolio** losses cause CDO investor losses. |

**GLOSSARY**

| | |
|---|---|
| **Tranche** | Each CDO issues multiple **Tranches** of notes collateralized by the CDO's **Collateral Portfolio**.  Principal and interest cashflow from the **Collateral Portfolio** flow in waterfall down the the **Tranches,** from most senior to most junior.  **Collateral Portfolio** losses "flood" up the **Tranche** structure, from most junior to most senior.  The end result is that junior **Tranches**, by first absorbing set amounts of **Collateral Portfolio** losses, protect more senior **Tranches** from such losses.  Senior **Tranches** thereby can garner higher credit ratings, while more junior **Tranches** receive progressively lower credit ratings. |
| **Tranche Structure** | The division of notes issued by the CDO into discrete senior/subordinated **Tranches,** each with a given credit rating, on the basis of each **Tranche's** remove from **Collateral Portfolio Expected Loss**.  More senior **Tranches,** removed from **Expected Losses** by more subordinate junior **Tranches,** thus could receive higher credit ratings. |
| **Underlying Credit Default Swap** | The basis for a **Synthetic CDO**.  As explained below, the **Underlying Credit Default Swap**:  (1) allows the **Synthetic CDO** to generate income to pay to investors in CDO **Tranches**; but (2) exposes CDO **Tranche** investors to the risk of **Reference Entity defaults**.  In the Underlying Credit Default Swap of each **Synthetic CDO**, the **Synthetic CDO** serves as **Protection Seller** with respect to a portfolio of **Reference Entities**, and the arranging bank as the **Protection Buyer**. In effect, the **Synthetic CDO** insures the arranging bank against **Reference Entity** losses.  As **Reference Entities** default and/or decline in value, the **Synthetic CDO**, under the terms of the **Underlying Credit Default Swap**, must "swap" funds to the arranging bank in the amount of such declines.   The funds used to make such payments are the funds invested in the **Synthetic CDO** by purchasers of CDO **Tranches.**  In exchange for providing the arranging bank with such protection against loss, the **Synthetic CDO** receives regular credit protection payments (akin to insurance premiums) from the arranging bank. These insurance payments to the Synthetic CDO are equivalent to the the interest income earned by a **Cash CDO** from the collateral assets in its **Collateral Portfolio:**  in both cases, the CDO is receiving funds.  These funds are used by the CDO to fund the coupon payments on the CDO **Tranches** issued to CDO investors. |
| **Unfunded CDO** | The **Markov Chain CDOs** were *inter alia*  **Unfunded CDOs**.  An **Unfunded CDO** is a CDO, practicable only in transactions between large and sophisticated financial institutions, that does not issue **Funded Tranches**, but only **Unfunded Tranches** in the form of **Credit Default Swaps**. |

| | |
|---|---|
| **Unfunded Tranche** | An **Unfunded Tranche** was a tranche for which no money was paid up-front. Cash CDOs did not feature **Unfunded Tranches,** but **Synthetic CDOs** often did. **Cash CDOs** issued only **Funded Tranches,** because the sale of such **Funded Tranches** was what enabled them to purchase their **Collateral Portfolio** assets (*e .g .*, a $1 billion Cash CDO issues $1 billion of **Funded Tranches**, and uses the $1 billion of proceeds to purchase $1 billion of collateral).  A **Synthetic CDO**, on the other hand, did not actually purchase actual **Collateral Portfolio** assets, but rather "referenced" them through an **Underlying Credit Default Swap** -- through which the CDO was exposed to **Reference Entity** losses.  Typically, **Synthetic CDOs** would issue a set of **Funded Tranches** (to raise funds that would allow it to make a certain initial amount of swap payments to cover **Reference Entity** losses), and issue an **Unfunded Super Senior Tranche** (which could be "funded" should the CDO require more money to make further swap payments to cover further **Reference Entity** losses). |

# EXHIBIT B

The Wall Street Money Machine
http://www.propublica.org/magnetar01

# The Magnetar Trade: How One Hedge Fund Helped Keep the Bubble Going

by Jesse Eisinger and Jake Bernstein
ProPublica, April 9, 2010, 12:59 p.m.



*A hedge fund, Magnetar, helped create arcane mortgage-based instruments, pushed for risky things to go inside them and then bet against the investments. (Ethan Miller/Getty Images)*

**Update October 29th, 2010:** This story has been corrected in response to a recent letter from Magnetar. Read their letter, along with our response [1].

In late 2005, the booming U.S. housing market seemed to be slowing. The Federal Reserve had begun raising interest rates. Subprime mortgage company shares were falling. Investors began to balk at buying complex mortgage securities. The housing bubble, which had propelled a historic growth in home prices, seemed poised to deflate. And if it had, the great financial crisis of 2008, which produced the Great Recession of 2008-09, might have come sooner and been less severe.

At just that moment, a few savvy financial engineers at a suburban Chicago hedge fund [2] helped revive the Wall Street money machine, spawning billions of dollars of securities ultimately backed by home mortgages.

When the crash came, nearly all of these securities became worthless, a loss of an estimated $40 billion paid by investors, the investment banks who helped bring them into the world, and, eventually, American taxpayers.

Yet the hedge fund, named Magnetar for the super-magnetic field created by the last moments of a dying star, earned outsized returns in the year the financial crisis began.

How Magnetar pulled this off is one of the untold stories of the meltdown. Only a small group of Wall Street insiders was privy to what became known as the Magnetar Trade [3]. Nearly all of those approached by ProPublica declined to talk on the record, fearing their careers would be hurt if they spoke publicly. But interviews with participants, e-mails [4], thousands of pages of documents and details about the securities that until now have not been publicly disclosed shed light on an arcane, secretive corner of Wall Street.

According to bankers and others involved, the Magnetar Trade worked this way: The hedge fund bought the riskiest portion of a kind of securities known as collateralized debt obligations -- CDOs. If housing prices kept rising, this would provide a solid return for many years. But that's not what hedge funds are after. They want outsized gains, the sooner the better, and Magnetar set itself up for a huge win: It placed bets that portions of its own deals would fail.

Along the way, it did something to enhance the chances of that happening, according to several people with direct knowledge of the deals. They say Magnetar pressed to include riskier assets in their CDOs that would make the investments more vulnerable to failure. The hedge fund acknowledges it bet against its own deals but says the majority of its short positions, as they are known on Wall Street, involved similar CDOs that it did not own. Magnetar says [5] it never selected the assets that went into its CDOs.

Magnetar says [6] it was "market neutral," meaning it would make money whether housing rose or fell. (Read their full statement. [7]) Dozens of Wall Street professionals, including many who had direct dealings with Magnetar, are skeptical of that assertion. They understood the Magnetar Trade as a bet against the subprime mortgage securities market. Why else, they ask, would a hedge fund sponsor tens of billions of dollars of new CDOs at a time of rising uncertainty about housing?

Key details of the Magnetar Trade remain shrouded in secrecy and the fund declined to respond to most of our questions. Magnetar invested in 30 CDOs from the spring of 2006 to the summer of 2007, though it declined [8] to name them. ProPublica has identified 26 [9].

An independent analysis [10] commissioned by ProPublica shows that these deals defaulted faster and at a higher rate compared to other similar CDOs. According to the analysis, 96 percent of the Magnetar deals were in default by the end of 2008, compared with 68 percent for comparable CDOs. The study [10] was conducted by PF2 Securities Evaluations, a CDO valuation firm. (Magnetar says defaults don't necessarily indicate the quality of the underlying CDO assets.)

From what we've learned, there was nothing illegal in what Magnetar did; it was playing by the rules in place at the time. And the hedge fund didn't cause the housing bubble or the financial crisis. But the Magnetar Trade does illustrate the perverse incentives and reckless behavior that characterized the last days of the boom.



*Magnetar says it invested in 30 CDOs from the spring of 2006 to the summer of 2007. At least nine banks helped the hedge fund hatch these deals, and Merrill Lynch, UBS and Citi all did multiple deals. (From left: Daniel Barry/Getty Images; Jonathan Fickies/Bloomberg News; Seokyong Lee/Bloomberg News)*

At least nine banks helped Magnetar hatch deals. Merrill Lynch, Citigroup and UBS all did multiple deals with Magnetar. JPMorgan Chase, often lauded for having avoided the worst of the CDO craze, actually ended up doing one of the riskiest deals with Magnetar, in May 2007, nearly a year after housing prices started to decline. According to marketing material and prospectuses [9], the banks didn't disclose to CDO investors the role Magnetar played.

Many of the bankers who worked on these deals personally benefited, earning millions in annual bonuses. The banks booked profits at the outset. But those gains were fleeting. As it turned out, the banks that assembled and marketed the Magnetar CDOs had trouble selling them. And when the crash came, they were among the biggest losers.

Some bankers involved in the Magnetar Trade now regret what they did. We showed one of the many people fired as a result of the CDO collapse a list of unusually risky mortgage bonds included in a Magnetar deal he had worked on. The deal was a disaster. He shook his head at being reminded of the details and said: "After looking at this, I deserved to lose my job."

Magnetar wasn't the only market player to come up with clever ways to bet against housing. Many articles and books, including a bestseller by Michael Lewis [11], have recounted how a few investors saw trouble coming and bet big. Such short bets can be helpful; they can serve as a counterweight to manias and keep bubbles from expanding.

Magnetar's approach had the opposite effect -- by helping create investments it also bet against, the hedge fund was actually fueling the market. Magnetar wasn't alone in that: A few other hedge funds also created CDOs they bet against. And, as the New York Times has reported, Goldman Sachs did too. But Magnetar industrialized the process, creating more and bigger CDOs.

Several journalists have alluded to the Magnetar Trade in recent years, but until now none has assembled a full narrative. Yves Smith, a prominent financial blogger who has reported on aspects of the Magnetar Trade, writes in her new book, "Econned," [12] that "Magnetar went into the business of creating subprime CDOs on an unheard of scale. If the world had been spared their cunning, the insanity of 2006-2007 would have been less extreme and the unwinding milder."

## Magnetar Gets Started



*Magnetar founder Alec Litowitz speaks at a private equity conference held at Kellogg School of Management at Northwestern University in February 2007. (Nathan Mandell)*

The guiding force behind Magnetar was Alec Litowitz, a triathlete, astronomy buff and rising star in the investing world. In 2003, Litowitz retired from a Chicago-based hedge fund, Citadel, one of the most successful in the world, where he had spent most of his career and became a top executive. He promised to stay out of the business for two years.

As he waited for his non-compete agreement to expire, Litowitz and his wife traveled through Europe collecting antiques to stock a big house they were building on the shores of Lake Michigan.

By spring 2005, Litowitz's wait was over. Then 38 years old, Litowitz quickly raised money to start his own hedge fund. The fund, Magnetar, attracted $1.7 billion from investors and opened in April.

Litowitz, who declined to be interviewed, had an approach to investing that emphasized scale and simplicity. He told those he hired: "Figure out a way to make money and figure out how to repeat it and do it over and over again," according to a former employee. The firm handed out T-shirts emblazoned with a confident slogan: "Very Bright, Very Magnetic." Employees privately joked about working for a fund named after something like a black hole.

Litowitz brought on board David Snyderman. A New Yorker with a serious mien, Snyderman, in his mid-30s, began hunting for investment opportunities in Wall Street's burgeoning market in mortgage-backed securities.

It didn't take them long to find something promising.

Snyderman and Magnetar focused on Wall Street's mortgage assembly line, which had been super-charged during Litowitz's time away from the business. Banks bundled pools of mortgages into large bonds, which they combined to create even larger investments. These were the now-infamous collateralized debt obligations. Each month, homeowners paid their mortgages. Each month, payments flowed to investors. (Here is an excellent video explaining CDOs [13].)

Large investors across the globe snapped up the CDOs, which took the hottest investment around -- the U.S. housing market -- and transformed it into something that supposedly had little or no risk. Wall Street preached that the risk had been diluted because it was spread out over such large collections of mortgage bonds. (CDOs can also be based on side bets that rise and fall with the value of other mortgage bonds. These are known as "synthetic" CDOs. Magnetar's deals were largely synthetic.)

Just as they did with mortgage-backed securities, investment banks divided CDOs into different layers, called tranches. As the mortgages were paid, money flowed to investors holding the top tranche. Since they were the first to get paid, and thus took the least amount of risk, they earned low interest rates. Next came the middle levels -- the so-called mezzanine tranches.

Last in line for money were investors in what's known as the equity. In return for being at the bottom, equity investors got the highest returns, sometimes 20 percent interest -- money they would receive only as long as the vast majority of mortgage holders made their payments.

Even back then, Wall Street insiders called the equity "toxic waste," and as anxiety built in late 2005 that the housing boom was over, investment banks struggled to find takers.

To Magnetar, the toxic waste was an opportunity.

At a time when fewer investors were stepping up to buy equity, the little-known hedge fund put out the word that it wanted lots and lots of it. Magnetar concentrated in a particularly risky corner of the CDO world: deals that were made up of the middle, or mezzanine, slice of subprime mortgage-backed bonds. Magnetar CDOs were big [9], averaging $1.5 billion, about three times the size of earlier deals built on subprime mortgages.

Magnetar's purchases solved a crucial problem for the banks. Since the equity was so risky and thus difficult to sell, banks didn't like to create new CDOs unless someone committed to buy them. Indeed, such buyers were so crucial that Wall Street referred to them as the CDOs' "sponsors."

Without sponsors, Wall Street's mortgage bond assembly line could grind to a halt, and with it bank profits and banker bonuses. A top CDO banker could earn $3 million to $4 million annually on the CDOs he created and sold.

Usually, investment banks had to go out and find buyers of the equity. With Magnetar, the buyer came right to the bank's doorstep. Wall Street was overjoyed.

"It seemed like a miracle," says one mortgage market investment banker, because "no one" had been buying equity.

"By the end of 2005, the general sense was that the CDO market would slow down. These trades continued to fuel the fire," says Bill Tomljanovic, who worked for a firm that helped build a Magnetar CDO. Magnetar was "a driving force in the market."

According to JPMorgan data, Magnetar's deals amounted to somewhere between a third and half the total volume in the particularly risky corner of the subprime market on which the fund focused.

Outsiders thought Magnetar was piling in at exactly the wrong time. A March 2007 Business Week article [14] titled "Who Will Get Shredded?" would later put Magnetar near the top of its list. The hedge fund, said the magazine, "showed bad timing."

How could Magnetar hope to make money on such risky stuff? It had a second bet that was known only to insiders.

At the same time it was investing in the equity, the fund placed bets that many of the same CDOs it had helped create would actually blow up. It did that using one of the most opaque corners of the investment world: credit default swaps, which function as a kind of insurance on CDOs and other types of bonds.

Credit default swaps work roughly like an insurance policy: You pay a small premium regularly, on any bond you want -- whether you own it or not -- and if it goes bust, you get paid off in full.

Nobody but Magnetar knows the full extent of its bets. Hedge funds are private and they don't disclose the details of their trades. Also, credit default swaps are mostly unregulated and not publicly disclosed. Magnetar says it didn't bet only against its own CDOs. The majority of its credit default swaps, says Magnetar, were on other CDOs. (**Update April, 9:**We have added additional detail [15] from Magnetar's response in which the hedge fund says it was "net long" on its own CDOs, an assertion on which the fund has declined to elaborate.)

Since it was the sponsor, Magnetar had privileges. Placing the risky equity was so important to banks that they typically gave those who bought it a say in how the deal was structured. Like all investors, equity buyers had to weigh risk and reward, the goal being to maximize returns while minimizing the chances that your investment will blow up.

But people involved in Magnetar's deals say the hedge fund took a different tack, pushing for riskier bonds to go inside its CDOs. Doing that would make it more likely that Magnetar's bets against the CDO would pay off.

The equity bought by Magnetar represented just a tiny fraction of the overall CDO. If it costs, say, $50 million, an entire CDO could be 20 times that, $1 billion. And if the CDO begins to go south and you're smart enough to have taken out enough insurance, you can make hundreds of millions of dollars. That, of course, would take a bit of the sting out of losing your original $50 million investment in the equity.

## Magnetar Does Its First Deal

As Magnetar set up its CDO shop, the hedge fund hired Jim Prusko, a smart and affable investor who had worked previously at the Boston money-manager Putnam Investments. He would shoulder much of the work of courting Wall Street bankers and managers who worked with the hedge fund. He operated out of Magnetar's office in midtown Manhattan around the corner from Saks Fifth Avenue. In an office of 20-somethings, Prusko, then 40 years old, stood out as the "old man."

Prusko and his boss at Magnetar, Snyderman, began approaching investment banks, offering to buy the riskiest, highest-yielding portion of CDOs. They always wanted a middleman, known as a CDO manager, on their deals. Many CDOs are operated day to day by such independent firms, who are often brought in by investment banks.

The managers also played a vital role in creating deals. When an investment bank created a CDO, it would often give what amounted to blueprints to the managers, who would then go out and find the exact bundles of bonds to fill the CDO. The managers had a fiduciary duty to represent the CDO fairly to all investors, ensuring investors got accurate and equal information.

Magnetar's deals were numerous and big, and just like for investment banks, the bigger the deal, the larger the fee for managers.

"Prusko's job was to butter up the CDO managers and the bankers," said one banker who dealt with him.

By relying on a manager rather than managing the deal itself, Magnetar had no legal obligations to the CDO or others who bought it.



*A guard stands outside the New York headquarters of Deutsche Bank in Lower Manhattan on April 8, 2010. An internal investment fund within Deutsche Bank bought the risky equity along with Magnetar in the hedge fund's maiden CDO. (Dan Nguyen/ProPublica)*

Magnetar completed its first deal in May 2006. In what became a habit, it named the CDO after a constellation, in this case, "Orion," known for the trio of stars that form the mythological Greek hunter's belt. For its maiden CDO, Magnetar enlisted a partner to buy risky equity alongside it, an internal investment fund within Deutsche Bank.

Deutsche and Magnetar didn't reach for a Wall Street powerhouse to put the deal together. Instead the investors worked with Alex Rekeda, a young Ukrainian immigrant who was then working for Calyon, the investment banking arm of the French bank Crédit Agricole.

Magnetar and Deutsche were deeply involved in creating Orion. "We want to make sure we control the deal," a banker who worked on it recalls them emphasizing.

One person involved in Orion recalls Deutsche's point person, Michael Henriques, and Magnetar's Prusko pressuring the CDO manager, a division of the Dutch bank NIBC, to include specific lists of bonds in the deal.

Prusko and Henriques told this person that the investors "needed more spread in the portfolio." More "spread" means more return and more risk.

This person recalled Magnetar asking, "Would you consider these bonds?" Their suggestions were invariably for riskier bonds. "Let's just say we didn't think their suggestions made a lot of sense," the person said.

He said the CDO manager refused Magnetar's requests to put riskier bonds in the deal. Still, it was an eye-opening experience. "I began to realize there were things you had to defend yourself against," he said.

Magnetar and Deutsche declined to comment on Orion specifically [8]. Magnetar says it made suggestions about the general outlines of the CDOs. But, the hedge fund says, it "did not select the underlying assets of the CDO at any time prior to or subsequent to transaction issuance."

Other buyers of the CDO could have figured out they were getting relatively risky bonds, but they would have had to look hard at the minutiae of the deal. By this point in market history, the ratings had less and less meaning. Two sets of bonds rated AA could have very different levels of risk. Most investors chose not to dig too deeply.

One investor in Orion was a fund affiliated with IKB, a small German bank. Eventually, it invested in at least four more Magnetar deals. In mid-2007, because of the disastrous investments in subprime securities, the German government was forced to bail out IKB. The failure of the bank was an early warning sign of the global financial crisis.

Deutsche's Henriques would later quit the bank and join Magnetar.

Orion lost value but never defaulted. That was better than every subsequent CDO that Magnetar helped create, according to ProPublica's research.

## Magnetar's (Nearly) Perpetual Money Machine

By buying the risky bottom slices of CDOs, Magnetar didn't just help create more CDOs it could bet against. Since it owned a small slice of the CDO, Magnetar also received regular payments as its investments threw off income.

With this, Magnetar solved a conundrum of those who bet against the market. An investor might be confident that things are heading south, but not know when. While the investor waits, it costs money to keep the bet going. Many a short seller has run out of cash at the gates of a big payday.

Magnetar could keep money flowing -- via its small investments in CDOs -- and could use that money to pay for its bets against CDOs.

Similar, commonly traded, assets appeared in multiple Magnetar CDOs. Experts say the benefit of that overlap to Magnetar was that when the hedge fund bet against non-Magnetar CDOs, the CDOs still had similar characteristics to the ones Magnetar had invested in.

Soon enough, bankers and CDO managers had a sense of how it worked. "Everyone knew," said one person who managed Magnetar CDOs. "They used the equity to fund the shorts."

Magnetar further increased its odds by insisting that the CDOs it helped create had an unusual construction. Typically, cash flowing to the last-in-line equity buyers is cut off at the first signs of trouble -- such as a rise in mortgage delinquencies. Those at the top of the CDO -- who accepted lower returns for less risk -- received that cash, leaving none for the high-risk holders.

Magnetar wanted its deals to be "triggerless," meaning lacking these cash-flow dams. When the market turned shaky and homeowners began to default, money kept flowing down to the risky slices that Magnetar owned.

Even today, bankers and managers speak with awe at the elegance of the Magnetar Trade. Others have become famous for betting big against the housing market. But they had taken enormous risks. Meanwhile, Magnetar had created a largely self-funding bet against the market.

## E-mails Give Glimpse of How Magnetar Worked



[4]By the fall of 2006, housing prices had already peaked and Magnetar's assembly line started producing, helping to create CDOs it would bet against. The hedge fund's appetite seemed insatiable. The deals were the talk of CDO desks across Wall Street.

Between the end of September and the middle of December 2006, Magnetar had a hand in spawning at least 15 CDOs [9], worth an estimated $23 billion. Among the banks involved with those deals were Citigroup, Lehman Brothers and Merrill Lynch.

E-mails [4] obtained by ProPublica from that time suggest Magnetar's clout. The firm was involved at the start of deals and pushed for riskier bonds to be included.

After Magnetar expressed interest in buying the equity, the French bank Société Générale began to build the CDO, and selected a New York-based manager, Ischus Capital Management, which would choose the exact bonds to go into the CDO.

Magnetar wanted to name the CDO after a small constellation in the southern sky called Hydrus, which means "male water snake." But by late September, Magnetar and Ischus began sparring over the composition of the deal.

Magnetar pressed Ischus to buy lower-quality assets for the deal, according to three people familiar with Hydrus. In an e-mail to bankers at Société Générale and Ischus executives, Magnetar's CDO specialist, Jim Prusko, wrote on Sept. 29, 2006 [16], "The original portfolio target spreadsheet that I have... had a strangely low spread target. That of course would not at all be beneficial to us. I have attached the target portfolio that I would like for this deal with target spreads."

The portfolio Magnetar outlined didn't list specific bonds, but executives at the CDO manager Ischus felt that they understood what Prusko wanted. A request for higher-spreading assets means more risk in the deal.

Andrew Shook, an Ischus executive, answered forcefully on Oct. 3 [17], "We will not assemble a portfolio we are not proud of and feel strongly about in the name of a spread target."

Prusko dialed down the pressure, responding within an hour. "Of course, the actual security selection is totally your purview," he wrote [17]. "I just wanted to make sure the overall portfolio characteristics worked for our strategy."

Shook declined to comment on the e-mail exchange. Magnetar says that the deal as originally conceived wouldn't have been profitable and that it was merely trying to get a higher return -- a higher "spread" -- to balance out the risk it was taking in owning the bottom-rated slice of the CDO.

The two sides subsequently drifted apart, partly over Ischus's unease with Magnetar's pressure, and the deal was never completed.

## Concerns About 'Reputational Risks'



As part of the big business Magnetar was doing in the fall of 2006, the hedge fund put together a CDO with Lehman Brothers named for the constellation Libra. John Mawe, a banker who worked on Libra, remembers that "there was a back-and-forth fight" about the assets between the bank's CDO manager and Magnetar, with the hedge fund pushing for riskier assets.

Mawe says Lehman's CDO in-house-management arm, which handled the deal, never put assets into Libra that it thought were bad investments.

Among the other banks that Magnetar approached during that time was Deutsche Bank, with whom it had teamed up to do its first deal months earlier. Deutsche Bank was anxious for

business in order to maintain its standing as one of the top CDO banks, according to one of its bankers. Deutsche recommended CDO manager State Street Global Advisors.

The State Street managers were "highly skeptical" of doing a deal with Magnetar, according to one participant. "State Street wanted their deals to do well," said the participant, and with Magnetar, there was "a lot of reputational risk to be concerned about."

Hoping to close the deal, Magnetar's master salesman Jim Prusko drove up from his home in the New York suburbs to State Street's headquarters in Boston, to mollify executives in the management team. After the meeting, the deal went forward. As one banker explained, "there were other managers who were dying to do this deal" and get the millions in fees.

After subprime losses, State Street closed the business that managed its CDOs in late 2007. Frank Gianatasio, who worked in State Street's CDO business says, "We were comfortable with every transaction we put into our CDOs."

Deutsche, Magnetar and State Street called the $1.6 billion CDO they created Carina, a constellation whose name in Latin means a ship's keel. In November 2007, Carina had the distinction of being the first subprime CDO of its kind to be forced into liquidation.

State Street and Magnetar declined to comment [18] on their negotiations over Carina.

## A Lawsuit Suggests Merrill Lynch's Role



By early 2007, the mortgage market was falling apart. Lenders were reporting big losses [19], delinquencies were mounting [20] -- and Magnetar's business was booming.

Between late February and April, banks rolled out five Magnetar-sponsored deals, with a value of about $7.2 billion. Among them was a $1.5 billion CDO named Norma. Following Magnetar's branding convention, Norma is a constellation in the Southern Hemisphere named for the Latin word for "normal." This CDO was anything but.

Details about Norma, which was created by Merrill Lynch, have emerged through an ongoing lawsuit between Merrill and Dutch bank Cooperatieve Centrale Raiffeisen-Boerenleenbank, known commonly on Wall Street as Rabobank. (The Wall Street Journal had the first detailed report [21] of Norma, in late 2007.) The dispute involves a side transaction that Rabobank made

with Merrill involving Norma. Magnetar is not a party to the litigation. Yet the allegations are scathing in their depiction of how the CDO was developed.

"Merrill Lynch teamed up with one of its most prized hedge fund clients -- an infamous short seller that had helped Merrill Lynch create four other CDOs -- to create Norma as a tailor-made way to bet ***against*** the mortgage-backed securities market," the complaint reads. (Emphasis in the original.)

"[T]o facilitate the selection of assets that would allow Norma to operate as a hedging instrument rather than an investment vehicle, Merrill Lynch hand-picked a beholden collateral manager that was willing to ignore its fiduciary duties to Norma's investors."

The manager for Norma was a small shop out of Long Island, N.Y., called NIR Capital Management. Run by Corey Ribotsky, the firm's primary line of business before entering CDOs was speculating in penny stocks.

NIR brought in a team of experienced bankers to run its CDO business. The firm also had a variety of other ventures. At one point, they put money into a documentary called "American Cannibal," that profiled the aborted launch of a reality television show in which contestant were stranded on an island and goaded into cannibalism. (The New York Times found it "absorbing." [22]) Ribotsky is now under investigation by federal authorities for misleading clients about its investment returns. NIR and Merrill Lynch declined to comment on dealings with Magnetar; Merrill Lynch denies liability in the litigation. Magnetar declined [23] to comment.

Norma began to suffer setbacks even before the deal closed in March 2007. According to the lawsuit, by the time Norma was completed, its value had already declined by more than 20 percent.

## JPMorgan Gets Into the Game -- And Loses



Despite the bad news in the mortgage market, Magnetar continued to find a few willing bankers to do CDOs, including a new one: JPMorgan Chase.

JPMorgan had avoided many of the complex financial transactions that decimated the banking industry. As the market grew frothier, JPMorgan pulled back from the CDO business. In 2005, the men who ran JPMorgan's CDO unit told their bosses that they couldn't see how to complete a CDO without sticking the bank with the large top tier, which would not appeal to investors

because of its low returns. Other banks dealt with this problem by retaining these CDO layers on their books.

But by mid-2006, JPMorgan joined the herd. It hired bankers to expand its CDO team and got to work.

A few months later -- in early 2007 -- Magnetar and JPMorgan banged out a deal. Unlike the earlier CDOs Magnetar helped create, this one wasn't named after a constellation. Instead, the deal was called "Squared," after the term for a CDO that was made up of other CDOs. Squared was filled in part with other CDOs Magnetar had helped create.

According to a person familiar with how the deal came together, Magnetar committed to purchase $10 million worth of Squared's equity. Magnetar's purchase allowed JPMorgan to create and sell a $1.1 billion CDO. As it had on previous deals, Magnetar pushed the bankers to select riskier bonds. "They really cared about it," said the person involved in the deal. "They wouldn't pull punches. It was always going to be crappier."

The hedge fund requested that Squared have slices from many Magnetar CDOs, including Auriga, Carina, Libra, Pyxis and Virgo. They all went into the deal. Magnetar also successfully pushed for Squared to include slices from one of the Abacus deals, a group of CDOs that, as the New York Times later reported [24], Goldman Sachs had created and bet against.

JPMorgan earned $20 million in creating Squared, according to the person involved in the deal.

JPMorgan's sales force fanned out across the globe. It sold parts of the CDO to 17 institutional investors, according to a person familiar with the transaction. The deal closed in May 2007, nearly a year after housing prices had peaked. Within eight months, Squared dropped to a fraction of its initial value.

Just about everybody lost out, including Thrivent Financial for Lutherans, a Minnesota-based not-for-profit fraternal organization, whose $10 million investment was wiped out. Thrivent declined to comment.

Small pieces of Squared, as well as Magnetar's CDO Norma, also ended up in mutual funds run by Morgan Keegan, a regional investment bank based in Memphis, Tenn.

The funds, advertised as conservative investments, cratered after betting on various exotic assets. Morgan Keegan was sued by individual investors who claimed that they were misled about the risks. Among the investors was former Chicago Bulls player Horace Grant, who was awarded $1.4 million in arbitration. This week, the SEC accused [25] two Morgan Keegan employees of misleading fund investors about the value of its holdings in CDOs. Morgan Keegan called the charges "factually inaccurate" and promised to defend itself "vigorously." Morgan Keegan did not respond to a request for comment on the specifics of the two Magnetar CDOs.

The biggest loser was JPMorgan Chase itself, which had kept the large, supposedly safe top slices of Squared on its books, without hedging itself. The bank lost about $880 million on the CDO. JPMorgan declined to comment on the details of the transaction.

Magnetar came out a winner. The fund earned about $290 million on its bet against Squared, according to a person familiar with the deal. Magnetar declined [26] to comment.

## Magnetar's Exit: A Deal so Bad Even a Credit-rating Agency Balked



Prusko was buoyant as Magnetar's trades began to make money as its short bets rose in value. One friend recalls Prusko ribbing him: "What are you going to do after this blows up?" (Magnetar declined to comment on the exchange.)

In the spring of 2007, Magnetar began to have a problem: The hedge fund was sitting on hundreds of millions of dollars' worth of CDO equity and other low-rated portions of its deals. With the decline of housing prices accelerating, off-loading these pieces would be very hard.

Magnetar needed a buyer and some deft financial engineering. It found the answer through its former partner, Alex Rekeda, who had been the banker on Magnetar's first CDO. Rekeda now worked at Mizuho, one of Japan's biggest banks. Mizuho was eager to get into the CDO world. It hired Rekeda in part because he could bring Magnetar's business, according to one CDO manager who worked with him.

Rekeda and Magnetar came up with a remarkable CDO. They took their risky portions of 18 CDOs they had helped created -- and repackaged them to sell them to others. Bundling up the dregs of a CDO was rare, if not unprecedented.

This deal, Tigris, which closed in March 2007, tied together $902 million of Magnetar's risky assets. Rekeda convinced two rating agencies, Standard & Poor's and Fitch, to rate it. Fitch designated $259 million of it as triple A, the highest rating. S&P rated nearly $501 million as triple A. (When contacted for this article, S&P said it was comfortable rating Tigris; Fitch didn't respond to questions about the deal.)

In a highly unusual move, the third major rating agency, Moody's, refused to rate Tigris. Rekeda lobbied Moody's for a rating, according to a person familiar with the deal. But Moody's then-head of CDOs, Eric Kolchinsky, wouldn't budge.

Magnetar got $450 million from Mizuho, which in return received income from assets in Tigris, according to several people familiar with the transaction. It was what's known as a non-recourse loan: If things went wrong, Mizuho could only lay claim to what was in Tigris.

In response to ProPublica's questions about this deal, Magnetar said [27] the fund "as a matter of general practice, and as do most hedge funds, enters into non-recourse financing on specific assets in its portfolio."

By September, just six months after Tigris had been created, Fitch downgraded most of the CDO's slices. By the end of January 2008, the CDO had gone into default. The Japanese ended up with the paper, which was worthless. Mizuho eventually wrote Tigris off, as part of about $7 billion in total losses from its subprime missteps. Mizuho declined to comment, as did [27] Magnetar.

Just as with a refi gone bad, when Tigris was wiped out, the hedge fund walked away from the house -- in this case its collateral. A person who worked on Tigris boasted about how innovative the deal was. If it hadn't blown up, he says, it would have been "deal of the year." For Magnetar, it may have been.

Records it shared with investors show Magnetar had a spectacular 2007. Founder Alec Litowitz pulled down $280 million, according to Alpha Magazine [28]. That spring, a trade journal awarded Prusko and Snyderman "Investor of the Year" honors. The Magnetar Constellation Fund, the firm's fund that had the most exposure to the CDO trades, was up 76 percent in 2007, according to a presentation Magnetar gave to investors in early 2009. The main fund, the Magnetar Capital Fund, was up 26 percent that year. By the end of 2007, Magnetar had $7.6 billion under management, up from the $1.7 billion it began with two years earlier. Magnetar declined [29] to comment on its performance.

ProPublica has learned that the SEC has been looking into how the Magnetar deals were created, but it's not clear how much progress the investigation has been made or who might be the target. In a statement yesterday, Magnetar said:

Our understanding is that for some time, the SEC staff has been looking broadly at the sales, marketing, and structuring of CDOs. In connection with that inquiry, the SEC staff has from time to time requested information from Magnetar and other market participants, and Magnetar has been cooperating and responding to the requests. We are not aware that this inquiry is focused on any particular person or firm.


*ProPublica Research Director Lisa Schwartz and researcher Kitty Bennett contributed to this story. ProPublica's Ryan Knutson also helped with research. Finally, a big thanks to This American Life's Alex Blumberg.*

# EXHIBIT C

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL: (212) 849-7000 FAX: (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7115**

WRITER'S INTERNET ADDRESS
jonpickhardt@quinnemanuel.com

May 11, 2010

<u>VIA ELECTRONIC FILING AND HAND DELIVERY</u>

The Honorable Bernard J. Fried
Supreme Court of the State of New York
60 Centre Street
New York, New York 10007

Re:  *Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A ("Rabobank") v. Merrill Lynch & Co., Inc.("Merrill")*, Index No. 601832/09 (Fried, J.)

Dear Justice Fried:

We represent plaintiff Rabobank in the above referenced action and write to request a pre-motion conference for a motion to compel third party Magnetar Capital LLC ("Magnetar") to comply with Rabobank's subpoena *duces tecum* dated August 12, 2009 (the "Subpoena," *see* Exhibit A).

In this action, Rabobank seeks to recover the balance on its $58 million loan to Norma CDO I Ltd ("Norma"). Merrill solicited Rabobank's loan based on numerous misrepresentations, including that Norma's portfolio had been rigorously selected by an independent collateral manager, NIR Capital Management, LLC ("NIR"). In fact — as discovery is demonstrating — Merrill knew NIR had abdicated its asset selection duties to Magnetar, an important Merrill client that was also Norma's equity investor. As Merrill understood, Magnetar's real interest in Norma was not in its long equity investment, but rather in using Norma to take a much more substantial *short* position in the very assets Magnetar was selecting for Norma's portfolio. By falsely touting NIR's role, Merrill Lynch thus concealed from Rabobank and Norma's other investors that Norma's assets were actually being selected by a party that stood to profit when Norma failed. For its part, understanding the impropriety of its having selected CDO assets, Magnetar has flatly denied any such involvement. *See* April 16, 2010 Letter from Pickhardt to Court; Ex. B at 4-5 (Magnetar Investor Letter: "Magnetar … did not select or have control over the assets that went into a CDO."). However, as initial discovery from Merrill has revealed:

- As early as August 2006, Magnetar assumed NIR's role in directing Merrill on what purchases to execute for Norma. *See, e.g.,* Ex. C (ML01395145) (James Prusko of Magnetar: "Here is the first batch of protection purchases I'm planning for NIR.").

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111-4788 | TEL (415) 875-6600 FAX (415) 875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois 60661-2510 | TEL (312) 463-2961 FAX (312) 463-2962
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000 FAX +44(0) 20 7653 2100
TOKYO | Akasaka Twin Tower Main Bldg., 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81 3 5561-1711 FAX +81 3 5561-1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000 FAX +49(0) 621 43298 6100

The Honorable Bernard J. Fried
May 11, 2010

- By November 2006, Magnetar had executed approximately $600 million in trades for Norma without NIR's apparent involvement or knowledge. *See, e.g.,* Ex. D (ML01396714) ("Apparently NIR allowed Magnetar to do some trading for their portfolio (in the area of 600MM). This accounted for a large chunk of trading that NIR originally didn't recognize.") This prompted a Merrill corporate risk manager to ask: "Dumb question. Is Magnetar allowed to trade for NIR?" *Id.*

- Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the selection of each asset. *See, e.g.,* Ex. E (ML01396692) (Prusko to NIR: "I definitely want to approve any CDO's that go in the deal, don't recall seeing any, so I assume 'Approved' [in NIR spreadsheet] means only that NIR has internally approved the credit."); Ex. F (ML01400671) (Prusko rejecting NIR request to include TABS 2006-6A cash bond in the portfolio: "Afraid so, tabs in particular I don't want the cash in there.").

- By January 2007 (when Merrill first approached Rabobank), Magnetar was already the short "counterparty" on $600 million of synthetic assets in Norma's portfolio. *See, e.g.,* Ex. G (ML01486349). Merrill recognized that such short positions were more important to Magnetar than its long investments. *See, e.g.,* Ex. H (ML01488729) ("I think Jim [Prusko] is less worried about his deal pricings and more worried about where he can short paper in the aftermarket."). Indeed, Magnetar's equity investment in Norma totaled less than $50 million after receiving undisclosed discounts funded through the loan from Rabobank. *See, e.g.,* Ex. I (ML01475982). This meant that Magnetar stood to make *10 times* more from its $600 million short position if Norma failed than Magnetar had invested in Norma's equity.

Merrill recently contended that no fraudulent intent can be inferred from Magnetar's involvement in selecting assets in light of Merrill's own investment in Norma's Class A-1 Notes. *See* April 19, 2010 Letter from Musoff to Court. However, documents produced by Merrill show that it "bought protection" that resulted in it being "long short netted" on its Norma Class A-1 Note exposure. *See* Ex. J (ML01378403) Thus, Merrill's own purported investment in Norma provides no basis for negating any inference that it intended to defraud Rabobank.

Rabobank therefore seeks discovery from Magnetar regarding its involvement in Norma, its relationships with Merrill and NIR, and the creation of Norma as a shorting vehicle. Magnetar has refused to respond to Rabobank's subpoena, citing cost and other issues. Rabobank requests a Rule 24(c) pre-motion conference in order that it may move to compel Magnetar's response.

Respectfully submitted,

Jonathan Pickhardt

cc:    Scott D. Musoff, Esq. (counsel for Merrill Lynch) (via electronic filing)
       Thomas L. Kirsch, Esq. (counsel for Magnetar) (via email)

2

NORMAFCIC000106

# EXHIBIT D

The Wall Street Money Machine

# Banks' Self-Dealing Super-Charged Financial Crisis



*Employees walk past a sign at Merrill Lynch headquarters in New York on Oct. 30, 2007. (Emmanuel Dunand/AFP/Getty Images)*

by Jake Bernstein and Jesse Eisinger
ProPublica, Aug. 26, 2010, 9:09 p.m.

**Oct. 20:** This text has been corrected [1].

Over the last two years of the housing bubble, Wall Street bankers perpetrated one of the greatest episodes of self-dealing in financial history.

Faced with increasing difficulty in selling the mortgage-backed securities that had been among their most lucrative products, the banks hit on a solution that preserved their quarterly earnings and huge bonuses:

They created fake demand.

A ProPublica analysis shows for the first time the extent to which banks -- primarily Merrill Lynch, but also Citigroup, UBS and others -- bought their own products and cranked up an assembly line that otherwise should have flagged.

The products they were buying and selling were at the heart of the 2008 meltdown -- collections of mortgage bonds known as collateralized debt obligations, or CDOs.

As the housing boom began to slow in mid-2006, investors became skittish about the riskier parts of those investments. So the banks created -- and ultimately provided most of the money for -- new CDOs. Those new CDOs bought the hard-to-sell pieces of the original CDOs. The result was a daisy chain [2] that solved one problem but created another: Each new CDO had its own risky pieces. Banks created yet other CDOs to buy those.

Individual instances of these questionable trades have been reported before, but ProPublica's investigation, done in partnership with NPR's Planet Money [3], shows that by late 2006 they became a common industry practice.



An analysis by research firm Thetica Systems, commissioned by ProPublica, shows that in the last years of the boom, CDOs had become the dominant purchaser of key, risky parts of other CDOs, largely replacing real investors like pension funds. By 2007, 67 percent of those slices were bought by other CDOs, up from 36 percent just three years earlier. The banks often orchestrated these purchases. In the last two years of the boom, nearly half of all CDOs sponsored by market leader Merrill Lynch bought significant portions of other Merrill CDOs [4].

ProPublica also found 85 instances during 2006 and 2007 in which two CDOs bought pieces of each other. These trades, which involved $107 billion worth of CDOs, underscore the extent to which the market lacked real buyers. Often the CDOs that swapped purchases closed within days of each other, the analysis shows.

There were supposed to be protections against this sort of abuse. While banks provided the blueprint for the CDOs and marketed them, they typically selected independent managers who chose the specific bonds to go inside them. The managers had a legal obligation to do what was best for the CDO. They were paid by the CDO, not the bank, and were supposed to serve as a bulwark against self-dealing by the banks, which had the fullest understanding of the complex and lightly regulated mortgage bonds.

It rarely worked out that way. The managers were beholden to the banks that sent them the business. On a billion-dollar deal, managers could earn a million dollars in fees, with little risk. Some small firms did several billion dollars of CDOs in a matter of months.

"All these banks for years were spawning trading partners," says a former executive from Financial Guaranty Insurance Company, a major insurer of the CDO market. "You don't have a trading partner? Create one."

The executive, like most of the dozens of people ProPublica spoke with about the inner workings of the market at the time, asked not to be named out of fear of being sucked into ongoing investigations or because they are involved in civil litigation.

Keeping the assembly line going had a wealth of short-term advantages for the banks. Fees rolled in. A typical CDO could net the bank that created it between $5 million and $10 million -- about half of which usually ended up as employee bonuses. Indeed, Wall Street awarded record bonuses in 2006, a hefty chunk of which came from the CDO business.

The self-dealing super-charged the market for CDOs, enticing some less-savvy investors to try their luck. Crucially, such deals maintained the value of mortgage bonds at a time when the lack of buyers should have driven their prices down.

But the strategy of speeding up the assembly line had devastating consequences for homeowners, the banks themselves and, ultimately, the global economy. Because of Wall Street's machinations, more mortgages had been granted to ever-shakier borrowers. The results can now be seen in foreclosed houses across America.

The incestuous trading also made the CDOs more intertwined and thus fragile, accelerating their decline in value that began in the fall of 2007 and deepened over the next year. Most are now worth pennies on the dollar. Nearly half of the nearly trillion dollars in losses to the global banking system came from CDOs, losses ultimately absorbed by taxpayers and investors around the world. The banks' troubles sent the world's economies into a tailspin from which they have yet to recover.

It remains unclear whether any of this violated laws. The SEC has said [6] that it is actively looking at as many as 50 CDO managers as part of its broad examination of the CDO business' role in the financial crisis. In particular, the agency is focusing on the relationship between the banks and the managers. The SEC is exploring how deals were structured, if any quid pro quo arrangements existed, and whether banks pressured managers to take bad assets.

The banks declined to directly address ProPublica's questions. Asked about its relationship with managers and the cross-ownership among its CDOs, Citibank responded with a one-sentence statement:

"It has been widely reported that there are ongoing industry-wide investigations into CDO-related matters and we do not comment on pending investigations."

None of ProPublica's questions had mentioned the SEC or pending investigations.

Posed a similar list of questions, Bank of America, which now owns Merrill Lynch, said:

"These are very specific questions regarding individuals who left Merrill Lynch several years ago and a CDO origination business that, due to market conditions, was discontinued by Merrill before Bank of America acquired the company."

This is the second installment of a ProPublica series about the largely hidden history of the CDO boom and bust. Our first story [7] looked at how one hedge fund helped create at least $40 billion in CDOs as part of a strategy to bet against the market. This story turns the focus on the banks.

**Merrill Lynch Pioneers Pervert the Market**

By 2004, the housing market was in full swing, and Wall Street bankers flocked to the CDO frenzy. It seemed to be the perfect money machine, and for a time everyone was happy.

Homeowners got easy mortgages. Banks and mortgage companies felt secure lending the money because they could sell the mortgages almost immediately to Wall Street and get back all their cash plus a little extra for their trouble. The investment banks charged massive fees for repackaging the mortgages into fancy financial products. Investors all around the world got to play in the then-phenomenal American housing market.



The mortgages were bundled into bonds, which were in turn combined into CDOs offering varying interest rates and levels of risk.

Investors holding the top tier of a CDO were first in line to get money coming from mortgages. By 2006, some banks often kept this layer, which credit agencies blessed with their highest rating of Triple A.

Buyers of the lower tiers took on more risk and got higher returns. They would be the first to take the hit if homeowners funding the CDO stopped paying their mortgages. (Here's a video explaining how CDOs worked [8].)

Over time, these risky slices became increasingly hard to sell, posing a problem for the banks. If they remained unsold, the sketchy assets stayed on their books, like rotting inventory. That would require the banks to set aside money to cover any losses. Banks hate doing that because it means the money can't be loaned out or put to other uses.

Being stuck with the risky portions of CDOs would ultimately lower profits and endanger the whole assembly line.

The banks, notably Merrill and Citibank, solved this problem by greatly expanding what had been a common and accepted practice: CDOs buying small pieces of other CDOs.

Architects of CDOs typically included what they called a "bucket" -- which held bits of other CDOs paying higher rates of interest. The idea was to boost overall returns of deals primarily composed of safer assets. In the early days, the bucket was a small portion of an overall CDO.

One pioneer of pushing CDOs to buy CDOs was Merrill Lynch's Chris Ricciardi, who had been brought to the firm in 2003 to take Merrill to the top of the CDO business. According to former colleagues, Ricciardi's team cultivated managers, especially smaller firms.

Merrill exercised its leverage over the managers. A strong relationship with Merrill could be the difference between a business that thrived and one that didn't. The more deals the banks gave a manager, the more money the manager got paid.

As the head of Merrill's CDO business, Ricciardi also wooed managers with golf outings and dinners. One Merrill executive summed up the overall arrangement: "I'm going to make you rich. You just have to be my bitch."

But not all managers went for it.

An executive from Trainer Wortham, a CDO manager, recalls a 2005 conversation with Ricciardi. "I wasn't going to buy other CDOs. Chris said: 'You don't get it. You have got to buy other guys' CDOs to get your deal done. That's how it works.'" When the manager refused, Ricciardi told him, "'That's it. You are not going to get another deal done.'" Trainer Wortham largely withdrew from the market, concerned about the practice and the overheated prices for CDOs.

Ricciardi declined multiple requests to comment.

Merrill CDOs often bought slices of other Merrill deals. This seems to have happened more in the second half of any given year, according to ProPublica's analysis, though the purchases were still a small portion compared to what would come later. Annual bonuses are based on the deals bankers completed by yearend.

Ricciardi left Merrill Lynch in February 2006. But the machine he put into place not only survived his departure, it became a model for competitors.

**As Housing Market Wanes, Self-Dealing Takes Off**

By mid-2006, the housing market was on the wane. This was particularly true for subprime mortgages, which were given to borrowers with spotty credit at higher interest rates. Subprime lenders began to fold, in what would become a mass extinction. In the first half of the year, the percentage of subprime borrowers who didn't even make the first month's mortgage payment tripled from the previous year.

That made CDO investors like pension funds and insurance companies increasingly nervous. If homeowners couldn't make their mortgage payments, then the stream of cash to CDOs would dry up. Real "buyers began to shrivel and shrivel," says Fiachra O'Driscoll, who co-ran Credit Suisse's CDO business from 2003 to 2008.

Faced with disappearing investor demand, bankers could have wound down the lucrative business and moved on. That's the way a market is supposed to work. Demand disappears; supply follows. But bankers were making lots of money. And they had amassed warehouses full of CDOs and other mortgage-based assets whose value was going down.

Rather than stop, bankers at Merrill, Citi, UBS and elsewhere kept making CDOs.

The question was: Who would buy them?

The top 80 percent, the less risky layers or so-called "super senior," were held by the banks themselves. The beauty of owning that supposedly safe top portion was that it required hardly any money be held in reserve.

That left 20 percent, which the banks did not want to keep because it was riskier and required them to set aside reserves to cover any losses. Banks often sold the bottom, riskiest part to hedge funds [7]. That left the middle layer, known on Wall Street as the "mezzanine," which was sold to new CDOs whose top 80 percent was ultimately owned by ... the banks.

"As we got further into 2006, the mezzanine was going into other CDOs," says Credit Suisse's O'Driscoll.

Get ProPublica's latest headlines and major investigations delivered to your inbox. [5]

This was the daisy chain [2]. On paper, the risky stuff was gone, held by new independent CDOs. In reality, however, the banks were buying their own otherwise unsellable assets.

How could something so seemingly short-sighted have happened?

It's one of the great mysteries of the crash. Banks have fleets of risk managers to defend against just such reckless behavior. Top executives have maintained that while they suspected that the housing market was cooling, they never imagined the crash. For those doing the deals, the payoff was immediate. The dangers seemed abstract and remote.

The CDO managers played a crucial role. CDOs were so complex that even buyers had a hard time seeing exactly what was in them -- making a neutral third party that much more essential.

"When you're investing in a CDO you are very much putting your faith in the manager," says Peter Nowell, a former London-based investor for the Royal Bank of Scotland. "The manager is choosing all the bonds that go into the CDO." (RBS suffered mightily in the global financial meltdown, posting the largest loss in United Kingdom history, and was de facto nationalized by the British government.)



*Source: Asset-Backed Alert*

By persuading managers to pick the unsold slices of CDOs, the banks helped keep the market going. "It guaranteed distribution when, quite frankly, there was not a huge market for them," says Nowell.

The counterintuitive result was that even as investors began to vanish, the mortgage CDO market more than doubled from 2005 to 2006, reaching $226 billion, according to the trade publication Asset-Backed Alert.

**Citi and Merrill Hand Out Sweetheart Deals**

As the CDO market grew, so did the number of CDO management firms, including many small shops that relied on a single bank for most of their business. According to Fitch, the number of CDO managers it rated rose from 89 in July 2006 to 140 in September 2007.

One CDO manager epitomized the devolution of the business, according to numerous industry insiders: a Wall Street veteran named Wing Chau.

Earlier in the decade, Chau had run the CDO department for Maxim Group, a boutique investment firm in New York. Chau had built a profitable business for Maxim based largely on his relationship with Merrill Lynch. In just a few years, Maxim had corralled more than $4 billion worth of assets under management just from Merrill CDOs.

In August 2006, Chau bolted from Maxim to start his own CDO management business, taking several colleagues with him. Chau's departure gave Merrill, the biggest CDO producer, one more avenue for unsold inventory.

Chau named the firm Harding, after the town in New Jersey where he lived. The CDO market was starting its most profitable stretch ever, and Harding would play a big part. In an eleven-month period, ending in August 2007, Harding managed $13 billion of CDOs, including more than $5 billion from Merrill, and another nearly $5 billion from Citigroup. (Chau would later earn

a measure of notoriety for a cameo appearance in Michael Lewis' bestseller "The Big Short [9]," where he is depicted as a cheerfully feckless "go-to buyer" for Merrill Lynch's CDO machine.)

Chau had a long-standing friendship with Ken Margolis, who was Merrill's top CDO salesman under Ricciardi. When Ricciardi left Merrill in 2006, Margolis became a co-head of Merrill's CDO group. He carried a genial, let's-just-get-the-deal-done demeanor into his new position. An avid poker player, Margolis told a friend that in a previous job he had stood down a casino owner during a foreclosure negotiation after the owner had threatened to put a fork through his eye.

Chau's close relationship with Merrill continued. In late 2006, Merrill sublet office space to Chau's startup in the Merrill tower in Lower Manhattan's financial district. A Merrill banker, David Moffitt, scheduled visits to Harding for prospective investors in the bank's CDOs. "It was a nice office," overlooking New York Harbor, recalls a CDO buyer. "But it did feel a little weird that it was Merrill's building," he said.

Moffitt did not respond to requests for comment.

Under Margolis, other small managers with meager track records were also suddenly handling CDOs valued at as much as $2 billion. Margolis declined to answer any questions about his own involvement in these matters.

A Wall Street Journal article [10] ($) from late 2007, one of the first of its kind, described how Margolis worked with one inexperienced CDO manager called NIR on a CDO named Norma, in the spring of that year. The Long Island-based NIR made about $1.5 million a year for managing Norma, a CDO that imploded.

"NIR's collateral management business had arisen from efforts by Merrill Lynch to assemble a stable of captive small firms to manage its CDOs that would be beholden to Merrill Lynch on account of the business it funneled to them," alleged a lawsuit filed in New York state court against Merrill over Norma that was settled quietly after the plaintiffs received internal Merrill documents.

NIR declined to comment.

Banks had a variety of ways to influence managers' behavior.

Some of the few outside investors remaining in the market believed that the manager would do a better job if he owned a small slice of the CDO he was managing. That way, the manager would have more incentive to manage the investment well, since he, too, was an investor. But small management firms rarely had money to invest. Some banks solved this problem by advancing money to managers such as Harding.

Chau's group managed two Citigroup CDOs -- 888 Tactical Fund and Jupiter High-Grade VII -- in which the bank loaned Harding money to buy risky pieces of the deal. The loans were paid back out of the fees the managers took from the CDO and its investors. The loans were disclosed to investors in a few sentences among the hundreds of pages of legalese accompanying the deals.

In response to ProPublica's questions, Chau's lawyer said, "Harding Advisory's dealings with investment banks were proper and fully disclosed."

Citigroup made similar deals with other managers. The bank lent money to a manager called Vanderbilt Capital Advisors for its Armitage CDO, completed in March 2007.

Vanderbilt declined to comment. It couldn't be learned how much money Citigroup loaned or whether it was ever repaid.

Yet again banks had masked their true stakes in CDO. Banks were lending money to CDO managers so they could buy the banks' dodgy assets. If the managers couldn't pay the loans back -- and most were thinly capitalized -- the banks were on the hook for even more losses when the CDO business collapsed.

**Goldman, Merrill and Others Get Tough**

When the housing market deteriorated, banks took advantage of a little-used power they had over managers.



*Source: Thetica Systems*

The way CDOs are put together, there is a brief period when the bonds picked by managers sit on the banks' balance sheets. Because the value of such assets can fall, banks reserved the right to overrule managers' selections.

According to numerous bankers, managers and investors, banks rarely wielded that veto until late 2006, after which it became common. Merrill was in the lead.

"I would go to Merrill and tell them that I wanted to buy, say, a Citi bond," recalls a CDO manager. "They would say 'no.' I would suggest a UBS bond, they would say 'no.' Eventually, you got the joke." Managers could choose assets to put into their CDOs but they had to come from Merrill CDOs. One rival investment banker says Merrill treated CDO managers the way Henry Ford treated his Model T customers: You can have any color you want, as long as it's black.

Once, Merrill's Ken Margolis pushed a manager to buy a CDO slice for a Merrill-produced CDO called Port Jackson that was completed in the beginning of 2007: "'You don't have to buy the deal but you are crazy if you don't because of your business,'" an executive at the management firm recalls Margolis telling him. "'We have a big pipeline and only so many more mandates to give you.' You got the message." In other words: Take our stuff and we'll send you more business. If not, forget it.

Margolis declined to comment on the incident.

"All the managers complained about it," recalls O'Driscoll, the former Credit Suisse banker who competed with other investment banks to put deals together and market them. But "they were indentured slaves." O'Driscoll recalls managers grumbling that Merrill in particular told them "what to buy and when to buy it."

Other big CDO-producing banks quickly adopted the practice.

A little-noticed document released this year during a congressional investigation into Goldman Sachs' CDO business reveals that bank's thinking. The firm wrote a November 2006 internal memorandum [11] about a CDO called Timberwolf, managed by Greywolf, a small manager headed by ex-Goldman bankers. In a section headed "Reasons To Pursue," the authors touted that "Goldman is approving every asset" that will end up in the CDO. What the bank intended to do with that approval power is clear from the memo: "We expect that a significant portion of the portfolio by closing will come from Goldman's offerings."

When asked to comment whether Goldman's memo demonstrates that it had effective control over the asset selection process and that Greywolf was not in fact an independent manager, the bank responded: "Greywolf was an experienced, independent manager and made its own decisions about what reference assets to include. The securities included in Timberwolf were fully disclosed to the professional investors who invested in the transaction."

Greywolf declined to comment. One of the investors, Basis Capital of Australia, filed a civil lawsuit in federal court in Manhattan against Goldman over the deal. The bank maintains the lawsuit is without merit.

By March 2007, the housing market's signals were flashing red. Existing home sales plunged at the fastest rate in almost 20 years. Foreclosures were on the rise. And yet, to CDO buyer Peter Nowell's surprise, banks continued to churn out CDOs.

"We were pulling back. We couldn't find anything safe enough," says Nowell. "We were amazed that April through June they were still printing deals. We thought things were over."

Instead, the CDO machine was in overdrive. Wall Street produced $70 billion in mortgage CDOs in the first quarter of the year.

Many shareholder lawsuits battling their way through the court system today focus on this period of the CDO market. They allege that the banks were using the sales of CDOs to other CDOs to prop up prices and hide their losses.

"Citi's CDO operations during late 2006 and 2007 functioned largely to sell CDOs to yet newer CDOs created by Citi to house them," charges a pending shareholder lawsuit against the bank

that was filed in federal court in Manhattan in February 2009. "Citigroup concocted a scheme whereby it repackaged many of these investments into other freshly-baked vehicles to avoid incurring a loss."

Citigroup described the allegations as "irrational," saying the bank's executives would never knowingly take actions that would lead to "catastrophic losses."

**In the Hall of Mirrors, Myopic Rating Agencies**

The portion of CDOs owned by other CDOs grew right alongside the market. What had been 5 percent of CDOs (remember the "bucket") now came to constitute as much as 30 or 40 percent of new CDOs. (Wall Street also rolled out CDOs that were almost entirely made up of CDOs, called CDO squareds [12].)

The ever-expanding bucket provided new opportunities for incestuous trades.

It worked like this: A CDO would buy a piece of another CDO, which then returned the favor. The transactions moved both CDOs closer to completion, when bankers and managers would receive their fees.



*Source: Thetica Systems*

ProPublica's analysis shows that in the final two years of the business, CDOs with cross-ownership amounted to about one-fifth of the market, about $107 billion.

Here's an example from early May 2007:

- A CDO called Jupiter VI bought a piece of a CDO called Tazlina II.
- Tazlina II bought a piece of Jupiter VI.

Both Jupiter VI and Tazlina II were created by Merrill and were completed within a week of each other. Both were managed by small firms that did significant business with Merrill: Jupiter by Wing Chau's Harding, and Tazlina by Terwin Advisors. Chau did not respond to questions about this deal. Terwin Advisors could not reached.

Just a few weeks earlier, CDO managers completed a comparable swap between Jupiter VI and another Merrill CDO called Forge 1.

Forge has its own intriguing history. It was the only deal done by a tiny manager of the same name based in Tampa, Fla. The firm was started less than a year earlier by several former Wall Street executives with mortgage experience. It received seed money from Bryan Zwan, who in 2001 settled an SEC civil lawsuit over his company's accounting problems in a federal court in Florida. Zwan and Forge executives didn't respond to requests for comment.

After seemingly coming out of nowhere, Forge won the right to manage a $1.5 billion Merrill CDO. That earned Forge a visit from the rating agency Moody's.

"We just wanted to make sure that they actually existed," says a former Moody's executive. The rating agency saw that the group had an office near the airport and expertise to do the job.

Rating agencies regularly did such research on managers, but failed to ask more fundamental questions. The credit ratings agencies "did heavy, heavy due diligence on managers but they were looking for the wrong things: how you processed a ticket or how your surveillance systems worked," says an executive at a CDO manager. "They didn't check whether you were buying good bonds."

One Forge employee recalled in a recent interview that he was amazed Merrill had been able to find buyers so quickly. "They were able to sell all the tranches" -- slices of the CDO -- "in a fairly rapid period of time," said Rod Jensen, a former research analyst for Forge.

Forge achieved this feat because Merrill sold the slices to other CDOs, many linked to Merrill.

The ProPublica analysis shows that two Merrill CDOs, Maxim II and West Trade III, each bought pieces of Forge. Small managers oversaw both deals.

Forge, in turn, was filled with detritus from Merrill. Eighty-two percent of the CDO bonds owned by Forge came from other Merrill deals.

Citigroup did its own version of the shuffle, as these three CDOs demonstrate:

- A CDO called Octonion bought some of Adams Square Funding II.
- Adams Square II bought a piece of Octonion.
- A third CDO, Class V Funding III, also bought some of Octonion.
- Octonion, in turn, bought a piece of Class V Funding III.

All of these Citi deals were completed within days of each other. Wing Chau was once again a central player. His firm managed Octonion. The other two were managed by a unit of Credit Suisse. Credit Suisse declined to comment.

Not all cross-ownership deals were consummated.

In spring 2007, Deutsche Bank was creating a CDO and found a manager that wanted to take a piece of it. The manager was overseeing a CDO that Merrill was assembling. Merrill blocked the manager from putting the Deutsche bonds into the Merrill CDO. A former Deutsche Bank banker

says that when Deutsche Bank complained to Andy Phelps, a Merrill CDO executive, Phelps offered a quid pro quo: If Deutsche was willing to have the manager of its CDO buy some Merrill bonds, Merrill would stop blocking the purchase. Phelps declined to comment.

The Deutsche banker, who says its managers were independent, recalls being shocked: "We said we don't control what people buy in their deals." The swap didn't happen.

**The Missing Regulators and the Aftermath**

In September 2007, as the market finally started to catch up with Merrill Lynch, Ken Margolis left the firm to join Wing Chau at Harding.

Chau and Margolis circulated a marketing plan for a new hedge fund to prospective investors touting their expertise in how CDOs were made and what was in them. The fund proposed to buy failed CDOs -- at bargain basement prices. In the end, Margolis and Chau couldn't make the business work and dropped the idea.

Why didn't regulators intervene during the boom to stop the self-dealing that had permeated the CDO market?

No one agency had authority over the whole business. Since the business came and went in just a few years, it may have been too much to expect even assertive regulators to comprehend what was happening in time to stop it.

While the financial regulatory bill passed by Congress in July creates more oversight powers, it's unclear whether regulators have sufficient tools to prevent a replay of the debacle.

In just two years, the CDO market had cut a swath of destruction. Partly because CDOs had bought so many pieces of each other, they collapsed in unison. Merrill Lynch and Citigroup, the biggest perpetrators of the self-dealing, were among the biggest losers. Merrill lost about $26 billion on mortgage CDOs and Citigroup about $34 billion.

*Additional reporting by Kitty Bennett, Krista Kjellman Schmidt, Lisa Schwartz and Karen Weise.*

**Correction:** This story previously reported that there were 85 instances during 2006 and 2007 in which two complex securities known as collateralized debt obligations bought pieces of each others' "unsold" inventory. In fact, there were some instances when this cross-exposure occurred through later transactions. The banks sometimes used such transactions to minimize their own exposure to CDOs they had created.

An interactive graphic we published includes at least one example of cross-exposure that did not involve "unsold" inventory. A CDO called Tourmaline III made a sidebet in 2007 that mirrored the performance of a piece of a CDO called Zais Investment Grade 8; that same year Zais 8 bought a piece of Tourmaline III. Both CDOs were underwritten by Deutsche Bank.