UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                        :

SPACE COAST CREDIT UNION, as successor in     :
interest to EASTERN FINANCIAL FLORIDA        :    11 Civ. 2802 (LLS)
CREDIT UNION,                               :

                                      :    **ORAL ARGUMENT**
            Plaintiff,              :    **REQUESTED**
      -against-                     :
                                        :

BARCLAYS CAPITAL, INC., BARCLAYS BANK    :
PLC, STATE STREET GLOBAL ADVISORS, STATE :
STREET BANK AND TRUST COMPANY, and      :
STATE STREET CORPORATION,             :

                                        :
            Defendants.            :

-------------------------------------------------------------------X

## JOINT MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

    A.    The Parties ....................................................................................................... 4

    B.    CDOs ............................................................................................................... 5

    C.    The Markov CDO ............................................................................................ 7

    D.    Eastern Financial's Investment in Markov ..................................................... 11

    E.    The Subprime Mortgage Crisis ....................................................................... 12

    F.    Eastern Financial's Demise ............................................................................. 13

    G.    This Action ....................................................................................................... 14

ARGUMENT ........................................................................................................................ 15

POINT I    PLAINTIFF'S EXCHANGE ACT CLAIMS AGAINST ALL DEFENDANTS SHOULD BE DISMISSED ................................................ 15

    A.    Relevant Standards .......................................................................................... 16

    B.    Plaintiff Fails to Plead Any Actionable Misrepresentation or Omission ............. 17

        1.    Plaintiff Pleads No Actionable Misrepresentation Regarding the Collateral Selection Process ..................................................... 17

        2.    Plaintiff Pleads No Actionable Misrepresentation Regarding the Credit Ratings of Markov's Collateral or Its Notes, or That Markov Was a "High Grade" CDO ..................................................... 22

        3.    Plaintiff Pleads No Actionable Misrepresentation Regarding the Benefit of Synthetic Assets ..................................................... 24

        4.    Plaintiff Pleads No Actionable Misrepresentation Regarding Markov's Safety and Ability to Withstand Collateral Losses ................. 25

    C.    Plaintiff Fails to Plead Particularized Facts Giving Rise to the Requisite Strong Inference of Scienter ......................................................... 27

       1.     Plaintiff Fails to Plead Motive to Defraud ............................................. 27

       2.     Plaintiff Fails to Plead Conscious Misbehavior ...................................... 31

   D.     Plaintiff Fails to Plead Reasonable Reliance ...................................... 34

   E.     Plaintiff's Exchange Act Claims Are Time-Barred ............................................. 37

   F.     Plaintiff's Section 20(a) Claim Against Barclays Bank and State Street Corporation Should Be Dismissed ............................................. 38

POINT II     PLAINTIFF'S COMMON LAW CLAIMS AGAINST ALL DEFENDANTS SHOULD BE DISMISSED ...................................... 39

   A.     Plaintiff's Fraud-Related Claims Against SSgA and Barclays Fail ................... 39

   B.     Plaintiff Fails to Plead Negligent Misrepresentation Against SSgA ................. 41

   C.     Plaintiff Fails to Plead Breach of Fiduciary Duty Against SSgA ....................... 43

   D.     Plaintiff Fails to Plead Aiding and Abetting Breach of Fiduciary Duty Against Barclays Capital ....................................................... 45

   E.     Plaintiff Fails to Plead Breach of Contract Harming a Third Party Against SSgA ......................................................... 46

CONCLUSION ............................................................................................. 48

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

<u>900 Unlimited, Inc. v. MCI Telecomms. Corp.</u>,
    215 A.D.2d 227 (N.Y. App. Div. 1995) .................................................. 42

<u>Abbad v. Amman</u>,
    285 F. Supp. 2d 411 (S.D.N.Y. 2003) ................................................ 3, 32

<u>Abercrombie v. Andrew College</u>,
    438 F. Supp. 2d 243 (S.D.N.Y. 2006) ................................................ 43-44

<u>Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC</u>,
    74 A.D.3d 652 (N.Y. App. Div. 2010) .................................................. 42

<u>Armstrong v. McAlpin</u>,
    699 F.2d 79 (2d Cir. 1983)..................................................................... 37

<u>Ashcroft v. Iqbal</u>,
    129 S. Ct. 1937 (2009)..................................................................... 16, 47

<u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>,
    493 F.3d 87 (2d Cir. 2007)......................................................... 4, 19, 27

<u>Bay Harbour Mgmt. LLC v. Carothers</u>,
    282 Fed. Appx. 71 (2d Cir. 2008).......................................................... 34

<u>Bell Atlantic Corp. v. Twombly</u>,
    550 U.S. 554 (2007)............................................................................... 47

<u>Berman v. Morgan Keenan</u>,
    No. 10 Civ. 5866(PKC), 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011)............... 40

<u>Boguslavsky v. Kaplan</u>,
    159 F.3d 715 (2d Cir. 1998)................................................................... 38

<u>Boley v. Pineloch Assocs., Ltd.</u>,
    700 F. Supp. 673 (S.D.N.Y. 1988)...................................................... 44-45

<u>Brecher v. Citigroup Inc.</u>,
    No. 09 Civ. 7359(SHS), 2011 WL 2209145 (S.D.N.Y. June 7, 2011) .................. 37-38

<u>Brown v. E.F. Hutton Grp., Inc.</u>,
    991 F.2d 1020 (2d Cir. 1993)................................................................. 35

iii

Brown v. Mitchell-Innes & Nash, Inc.,
    No. 06 Civ. 7871(PAC), 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009) ............... 47

Burstyn v. Worldwide Xceed Grp., Inc.,
    No. 01 Civ. 1125(GEL), 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)............. 39

City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.,
    637 F.3d 169 (2d Cir. 2011)................................................................. 37

ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir. 2009)................................................16, 25, 27, 28

Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,
    343 F.3d 189 (2d Cir. 2003)................................................................. 35

Epirus Capital Mgmt., LLC v. Citigroup Inc.,
    No. 09 Civ. 2549(SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)................ 4, 22, 28

Ernst & Ernst v. Hochfelder,
    425 U.S. 185 (1976)........................................................................ 16

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,
    375 F.3d 168 (2d Cir. 2004)............................................................. 42, 43

Fait v. Regions Fin. Corp.,
    10-2311-civ, 2011 WL 3667784 (2d Cir. Aug. 23, 2011) ..................................... 23

Feinman v. Schulman Berlin & Davis,
    677 F. Supp. 168 (S.D.N.Y. 1988)........................................................ 36

Footbridge Ltd. v. Countrywide Home Loans, Inc.,
    No. 09 Civ. 4050(PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)............... 18, 28

Freidus v. ING Groep N.V.,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010)..................................................... 23

Glaser v. The9, Ltd.,
    722 F. Supp. 2d 573 (S.D.N.Y. 2011)..................................................... 30

Good Hill Partners L.P. v. WM Asset Holdings Corp.,
    583 F. Supp. 2d 517 (S.D.N.Y. 2008)..................................................... 16

Holloway v. King,
    361 F. Supp. 2d 351 (S.D.N.Y. 2005)..................................................... 44

Hydro Investors, Inc. v. Trafalgar Power Inc.,
    227 F.3d 8 (2d Cir. 2000) ................................................................. 41

In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.,
    No. 03 MD 1529(LMM), 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ............. 30

In re eSpeed, Inc. Sec. Litig.,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................................ 30

In re MBIA, Inc. Sec. Litig.,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) ........................................................................ 39

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003) ........................................................................ 28

In re Mid-Island Hosp., Inc.,
    276 F.3d 123 (2d Cir. 2002) ...................................................................................... 44

In re PXRE Grp., Ltd., Sec. Litig.,
    600 F. Supp. 2d 510 (S.D.N.Y 2009) ................................................................. 31, 34

In re Sharp Int'l Corp.,
    403 F.3d 43 (2d Cir. 2005) ........................................................................................ 45

In re Sotheby's Holdings, Inc.,
    No. 00 Civ. 1041(DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............... 34

Kalin v. Xanboo, Inc.,
    526 F. Supp. 2d 392 (S.D.N.Y. 2007) ...................................................................... 39

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ...................................................................................... 31

Kaufman v. Cohen,
    307 A.D.2d 113 (N.Y. App. Div. 2003) ................................................................... 46

Klamberg v. Roth,
    473 F. Supp. 2d 544 (S.D.N.Y. 1979) ...................................................................... 18

Kosovich v. Metro Homes, LLC,
    No. Civ. 6992(JSR), 2009 WL 5171737 (S.D.N.Y. Dec. 30, 2009) ..................... 35-36

Lasker v. N.Y. State Elec. & Gas Corp.,,
    95 F.3d 55 (2d Cir. 1996) .......................................................................................... 25

Lerner v. Fleet Bank, N.A.,
    459 F.3d 273 (2d Cir. 2006) ...................................................................................... 40

Madeira v. Affordable Hous. Found., Inc.,
    469 F.3d 219 (2d Cir. 2006) ...................................................................................... 46

Marcus v. Frome,
    275 F. Supp. 2d 496 (S.D.N.Y. 2003)....................................................... 40

MBIA Ins. Corp. v. Merrill Lynch,
    81 A.D.3d 419 (N.Y. App. Div. 2011) ...................................................... 41

Mechigian v. Art Capital Corp.,
    612 F. Supp. 1421 (D.C.N.Y. 1985) ........................................................ 45

Merck & Co., Inc. v. Reynolds,
    130 S. Ct. 1784 (2010)............................................................................. 37

Moore U.S.A., Inc. v. Standard Register Co.,
    139 F. Supp. 2d 348 (W.D.N.Y. 2001) ...................................................... 4

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)..................................................................... 25

Onanuga v. Pfizer, Inc.,
    No. 03 Civ. 5405(CCM), 2003 WL 22670842 (S.D.N.Y. Nov. 7, 2003).............. 46

Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)................................................... 33-34

Pollio v. MF Global, Ltd.,
    608 F. Supp. 2d 564 (S.D.N.Y. 2009)....................................................... 33

Rich v. Maidstone Fin. Inc.,
    No. 98 Civ. 2569(DAB),2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002).............. 39

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004)..................................................................... 16

Rosenblatt v. Christie, Manson & Woods Ltd.,
    No. 04 Civ. 4205, 2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005) .......................... 44

Saltz v. New Frontier, LP,
    No. 10 Civ. 964(LBS), 2010 WL 5298225 (S.D.N.Y. Dec. 23, 2010)................... 40

San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996)................................................................... 16, 33

Sheppard v. TCW/DW Term Trust 2000,
    938 F. Supp. 171 (S.D.N.Y. 1996)............................................................ 18

Silvers v. State,
    68 A.D.3d 668 (N.Y App. Div. 2009) ....................................................... 42

S. Cherry St., LLC v. Hennessee Grp. LLC,
    573 F.3d 98 (2d Cir. 2009)................................................................27, 28, 29, 30

Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,
    No. 00 Civ. 8058 (NRB), 2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004)..............   35

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,
    552 U.S. 148 (2008)...........................................................................   16

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    531 F.3d 190, 196 (2d Cir. 2008)............................................................   32-33

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)...............................................................16-17, 27, 31

Travelers Indem. Co. of Conn. v. Losco Grp.,
    150 F. Supp. 2d 556 (S.D.N.Y. 2002)........................................................   46

Tuchman v. DSC Commc'ns Corp.,
    14 F.3d 1061 (5th Cir. 1994) ................................................................   18

UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney,
    288 A.D.2d 87 (N.Y. App. Div. 2001) ......................................................   41

**Rules and Statutes**

15 U.S.C. § 78u-4(b)(1) .......................................................................   16

15 U.S.C. § 78u-4(b)(2) .......................................................................   16, 27

15 U.S.C. § 78u-4(b)(3)(A)....................................................................   17

28 U.S.C. § 1658(b) ...........................................................................   37

Defendants Barclays Capital Inc. ("Barclays Capital") and Barclays Bank PLC ("Barclays Bank") (collectively "Barclays"), State Street Global Advisors, a division of State Street Bank & Trust Co. (collectively, "SSgA" or "State Street"), and State Street Corporation (with Barclays, "Defendants"), respectfully submit this joint memorandum of law in support of their motion to dismiss Plaintiff's complaint ("the Complaint")[1] under Fed. R. Civ. P. 9(b) and 12(b)(6).  Defendants have separately filed, pursuant to Fed. R. Civ. P. 12(f), a motion to strike the improper allegations in the Complaint relying on allegations in other lawsuits, press reports, and regulatory investigations.

## PRELIMINARY STATEMENT

Eastern Financial Florida Credit Union ("Eastern Financial") was a sophisticated institutional investor that purchased AA-rated, Class B Notes issued by Markov CDO I, Ltd. ("Markov").  Markov was a Collateralized Debt Obligation ("CDO"), which was structured, offered, and underwritten by Barclays, and whose collateral assets were managed by SSgA. When financial crisis hit the global economy in late 2007 and early 2008, Markov, like many other CDOs in the market at the time, suffered serious defaults and was liquidated.  As a result, Eastern Financial, like many other CDO investors in the market at the time, lost its investment.

More than four years after its investment, Eastern Financial—which itself collapsed in part due to investments in multiple CDOs—initiated this lawsuit through its successor in interest, Space Coast Credit Union ("SCCU"), to recover its losses.  In doing so, Plaintiff spins a fanciful tale that is full of rhetoric but bereft of facts.  According to Plaintiff, Barclays built Markov as a "secret" and "disguised" "rigged" bet:  First, Barclays both offered the CDO and took the "short" position on the underlying credit default swaps that would pay Barclays if the collateral assets

---

[1]     References to "¶ __" are to paragraphs in the Complaint, and references to "Compl. Ex. __" are to exhibits appended to the Complaint.

referenced in the swaps failed.  Second, Barclays secretly controlled selection of the collateral assets, and intentionally selected collateral that Barclays knew would fail and thus trigger swap payments to itself.  Third, Barclays disguised that it was selecting collateral it knew was destined to fail, by choosing securitization tranches that were rated AA or AAA, when in fact the assets backing those tranches were BBB-rated nonprime residential mortgage backed securities ("RMBS").

This tale suffers multiple defects.  Most fundamentally, there was nothing hidden about Markov.  Barclays' role as the initial swap counterparty with the "short" interest <u>was</u> fully disclosed in the CDO's offering documents, including a Pitchbook and and Offering Circular (collectively, the "Offering Documents").  <u>See</u> Ex. A, B.[2]  Indeed, Plaintiff concedes that it was "common" for financial institutions arranging CDOs to serve as the swap counterparty.  The Offering Documents also specifically warned of the potential conflict of interest that could arise from Barclays' role as initial swap counterparty.  Additionally, Barclays' role in collateral selection also <u>was</u> disclosed:  the Offering Documents twice stated that collateral would be selected "subject to the consent" of Barclays.  Moreover, there was nothing hidden or "disguised" about the collateral that was selected.  To the contrary, Barclays provided Eastern Financial with extensive, detailed data about Markov's collateral and each and every one of the assets that backed the collateral.  Indeed, Barclays disclosed that the assets backing the collateral were overwhelmingly nonprime RMBS rated BBB+ or lower.

The remaining piece of Plaintiff's theory—that Barclays intentionally selected collateral it "knew" would fail—is pure conclusory assertion.  The Complaint is replete with bald assertions about what Barclays "knew," "believed," or "understood," but such conclusions are

---

[2]    References to "Ex. __" are to exhibits appended to the Declaration of Arminda B. Bepko, executed August 30, 2011.

not supported by a <u>single</u> fact, much less particularized facts, describing what Barclays allegedly knew and how.  In the Second Circuit, allegations that Defendants "'knew but concealed' some things or "'knew or were reckless in not knowing'" other things are "'so broad and conclusory as to be meaningless.'"  <u>Abbad v. Amman</u>, 285 F. Supp. 2d 411, 420 (S.D.N.Y. 2003) (citing <u>Shields v. Citytrust Bancorp., Inc.</u>, 25 F.3d 1124, 1129 (2d Cir. 1994)).  Plaintiff proffers not a single document from Barclays or SSgA (other than the Offering Documents themselves), not a single statement from a Barclays or SSgA witness, and not a single piece of evidence from any other source concerning Markov.  Rather, Plaintiff's Complaint rests solely on:  the design of Markov, which was fully disclosed in the Offering Documents; unsubstantiated allegations and media reports concerning other CDOs, which may not be used here to plead fraud with particularity and should be struck pursuant to Fed. R. Civ. P. 12(f); Plaintiff's conclusory assertions of what Barclays "knew" and "intended"; and the fact that Markov failed and Eastern Financial lost its investment.  Such fraud-by-hindsight pleading falls woefully short of the requirements imposed by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

Plaintiff's theory of fraud—that Markov was a "secret" and "disguised" "rigged" bet—is fundamentally inconsistent with the fulsome disclosure provided to Eastern Financial, both in the Offering Documents and in detailed spreadsheets of data provided for Eastern Financial's inspection.  Plaintiff spins a fanciful and illogical tale that requires piling speculative leap upon speculative leap, supported only by what Plaintiff already knew when it invested and an impermissible fraud-by-hindsight theory.  Plaintiff's federal securities and common law claims thus fail to plead an actionable misrepresentation or omission, the requisite strong inference of fraudulent intent, and reasonable reliance.  Plaintiff's federal claims are also time-barred.

At bottom, Eastern Financial knowingly made an investment in a complex and highly leveraged product, chasing the higher yields that accompany such investments.  Eastern Financial did so only after being provided extensive information and lengthy risk warnings about the investment, and only after representing that it was an experienced and sophisticated investor that could and would analyze and ultimately bear the substantial risks associated with the investment.  As it turned out, the risks, rather than rewards, materialized.  But that does not mean fraud occurred, and it does not entitle Plaintiff to relief under the securities laws.  See Epirus Capital Mgmt., LLC v. Citigroup Inc., No. 09 Civ. 2549(SHS), 2010 WL 1779348, at *6 (S.D.N.Y. Apr. 29, 2010) (dismissing fraud complaint brought by CDO investor, "[t]o the extent that plaintiffs made a bad business decision by investing in Octonion [CDO], doing so does not entitle them to relief under the securities laws").

## BACKGROUND[3]

### A.   The Parties

Plaintiff is the successor in interest to Eastern Financial, a federally insured state-chartered credit union.  ¶¶ 23-24; Ex. C at 1 (National Credit Union Administration Office of Inspector General, Material Loss Review of Eastern Financial Florida Credit Union, dated May 5, 2010).  Eastern Financial was an active CDO investor in 2007, placing nearly $100 million in collateralized debt obligations, like the Markov CDO, secured by real estate-backed loans and investments.  Ex. C at 2.  On March 19, 2009, the Florida State Supervisory Authority ("Florida

---

[3]      On a motion to dismiss, the Court may consider:  any written instrument attached to the complaint; statements or documents incorporated into the complaint by reference; legally required public disclosure documents filed with the SEC; matters of public record, including published reports of administrative bodies; and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Moore U.S.A., Inc. v. Standard Register Co., 139 F. Supp. 2d 348, 363 (W.D.N.Y. 2001).

SSA") issued and published a permanent Cease and Desist Order against Eastern Financial, addressing severe deficiencies in board and management oversight, inadequate maintenance of capital, deterioration of asset quality, inadequate liquidity, and excessive levels of concentrations in the member business loan portfolio. Ex. C at 6. On April 24, 2009, the Florida SSA placed Eastern Financial into conservatorship, and appointed the National Credit Union Administration ("NCUA") as agent for the conservator. Id. The NCUA merged Eastern Financial into Plaintiff effective June 30, 2009. Id.

Barclays Bank is a public limited company registered in England and Wales that provides a range of global diversified financial services. Ex. B at 186. Barclays Capital Inc. is a U.S. broker/dealer and has served as underwriter for many CDOs, including the Markov CDO. Id. at i.[4]

SSgA, a division of State Street Bank & Trust Co., is a leading provider of financial services to institutional investors, with experience managing trillions of dollars for institutional investors. Id. at 172.[5] State Street Bank & Trust Co. is a wholly owned subsidiary of State Street Corporation. Id.

**B.     CDOs**

A CDO is an asset-backed security constructed from a portfolio of fixed-income assets such as RMBS or other CDO securities. See Ex. D at 7-8 (Barclays Capital, CDO & Structured Funds Grp., The Barclays Capital Guide to Cash Flow Collateralized Debt Obligations, Mar. 2002, ("Barclays CDO Guide")); ¶ 191 (referencing Barclays CDO Guide). The rights to the

---

[4]     Barclays Bank and Barclays Capital Inc. were involved in different aspects of structuring and underwriting Markov. For ease of reference in this motion, they are referred to collectively as "Barclays."

[5]     SSgA has no separate legal existence except as a division of State Street Bank & Trust Co. and, therefore, State Street Bank & Trust Co. is the true party in interest to the claims asserted against SSgA.

cash flow from the CDO's collateral assets are divided into a number of tranches, whereby note holders of the senior tranches receive payment before note holders in the junior and equity tranches. ¶¶ 53-54.  Losses on the underlying collateral assets are applied in reverse order of seniority and the junior tranche note holders protect the senior tranche note holders from losses on the underlying portfolio.  Id.  To compensate for the higher risk, the junior tranches offer higher coupon payments.  ¶¶ 54-55.  Different tranches attract different investors depending on their risk tolerance and investment goals.  Ex. D at 1.

A CDO can include cash and/or synthetic collateral assets.  "Cash" collateral assets are actual RMBS notes purchased by the CDO.  ¶ 105.  "Synthetic" collateral assets are not actually purchased.  Instead, exposure to synthetic assets is achieved by referencing them through Credit Default Swaps ("CDS"), which are contracts with counterparties whereby the CDO effectively insures the value of the referenced assets against default in exchange for regular payments, akin to insurance premiums, from a counterparty who "buys protection" on those assets.  ¶¶ 105, 107.  The counterparty who buys protection is said to hold a "short" position, while the CDO, and by extension the CDO's note holders, take the "long" position.  Synthetic collateral possesses several structural advantages.  Most obviously and by definition, it is more efficient because the CDO does not actually have to go into the market and purchase them.  As a result, it also allows for a greater diversification in the composition and risk profile.

The CDS counterparty, i.e. the party holding the "short" position, makes regular payments to the CDO, so long as the referenced collateral assets perform well.  See ¶ 107.  The note holders, or investors, benefit from those payments.  If there is a decline or default on a referenced asset, the CDO must "swap" payments in the amount of the decline to the CDS counterparty.  ¶ 9.  Accordingly, parties taking a "short" position benefit if the value of the

referenced assets declines, while parties taking a "long" position benefit if the referenced assets perform, so that the CDS counterparty continues to pay the CDO. Synthetic CDOs by their very nature require a party to take the "short" position, so that the CDO can take the "long" position. Id. As Plaintiff admits, it was "common" for the underwriting financial institution to act as the CDS counterparty—at least initially—and take the "short" position with respect to the synthetic collateral assets. Id. That way, the underwriter did not have to locate and secure swap counterparties before the offering, but could do so afterward.

**C.   The Markov CDO**

This action concerns Plaintiff's investment in AA-rated Class B Notes issued as part of the Markov CDO. The Offering Documents for the CDO—including the Pitchbook and the Offering Circular—provided extensive information and warnings about Markov's structure, collateral assets, risks, and potential conflicts of interest for Barclays.

**Markov's Structure.** The Offering Documents disclosed that Markov was a $2 billion "hybrid" CDO, meaning that its collateral was comprised of both cash and synthetic collateral assets.[6] According to the Offering Circular, the target allocations were 90% synthetic and 10% cash. See Ex. B (Offering Circular) at 124-25. In addition, the Offering Circular expressly described that up to 35% of Markov's collateral assets would consist of other CDOs—what Plaintiff refers to as the "CDO bucket." Id. at 148. The Offering Circular also described that up to 15% of Markov's collateral assets would consist of 12 synthetic bespoke CDOs specifically created for Markov—referred to as the "Portfolio CDS Assets" or "Markov Chain CDOs." Id. at 124; see also id. at 293.

---

[6]      The synthetic collateral consisted of CDSs and total return swaps ("TRSs"), which in each case were contracts that referenced securities that were not actually purchased by Markov. Because the CDS and TRS contracts were synthetic investments in those referenced securities, when the terms "collateral" and "collateral assets" are used in this motion with respect to synthetic assets, they are intended to refer to both the CDSs and TRSs themselves and the securities they referenced.

**Markov's Collateral.**  The Offering Documents further disclosed a great deal of information about Markov's collateral assets, including all of its eligibility criteria.  The Pitchbook made clear that the collateral assets were overwhelmingly RMBS:  10% were prime RMBS, 30% were midprime RMBS, and 25% were subprime RMBS.  Ex. A. (Pitchbook) at 9.

The Offering Documents stated that, as a "High Grade" CDO, Markov could only purchase collateral assets that were rated at least A- by Standard & Poor's.  Ex. B at 148. The documents further specifically warned, however, that where the collateral was comprised of CDO Securities—such as the Markov Chain CDOs and the other CDOs that could be placed in the "CDO bucket"—additional risks attached, including that exposure was leveraged and that the assets underlying the CDO Securities might have lower ratings than those of the CDO Securities themselves:

- ***Risk of CDO Securities.***  "The Issuer's exposure under a CDO Security will be leveraged…The leveraged nature of such exposure may mean that the Issuer is **highly exposed to small changes in the overall credit market conditions** relating to the pool of underlying assets, **which may have a lower rating than that of the related CDO Security**…"  Ex. A at 62 (emphasis added); see also Ex. B at 38-40.

The Offering Documents disclosed further lengthy warnings about Markov's collateral, including that the collateral was subject to various types of risk (including credit, market, and liquidity risks), and that collateral containing RMBS assets was further subject to particular risks, which were "particularly acute" for subprime RMBS:

- ***General Collateral Risk.*** "The Collateral is subject to various types of risks including, but not limited to, credit, market and liquidity risks…The actual default rates of the Cash Assets or Synthetic Assets or of Reference Obligations may exceed any hypothetical default rates assumed by investors in determining whether to purchase the Notes."  Ex. B at 33.

- **"*Risk of Subordinate Asset-Backed Securities.*** It is expected that substantially all of the collateral and reference obligations will consist of asset-backed securities that are subordinate in right or payment to other securities…because subordinate asset-backed securities may represent a relatively small percentage of the size of the asset pool being securitized, **the impact of a relatively small loss on the overall pool may be**

**substantial on the individual subordinate asset-backed security**…"  Ex. A at 62 (emphasis added); <u>see also</u> Ex. B at 35.

- **"Risks Related to Subprime RMBS Reference Assets.**  Residential mortgage backed securities are subject to credit risk arising from losses due to defaults by the borrowers on the underlying mortgage loans… recent increases in the default rates by subprime borrowers and the discovery of fraudulent mortgage applications in connection with such defaults may imply that the **risks associated with subprime mortgage loans are particularly acute at this time** and such risks **may result in further increases in default rates**…."  Ex. A at 63 (emphasis added); <u>see also</u> Ex. B at 35-37.

**The Parties' Roles In Markov.**  The Offering Documents also fully disclosed the parties' roles in the CDO.  In addition to disclosures that Barclays would serve as underwriter and SSgA as collateral manager, the Offering Documents made clear that Barclays held a "long" position similar to Plaintiff:  as super senior note holder, Barclays was responsible to pay for any losses Markov sustained over $400 million (the amount of issued Notes), up to $1.6 billion. ¶ 153.

Critically, Markov's Pitchbook also disclosed that Barclays would be the "Initial Synthetic Asset Counterparty," and thus would take the initial "short" position for all the synthetic assets in Markov.  Ex. A at 6, 16.  The Pitchbook further disclosed that Barclays would act as "CDS Intermediary on an ongoing basis," meaning that Barclays intended to sell most of its "short" position—up to 75%—into the market.  Ex. A at 6, 16; <u>see also</u> Ex. B at 40 (stating that "additional Synthetic Asset Counterparties [parties going "short"], may be added" after deal closed).  The Offering Documents further provided clear warnings of potential conflicts of interest stemming from Barclays' role as the Initial Synthetic Asset Counterparty:

> **"Conflicts of Interest.**  Barclays or an Affiliate of Barclays in its role as the Synthetic Asset Counterparty will have the right to make determinations and to take actions or to decline to take actions which may have an adverse effect on the Issuer, Rated Noteholders or Income Noteholders…Barclays and any of its Affiliates may act in its own commercial interest in the various capacities described above without regard to whether its interests conflict with those of the Noteholders or any other party."  Ex. B at 55-57.

The Offering Documents also fully disclosed that Barclays Bank would serve as Warehouse Provider, holding Markov's collateral assets on its own books while the deal was being structured and prior to the deal's closing.  Ex. B at 53.  Again critically, the Offering Documents expressly noted that, given the risks associated with this role, all of the collateral assets to be included in Markov were "subject to the consent of" Barclays.  Id. at 53, 124.

**Additional Warnings Concerning Investment In Markov.**  The Offering Documents separately provided extensive warnings, spanning over fifty pages in the Pitchbook and the Offering Circular, about the substantial risks involved in a Markov investment.  Id. at 26-67; Ex. A at 2-3, 62-68.  The Pitchbook generally warned investors that "[t]hese securities are intended for purchase only by experienced and sophisticated investors who can and are willing to bear the substantial risks involved with an investment in such securities."  Ex. A at 3 (emphasis added).  Likewise, the Offering Circular warned that the investment was "appropriate only for an investor capable of (i) analyzing and assessing the risks associated with defaults, losses … and other characteristics of assets such as those included among the collateral assets and (ii) bearing such risks and the financial consequences thereof as they relate to an investment in the offered notes."  Ex. B at iv.

The Offering Documents provided further warnings, including specifically warning that investors should not place emphasis on the various credit ratings provided and that projections provided were speculative:

- "***Credit Ratings***.  Credit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are **not a guarantee of quality**.  Rating agencies attempt to evaluate the safety of principal and interest payments and do not evaluate the risk of fluctuations in market value, therefore, they **may not fully reflect the true risks of an investment**.  Also, rating agencies may fail to make timely changes in credit ratings in response to subsequent events, so that an issuer's current financial condition **may be better or worse than a rating indicates**."  Ex. B at 48 (emphasis added).

- ***"Future Projections***.  "Any projections, forecasts and estimates contained herein are forward-looking statements and are based upon certain assumptions.  Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.  Accordingly, the projections are only an estimate.  Actual results may vary from the projections, and the variations may be material...**the inclusion of projections herein should not be regarded as a representation by Barclays [or] SSgA…of the results that will actually be achieved by the Issuer**."  Ex. A at 2 (emphasis added); <u>see also</u> Ex. B at x.

D.     **Eastern Financial's Investment In Markov**

On or about June 12, 2007, more than a month after Markov closed, Eastern Financial invested $10 million in the offering (AA-rated Class B Notes), at a discounted price of 94.2374% of par value.  ¶ 24.  Before making this investment, Eastern Financial made several express disclaimers, including that it had made its own investment decisions "based upon its <u>own</u> judgment" and "not upon any view expressed by [Defendants]," Ex. B at 207, and that it was a "sophisticated investor" familiar with similar transactions and was "purchasing the Applicable Notes with a full understanding of all the terms, conditions and risks thereof (economic and otherwise), and it [was] capable of assuming and willing to assume (financially and otherwise) those risks," <u>id.</u>

Critically, two months before Eastern Financial invested in Markov, on April 17, 2007, Barclays sent Eastern Financial additional extensive information regarding Markov, beyond the Offering Documents.  Specifically, Barclays provided Eastern Financial with a complete list of the collateral to be included in Markov's portfolio, for Eastern Financial's inspection.  Ex. E (Email with Attachments from Michael Teifeld of Barclays Capital, Inc. to Manuel Borrajo of Eastern Financial Florida Credit Union, dated April 17, 2007); <u>see</u> ¶¶ 28, 421(h), 429(h) (referencing emails sent to Eastern Financial).  The list included, among other things, the name, amount, and rating for each piece of collateral included in Markov's portfolio (including the

Mezzanine CDOs and Markov Chain CDOs), as well as the name and rating for each and every asset backing each piece of Markov collateral.

For example, with respect to the Mystic Point CDO included within Markov's collateral in the CDO bucket, see ¶ 203 Table 1, Barclays disclosed that this CDO consisted of 3% prime RMBS, 46.5% mid-prime RMBS, 40.5% sub-prime RMBS, and 10% ABS.  See Ex. E. at 7. Barclays further disclosed that 13% of these underlying assets were rated BBB+, 32% were rated BBB, and 55% were rated BBB-.  See id.  Likewise, with respect to the Dutch Hill Funding CDO that was included within Markov's collateral in the CDO bucket, see ¶ 203 Table 1, Barclays disclosed that this CDO consisted of 12% prime RMBS, 21.4% mid-prime RMBS, 48.2% sub-prime RMBS, and 8.6% ABS.  See Ex. E at 7.  Barclays further disclosed that 7.9% of these underlying assets were rated BBB+, 50.4% were rated BBB, 24.8% were rated BBB-, 14.4% were rated BB+, 2% were rated BB, and only 0.5% were rated above BBB+.  See id.  With respect to the Markov Chain CDOs that served as Markov collateral, Barclays similarly disclosed that, for each chain, 60 of 69 underlying assets were RMBS, and between 73% and 76.6% of those RMBS were rated BBB+ or lower.  See id. at 13-16.

Thus, Barclays disclosed to Eastern Financial exactly what collateral went into Markov (including the Mezzanine CDOs and Markov Chain CDOs), as well as the fact that such collateral was itself backed by nonprime RMBS with ratings ranging from A all the way down to BBB-, with the overwhelming majority carrying ratings BBB+ or lower.  See id. at 7, 13-16.

E.      **The Subprime Mortgage Crisis**

In late 2007, an unprecedented financial crisis unfolded worldwide and caused severe declines in all sectors of the market.  Credit markets froze and investors began to pull away from all mortgage-related debt as the U.S. housing market collapsed.  See ¶ 99.  The CDO market generally suffered dramatic losses even in the higher-rated CDO tranches.  On November 16,

2007, amidst this financial crisis, Markov experienced its first event of default.  ¶ 398.  On

January 22, 2008, as the financial crisis deepened, Markov went into liquidation.  Id.

**F.      Eastern Financial's Demise**

After Eastern Financial was placed into conservatorship, the NCUA Office of Inspector

General commissioned a Material Loss Review ("MLR") to determine the causes for the credit

union's failure.  Ex. C at 1.  The MLR showed that Eastern Financial's investment in Markov

was far from unusual; rather, the credit union had effectively doubled down on its CDO bets:

while Eastern Financial began investing in CDOs at "relatively modest levels" in 2005, it

purchased another $94.8 million in CDOs during the three months between March and June

2007.  Id. at 2, 24.

Critically, the MLR did not attribute Eastern Financial's losses stemming from CDO

investments to fraud on the part of Barclays or any financial institution.  Rather, the MLR

concluded that Eastern Financial's management, inter alia, "failed to perform adequate due

diligence and establish appropriate limits and controls on investments in CDOs," and "relied too

heavily on rating agencies' grading of CDO investments."  The MLR also observed:

> [W]e believe that readily available market data existed that should have prompted
> [Eastern Financial] management and Board to further evaluate planned CDO purchases
> during early 2007, or at least to have limited exposure to types of underlying collateral.
> In industry circles, it is reasonable to expect prudent management would have reviewed
> such readily available market data.  Since CDOs historically paid higher yields than
> corporate bonds, [Eastern Financial] management and the Board should have understood
> that higher yields came from taking greater risk associated with uncertainties and risks
> associated with the CDOs.

Id. at 12.  Indeed, the MLR specifically noted that Eastern Financial knowingly invested in

CDOs in order to chase higher yields:  "Credit Union management and the Board looked at

CDOs as an opportunity to increase earnings (yields) without fully understanding the dramatic

market decreases that could occur given the riskiness of the underlying collateral of the CDOs

which consisted of home equity lines of credit (HELOCs) and other subprime loan products."

Id.; see also id. at 13 (noting that Eastern Financial's "Board supported a high cost, aggressive

growth strategy that ultimately drove down core earnings and encouraged management to search

for higher returns in higher risk investments").

## G.   This Action

Although Markov was liquidated in 2008, Plaintiff waited until April 26, 2011 to file suit.

The theory in Plaintiff's Complaint boils down to this:  First, Barclays served both as the

financial institution that "arranged" the CDO, and as the "short" party on the underlying credit

default swaps.[7]  Second, Barclays secretly controlled SSgA and the collateral selection process,

and secretly selected collateral that Barclays knew would fail in order to trigger swap payments

owed to Barclays as the "short" party.  In particular, Plaintiff alleges, Barclays built into Markov

a "CDO bucket" that allowed 35% of Markov's collateral to consist of tranches from other

CDOs, and Barclays placed into this bucket collateral consisting of tranches from other

Mezzanine CDOs and specially-built Markov Chain CDOs, which Barclays knew would fail.[8]

Third, Barclays "disguised" that it was "stuffing" the "CDO bucket" with collateral it knew

would fail, because that collateral (Mezzanine CDOs and Markov Chain CDOs) itself had AA or

AAA ratings—but Barclays knew that these ratings were misleading because the assets backing

them were BBB-rated nonprime RMBS.[9]

Based on this theory, Plaintiff claims that the Offering Documents made four types of

misrepresentations:  (i) who selected the collateral assets and how, ¶¶ 8, 11-12, 277-303; (ii) the

credit quality of the collateral underlying Markov and its Notes, ¶¶ 13, 304-351; (iii) the benefits

---

[7]      ¶¶ 3, 9, 145, 155, 168, 200, 204-05, 211.

[8]      ¶¶ 3, 8, 11-12, 21, 129-30, 158-59, 162, 167, 177, 200, 204-205, 211, 267-76, 293-96.

[9]      ¶¶ 3, 13-18, 162, 164-70, 181, 200, 208, 227, 237-39, 304-05, 312-315, 320-51.

of selecting synthetic assets, ¶¶ 352-55; and (iv) protections from collateral losses, ¶¶ 20, 356-69.

None of these claims can survive a motion to dismiss.

<u>**ARGUMENT**</u>

**POINT I**

<u>**PLAINTIFF'S EXCHANGE ACT CLAIMS AGAINST ALL DEFENDANTS SHOULD BE DISMISSED**</u>

Despite the heft of its Complaint (150 pages), Plaintiff alleges no facts, much less the

requisite particularized facts, demonstrating that Defendants made any misstatement or omitted

facts necessary to render its statements not misleading, or acted with fraudulent intent.

Conspicuously absent are <u>any</u> internal documents from Barclays or SSgA, statements from

"confidential witnesses" at Barclays or SSgA, or evidence from any other source regarding

Markov.  Rather, Plaintiff's allegations are based entirely on (i) Plaintiff's lengthy exposition of

CDOs in general, ¶¶ 52-115, which is wholly unsupported by facts, and in any event, does

nothing to make out a fraud claim; (ii) allegations relating to other CDOs, ¶¶ 116-44, 171-76, all

of which are impermissible, irrelevant, and should be stricken, <u>see</u> Def. Motion to Strike; (iii) the

structure and nature of Markov, ¶¶ 148-70, 178-81, 199-264, all of which was fully disclosed to

Eastern Financial before it made its investment; and (iv) the fact that Markov ultimately failed.

Indeed, the only "smoking gun" here is the one submitted by Defendants:  two months before

Eastern Financial made its investment, Barclays sent Eastern Financial documents detailing the

specific collateral underlying Markov—including the very BBB (or lower) ratings attached to

assets backing Markov's collateral, which Plaintiff insists were the key to the "disguised"

"rigged" bet.  <u>See</u> Ex. E.

A.       **Relevant Standards**

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must plead (1) a

material misrepresentation or omission; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic

loss; and (6) loss causation.  Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S.

148, 157 (2008).  Failure to plead properly any one element necessitates dismissal of the claim.

Good Hill Partners L.P. v. WM Asset Holdings Corp., 583 F. Supp. 2d 517, 520-21 (S.D.N.Y.

2008).  In support of its claims, Plaintiff must plead "enough facts to state a claim to relief that is

plausible on its face."  ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan

Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  "A pleading that offers 'labels and conclusions' or

'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 129

S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007))

(internal quotation marks and citations omitted).

A securities fraud complaint separately must satisfy the heightened pleading requirements

of Rule 9(b) and the PSLRA.  It must allege with particularity "in what respects the statements at

issue were false" when made, San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip

Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996), and must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent," Rombach v. Chang,

355 F.3d 164, 170 (2d Cir. 2004); see also 15 U.S.C. § 78u-4(b)(1).

Further, a complaint must "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind," 15 U.S.C § 78u-4(b)(2), which here is

scienter, an "intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 193 (1976).  The inference of scienter must be "powerful," "cogent," "compelling," "strong

in light of other explanations," and "at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  If the PSLRA's exacting requirements are not met, "the court shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

**B.**     **Plaintiff Fails to Plead Any Actionable Misrepresentation or Omission**

      1.      Plaintiff Pleads No Actionable Misrepresentation Regarding the Collateral Selection Process

Plaintiff's main cavil is that Defendants represented that SSgA would select Markov's collateral, when "[i]n truth, Barclays, rather than SS[g]A, controlled Markov's operative collateral selection," ¶ 8, and "secretly used such control to service Barclays' interest in its short interest in Markov's collateral," ¶ 11.  See also ¶¶ 2, 157-58, 204-05, 267, 275-76.  As an initial matter, Plaintiff apparently admits that an alleged misrepresentation concerning which party selected the collateral—standing on its own—would be immaterial.  Rather, according to Plaintiff, the alleged misrepresentation has two necessary parts:  not only that Barclays allegedly controlled collateral selection, but also that Barclays supposedly exercised such control in order to serve its "short" interest in the underlying credit default swaps.  ¶¶ 9-11, 157-58, 276.

Plaintiff's claim fails at the threshold for the simple reason that the Offering Documents expressly disclosed, twice, that collateral selection was subject to Barclays' consent:

> "Such Collateral Assets were selected by an Affiliate of the Collateral Manager **subject to the consent of the Warehouse Provider**." Ex. B at 53 (emphasis added).

* * *

> "The Collateral Assets to be Acquired by the Issuer were selected by the Collateral Manager **subject to the consent of the Warehouse Provider** prior to the Closing Date." Id. at 124 (emphasis added).

* * *

> "**'Warehouse Provider' means Barclays** in its capacity as warehouse provider under a warehouse agreement." Id. at 304 (emphasis added).

-17-

Indeed, according to Plaintiff, the Offering Documents disclosed that Barclays was given "veto

power" over the collateral selection process.  ¶¶ 177, 290-91.  The difference between

representing that a party had "veto power" rather than alleged "control" over collateral section is

mere semantics and cannot give rise to a claim of actionable misrepresentation, as the securities

laws do not demand any talismanic phrasing.  See Footbridge Ltd. v. Countrywide Home Loans,

Inc., No. 09 Civ. 4050(PKC), 2010 WL 3790810, at *12 (S.D.N.Y. Sept. 28, 2010) (allegation

that offering documents failed to state that defendants were "too flexible" in underwriting

decisions, when offering documents already disclosed that underlying loans would be used under

"more flexible" set of underwriting guidelines, was "insufficient to set forth a plausible claim of

fraud based on the heightened pleading requirements of Rule 9(b) and the PSLRA"); see

generally Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1069 (5th Cir. 1994) ("[D]efendants

were under no duty to 'employ the adjectorial characterization' that the plaintiffs [prefer]");

Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) (defendants not

required to describe facts in "pejorative" terms); Klamberg v. Roth, 473 F. Supp. 2d 544, 551

(S.D.N.Y. 1979) (defendants not required to use "pejorative nouns and adjectives," or "verbalize

all adverse inferences expressly") (citations omitted).[10]

    Given the express disclosures that collateral selection was subject to Barclays' consent,

Plaintiff must instead allege that Barclays "wield[ed]" its "requisite 'consent'" as a "club so as to

seize effective control over" both SSgA (as collateral manager) and collateral selection.  ¶ 296;

---

[10]    Plaintiff reads into the two disclosures regarding Barclays' right of consent an allegedly
misleading "two-fold ratification—that Barclays had approved all of the assets in question as
worthy ones."  ¶ 293.  Plaintiff also interprets these disclosures as representing that Barclays'
consent was "immaterial, innocuous or positive for Markov investors." ¶ 295.  But the simple
and plain statements regarding Barclays' right of consent make no such representations.  Nor
does Plaintiff proffer any facts—as opposed to conclusory assertions—that Barclays actually
believed that the collateral assets were unworthy or that Barclays intentionally exercised its right
of consent to the detriment of Markov investors.

see also ¶ 276.  But Plaintiff fails to plead a single fact supporting this allegation.

First, Plaintiff insists that Barclays must have wielded control over collateral selection because it designed a 35% CDO bucket that could include as collateral tranches from other CDOs.  Plaintiff asserts that a 35% bucket was "extreme" and "unusually high," ¶ 166, but provides no comparative facts to support the conclusory labels it attaches to the bucket. Moreover, the existence of the 35% bucket was fully disclosed in the Offering Documents.  Ex. A at 9-10; Ex. B at 148.  In any event, Plaintiff provides no facts to bridge the gap between (i) the mere existence of a fully-disclosed 35% CDO bucket, and (ii) the entity that selects the collateral to place inside the bucket.  Rather, Plaintiff asks this Court to string together a series of speculative leaps:  Barclays must have created the bucket so that it could control what was placed inside, and Barclays must have done so in order to maximize its ability to trigger credit default swap payments and at the same time disguise what it was doing because the other CDOs in the bucket had higher credit ratings than their underlying assets.  ¶¶ 162, 167, 201-02, 204-05. But merely restating Plaintiff's farfetched theory does not provide facts, much less particularized facts.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (holding dismissal appropriate where plaintiff fails "to raise a right to relief above the speculative level").

Second, Plaintiff insists that SSgA could not have picked the collateral because the 35% bucket was allegedly contrary to SSgA's stated collateral management philosophy.  ¶¶ 182-84. Plaintiff seizes on a snippet of SSgA's statement that is entirely unhelpful to the asserted claims: while SSgA has stated that it "manage[s] portfolios that do not rely on credit or interest rate structure elements such as . . . [e]xcessive CDO buckets," ¶ 182, Plaintiff does not, and cannot, allege that SSgA has stated that it considers a 35% bucket "excessive."  In fact, SSgA unquestionably "managed" the Markov portfolio—Plaintiff does not contend otherwise—thus

demonstrating that SSgA did <u>not</u> believe that the 35% bucket was "excessive."

Third, Plaintiff speculates that SSgA had no reason to, and thus must not have, picked CDO bucket collateral that contained such investments as the Mezzanine CDOs and Markov CDO Chains.  ¶¶ 186-89.  Again, this is pure conjecture.  Plaintiff proffers no facts indicating that SSgA did not pick these AA and AAA-rated assets for the CDO bucket.  Plaintiff's theory fundamentally rests on fraud-by-hindsight:  because Markov failed, SSgA must have known all along that the Mezzanine CDOs and Markov Chain CDOs—which were fully disclosed to and described for Plaintiffs, <u>see</u> Ex. E—were "toxic," and SSgA must not have picked them for inclusion in the bucket.

Fourth, Plaintiff points to the fact that SSgA did not invest in Markov, when supposedly it was "common" for collateral managers to make an equity investment in a CDO.  <u>See</u> ¶¶ 19, 60, 65, 190-98.  Plaintiff, however, does not support its assertion that SSgA "commonly" made an equity investment whenever it served as a collateral manager.  Indeed, Plaintiff points to a mere two instances—from 2005—when SSgA invested in a CDO.  ¶ 351.  Without pleading the total number of times SSgA served as collateral manager, these two instances are meaningless.[11] Instead, Plaintiff simply concludes that SSgA's decision not to invest in Markov must have reflected SSgA's belief, at the time of the offering, that "nothing good would come" of Markov. ¶ 195.  This bald assertion is also illogical.  According to Plaintiff, SSgA—a sophisticated and experienced asset manager, with $1.8 trillion under management in March 2007, Ex. B at 172;

---

[11]     Instead, Plaintiff relies on and misrepresents a page from the Barclays CDO Guide. ¶ 191.  The Barclays CDO Guide does not, as Plaintiff asserts, state that the "raison d'être" of collateral managers' involvement in CDO transactions is to invest in the equity tranche.  ¶ 191. Indeed, the referenced page does not even address collateral managers.  Rather, it states only that the spread differential or "excess spread" in the equity position generates returns for CDO equity investors, and that spread differential is the "raison d'être" of most arbitrage cash flow CDO transactions.  <u>See</u> Ex. D at 10.

Ex. A at 23-31—"refused" to expose itself to financial loss based on what it expected to be poor performance, but nonetheless agreed to serve as a "puppet" collateral manager and expose itself to liability for making false statements.

Finally, Plaintiff resorts to press reports and allegations concerning other CDOs (none involving Barclays) where other financial institutions allegedly "controlled" other collateral managers.  ¶¶ 171-77, 298-302.  These allegations may not be considered in this motion to dismiss.  See Def. Motion to Strike.  Reliance on allegations regarding the Goldman Sachs Abacus CDO is particularly inappropriate.  There, investors were not told that an undisclosed third-party investor selected the collateral assets and took a "short" position against the deal.  ¶ 117.  Here, in strong contrast, the Offering Documents expressly disclosed that collateral would be selected "subject to the consent of" Barclays, and that Barclays would be the initial "short" swap counterparty.  The documents further warned of potential conflicts of interest stemming from Barclays' role as initial swap counterparty.  Ex. B at 55-57.

Even putting all of these pleading deficiencies aside, Plaintiff's claim separately fails because it proffers no facts or evidence regarding the necessary second prong of the alleged misstatement:  that Barclays secretly used its alleged control over collateral selection to serve its "short" interest, by picking collateral for the CDO bucket (Mezzanine CDOs and Markov CDO Chains) that Barclays knew would fail notwithstanding their AA and AAA ratings.  ¶¶ 199-209.  Rather, again Plaintiff provides nothing but its own speculation.  Indeed, the Offering Documents expressly disclosed Barclays' "short" interest and the resulting potential conflict of interest, Ex. B at 55-57, and Plaintiff admits that these were "custom" and "obvious."  ¶ 9.  In addition, Barclays fully disclosed extensive detail about the Mezzanine CDOs and Markov CDO Chains in the CDO bucket, including that they were backed almost entirely by BBB-rated

nonprime RMBS.  See Ex. E.  Even putting aside Plaintiff's access to the very same details about

the collateral, Plaintiff's bald assertion that Barclays "knew" the CDO bucket collateral would

fail is not supported by a single document from Barclays or SSgA, or a single statement from a

Barclays or SSgA witness, or any other fact from any other source concerning Markov.[12]

Accordingly, Plaintiff has failed to allege any actionable misrepresentation concerning

collateral selection.  See Epirus, 2010 WL 1779348 at *1, 5 (CDO purchaser failed to allege

actionable misrepresentation regarding collateral selection, where purchaser failed to allege any

facts suggesting that process was different than represented).

> 2.    Plaintiff Pleads No Actionable Misrepresentation Regarding the Credit Ratings of
>        Markov's Collateral or Its Notes, or That Markov Was a "High Grade" CDO

Plaintiff next complains that Defendants made misrepresentations about the credit ratings

assigned to Markov's collateral (specifically, the AA/AAA ratings assigned to the Mezzanine

CDOs and Markov Chain CDOs), and the AA rating assigned to the Notes.  ¶¶ 13-14, 307-10,

315-17, 327.  According to Plaintiff, these statements were misleading because the Mezzanine

CDOs and Markov Chain CDOs were backed by BBB-rated nonprime RMBS, and Barclays

"knew" that the AAA/AA ratings falsely reflected the true risks of the collateral.  ¶¶ 13-15, 312-

14, 320, 322-26, 334, 338-39.

Most fundamentally, with one exception, Plaintiff concedes that Defendants accurately

reported the ratings that had been assigned to Markov's collateral and Notes by the rating

agencies.[13]  ¶ 314.  Courts have repeatedly held that ratings are subjective opinions; such

---

[12]    Plaintiff likewise alleges that the Offering Documents misrepresented the methods,
modeling, and analyses used to select Markov's collateral, ¶¶ 12, 278-86, because in reality
assets supposedly were chosen simply by "consideration of which assets were likely to fail,"
¶ 287(a).  As explained supra, Plaintiff fails to provide any facts, much less particularized facts,
in support of these conclusory assertions.

[13]    Plaintiff alleges that Defendants misrepresented the Markov Chain CDOs' credit ratings

opinions can be false or misleading only if the opinion-giver—the rating agencies—did not truly believe them at the time they were given.  See Freidus v. ING Groep N.V., 736 F. Supp. 2d 816, 836 (S.D.N.Y. 2010) (citing cases); see generally Fait v. Regions Financial Corp., 10-2311-cv, 2011 WL 3667784, at *5-6 (2d Cir. Aug. 23, 2011).  Plaintiff makes no allegations whatsoever about what any credit rating agency knew or believed, at any time.

In addition, Plaintiff's assertion that Defendants' "literally true" repetition of credit ratings was somehow misleading—because the Mezzanine CDOs and Markov Chain CDOs had high ratings, but themselves were backed by BBB-rated nonprime RMBS—is foreclosed in light of the extensive disclosures made.  The Offering Documents expressly warned that "[c]redit ratings of debt securities represent the rating agencies' opinions regarding their credit quality and are not a guarantee of quality" and "may not fully reflect the true risks of an investment."  Ex. B at 48.  With respect to CDO Securities in particular, the Offering Documents warned that their underlying assets "may have a lower rating than that of the related CDO Security."  Ex. B at 38-40; see also Ex. A at 62.  Indeed, Plaintiff concedes that "[t]he goal of tranched securitization was 'credit transformation':  to generate ABS of higher credit quality (and higher credit ratings) than the actual pool of underlying assets."  ¶ 68 n.4.

Moreover, Barclays fully disclosed to Eastern Financial the nature and rating of each and every asset underlying the Markov collateral, including the Mezzanine CDOs and Markov Chain CDOs.  See Ex. E.  In particular, Barclays disclosed that those CDO bucket assets were backed

---

as "AAA," when in fact they were rated "AAAsrb."  ¶ 329.  Plaintiff bases this claim on a September 15, 2006 S&P report—which was publicly available to Eastern Financial at the time of its June 2007 investment—generally explaining a new set of "swap risk credit ratings" that would bear suffixes such as "srb," and that would be applied to "'synthetic CDOs . . . structured in an unfunded form, as a credit default swap between two parties.'"  ¶ 330.  Putting aside that Plaintiff offers no facts indicating that S&P actually did rate the Markov Chain CDOs "AAAsrb" as opposed to "AAA," Plaintiff cannot claim that it was misled as the result of an alleged omission of information that was publicly available at the time.

by nonprime RMBS with ratings ranging from A all the way down to BBB-, <u>with the</u> <u>overwhelming majority carrying ratings BBB+ or lower</u>.  <u>See</u> <u>supra</u> at 12.[14]

Finally, Plaintiff's allegation that the Offering Documents misrepresented that Markov was a "High Grade" CDO is nothing more than a variation on the same defective theme: according to Plaintiff, the "High Grade" designation was misleading because Markov's collateral included Mezzanine CDOs and Markov Chain CDOs that, although they were rated AA and AAA, were backed by BBB-rated nonprime RMBS.  ¶¶ 344-48.  Again, the representation <u>was</u> true:  the "High Grade" designation was defined as containing collateral with credit ratings of at least A-, ¶¶ 341-42, and Plaintiff concedes that Markov's collateral—including the Mezzanine CDOs and Markov Chain CDOs—was indeed rated at least that high.  To the extent Plaintiff insists that the "High Grade" designation was nonetheless misleading because assets backing the collateral were BBB-rated nonprime RMBS, Plaintiff's claims fail for the reasons described above.  While Plaintiff again insists that Barclays did not believe Markov to be "High Grade," it provides no facts, much less particularized facts, in support of that bald assertion.

3.     Plaintiff Pleads No Actionable Misrepresentation Regarding the Benefit of Synthetic Assets

Plaintiff further challenges statements in the Offering Documents that use of synthetic assets allowed "flexibility to purchase unfunded synthetic assets" and the "design [of] a portfolio from a broader collateral than available in cash."  ¶ 353.  Plaintiff provides no facts indicating

---

[14]     Plaintiff complains in particular that the Markov Chain CDOs "bore the highest credit ratings of all of Markov's collateral, [but] they in fact were . . . the riskiest of all of Markov's collateral."  ¶228; <u>see also</u> ¶¶ 18, 91, 187-88, 229-33, 237-40.  In making this argument, however, Plaintiff relies on the very facts disclosed in the Offering Documents and by Barclays. <u>See</u> ¶¶ 215 (noting that each chain was an "unfunded, bespoke, static, synthetic single-tranche Mezzanine CDO), 227 (noting that each chain was collateralized by portfolios of BBB-rated nonprime RMBS chosen by SSgA and Barclays).  Plaintiff also bemoans that there is "almost no publicly-available information" concerning the Markov Chain CDOs, ¶¶ 214, ignoring the detailed information provided to Eastern Financial.  <u>See</u> Ex. E. at 8-16.

that these statements were not, in fact, true.  Moreover, such generalized statements are mere

puffery.  See ECA, 553 F.3d at 206 (statements that are "too general" and do not amount to

"guarantee" are inactionable puffery); Lasker v. N.Y. State Elec. & Gas Corp., 95 F.3d 55, 58-59

(2d Cir. 1996) (reasonable investor would not rely upon "broad, general" statements).

      In any event, Plaintiff simply rehashes the same themes described above:  that somehow

these limited statements falsely represented that "using synthetic collateral would allow for better

selection of collateral and for better collateral to be selected," when supposedly Barclays was

selecting "toxic" assets that it knew would fail.  ¶¶ 326, 355.  Putting aside that Plaintiff does

not, and cannot, show that the immaterial statements were false, Plaintiff's conclusory assertions

fail for the reasons set forth above.

      4.      Plaintiff Pleads No Actionable Misrepresentation Regarding Markov's Safety and Ability to Withstand Collateral Losses

      The Complaint further alleges that Barclays made misrepresentations directly to Eastern

Financial about Markov's safety and ability to withstand collateral losses.  ¶ 356.  Specifically,

Plaintiff alleges that Barclays represented that "Markov's Class B tranche could withstand

cumulative collateral defaults within Markov of 20%-25% before suffering principal loss."

¶ 358.  This allegation fails because it does not identify any of the requisite particulars:  who

made the representation, and where, when, and how it was made.  See, e.g., Novak v. Kasaks,

216 F.3d 300, 306 (2d Cir. 2000) (securities fraud complaint must, among other things, identify

speaker and state where and when challenged statements were made).

      It appears that Plaintiff refers either to a page in the Pitchbook that shows "Hypothetical"

Income Note Returns, or a communication in which Barclays provided modeling and possible

future projections with respect to Markov, based on various assumptions about the market.  See

Ex. A at 12.  Any such representation, however, would have been a forward looking estimation,

and could not serve as a guaranty of Markov's future performance.  Indeed, the Offering

Documents specifically instructed that any "modeling . . . contained herein is no indication as to

future performance.  No representation is made as to the reasonableness of the assumptions made

within or the accuracy or completeness of any modeling . . ."  <u>Id.</u> at 2, 12, 14.  The Offering

Documents also expressly warned Eastern Financial not to rely on such statements about future

performance:  "[a]ny projections, forecasts and estimates … are forward-looking statements and

are based upon certain assumptions … [which are] necessarily speculative in nature, and it can

be expected that some or all of the assumptions underlying the projections will not materialize or

will vary significantly from actual results.  Accordingly, the projections are only an estimate.

Actual results may vary from the projections, and the variations may be material . . . the

inclusion of projections herein should not be regarded as a representation by Barclays [or]

SSgA…of the results that will actually be achieved by the Issuer."  <u>Id.</u> at 2-3; <u>see also</u> Ex. B at x.

The Pitchbook also listed specific factors that could affect the projections, such as "changes in

interest rates," "market, financial or legal uncertainties," and "the timing and frequency of

defaults on the collateral."  Ex. A at 2.  It went on to warn:

> "[T]he following assumptions are as to future events and conditions
> which are uncertain and unpredictable.  A prospective client should
> evaluate the assumptions and decide for itself whether they are
> appropriate for their purposes..."
>
> \* \* \*
>
> "This information is provided to you on the understanding that, as a
> sophisticated investor, you will understand and accept its inherent
> limitations, will review each assumption carefully and make your own
> determination as to its accuracy or reasonableness…"

<u>Id.</u> at 13-14 (emphasis added); <u>see also</u> Ex. B at 206-07 ("the purchaser acknowledges and agrees

that…it has made its own investment decisions …based upon its own judgment").

In sum, Plaintiff fails to plead particularized facts identifying any actionable

misrepresentation or omission by Defendants.

**C.    Plaintiff Fails to Plead Particularized Facts Giving Rise to the Requisite Strong Inference of Scienter**

Under the PSLRA, Plaintiff must "state <u>with particularity</u> facts giving rise to a <u>strong inference</u> that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" <u>ECA</u>, 553 F.3d at 198 (quoting <u>Tellabs,</u> 551 U.S. at 313 (2007)).

The requisite strong inference of scienter can only be established by pleading adequately facts that (1) show that the defendants had both motive and opportunity to commit the fraud, or (2) constitute strong circumstantial evidence of conscious misbehavior. See <u>ATSI</u>, 493 F.3d at 99. The resulting inference of scienter "must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314. Here, Plaintiff fails to show either motive or intentional misbehavior.[15]

1.    <u>Plaintiff Fails to Plead Motive to Defraud</u>

In order to raise a strong inference of scienter through motive and opportunity to defraud, Plaintiff must allege that Defendants "'benefitted in some concrete and personal way from the purported fraud.'" <u>ECA</u>, 553 F.3d at 198 (quoting <u>Novak</u>, 216 F.3d at 307-08).

---

[15]    Although recklessness may also be considered a "sufficiently culpable mental state for securities fraud," <u>ECA</u>, 553 F.3d at 198, Plaintiff does not plead such a theory. To the contrary, Plaintiff repeatedly alleges intentional fraud: Barclays secretly controlled the collateral section process <u>and</u> secretly used such alleged control to serve its "short" interest; Barclays knew the CDO bucket collateral assets would fail <u>and</u> "disguised" that fact through artificially high ratings that it supposedly did not believe. <u>See, e.g.</u>, ¶¶ 11-12, 14-15, 19 (alleging Markov's "deliberate—indeed, malevolent—design"). In any event, recklessness is "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>S. Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 109 (2d Cir. 2009).

Plaintiff alleges that Barclays wanted to make a "guaranteed $400 million of profit" from Markov.  ¶ 259.  But such generalized allegations of corporate motive to make profit are insufficient.  See, e.g., S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 ("it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to…sustain the appearance of corporate profitability or the success of an investment"); Epirus, 2010 WL 1779348, at *6 (motive of bank to profit from CDO too generalized to be sufficient); Footbridge, 2010 WL 3790810, at *18 (allegation that bank issuing RMBS intended to deceive plaintiffs in order to "maximize [their] own profits and market share" insufficient).  If the Court were to accept such a generic theory based on the desire to make money, "it would essentially read the scienter element out of existence," as "all firms in the securities industry want to increase profits."  In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003); see also ECA, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable…do not constitute 'motive' for purposes of this inquiry").

Moreover, Plaintiff's motive allegations regarding Barclays are fundamentally flawed. Plaintiff's assertion that Barclays sought to make a "guaranteed $400 million profit" rests on the false premise that Barclays intended to retain its "short" position on the credit default swaps. According to Plaintiff, Barclays was on "both sides of the swap," as (i) super senior tranche holder on the "long" side, obligated to fund Markov for any losses above $400 million (up to $1.6 billion), and (ii) as the counterparty on the "short" side, receiving payments in the face of losses.  See  ¶¶ 153-54, 256-58.  While this was a "wash" so long as Barclays stayed "on both sides," ¶¶ 154, 258, the Offering Documents specifically disclosed that Barclays would be the "Initial Synthetic Asset Counterparty," and then sell most of its "short" position—up to 75%—to

the market after closing.  Ex. A at 6, 16; Ex. B at 40.  At that point, Barclays would not be

entitled to 75% of the credit default swap payments, but would remain obligated to fund Markov

for any losses above $400 million and up to $1.6 billion.  Plaintiff nowhere challenges the

representations that Barclays intended to sell off most of its "short" interest.  Nor could it, as

Barclays did so.  In fact, Plaintiff nowhere alleges that Barclays ultimately made money on

Markov.  Again, nor could it:  as a result of its obligations as super senior tranche holder,

Barclays sustained extensive losses in connection with Markov.

    Finally, the motive allegations against Barclays are fundamentally flawed for yet another

reason.  As the underwriter of a number of CDOs, Barclays had a strong reputational interest in

Markov's performance, making it all the more implausible that it would have allegedly

"schemed" to construct Markov to fail.  See S. Cherry St., 573 F.3d at 113 (implausibility that

defendant "would deliberately jeopardize its standing and reliability, and the viability of its

business" weighed against inference of scienter).

    Plaintiff's motive allegations against SSgA fare no better.  Plaintiff does not allege that

SSgA benefited in any way from any purported scheme.  Instead, the Complaint demonstrates

that SSgA stood only to gain from Markov's success and only to lose from Markov's failure—

and, in doing so, acknowledges that SSgA's interests were aligned with those of Markov's CDO

note holders "insofar as SS[g]A's collateral management fees depended on continued collateral

performance."  ¶ 186.  Elsewhere in the Complaint, Plaintiff describes in the clearest terms the

alignment of interests between SSgA, as Markov's collateral manager, and the CDO's note

holders:

> [I]f the assets selected by the CDO collateral manager defaulted (and thus ceased paying
> interest), any shortfall in funds available to the CDO would first affect the CDO collateral
> manager's fees before resulting in shortfalls on promised payments to CDO note
> investors.  This was understood to motivate the CDO manager to select assets that would

continue to perform, which thereby benefitted CDO note investors.

¶ 59 (emphasis added).  In short, Plaintiff took pains in the Complaint to explain in its own

words why SSgA had every incentive to propose for selection collateral it expected to perform

well.

Courts repeatedly have dismissed cases on scienter grounds where, as here, a plaintiff's

own allegations regarding the defendant's economic interests undermine the inference of motive.

See In re Adelphia Commc'ns Corp. Sec. and Derivative Litig., No. 03 MD 1529(LMM), 2007

WL 2615928, at *3 (S.D.N.Y. Sept. 10, 2007) ("'Where [Plaintiff's] view of the facts defies

economic reason . . . it does not yield a reasonable inference of fraudulent intent.'"); Glaser v.

The9, Ltd., 722 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("[P]laintiffs' own allegations of [fraud]

undermine the inference plaintiffs advance)." In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266,

290 n. 182. (S.D.N.Y. 2006) (in stock sale case, noting that "dozens of cases dismiss[]

complaints on scienter grounds where . . . motive allegations were undermined by increase in

total holdings") (alteration in original).  Just as in those cases, any suggestion that SSgA

knowingly participated in a scheme to orchestrate Markov's failure "defies economic reason"

and cannot possibly "yield a reasonable inference of fraudulent intent," in view of Plaintiff's

explicit allegations that SSgA's interests were aligned with investors.

Also, as the manager of many CDOs, SSgA too had a strong reputational interest in

Markov's performance, again making it all the more implausible that SSgA would have

participated in any alleged scheme to construct Markov to fail.  See S. Cherry St., 573 F.3d at

113.  Here, again, the Complaint itself provides helpful supporting material, incorporating and

attaching (as Exhibit A) to the pleading a ProPublica article attesting to SSgA's interest in

maintaining its reputation as a collateral manager:  "State Street wanted their deals to do well . . .

there was a 'lot of reputational risk to be concerned about.'"  See ¶ 141.  The ProPublica article

on which Plaintiff relies also quotes SSgA's Frank Gianatasio as stating, "We were comfortable with every transaction we put into our CDOs," further undermining any inference that SSgA has a motive to defraud.  See Compl. Ex. A.[16]

Accordingly, the Complaint fails to plead that Defendants had "motive and opportunity" to commit fraud.

    2.    Plaintiff Fails to Plead Conscious Misbehavior

Where motive is not apparent, the only way Plaintiff can raise a strong inference of scienter is by showing circumstantial evidence of conscious misbehavior, although "the strength of the circumstantial allegations must be correspondingly greater."  Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks and citation omitted).

Here, Plaintiff's scienter allegations are simply repeated conclusory assertions that Barclays secretly designed the Markov CDO in order to fail so that it could receive swap counterparty payments, and that Barclays disguised its alleged efforts by choosing as collateral other CDOs with AA/AAA ratings that were in fact backed by BBB-rated nonprime RMBS.  The Complaint is replete with conclusory allegations of what Barclays "knew" or "believed":  Barclays "believed [the Markov collateral was] likely to fail," ¶ 12; see also ¶ 159; "Barclays understood that the BBB-rated RMBS tranches were certain to fail," ¶ 14; see also ¶ 181;

---

[16]    Plaintiff's allegations regarding SSgA's motive also create a far more compelling inference—specifically, that State Street made a good faith effort to select worthy assets but was undermined by a market crisis that caused all such assets to be rapidly devalued—than Plaintiff's unsupported allegations of an intent to defraud.  Tellabs, 551 U.S. 308, 324 (2007) (claims for securities fraud must be dismissed unless they raise inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged"); In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 529 n.21 (S.D.N.Y. 2009) ("[A] finding by a court that a securities fraud plaintiff has failed to allege a proper 'concrete and personal' benefit, as required by Second Circuit case law to allege 'motive and opportunity' to commit fraud . . . certainly makes competing, non-fraudulent inferences more 'compelling' for purposes of the Tellabs analysis.").

"Barclays knew that, despite Mezzanine CDO tranche ratings of AA or even AAA, the risk was something else entirely:  the risk of BBB-rated RMBS tranches (which Barclays likewise understood to be far riskier than their BBB ratings indicated)," ¶ 15; "Barclays itself expected very high rates of collateral default and loss," ¶ 20; Defendants "knew" the Markov Chain CDOs to be "the riskiest instruments in Markov," ¶ 240; Barclays "was sure it would win" the "disguised short bet," ¶ 296; "Barclays understood that Mezzanine CDO tranches' high credit ratings were illusory," and that underlying collateral was "headed for default and total or near-total loss," ¶ 312; see also ¶ 322; Barclays "knew that the above-detailed representations concerning the credit ratings . . . were materially false and/or misleading," "knew that the credit ratings . . . falsely reflected the risks of [Markov's] collateral," and "knew that such ratings vastly understated the risks of the collateral," ¶¶ 313-14; see also ¶¶ 315, 325; "Barclays knew the actual loss [of the collateral] would be much, much greater," ¶ 320 n.23; "Barclays knew Mezzanine CDO junior tranche ratings were all materially false and misleading; indeed, Markov was predicated on Barclays' understanding of that fact," ¶ 334; Barclays "knew such Mezzanine CDO tranches were not 'High Grade' collateral, no matter their credit ratings," ¶ 344; Barclays had "decidedly more negative views concerning both loss upon default and the timing of default," ¶ 359; Barclays "did not expect that defaults in Markov's collateral portfolio would be low and constant, but rather that they would be high and imminent."  ¶ 369.

Starkly absent is any fact—much less particularized facts—explaining how Barclays "knew" or "intended" any of this.  Second Circuit law is clear that allegations "that defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing'" other things are "'so broad and conclusory as to be meaningless.'"  Abbad, 285 F. Supp. 2d at 420 (citing Shields, 25 F.3d at 1129).  Likewise, it is beyond question that, where a plaintiff alleges that

defendants possessed information contrary to their public statements, that plaintiff must identify

with specificity what the contrary information was and how defendants received it.  See

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d

Cir. 2008) ("'[W]here plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information.'") (citing Novak, 216

F.3d at 309); accord San Leandro Emergency Med. Grp. Profit Sharing Plan, 75 F.3d at 812-13

(where plaintiff alleges defendant possessed "unreleased or internal information that allegedly

contradict[s] [defendants'] public statements," plaintiff must identify with specificity reports that

contain undisclosed information and indicate "who prepared the projected figures, when they

were prepared, how firm the numbers were, or which [company] officers reviewed them");

Pollio v. MF Global, Ltd., 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009) (dismissing complaint

where plaintiff alleged that defendants "knew" but failed to disclose certain "true facts," but

failed "to identify a single document, communication, report, or piece of information received by

or in the possession of any defendant . . . that was in any way different . . . than what was

disclosed to the market").

Plaintiff does not even come close:  the Complaint fails to proffer a single Barclays or

SSgA document, a single witness from Barclays or SSgA, or a single piece of evidence from any

other source regarding Markov.  Rather, Plaintiff merely speculates about what must have

happened based on Markov's fully-disclosed structure and collateral, improper allegations

regarding other CDOs, and the fact that the deal ultimately failed amidst widespread upheaval in

the financial sector.  See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co,

753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010) ("[T]he plaintiffs have failed to allege with

particularity any contrary information that rendered the defendants' statements reckless or worse.

-33-

Instead, the plaintiffs rely on general facts about the financial world as a substitute for specific facts about either the defendants' knowledge or the true condition of [defendant's] balance sheet").

Conclusory allegations that Barclays or SSgA must have known that specific disclosures were untrue or misleading does not suffice.  See PXRE Grp., 600 F. Supp. 2d at 536; In re Sotheby's Holdings, Inc., No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).  At most, Plaintiff's allegations amount to mere speculation of what "must have been" based on hindsight, which has long been deemed insufficient to plead scienter.  See Bay Harbour Mgmt. LLC v. Carothers, 282 Fed. Appx. 71, 75 (2d Cir. 2008) (confirming that "fraud by hindsight" is "not actionable in this Circuit").

At bottom, the inference of fraud that Plaintiff seeks is fundamentally inconsistent with the transparency of Defendants' actions.  The Offering Documents expressly disclosed that Barclays held the "short" side of the referenced credit default swaps, and warned about conflicts of interest arising from this role.  Ex. B at 56.  Plaintiff itself admits that this was "custom" and "obvious."  ¶ 9.  In addition, the allegedly "deliberate" and "malevolent" design and structure of Markov—including the 35% CDO bucket, which contained Mezzanine CDOs and Markov Chain CDOs—was fully disclosed.  Ex. A at 9; Ex. B at 148.  Further, Barclays provided Eastern Financial with detailed information about Markov's collateral, including identification and the ratings of each and every asset that backed the collateral.  See Ex. E.  Such transparency not only precludes Plaintiff from demonstrating a "powerful," "cogent," and "compelling" inference of fraud, but negates any such inference.

### D.  **Plaintiff Fails to Plead Reasonable Reliance**

Plaintiff also fails to plead reasonable reliance as required.  In determining whether reliance on alleged misrepresentations or omissions is justified, the Court should consider: (1)

the complexity and magnitude of the transaction; (2) the sophistication of the parties; and (3) the

context of any agreement between the parties.  See Emergent Capital Inv. Mgmt., LLC v.

Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) (citation omitted).  Here, there can be no

dispute that Eastern Financial was a sophisticated investor that had both the means and the

opportunity to conduct its own analysis of Markov's quality—as Eastern Financial represented

through the Offering Document disclaimers.  See Ex. B. iv, 206-07.  Prior to Markov, Eastern

Financial had already invested in other CDOs.  See Ex. C at 2.  During the period at issue,

Eastern Financial was actively engaged in analyzing the Markov CDO.  See, e.g., ¶¶ 373-74.

As a sophisticated investor, Eastern Financial is charged with knowledge of the

information in the materials provided.  See Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00

Civ. 8058 (NRB), 2004 WL 2072536, at *8 (S.D.N.Y. Sept. 14, 2004) (plaintiffs could not

maintain fraud claim "if it chose not to investigate the information available to it prior to its

purchase of the Private Certificates").  Here, Eastern Financial was provided with comprehensive

materials concerning the structure of the CDO, including a list of the underlying assets that

contained ratings, originator and servicer information, and delinquencies.  See Ex. A, B, and E.

In addition, Eastern Financial was charged with having carefully considered the myriad

of risk factors relating to Markov, which were outlined in more than fifty pages of the Offering

Documents.  Extensive disclosures in offering documents generally defeat claims of reliance.

See Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032-33 (2d Cir. 1993).  This is true even in

the case of less experienced investors.  See Kosovich v. Metro Homes, LLC, No. Civ.

6992(JSR), 2009 WL 5171737, *4 (S.D.N.Y. Dec. 30, 2009) (declining to find reasonable

reliance because "the written offering materials unambiguously demonstrate[d] the true nature of

[the] investment, [and were] replete with disclaimers as to the risks associated with the

-35-

investment").  Plaintiff admits that Eastern Financial conducted an analytical review of Markov "to scrutinize inter alia: (a) the CDO's collateral; (b) the CDO's structure, and the structural protections the CDO afforded against collateral losses…."  ¶ 374.  Plaintiff's review also included an entire section "devoted to analysis of Markov's collateral," ¶ 375(a), and another section "devoted to analyses of the Markov's structure and how that structure would operate to shield the Markov's AA-rated tranche from collateral losses."  ¶ 375(b).

Moreover, the Offering Documents fully described the risks involved with respect to every aspect of the deal, including:  (1) collateral ratings; (2) collateral risk; (3) conflicts of interest; and (4) projection of Markov's future performance.  The Offering Circular also fully disclosed the potential conflicts of interest that may arise due to Barclays' roles as the Initial Swap Counterparty and the holder of the super senior Notes.  See Ex. B at 55-57.  Finally, the Offering Documents warned that any projection of Markov's future performance was speculative and could not be relied upon.  See Ex. A at 3; Ex. B at 30.  The Offering Documents thus clearly outlined all risks associated with investing in Markov, and Plaintiff's reliance on any alleged misrepresentation was therefore entirely unreasonable.  See Feinman v. Schulman Berlin & Davis, 677 F. Supp. 168, 170-71 (S.D.N.Y. 1988) (holding plaintiffs' reliance "wholly unreasonable" because the offering documents "unequivocally warn[ed] potential investors of the risks involved").

Furthermore, prior to purchasing the Notes, Eastern Financial represented that it fully understood the risks involved in investing in Markov, that its decision to participate in the deal was solely based on its own analysis, and that it was not relying on the advice or recommendations of Barclays or SSgA.  See Ex. B at iv, 206-07; see also Ex. E at 8, 14 ("Potential investors should ensure that they fully understand the terms of the securities and any

applicable risks.").  Thus, Eastern Financial not only disclaimed reliance on any representations made by Defendants, but also represented that it was capable of assessing and assuming all risks associated with Markov and did in fact conduct such an analysis.  Id.

E.    **Plaintiff's Exchange Act Claims Are Time-Barred**

In addition to all of the above-described defects, Plaintiff's Exchange Act claims are time-barred.  A plaintiff asserting claims under the Exchange Act must bring them within the earlier of two years after discovery of "the facts constituting the violation," or five years after the violation.  28 U.S.C. § 1658(b).  The statute of limitations period begins to run when a plaintiff "did in fact discover" or a "reasonably diligent plaintiff would have discovered" the facts constituting the violation.  Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1798 (2010).  A fact is deemed "discovered" when "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint."  City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

All of the facts concerning the alleged fraud were known to Plaintiff at the time of its investment in Markov, or shortly thereafter.  Plaintiff purchased its Notes on June 12, 2007, after receiving copies of Markov's extensive disclosures in the Offering Documents and a list of all the collateral to be included.  Markov experienced its first event of default on November 16, 2007, and was subsequently liquidated on January 22, 2008.  ¶ 398.  Plaintiff, however, waited more than three and one-half years later, until April 26, 2011, to commence this lawsuit.  Courts faced with similar facts have granted motions to dismiss where, as here, the very basis for Plaintiff's securities fraud claims was disclosed at the time of purchase.  See Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983) (charging investors with knowledge of prospectuses); Brecher v. Citigroup Inc., No. 09 Civ. 7359(SHS), 2011 WL 2209145, at *9 (S.D.N.Y. June 7, 2011) (dismissing Section 12 claim as time-barred in CDO and subprime mortgage lawsuit

-37-

where many of defendant's disclosures "announced the very information the Complaint alleges had been misrepresented or withheld").

The only other "facts" to which Plaintiff points are unsubstantiated allegations regarding another CDO offered by Barclays, Corvus.  ¶¶ 6(b), 9, 123-36, 303.[17]  Plaintiff's allegations regarding Corvus are an impermissible basis to plead fraud.  See Def. Motion to Strike.  The allegations do, however, demonstrate that Plaintiff's claims are time-barred.  Each of the alleged facts regarding Corvus on which Plaintiff relies in claiming fraud was in the public realm in 2004 or 2005.  See ¶¶ 124 n.7, 133 n.8, 135 n.9, 136 n.10.  Thus, according to Plaintiff's own allegations, its theory of fraud was discoverable many years before Plaintiff filed suit.  Because Plaintiff did not sue until April 26, 2011, its claims fall outside the two-year limitations period and are time-barred.

## F.   Plaintiff's Section 20(a) Claim Against Barclays Bank and State Street Corporation Should Be Dismissed

In order to establish a violation of Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) a control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted). Because Plaintiff has failed to show that Barclays or SSgA violated Section 10(b), Plaintiff's Section 20(a) claim also fails.

Additionally, Plaintiff's claim that State Street Corporation is liable as a "control person" of SSgA should be dismissed.  Plaintiff was required to "plead with particularity facts giving rise

---

[17]   While Plaintiff points to unsubstantiated allegations and news reports regarding different CDOs offered by different financial institutions, such allegations are an impermissible basis to plead fraud and should be disregarded.  Plaintiff cannot rely on them in claiming that it did not discover until a later time the alleged fraud regarding Markov.  See Def. Motion to Strike.

to a strong inference" that State Street Corporation "knew or should have known" of SSgA's alleged fraudulent conduct.  Burstyn v. Worldwide Xceed Grp., Inc., No. 01 Civ. 1125(GEL), 2002 WL 31191741, at *4 (S.D.N.Y. Sept. 30, 2002) (internal quotation marks and citation omitted).  "[A] claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehaviour or recklessness."  In re MBIA, Inc. Sec. Litig., 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010).  At best, the Complaint merely asserts in conclusory terms that "State Street Corporation [was] aware or directly participated in" the primary violation, without any more particularized content.  ¶ 417.  The absence of particularized facts establishing conscious misbehavior on the part of State Street Corporation compels dismissal of the Section 20(a) claim against it. Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007).

* * *

In sum, Plaintiff's federal securities claims against all Defendants (Counts I and II of the Complaint) should be dismissed.

POINT II

PLAINTIFF'S COMMON LAW CLAIMS AGAINST ALL DEFENDANTS SHOULD BE DISMISSED

Just as its federal claims should be dismissed, Plaintiff's common law claims—which echo its federal securities law claims—should be dismissed.

A.    **Plaintiff's Fraud-Related Claims Against SSgA and Baclays Fail**

The elements of common law fraud, fraud in the inducement, and aiding and abetting fraud claims under New York law are "substantially identical to those governing § 10(b)," and as such the "identical analysis applies."  Rich v. Maidstone Fin. Inc., No. 98 Civ. 2569(DAB), 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (internal quotation marks and citation omitted).  Thus, Plaintiff's common law fraud claims fail for the same reasons discussed above with

respect to its Exchange Act claims:  failure to allege an actionable misstatement or omission,

failure to allege fraudulent intent, and failure to allege reasonable reliance.  See Saltz v. New

Frontier, LP, No. 10 Civ. 964(LBS), 2010 WL 5298225, at *8 (S.D.N.Y. Dec. 23, 2010)

(dismissing common law fraud claims where plaintiff failed to satisfy requirements of 10b-5

claim); Marcus v. Frome, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003) (same).[18]

Plaintiff's claims are separately barred in light of the specific and extensive disclaimers

in the Offering Documents, including that:  Defendants were not acting as a fiduciary or financial

or investment advisor for Eastern Financial; that Eastern Financial was not relying on any

advice, counsel or representations of Defendants other than in the Offering Documents; that

Eastern Financial had consulted with its own legal, regulatory, tax, business, investment,

financial, and accounting advisers to the extent it deemed necessary, and had made its own

investment decisions based on upon its own judgment and upon any advice from such advisors;

that Eastern Financial had a full understanding of all terms, conditions and risks of the

investment, and was capable of assuming and willing to assume those risks; and that Eastern

Financial was a sophisticated investor familiar with similar transactions.  Ex. B at 206-07; see

also Ex. A at 14 ("A prospective client should evaluate the assumptions and decide for itself

whether they are appropriate for their purposes . . .  This information is provided to you on the

understanding that, as a sophisticated investor, you will understand and accept its inherent

---

[18]    As to Plaintiff's claim of aiding and abetting fraud against SSgA, Plaintiff has failed to
plead specific facts that SSgA "knew" of the alleged, but non-existent, scheme.  Lerner v. Fleet
Bank, N.A., 459 F.3d 273, 292 (2d Cir. 2006) ("[A]ctual knowledge is required to impose
liability on an aider and abettor under New York law.") (internal quotation marks and citations
omitted); Berman v. Morgan Keenan, No. 10 Civ. 5866(PKC), 2011 WL 1002683, at *10
(S.D.N.Y. Mar. 14, 2011) ("Allegations that a defendant was reckless in not knowing of the
fraudulent conduct are not sufficient to plead aiding and abetting fraud with particularity")
(citations omitted).

limitations, will review each assumption carefully and make your own determination as to its accuracy or reasonableness.").

These disclaimers are substantially the same as those considered in MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 419 (N.Y. App. Div. 2011), where plaintiff disclaimed (through CDO offering documents) that it "would not rely on defendants' advice, that it had the capacity to evaluate the transactions, and that it understood and accepted the risks."  In light of such disclaimers, the Appellate Division affirmed the dismissal of fraud-related claims based on allegations that the underwriter of a CDO misrepresented the quality and ratings of the CDO's collateral.  The same result obtains here.[19]

Accordingly, Plaintiff's common law fraud claims against all defendants (Counts III, IV, V, and VI of the Complaint) should be dismissed.

**B.      Plaintiff Fails to Plead Negligent Misrepresentation Against SSgA**

Under New York law, the elements of a claim for negligent misrepresentation include, inter alia, that the defendant had a duty, as a result of a special relationship, to give correct information, and that the plaintiff reasonably relied on the information to its detriment.  Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).  The Complaint fails to plead either that there was a "special relationship" under New York law between Eastern

---

[19]      The disclaimers carry additional weight where, as here, the Plaintiff touts its sophistication and thorough analytical review.  See ¶¶ 373-74; UST Private Equity Investors Fund, Inc. v. Salomon Smith Barney, 288 A.D.2d 87, 88-89 (N.Y. App. Div.  2001) ("As a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it.") (citing cases).

Financial and SSgA to support a claim or that Eastern Financial reasonably relied on the information provided.[20]

In the context of commercial transactions, liability for negligent misrepresentation is "'imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (citing Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (N.Y. 1996)).  An arm's-length business relationship is not a special relationship.  See Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC, 74 A.D.3d 652, 653 (N.Y. App. Div. 2010) ("[T]he parties to the agreements dealt at arm's-length, so the close relationship required to support the negligent misrepresentation claim was lacking"); Silvers v. State, 68 A.D.3d 668, 669 (N.Y App. Div. 2009) ("[T]he arm's-length business relationship . . . is not generally considered to be of the sort of a confidential or fiduciary nature that would support a cause of action for negligent misrepresentation").

In Eternity Global, the Second Circuit dismissed a negligent misrepresentation claim premised on a special relationship of trust and confidence between the purchaser and the seller of credit default swaps.  375 F.3d at 188-89.  In dismissing the purchaser's claim, the Court noted that the purchaser was "sophisticated about the credit derivates transactions it was contemplating, was not dissuaded from due diligence, and had the capacity to conduct it."  Id at 189.  Any imbalance in the parties' expertise was thus insufficient to transform an arm's-length

---

[20]    The lack of a special relationship between SSgA and Plaintiff further establishes that the claim against SSgA for fraudulent concealment is without support.  900 Unlimited, Inc. v. MCI Telecomms. Corp., 215 A.D.2d 227, 227 (N.Y. App. Div. 1995) ("In the absence of a contractual relationship or a confidential or fiduciary relationship, a party may not recover for fraudulent concealment of fact, since absent such a relationship, there is no duty to disclose.").

business transaction into a "special" relationship of trust and confidence necessary for liability

for negligent misrepresentation to attach.

Additionally, as argued above, Eastern Financial cannot establish that it reasonably relied

on the various misstatements cited in the Offering Documents.  See infra.  Moreover, Eternity

Global demonstrates that where there is no special relationship among sophisticated parties, it is

virtually impossible to plead reasonable reliance in support of a negligent misrepresentation

claim.  There, the Second Circuit noted that "the New York Court of Appeals has observed that a

relationship sufficiently special to justify reliance (and a subsequent action for negligent

misrepresentation) may arise when a person 'wholly without knowledge seek[s] assurances from

one with exclusive knowledge.'  Reliance is less plausible when the defendant is not 'imparting

exclusive information,' and the plaintiff exhibits familiarity with the 'hazards' inherent to a

particular transaction."  Id. (citing Heard v. City of New York, 83 N.Y.2d 66, 75 (N.Y. 1993)).

The sophisticated purchaser of the credit default swaps had not alleged facts suggesting that its

purported reliance on the seller's alleged representations was justified, leading the court to

dismiss the purchaser's negligent misrepresentation claim.  Id. at 189-90.  For the same reason,

the Court should dismiss Plaintiff's negligent misrepresentation claim against SSgA (Count VII

of the Complaint).

**C.**     **Plaintiff Fails to Plead Breach of Fiduciary Duty Against SSgA**

"'[I]n order to survive a motion to dismiss a claim for breach of fiduciary duty [based in

fraud], the plaintiff must set forth specific facts constituting the alleged relationship with

sufficient particularity to enable the court to determine whether, if true, such facts could give rise

to a fiduciary relationship.'"  See Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 274

(S.D.N.Y. 2006) (quoting Diamond Phoenix Corp. v. Small, No. Civ. 05-79, 2005 WL 1530264,

at *6 (D. Me. June 28, 2005)).  The allegations in Count VIII (for breach of fiduciary duty by SSgA) fall well short of meeting this requirement.

"'[W]hen parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.'"  In re Mid-Island Hosp., Inc., 276 F.3d 123, 130 (2d Cir. 2002) (quoting Pan Am. Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994)); see also Abercrombie, 438 F. Supp. 2d at 274 ("[F]iduciary relationships typically do not arise between parties engaging in arms length business transactions").  Mere assertions of "trust and confidence" are insufficient to allege a fiduciary relationship.  See id. (quoting Freedman v. Pearlman, 706 N.Y.S.2d 405, 409 (1st Dept. 2000)); see also Holloway v. King, 361 F. Supp. 2d 351, 361 (S.D.N.Y. 2005) ("[C]onclusory allegations of a 'special relationship' [and] 'complete trust and confidence'. . . [do] not transform an ordinary commercial relationship into a fiduciary relationship."); Rosenblatt v. Christie, Manson & Woods Ltd., No. 04 Civ. 4205, 2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005)).  Accordingly, Plaintiff's conclusory allegation that it "reposed trust and confidence in SSgA," ¶ 455, is insufficient to establish the existence of a fiduciary relationship.

The hollow claim that SSgA's "superior expertise and knowledge" of Markov's collateral created a fiduciary relationship also fails.  ¶ 454.  Allegations of reliance on another party alleged to possess superior expertise in investment matters, standing by themselves, will not suffice to support a claim for breach of fiduciary duty.  See Boley v. Pineloch Assocs., Ltd., 700 F. Supp. 673, 681 (S.D.N.Y. 1988) (dismissing breach of fiduciary duty claim supported only by conclusory allegation that "[a]s a consequence of undertaking to act as a dealer-manager, promoters, sellers, accountants and bankers regarding the offering of Pineloch limited

-44-

partnership interests, defendants entered into a fiduciary relationship of trust and confidence with plaintiffs."); see also Mechigian v. Art Capital Corp., 612 F. Supp. 1421, 1431 (D.C.N.Y. 1985). Plaintiff's conclusory allegation that SSgA possessed "superior expertise and knowledge" as Markov's collateral manager is insufficient to transform an ordinary business relationship into a fiduciary relationship.  See id. ("[P]laintiff has provided no support for the proposition that mere expertise in a matter creates fiduciary responsibilities, which is essentially the sum and substance of [Plaintiff's] argument.").

This is particularly so in light of explicit disclaimers contained in both the Pitchbook, Ex. A at 2 ("Barclays and SSgA are solely arm's length contractual counterparties.  Neither Barclays nor SSgA is your advisor or fiduciary"), and the Offering Circular, Ex. B at 206-07 ("In connection with the purchase of the Applicable Notes, the purchaser acknowledges and agrees that (i) none of the Issuer, the Initial Purchasers, the Deposit Agreement Counterparty or the Collateral Manager is acting as a fiduciary or financial or investment advisor for the purchaser.") (emphasis added).  Eastern Financial represented that it was a sophisticated, qualified institutional investor eligible to invest in the Markov, and agreed that it was not looking to SSgA as a fiduciary.  This Court should not liberate Plaintiff from these commitments.

Accordingly, Plaintiff's claim for breach of fiduciary duty against SSgA (Count VIII of the Complaint) should be dismissed, for failure to plead the existence of a fiduciary relationship.

**D.**   **Plaintiff Fails to Plead Aiding and Abetting Breach of Fiduciary Duty Against Barclays Capital**

A claim for aiding and abetting a breach of fiduciary duty requires the demonstration of (1) a breach of fiduciary obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damage as a result.  See In re Sharp Int'l Corp., 403 F.3d 43, 49-50 (2d Cir. 2005).  Aside from the defects noted supra at Point II.C

(discussing alleged breach of fiduciary duty by SSgA), Plaintiff has not pleaded a single fact demonstrating that Barclays had actual knowledge of any alleged breach of fiduciary duty by SSgA.  See Kaufman v. Cohen, 307 A.D.2d 113, 125-26 (N.Y. App. Div. 2003) (finding constructive knowledge insufficient and noting that plaintiffs' "extremely sparse and wholly conclusory" statement did not establish actual knowledge).  Accordingly, Plaintiff's claim for aiding and abetting breach of fiduciary duty against Barclays Capital (Count IX of the Complaint) should be dismissed.

**E.**   **Plaintiff Fails to Plead Breach of Contract Harming a Third Party Against SSgA**

Count X alleges that SSgA harmed Eastern Financial by breaching the collateral management agreement.  A third party asserting rights under a contract must allege that ( i) a valid contract existed; (ii) it was intended for the third party's benefit; and (iii) the intended benefit was immediate, not incidental.  See Madeira v. Affordable Hous. Found., Inc., 469 F.3d 219, 251-52 (2d Cir. 2006) (internal quotation marks and citations omitted).  The parties' intent to benefit the third party must clearly appear on the face of the agreement.  See Onanuga v. Pfizer, Inc., No. 03 Civ. 5405(CCM), 2003 WL 22670842, at *4-5 (S.D.N.Y. Nov. 7, 2003) (dismissing third-party beneficiary claim where plaintiff failed to demonstrate parties' intent to benefit third party "within the four corners of the agreement"); Travelers Indem. Co. of Conn. v. Losco Grp., 150 F. Supp. 2d 556, 561 (S.D.N.Y. 2002) (same).  The Complaint lacks any allegations establishing that purchasers of the Markov Notes were intended third-party beneficiaries of the collateral management agreement.  To be sure, the Complaint contains the general allegation that the agreement was intended "for the benefit of investors," ¶ 464, but Eastern Financial fails to cite a single provision of the agreement demonstrating an intent to make note purchasers an immediate beneficiary of that agreement.  Critically, Plaintiff also fails to state which provisions of the agreements SSgA is alleged to have breached or how SSgA is

alleged to have breached it.  These allegations fail to "raise a right to relief above the speculative level," as required to survive a motion to dismiss. Twombley, 550 U.S. at 555; see also Iqbal, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); see also Brown v. Mitchell-Innes & Nash, Inc., No. 06 Civ. 7871(PAC), 2009 WL 1108526, at *3 (S.D.N.Y. Apr. 24, 2009) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss") (internal quotation marks and citations omitted).

Accordingly, Plaintiff's claim for breach of contract harming a third party against SSgA (Count X of the Complaint) should be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety against all

Defendants.

Dated: New York, New York
       August 30, 2011


Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP        ROPES & GRAY LLP


By: _Miranda Kim_____              By: _Robert Jones by mk_____
    David E. Brodsky                           Robert G. Jones
    Joon H. Kim                                Daniel J. Maher
    Meredith E. Kotler
    Arminda B. Bepko                           Prudential Tower
                                               800 Boylston Street
One Liberty Plaza                              Boston, Massachusetts   02199-3600
New York, New York 10006                       Telephone:  (617) 951-7564
Telephone:  (212) 225-2000                     Facsimile:  (617) 235-045
Facsimile: (212) 225-3999


*Attorneys for Defendants Barclays Capital, Inc., and*        *Attorneys for Defendants State Street*
*Barclays Bank PLC*                                            *Global Advisors, State Street Bank and*
                                                               *Trust Company, and State Street*
                                                               *Corporation*