UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SPACE COAST CREDIT UNION, as successor in interest to EASTERN FINANCIAL FLORIDA CREDIT UNION,<br><br>                Plaintiff,<br><br>        -vs.-<br><br>BARCLAYS CAPITAL, INC., BARCLAYS BANK PLC, STATE STREET GLOBAL ADVISORS, STATE STREET BANK AND TRUST COMPANY, and STATE STREET CORPORATION,<br><br>                Defendants. | Case No.: 11 Civ. 2802 (LLS)<br><br>**ORAL ARGUMENT<br>REQUESTED** |

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**KIRBY McINERNEY, LLP**
Daniel Hume
David Bishop
Beverly Tse Mirza
Surya Palaniappan
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: 212-371-6600
Facsimile: 212-699-1194
*Counsel for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Overview of the Markov CDO and Synthetic CDOs Generally . . . . . . . . . . . . . 2

    B.    Defendants' Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    Indicia of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           1.    Defendants' Prior History of CDO Fraud . . . . . . . . . . . . . . . . . . . . . 5

           2.    SSGA Did Not Itself Invest in the Very Assets it Supposedly Was
                 Selecting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           3.    Markov's Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           4.    Discovery of the Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    STANDARD GOVERNING MOTIONS TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . 8

II.    PLAINTIFF HAS SUFFICIENTLY PLED ITS EXCHANGE ACT CLAIMS . . . . . . . 8

    A.    Plaintiff Has Sufficiently Pled Actionable Misrepresentations and Omissions . . . 8

           1.    Misstatements by Barclays and SSGA Concerning the
                 Collateral Selection Process are Actionable . . . . . . . . . . . . . . . . . . . . 9

                 a.    Barclays' Misleading Representation Concerning its "Consent"
                        to the Collateral Purportedly Selected by SSGA Is Actionable . . . 9

                 b.    The 35% CDO Bucket in the Markov Portfolio Was Excessive . 10

                 c.    SSGA's Failure to Invest in the Collateral it
                        Supposedly Selected, Inconsistent with Usual
                        Industry Practice, Is Evidence That SSGA Knew
                        Something Was Wrong with the Collateral Mix . . . . . . . . . . . . 11

i

          d.     Plaintiffs Have Adequately Alleged that Barclays
Created a Short Position Designed to be In the Money
at Plaintiff's Expense and for Barclay's Gain . . . . . . . . . . . . . . 12

     2.     Barclays' Misleading Representations Concerning the Credit Ratings
of Markov's Collateral and that Markov was a "High Grade" CDO
Are Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     3.     Barclays' Misleading Representations Concerning the Superiority of
Markov's Syntheic Collateral Are Actionable . . . . . . . . . . . . . . . . . . . . . 18

     4.     Barclays' Misleading Representations Concerning Markov's Safety and
Structural Protections from Collateral Losses are Actionable . . . . . . . . 20

B.     Plaintiff Has Sufficiently Pled Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     1.     Plaintiff Has Adequately Pled Motive and Opportunity . . . . . . . . . . . . 21

     2.     Plaintiff Has Adequately Pled Conscious Misconduct . . . . . . . . . . . . . 24

     3.     SSGA's Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.     Plaintiff Has Adequately Pled Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.     Plaintiff Has Sufficiently Pled Section 20(a) Claims . . . . . . . . . . . . . . . . . . . . 31

E.     Plaintiff's Exchange Act Claims are Not Time-Barred . . . . . . . . . . . . . . . . . . 34

III.     PLAINTIFF HAS ADEQUATELY PLED STATE LAW CLAIMS . . . . . . . . . . . . . . . 36

A.     Fraud Based Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.     Negligent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     1.     The Relationship Between Plaintiff and SSGA Imposed a Duty Upon
SSGA to Impart Accurate Information to Plaintiff . . . . . . . . . . . . . . . . 41

          a.     Special Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

          b.     Privity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     2.     Incorrect or Incomplete Information . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

       3.     Reasonable Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.     Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

D.     Aiding and Abetting Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

E.     Breach of Contract Harming a Third Party . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*900 Unlimited v. MCI Telecomm'ns Corp.*,
   626 N.Y.S.2d 188 (App. Div. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*,
   896 N.E.2d 61, 68 (N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Argonaut P'ship L.P. v. Bancomer, S.A.*,
   No. 96 Civ. 2222, 2001 WL 585525 (S.D.N.Y. May 30, 2001) . . . . . . . . . . . . . . . . . . . 8

*Aievoli v. Farley*,
   223 A.D.2d 613, 636 N.Y.S.2d 833 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Argonaut P'ship L.P. v. Bancomer, S.A.*,
   No. 96 Civ. 2222, 2001 WL 585525 (S.D.N.Y. May 30, 2001) . . . . . . . . . . . . . . . . . . . 8

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Bank of Tokyo Trust Co. v. Friedman*,
   602 N.Y.S.2d 125 (N.Y. App. Div. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.*
   28 Misc.3d 1232(A), 2010 WL 3504780 (Table) (N.Y. Sup. Ct. Aug. 9, 2010) . . . . . . . 38

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 31

*Bestolife Corp. v. American Amicable Life*
    5 A.D.3d 211 (N.Y. App. Div. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Boley v. Pineloch Assocs. Ltd.,*
    700 F. Supp. 673 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bolt Elec., Inc. v. City of New York,*
    53 F.3d 465 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Borochoff v. GlaxoSmithKline PLC,*
    No. 07 Civ 5574, 2008 WL 2073421 (S.D.N.Y. May 9, 2008) . . . . . . . . . . . . . . . . . . 20

*Brecher v. Citigroup Inc.,*
    No. 09 Civ 7359, 2011 WL 2209145 (S.D.N.Y. June 7, 2011) . . . . . . . . . . . . . . . . . . 34

*Caiola v. Citibank, N.A.,*
    295 F.3d 312 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 30

*Century Pac., Inc. v. Hilton Hotels Corp,*
    No. 03 Civ. 8258, 2004 WL 868211 (S.D.N.Y. Apr. 21, 2004) . . . . . . . . . . . . . . . . . . 41

*China Dev. Bank v. Morgan Stanley & Co. Inc.,*
    No. 650957/2010 (N.Y. Sup. Ct. Feb. 28, 2011) . . . . . . . . . . . . . . . . . . . . . . 15, 27, 30

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.,*
    637 F.3d 169 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.,*
    915 N.Y.S.2d 2 (App. Div. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*CompuDyne Corp. v. Shane,*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*CRT Investments, Ltd. BDO Seidman, LLP,*
    925 N.Y.S.2d 439 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*CRT Investments, Ltd. v. Merkin,*
    918 N.Y.S.2d 397 (Sup. Ct. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Dandong, et al. v. Pinnacle Performance Ltd, et al.*,
No. 10 Civ. 8086 (LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) . . . . . . . . . *passim*

*EBC I, Inc. v. Goldman, Sachs & Co.*,
832 N.E.2d 26, 32 (N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Edge Mgmt. Consulting, Inc. v. Blank*,
807 N.Y.S.2d 353 (App. Div. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
551 F. Supp. 2d 210 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
387 F. Supp. 2d 265 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
387 F. Supp. 2d 265 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Elliot v. Nelson*,
301 F. Supp. 2d 284 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Epirus Capital Mgmt., LLC v. Citigroup Inc.*,
No. 09 Civ. 2594 (SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010) . . . . . . . . . . . . 22

*Eternity Global Master Fund v. Morgan Guar. Trust Co. of N.Y.*,
No. 02 Civ. 1212, 2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002) . . . . . . . . . . . . . 30, 38

*Eternity Global*,
375 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Feinman v Schulman Berlin & Davis*,
677 F. Supp. 168 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fezzani v. Bear, Stearns & Co. Inc.*,
    592 F. Supp. 2d 410 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    No. 09 Civ. 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) . . . . . . . . . . . . . . 10, 22

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fait v. Regions Fin.Corp.*,
    655 F.3d 105 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Freidus v. ING Groep N.V.*,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Fujisawa Pharm.Co, Ltd. v. Kapoor*,
    115 F.3d 1332 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Gabriel Capital, L.P. v. Natwest Fin., Inc.*,
    137 F. Supp. 2d 251 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gagliardi v. Village of Pawling*,
    18 F.3d 188 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gindi v. Silvershein*,
    No. 93 Civ. 8679, 1995 WL 347397 (S.D.N.Y. June 8, 1995) . . . . . . . . . . . . . . . . . . . . 8

*Global Intellicom, Inc. v Thomson Kernaghan & Co.*,
    No. 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) . . . . . . . . . . . . . . . . 25, 27

*Global Network Comm'ns, Inc. v. City of N.Y.*,
    458 F.3d 150 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Henneberry v. Sumitomo Corp. of America*,
    532 F.Supp.2d 523 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*HF Mgmt. Services LLC v. Pistone*
    818 N.Y.S.2d 40 (App. Div. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hunt v. Enzo Biochem, Inc.*,
    530 F. Supp. 2d 580 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Icebox-Scoops v. Finanz St. Honore, B.V.*,
    676 F. Supp. 2d 100 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*In re Citigroup Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C. D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 29

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Durso Supermarkets, Inc.*,
    No. 94 Civ. 6035, 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995) . . . . . . . . . . . . . . . . . . 44

*In re Dynex Capital, Inc. Sec. Litig.*,
    No. 05 Civ. 1897, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) . . . . . . . . . . . . . . . . . . 26

*In re Global Crossing, Ltd. Sec. Litig.*,
    No. 02 Civ. 910, 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) . . . . . . . . . . . . . . . . . . . . 33

*In re Indep. Energy Holdings, PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re MBIA, Inc., Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 28

*In re Mid-Island Hosp., Inc.*,
    276 F.3d 123 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Parmalat Sec. Litig.*,
    383 F. Supp. 2d 616 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Parmalat Sec. Litig.*,
    497 F. Supp. 2d 526 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Polaroid Corp. Sec. Litig.*,
    465 F. Supp.2d 232 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 40

*In re Sadia, S.A. Sec. Litig.*,
    643 F. Supp. 2d 521 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

*In re Sadia, S.A. Secs. Litig.*,
    No. 08 Civ. 9528 (SAS), 2009 WL 2356181 (S.D.N.Y. Jul. 29, 2009) . . . . . . . . . . . . 27

*In re Scholastic Corp. Secs. Litig.*,
    252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Scholastic Corp. Secs. Litig.*,
   252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Vivendi Universal S.A.*,
   381 F. Supp. 2d 158, 190  (S.D.N.Y.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*J.A.O. Acquisition Corp. v. Stavitsky*
   8 N.Y.3d 144 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jaquith v. Newhard*,
   No. 91 Civ. 7503, 1993 WL 127212 (S.D.N.Y. Apr. 20, 1993) . . . . . . . . . . . . . . . . . . . 27

*JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*,
   189 F. Supp. 2d 24 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 38

*Kalin v. Xanboo, Inc.*
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Klamberg v. Roth*,
   473 F. Supp. 2d 544 (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kimmell v. Schaefer*,
   675 N.E.2d 450 (N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Kosovich v. Metro Homes, LLC*,
   No. Civ. 6992, 2009 WL 5171737 (S.D.N.Y. Dec. 30, 2009) . . . . . . . . . . . . . . . . . . . . 31

*Kotchina v. Luna Park Hous. Corp.*,
   27 A.D.3d 696, 815 N.Y.S.2d 594 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

x

*Kurtzman v. Bergstol*,
    835 N.Y.S.2d 644 (N.Y. App. Div. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Law v. Medco Research Inc.*,
    113 F.3d 781 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*M&T Bank Corp. v. Gemstone CDO VII, Ltd*,
    No. 7064/08, 2009 WL 921381 (N.Y. Sup. Ct. Apr. 7, 2009) . . . . . . . . . . . 15, 28, 42, 43

*Maloul v. Berkowitz*,
    No. 07 Civ. 8525, 2008 WL 2876532 (S.D.N.Y. July 23, 2008) . . . . . . . . . . . . . . . . 27, 45

*Mfrs. Hanover Trust Co. v. Yanakas*
    7 F.3d 310 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*MBIA Ins. Corp. v. Merrill Lynch*
    No. 12238109, 2010 WL 3294302 (N.Y. Sup. Ct. Aug. 19, 2010) . . . . . . . . . . . . . . . . . 39

*MBIA Ins. Corp. v. Royal Bank of Canada*
    81 A.D.3d 419 (N.Y. App. Div. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 40

*Mechigian v. Art Capital Corp.*,
    612 F. Supp. 1421 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    89 F. App'x 287 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 27, 37

*Oanugua v. Pfizer, Inc.*,
    No. 03 Civ. 5405, 2003 WL 22670842 (S.D.N.Y. Nov. 7, 2003) . . . . . . . . . . . . . . . . . . 50

xi

*Ossening Union Free Sch. Dist. v. Anderson LaRocca Anderson*,
    73 N.Y.2d 417 (N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Pergament v Roach*,
    838 NYS2d 591 (App. Div. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.,*
    741 F. Supp. 2d 474 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Rosenblatt v. Christie, Manson, & Woods Ltd.,*
    No. 04 Civ. 4205,  2005 WL 2649027 (S.D.N.Y. Oct. 14, 2005) . . . . . . . . . . . . . . . . . 47

*Ruskin v. TIG Holdings, Inc.*,
    No. 98 Civ. 1068, 2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000) . . . . . . . . . . . . . . . 8, 16

*S. Cherry St. LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

*Schwarz v. ThinkStrategy Capital Management LLCI*,
    No. 09 Civ 9346, 2011 WL 2732218 (S.D.N.Y. July 14, 2011) . . . . . . . . . . . . . . . . . . 44

*S.E.C. v. Citigroup Global Markets Inc.*,
    No. 11 Civ. 7387, 2011 WL 4965843 (S.D.N.Y.  Oct. 19, 2011) . . . . . . . . . . . . . . . . . 16

*S.E.C. v. Tourre*,
    No. 10 Civ. 3229,  2010 WL 5863739 (S.D.N.Y. Nov. 22, 2010) . . . . . . . . . . . . . . . . 16

*S.E.C. v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shahzad v. Meyers*,
    No. 95 Civ. 6196, 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) . . . . . . . . . . . . . . . . . . . . 25

*Sheppard v. TCW/DW Term Trust 2000*,
    938 F. Supp. 171 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
  No. 00 Civ. 8058 (NRB), 2004 WL 2072536 (S.D.N.Y. Sept. 14, 2004) . . . . . . . . . . . 29

*Stephenson v. Citco Group Ltd.*,
  700 F. Supp. 2d 599 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Suez Equity Investors LP v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Talansky v. Schulman*,
  770 N.Y.S.2d 48, 53 (App. Div. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Tellabs, Inc. V. Makor Issues & Rights, Ltd..*,
  551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*,
  150 F. Supp. 2d 556 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Tuchman v. DSC Commc'ns Corp.*,
  14 F.3d 1061 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Blum*,
  62 F.3d 63 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Semak*,
  536 F.2d 1142 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*UST Private Equity Investors Fund, Inc. v. Saloman Smith Barney*,
  733 N.Y.S.2d 385 (App. Div. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*,
  247 F. Supp. 2d 352 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Whalen v. Hibernia Foods PLC*,
  No. 04 Civ. 3182, 2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005) . . . . . . . . . . . . . . . . . 26

*Williams v. Deutsche Bank Sec., Inc.*,
  No. 04 Civ. 7588, 2005 WL 1414435 (S.D.N.Y. June 13, 2005) . . . . . . . . . . . . . . . . . 46

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
     399 F. Supp. 2d 375 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**Other Authorities**

Fed.R.Evid. 404(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Statutes**

28 U.S.C. § 1658(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

78 U.S.C. § 78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## PRELIMINARY STATEMENT

The term "built to fail" has entered the lexicon as an unfortunate reference to a business practice engaged in by Wall Street to profit at investors' expense from the housing/mortgage crisis that they were in a unique position to see unfold in 2007.  Banks such as Barclays created collateralized debt obligations (CDOs) and marketed them as high grade securities collateralized by highly rated grade assets, selected by independent experts, and providing fair rates of return.  The problem, as Plaintiff here ultimately learned, was that these CDOs were not high grade securities collateralized by high grade assets selected by independent experts, but rather highly risky securities collateralized by toxic mixes of assets selected by the banks themselves for their likelihood of default – "built to fail" – resulting in total investor loss and bank gain.

The Markov CDO at issue here was one of these.  Plaintiff alleges that Defendants misrepresented:  (i) who selected the collateral assets referenced in Markov, (ii) the methods used to select those collateral assets; (iii) the credit quality of those assets; and (iv) the protections Markov's structure was supposed to provide against losses experienced by the collateral assets. Because of these misrepresentations, Plaintiff did not know that Markov was a rigged bet in the form that would pay the Defendants when its riskiest collateral assets inevitably failed.

As set forth below, Plaintiff has adequately pled the elements of both Exchange Act and common law fraud, and the other common law claims.  Plaintiff could not have known at the time of investment that Defendants were misrepresenting the key terms of the investment, notwithstanding the boilerplate "warnings" Defendants now try to hide behind.   Plaintiffs demonstrably relied on Defendants' misrepresentations, and were damaged thereby.  Accordingly, Defendants motion to dismiss the Complaint should be denied.

1

## STATEMENT OF FACTS

### A.     Overview of the Markov CDO and Synthetic CDOs Generally

In June of 2007, Plaintiff Eastern Financial Florida Credit Union (now part of Space Coast Credit Union) purchased AA-rated tranched notes of Markov, a synthetic collateralized debt obligation ("CDO") underwritten and sold by defendant Barclays. (¶ 24.)[1]  Plaintiff believed it was buying a security whose collateral was selected by an independent expert in picking mortgage bonds to provide value – defendant SSGA. (¶¶ 269-289.)  Unbeknownst to Plaintiff, Barclays (i) controlled the collateral selection process , (ii) used that control to build a CDO designed to fail, and (iii) made a disguised short bet against the collateral to profit from the CDO's failure.  (¶¶ 145-264.)

CDOs are special purpose vehicles set up by banks (underwriters) to acquire a portfolio of collateral and issue notes backed by the collateral selected. (¶ 52.)  In synthetic CDOs, the assets constituting a CDO's collateral portfolio are not actually purchased, but instead "referenced" through an underlying credit default swap in which the CDO effectively "insures" the full value of the referenced assets. (¶¶ 105, 107.)  In exchange, the CDO receives regular payments, akin to insurance premiums, made by the CDO's counterparty. (¶ 9 n.1.)  As a result, the CDO (and through it, CDO note investors) possesses a "long" exposure to the referenced assets, and in effect "insures" the full value of those assets. (¶¶ 9, 107, 113, 126.)  Should the referenced assets decline, the CDO must "swap" to its credit default swap counterparty, payments in the amount of such decline (in effect, insurance proceeds). (¶ 9 n.1.)  The counterparty to the underlying credit default swap thus possesses

---

[1]      References made herein include: "¶ __" (paragraphs in the Complaint); "Defs. Br." (Joint Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint [Docket No. 29]); and "Hume Ex." (Exhibits attached to Declaration of Daniel Hume in Opposition to Defendants' Motion to Dismiss, filed contemporaneously herewith). Unless otherwise defined, capitalized terms shall have the meanings attributed to them in the Complaint.

a "short" interest with respect to the referenced assets. (¶¶ 9 n.1, 105-12.)

The role of independent collateral managers such as SSGA is to select the collateral that conforms to the goals and purposes of the transaction. (¶ 115.) Although a supposedly independent collateral manager was present here (SSGA), Barclays itself controlled the collateral selection process and kept the short position. (¶¶ 312, 322.) Through credit default swaps embedded in the Markov CDO, Barclays constructed a short position for itself against the performance of the referenced collateral. (¶¶ 312, 322.) Markov's structure ensured that the first $400 million of cash and cash collateral invested would be available for Barclays to collect when the referenced synthetic collateral defaulted. (¶ 151.) The cash to pay off Barclays' short position was provided by investors, such as the Plaintiff, who purchased the $400 million of funded notes. (¶ 155.) The effect of this arrangement was that Markov investors' principal was hostage to the performance of Markov's synthetic collateral. Should such collateral suffer losses, Markov would swap investors' principal to Barclays to compensate Barclays, as initial short party, for such synthetic collateral losses. (¶ 152.)

## B.    Defendants' Misrepresentations

Plaintiffs allege that Defendants, in offering and marketing materials they drafted, prepared, and disseminated, made the following material misrepresentations concerning Markov:

- Defendants misrepresented SSGA as the party independently responsible for Markov's collateral selections.(¶¶ 267-73.) Defendants' arguments otherwise create issues of fact, and are not plausible when viewed against the known facts, including that Markov's collateral selection violated SSGA's own exposition of its CDO collateral management principles and practices. (¶¶ 182-84.)  SSGA's refusal to make customary equity investment in the CDO it purportedly created suggests SSGA did not trust its money to the CDO it had purportedly created. (¶¶ 190-93.)

- Defendants misrepresented that SSGA would apply rigor, diligence, and expertise to select collateral most likely to perform well. (¶¶ 277-86.)  In reality, another party was making collateral determinations and on the oppositive basis:  selecting collateral most likely to fail,

3

rather than to succeed. (¶¶ 290-97.)

• Barclays misrepresented that Markov would benefit by use of synthetic collateral, which per Defendants allowed Markov unlimited access – at the stroke of pen in a CDS contract – to all the best collateral ever created, rather than the more limited supply of actual "cash" securities then available for purchase. (¶¶ 352-53.)   In reality, Defendants used CDS technology to Markov's detriment, by filling Markov with synthetically-referenced collateral chosen for its likelihood to fail. (¶¶ 354-55.)

• Barclays misrepresented that SSGA's collateral selections were merely subject to Barclays' consent rather than total control. (¶¶ 290-93.)  The impression created was that Barclays' "consent" would operate as a "double check" on collateral quality, ensuring that two sets of sophisticated eyes – first SSGA's, then Barclays' – found the collateral meritorious. (¶ 293.)  In reality, Barclays used its power of consent to prevent selection of meritorious collateral and enforce selection of collateral deemed likely to fail, so as to benefit Barclays' short interest in such collateral (¶¶ 294-97) and that violated SSGA's own collateral management guidelines (¶¶ 182-84, 296).  Given all the facts pled, the more reasonable conclusion is that Barclays – not SSGA – was driving significant parts of Markov's collateral selection.  The contrary inference of innocence – that SSGA freely abandoned its longstanding CDO collateral management principles to make collateral selections here, and that these just happened to serve Barclays' interests – strains credibility.

• Barclays misrepresented the purported safety of Markov's collateral, as indicated by the credit ratings of such collateral and by Markov's billing as a High Grade CDO. (¶¶ 307-10, 315-18.)  In fact, Markov's collateral selection was premised on a sophisticated disbelief in the credit ratings of the collateral heaped into Markov. (¶¶ 311-14, 319-26.)  Plaintiff does not claim that defendants provided false credit ratings, but that they marketed Markov on the basis of credit ratings they themselves disbelieved.

• Barclays misrepresented the safety provided by Markov's tranche structure against collateral losses. (¶¶ 359-71.)  Plaintiff alleges Barclays believed that the much of the collateral selected for Markov would likely fail (precisely the reason for its selection). (¶ 371.)

## C.    Reliance

Plaintiff evaluated all potential CDO investments through a standard  "Analytical Review" investment protocol. (¶ 373.)  In its Analytical Review for Markov, Plaintiff reiterated many of Defendants' misrepresentations and misleading statements that form the basis of this action, thereby directly establishing reliance. (¶¶ 377, 379-83.)  Here, Plaintiff's Analytical Review scrutinized

Markov's structure, collateral, collateral manager, and the bases and methods purportedly used by the collateral manager to select Markov's collateral.  (¶ 374.)  The Analytical Review makes clear that Plaintiff believed SSGA would control Markov's collateral selection through application of the represented diligence, rigor, and expertise (¶¶ 378-82), and that Markov had been structured by Barclays to protect Plaintiff to at least an AA-rated level from expected collateral losses (¶¶ 384-88).

## D.   Indicia of Fraud

### 1.   Defendants' Prior History of CDO Fraud

Barclays and SSGA had engaged in the activity complained of here before. (¶¶ 123-44.)  In and after 2000, Barclays collateralized a prior synthetic CDO, Corvus, with assets Barclays believed would fail, including bespoke toxic assets of Barclays' own design. (¶¶ 124-136.)   In Corvus, Barclays served simultaneously as arranger, collateral manager and short party with respect to Corvus' collateral. (¶¶ 126-27.)  Barclays used its position as collateral manager to serve Barclays' short interest, and acted to fill Corvus with subpar collateral, including junior tranches of synthetic CDOs that Barclays created. (¶¶ 128, 131, 133.)   After Corvus investors sued, Barclays lost a December 2004 pre-trial ruling and then settled the matter a week prior to a scheduled February 2005 trial. (¶136.)   SSGA was the supposed collateral manager for the 2006 Carina CDO.  (¶138.)  However, as here, SSGA did not actually select the Carina collateral but rather ceded that role to a party with a short interest in the CDO who, like Barclays here, selected collateral more likely to fail. (¶ 143.)  Carina was liquidated within a year and press reports indicate that the SEC is now investigating it. (¶ 142.)

### 2.   SSGA Did Not Itself Invest in the Very Assets it Supposedly Was Selecting.

It was long custom for CDO collateral managers to make a substantial investment in the

lowest tranche of a CDO they managed.  This was a matter of both duty (to demonstrate that they were "eating [their] own cooking" [¶¶ 60, 191]) and opportunity (Barclays itself explained that the "raison d'etre" for collateral manager CDO involvement was the chance to earn leveraged returns from investing in the equity tranche of their own CDOs [¶¶ 60-64, 191, 195]).  SSGA's dissatisfaction with Markov is evident.  In marked departure from SSGA's own prior practice and from industry-wide custom, SSGA voted with its feet and refused to make any investment in Markov's equity tranche.  (¶¶ 65-66, 143-44, 191, 194-98.)

### 3. Markov's Composition

The Complaint pleads detailed facts to demonstrate that Markov did not merely "happen" to fail, but was intentionally designed to do so.  Markov was structured with a 35% CDO bucket. (¶ 166.) This was larger than any prior Barclays CDO during the prior 3 years, and was the maximum such bucket used in High Grade CDOs. (¶ 167.)  Markov's CDO bucket of 35% nearly doubled the average High Grade CDO bucket of 19%.  Markov's CDO bucket (which represented merely the option rather than the necessity of using other CDO tranches as up to 35% of Markov's collateral) was then filled to its structural brim with $655 million of CDO tranche collateral, representing 32.75% of Markov's total $2 billion portfolio. (¶¶ 167, 201.)

The CDO tranches selected  for inclusion in Markov were almost exclusively from Mezzanine CDOs.  All of the CDO tranches that were referenced synthetically in Markov (*i.e.*, that were shorted through Markov) were tranches from Mezzanine CDOs. (¶ 168.)  Defendants then went out of their way to custom-fabricate a yet-riskier $300 million subset of collateral to bet against: the twelve bespoke single-tranche synthetic CDOs Markov Chain I-XII (the "Markov Chain CDOs"). (¶ 210.)

6

These CDOs were designed with a double face: on the outside, their triple-A ratings made them appear the safest of all of Markov's collateral; on the inside, they were in fact the riskiest and the most likely of all of Markov's collateral to fail first. (¶¶ 18, 199-209.)  This latter face was unknown to all except Defendants as "bespoke" CDOs, no public information concerning the Markov Chain CDOs existed except for their credit ratings.  (¶¶ 18, 214.)

Defendants collateralized Markov with a hidden, systematic short bias that operated to (i) make it more likely that the short bets would be won by the short parties and lost by Markov and Markov investors; and (ii) make it more likely that Markov would possess the funds with which to pay the short parties their winnings. (¶¶ 249-52.)  Within each broad category of collateral the synthetic collateral chosen for Markov had lower credit ratings than the cash collateral chosen for Markov. (*Id.*)  By referencing lower-rated tranches of RMBS and CDOs synthetically, Markov offered bets on collateral more likely to fail.  (*Id.*)

### 4.    Discovery of the Fraud

When Plaintiff purchased its Notes on June 12, 2007, it had no way of knowing that Defendants intentionally misrepresented their role in the selection of collateral and the method by which collateral would be selected.  (¶¶ 66, 156-60, 267-87.)  No disclosures or lists of collateral given to Plaintiff contained the Defendants' intent to deceive.  (*Id.*)  Plaintiff's $10 million dollar investment was completely lost just a few months after it was made in 2007.  (¶¶ 1, 24.)  Plaintiff's first indication that a fraud may have occurred came in April 2010, when the public discovered that many synthetic CDOs were secretly built to fail through schemes where underwriters would control collateral selection and then profit when the collateral failed.  (¶¶ 116-22.)

**ARGUMENT**

## I.   STANDARD GOVERNING MOTIONS TO DISMISS

Defendants must overcome a high burden for their motion to succeed.  "On a motion to dismiss under Rule 12(b)(6), the court *must* accept as true the factual allegations in the complaint, and draw *all* reasonable inferences in favor of the plaintiff.  The district court should grant such a motion *only if,* after viewing plaintiff's allegations in this favorable light, it appears *beyond doubt* that the plaintiff can prove *no* set of facts in support of his claim which would entitle him to relief." *Gindi v. Silvershein*, No. 93 Civ. 8679, 1995 WL 347397, at *3 (S.D.N.Y. June 8, 1995) (Stanton J.) (citing *Bolt Elec., Inc. v. City of N.Y.,* 53 F.3d 465, 469 (2d Cir. 1995)) (emphasis added) (quotations omitted).[2]  "The function of a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ruskin v. TIG Holdings, Inc*., No. 98 Civ. 1068, 2000 WL 1154278, at *4 (S.D.N.Y. Aug. 14, 2000) (Stanton J.) (citation omitted).

## II.   PLAINTIFF HAS SUFFICIENTLY PLED ITS EXCHANGE ACT CLAIMS

### A.   Plaintiff Has Sufficiently Pled Actionable Misrepresentations and Omissions

The Complaint adequately pleads the material and false statements made by Defendants.  "At the pleading stage, a plaintiff satisfies the materiality requirement...by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 329 (2d Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

---

[2]      *See also Argonaut P'ship L.P. v. Bancomer, S.A.*, No. 96 Civ. 2222, 2001 WL 585525, at *1 (S.D.N.Y. May 30, 2001) (Stanton J.) (citing *Gagliardi v. Village of Pawling,* 18 F.3d 188, 191 (2d Cir. 1994)) (same).

(1988)) (an omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). A "complaint may not properly be dismissed...on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (citations omitted).

1.      **Misstatements by Barclays and SSGA Concerning the Collateral Selection Process are Actionable**

a.      **Barclays' Misleading Representation Concerning its "Consent" to the Collateral Purportedly Selected by SSGA Is Actionable**

Defendants argue that Plaintiff's claim "fails at the threshold" because the Offering Documents expressly disclosed that collateral selection was subject to Barclays' consent. (Defs. Br. at 17.) Yet Plaintiff alleges that this representation itself was materially misleading as to the real dynamic of collateral selection for Markov. (¶¶ 290-303.) It gave the impression that Markov's collateral had received double ratification first from SSGA and then from Barclays. (¶¶ 292-93, 295.)[3] Investors understood this to provide an extra level of collateral safety: Barclays would grant consent to the most promising collateral and withhold consent from risky or unwise collateral selections. (¶ 293.) The truth was the opposite: Barclays wielded its consent to screen out safe

---

[3]      Defendants rely on *Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 Civ. 2549, 2010 WL 1779348, at *1, 5 (S.D.N.Y. Apr. 29, 2010) for the argument that Plaintiff "has failed to allege any actionable misrepresentation concerning collateral selection." (Defs. Br. at 22.) That case is inapplicable because unlike the plaintiff there, Plaintiff here has pled with sufficient particularity that contrary to the SSGA selecting the collateral for the Markov portfolio, it was Barclays who controlled the collateral selection process and kept the short position. (¶¶ 66, 156-60, 267-76, 287, 312, 322.)

collateral and granted "consent" to bad assets meant to drain Plaintiff's and other Markov investors' principal through swap to Barclays rather than conserve it.[4]   (¶¶ 158-59, 294.)

### b.    The 35% CDO Bucket in the Markov Portfolio Was Excessive

Defendants assert that Plaintiff does not plead facts that a 35% bucket was "extreme" and "unusually high."  (Defs. Br. at 19.)  Yet the Complaint pleads this very fact: Markov's 35% CDO bucket was "greater than any prior allowance Barclays had granted to the other ABS CDOs it created between 2005 and 2007." (¶ 167.)  It was this extreme structural proviso that allowed Barclays the necessary loophole to make its disguised "short" bet against BBB-rated RMBS. (¶¶ 164, 167.)

Industry standards show that, on average, about 19% of High Grade CDO collateral consists of other CDOs.  *See* Hume Ex. A (Basel Committee on Banking Supervision report, Credit Risk Transfer Developments from 2005 to 2007, July 2008, at p. 5).  The 35% CDO bucket Barclays

---

[4]    Defendants' authorities cited in reliance are all inapposite.  *See* Defs. Br. at 18.  *Footbridge* and *Tuchman* are inapposite because neither case involved plaintiffs who pleaded particularized facts showing falsity.  *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *8-17 (S.D.N.Y. Sept. 28, 2010) (plaintiff failed to provide any particularized facts showing falsity, fraudulent scienter, and factual link from alleged fraud to plaintiffs' particular securitization transaction); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("Conspicuously absent from plaintiffs' allegations related to the re-negotiated [ ] contract [was] any statement that the defendants concealed or misrepresented material information relating to that agreement."). Defendants' reliance on *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) is also misplaced.  That decision held disclosures to be sufficient when they were not buried and given adequate prominence.  *Id.* at 176 ("Such disclosures were not buried or given inadequate prominence in the prospectus; rather, they constituted an integral part of the information presented to potential investors).  In contrast here, Defendants did not disclose that Barclays had control rather than "veto power" over collateral selection.  Lastly, when citing *Klamberg v. Roth*, 473 F. Supp. 2d 544, 551 (S.D.N.Y. 1979) (Defs. Br. at 18), Defendants conveniently omitted the first and most critical part of the court's statement:  "As a general rule, *so long as material facts are disclosed or already known*, it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly." (emphasis added) (citation omitted).  Here, Plaintiff did not know the degree of control Barclays exercised over SSGA's collateral selection.

created for Markov departed markedly from this industry average by nearly double.  Moreover, Markov's CDO bucket was filled to maximum capacity with tranches from risky Mezzanine CDOs.[5]

### c.   SSGA's Failure to Invest in the Collateral it Supposedly Selected, Inconsistent with Usual Industry Practice, Is Evidence That SSGA Knew Something Was Wrong with the Collateral Mix

It was customary for CDO collateral managers to make a substantial investment in the lowest tranche of the CDO they managed – the equity tranche. (¶¶ 60-64, 191, 195.)  In a legitimate transaction, CDO collateral managers have a strong interest in doing so – the CDO's "excess spread" belonged solely to equity tranche investors, who thus could earn leveraged returns from the CDO's entire portfolio. (¶¶ 60-64, 191, 195.)  In past management of CDOs, SSGA had in fact made such investments: for example, the Diogenes I CDO and Pascal CDO whereby SSGA purchased 49% and 26%, respectively, of the equity tranche.  (¶ 351.)  However, SSGA's actions as to Markov diverged from this norm. (¶¶ 65-66.)

Improperly asserting facts on their motion to dismiss, Defendants contend that "SSGA did not believe that the 35% bucket was 'excessive'" and that SSGA "unquestionably" managed and constructed Markov's collateral portfolio. (Defs. Br. at 19-20.)  However, Defendants have no answer for Plaintiff's allegation that SSGA's dissatisfaction with Markov is shown by its refusal to invest in Markov's equity tranche.  This refusal indicates not SSGA's belief in Markov's collateral and collateral performance, but the opposite.  (¶¶ 65-66, 194-98.)

---

[5]     Defendants' reliance on *ATSI Comm'cns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) that Plaintiff's facts are a "series of speculative leaps," (Defs. Br. at 19), is misplaced. *ATSI* involved a market manipulation case and the court found that plaintiff there asserted no specific manipulation allegations. *ATSI*, 493 F.3d at 104.  Notably, the *ATSI* court cites *Ganino*, which held that "[a]lthough speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169 (internal citation omitted).

Defendants' argument now that SSGA constructed Markov's collateral portfolio also makes no sense. SSGA's own CDO management philosophy was not to use "[e]xcessive CDO buckets" in managing CDOs. (¶ 182.) Although Markov had been structured by Barclays to *allow* for up to 35% of its collateral to consist of tranches from other CDOs, that did not *require* this large CDO bucket to be actually filled. (¶¶ 166, 183.) Were SSGA truly independent, SSGA, per its own stated CDO collateral management philosophy, would have selected a portfolio less reliant on CDOs. (¶¶167-68, 184, 201-03.) SSGA's refusal to take the traditional equity investment in connection with Markov evidences SSGA's disbelief in such collateral.[6]

> ### d.   Plaintiff Has Adequately Alleged that Barclays' Created a Short Position Designed to be In the Money at Plaintiff's Expense and for Barclays' Gain

Defendants argue that Plaintiff has no basis for alleging that Barclays held the short position created by the Markov asset selection, and that this failure dooms the claim. (Defs. Br. at 21.) Defendants miss the point that it is not necessarily about who ultimately held the short position, but that (i) Barclays created the short so as to be necessarily "in the money" at Plaintiff's expense, and (ii) the short itself was valuable to Barclays, either for purposes of hedging its own exposure or selling to a third party for lucrative consideration.

The Complaint clearly alleges that the Markov portfolio was selected so as to create a short position guaranteed to be "in the money." Specifically, section III of the Complaint details

---

[6]      Indeed, the only other recent instance in which SSGA declined to make an equity tranche investment in a CDO it managed can be found in the November 2006 synthetic Mezzanine CDO named Carina, which was one of the misrepresented and built to fail Constellation CDOs described in the Complaint. (¶¶116-22, 138.) As in Markov, SSGA did not make any investment in the equity tranches of Carina (¶ 144) and it secretly ceded its role and control over selecting Carina's collateral to a hedge fund, Magnetar, whose interest lay in the CDO failing rather than succeeding (¶¶138-43).

12

Defendants' true intention for and operation of Markov as a disguised proprietary trading vehicle, and the triply-disguised, rigged bet that defendants created for themselves through Markov.  *(See ¶¶ 148-264.)*  These facts include:

- Markov's basic structure that allowed Barclays to create a very large short bet through Markov against Mezzanine CDO risk.  (¶¶ 148-55.)

- Markov's structural proviso that allowed up to 35% of Markov's $2 billion collateral portfolio to consist of tranches from other CDOs (the "CDO bucket").  (¶¶ 88, 166-67, 170, 183, 201, 351.)

- The selection of collateral to (i) fill Markov's CDO bucket to maximum possible capacity, with (ii) specifically, tranches of Mezzanine CDOs.  (¶¶199-205.)

- The decision to take the overwhelming majority of such exposure synthetically (thereby generating a short position on such collateral), including particularly $550 million of Mezzanine CDO tranches.  (¶¶ 17, 88, 168, 179, 205, 254.)

- The extra step taken to ensure Mezzanine CDO failure: Barclays' creation of $300 million of bespoke built-to-fail Mezzanine CDOs - the Markov Chain CDOs - that served the dual purpose of appearing to be Markov's safest collateral when in fact it was its riskiest. (¶¶ 18, 91, 129, 162, 177, 187-88, 210-13, 242-47, 262, 275, 327-29.)

- The hidden principle underlying divergent synthetic/cash collateral selection that operated to choose  riskier, lower-rated synthetic collateral (thereby increasing the likelihood that the short bets would be won by the short party) but safer, higher-rated cash collateral (thereby increasing the likelihood that the winner of such bets could be paid in full).  (¶¶ 21, 249-52.)

The Complaint also alleges that Barclays itself was the recipient of the short position.  (*See, e.g.*, ¶¶ 149-59, 204-05, 256-64, 350 (noting Barclays' initial position as short counterparty to all $1.8 billion of Markov's synthetic collateral) and ¶¶ 259-64 (noting various options Barclays had to retain or offload its initial short positions).)[7]  Barclays denies these allegations but by doing so,

_____

[7]      Even if Barclays sold or transferred the short position to a third party, then it still necessarily received valuable consideration for it.  As the Complaint alleged, Barclays could have sold some of the $1.8 billion of credit protection that it gained from Markov (as Markov's Initial Synthetic Asset Counterparty) to a third party who would become the "short" party with respect to some of the collateral, thus leaving Barclays as a mere middleman (with a fee or profit).  (¶ 261.)  This would not be unusual: it happened in the Abacus CDO and the 26 Constellation CDOs. (*See* ¶¶ 117-20,

merely creates an issue of fact to be decided later.[8] *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 531 (S.D.N.Y. 2009) (at the motion to dismiss stage, rejecting as premature fact-based arguments that alleged misrepresentations were accurate).  Plaintiff's allegations, when viewed in their totality, support the inference that Defendants' Markov scheme was to bet against Mezzanine CDOs to Plaintiff's detriment.[9]

> ### 2. Barclays' Misleading Representations Concerning the Credit Ratings of Markov's Collateral and that Markov was a "High Grade" CDO Are Actionable

Defendants argue that Plaintiff failed to allege what credit rating agencies knew or believed about the ratings assigned to Markov's collateral and Notes.  (Defs. Br. at 22-23.)  This argument

---

139-42, 172.)  In each of these CDOs  an independent collateral manager was represented to be in charge of collateral selection, when in fact a short investor (the Paulson & Co. Hedge fund in Abacus, the Magnetar hedge fund in the Constellation CDOs) masterminded the selection.  (*Id.*)  For example, in Abacus, the SEC alleged that Paulson and Goldman constructed Abacus to be built-to-fail, on the basis of adversely-selected collateral chosen for its promise of failure, in order to allow Paulson to bet against it. When Abacus failed, Paulson's near $1 billion short bet succeeded completely.  (*Id.*)

[8]     Barclays claims the Offering Documents disclosed that it would "sell most of its 'short' position - up to 75% - to the market after closing."  Defs. Br. at 28-29 (citing Ex. A at 6, 16; B at 40).  An examination of these exhibit citations reveals no such disclosure, but even if that were otherwise, it would just add to Barclays' misrepresentations to the extent that in reality Barclays did not, as plaintiff alleges, sell off the short position.  Either way, such fact disputes are premature and accepting defendants' argument would impermissibly require the Court to resolve a factual issue against plaintiff on a motion to dismiss rather than draw all reasonable inferences in Plaintiff's favor.

[9]     *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) ("[W]e are not inclined to create a nearly impossible pleading standard when the 'intent' of a corporation is at issue...To require more...would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual. We refuse so to hold at the pleading stages"); *Ganino*, 228 F. 3d at 169 ("Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent'") (citations omitted).

14

misses the point.  The issue is not the rating agencies' representations but that Barclays knew that

such Mezzanine CDO tranches were not "High Grade" collateral no matter their credit ratings.  (¶¶

13-16, 86-91, 344-45.)[10]

Similarly, Defendants assert that Plaintiff is "foreclosed" from alleging that Defendants'

"literally true" repetition of credit ratings were misleading because of Defendants' "extensive

disclosures" in the Offering Documents.  Courts in New York, however, have repeatedly upheld

claims of fraud based on allegations that the arranging bank knowingly obtained inflated credit

ratings on CDOs and then marketed the CDOs on the basis of those ratings. *See Abu Dhabi*

*Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 177 (S.D.N.Y. 2009) (upholding

fraud claim where defendant "obtained the ratings assigned to the [Senior] Notes by the Rating

Agencies," and "provided...potential investors...[with] the alleged misleading ratings, accompanying

definitions of the ratings, and statements regarding the [Senior] Notes' safety and stability through

preliminary and final Information Memoranda."); *M&T Bank Corp. v. Gemstone CDO VII,* Ltd, No.

7064/2008, 2009 WL 921381, at *10-11 (N.Y. Sup. Ct. Apr. 7, 2009); *China Dev. Bank v. Morgan*

*Stanley & Co. Inc.*, No. 650957/2010, at 7 (N.Y. Sup. Ct. Feb. 28, 2011) attached as Hume Ex. B)

("The court is of the view that [plaintiff] has alleged in sufficient detail that [defendant] Morgan

Stanley knew the Supersenior Swap was a highly risky, if not troubled, investment and also that the

---

[10]     Accordingly, Defendants' reliance on *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 836
(S.D.N.Y. 2010) regarding the opinions of ratings agencies is entirely misplaced.  Similarly, both
*Freidus* and *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) are distinguishable
because they only alleged claims for Securities Act violations.  The requirement that opinions are
only actionable if the statement "falsely represented the speakers' beliefs at the time they were
made," is specific to claims brought under Section 11 and 12 of the Securities Act and derives from
the fact that these provisions impose "virtually absolute liability" for false statements and "do not
require allegations of scienter, reliance, or loss causation."  *Fait*, 655 F.3d at 107.

ratings process which made it appear to be safe, or even more secure than a 'AAA' rated security, was deeply flawed. These flaws are pointedly alleged to be due in part to Morgan Stanley's influence over the ratings process.").[11]

Defendants' contention that the Offering Documents fully disclosed to Plaintiff "the nature and rating of each and every asset underlying the Markov collateral, including the Mezzanine CDOs and Markov Chain CDOs" is legally and factually unavailing. (Defs. Br. at 23-24.) As a matter of law, such collateral disclosures have precluded neither (i) the SEC from bringing a series of CDO securities fraud cases (where, in each case, CDO collateral was disclosed to CDO investors),[12] nor (ii) courts from finding cognizable securities fraud claims in CDO-related actions.[13] No reasonable

---

[11]     *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("'[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.'") (citations omitted); *Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068, 2000 WL 1154278, at *7 (S.D.N.Y. Aug. 14, 2000) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.").

[12]     *See, e.g.*, ¶¶ 116-20; *S.E.C. v. Citigroup Global Markets Inc.*, No. 11 Civ. 7387, (S.D.N.Y. Oct. 19, 2011), 2011 WL 4965843 (attached as Hume Ex. C), *S.E.C. v. Tourre*, No. 10 Civ. 3229, 2010 WL 5863739 (S.D.N.Y. Nov. 22, 2010) (attached as Hume Ex. D). *See also* ¶¶ 118-20 (discussing on-line investigative journal Propublica releasing its analysis of the role of Magnetar hedge fund in 26 CDO deals in 2006 and 2007). Plaintiff cites to S.E.C. complaints to illustrate that the S.E.C. considers it worthwhile to file complaints against defendants in CDO cases despite the complaints alleging that the underlying collateral was disclosed. The Court can take judicial notice of these S.E.C complaints. *See, e.g.*, *Global Network Comm'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (court may take judicial notice of documents extraneous to the complaint filed in other courts to determine what the documents state); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.") (citations omitted).

[13]     *See generally In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 579-80 (S.D.N.Y. 2010); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 588-90 (S.D.N.Y. 2010); *In re Countrywide*

investor could have determined from the Offering Documents that Barclays effectively controlled Markov's collateral selection, and secretly used such control to serve Barclays' interest in its short interest in Markov's collateral.  (¶¶ 207-08.)  *See, e.g.*, *Dandong, v. Pinnacle Performance Ltd.* ("*Pinnacle*"), No. 10 Civ. 8086 (LBS), 2011 WL 5170293, at *14 (S.D.N.Y. Oct. 31, 2011) ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that [defendant] would select inherently risky underlying assets and short them.").

Here, there is a further unique and dispositive fact.  The Markov Chain CDOs were bespoke CDOs, which meant they were private transactions between counterparties. (¶ 214.)  The CDOs had no CUSIP numbers and information about their structure and their collateral was not available. (¶¶ 214, 223.)  Even were the standard that Plaintiff should have read one million pages to learn more about the collateral, there was no information available on the Markov Chain CDOs, which as detailed here were Markov's greatest hidden risk.  It is not reasonable for Defendants now to suggest that Plaintiff could have done its own investigation into the Markov asset mixtures to sniff out that it was being lured into a trap.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008) ("Countrywide Defendants argue that these approximately 250,000 pages of prospectuses, issued by SIVs and not Countrywide itself, put the truth on the market and thereby negate the reliance element....[T]he Court rejects a truth-on-the-market defense at the pleading stage....Countrywide's MBS were complex instruments and the prospectuses are very large documents; it is perfectly reasonable to infer that this complexity, coupled with Countrywide's alleged public misrepresentations, would blunt the effect of any disclosures in MBS' prospectuses."); *MBIA*, 700 F. Supp. 2d at 584 ("Nor is the Court persuaded that investors could have discovered the

---

*Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171-73 (C.D. Cal. 2008).

truth about the CDOs-squared through minimal diligence. Although 'an investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth,'...Defendants do not explain what 'minimal diligence' investors could have performed.") (citation omitted); *see also Gabriel Capital, L.P. v. Natwest Fin., Inc.*, 137 F. Supp. 2d 251, 262 (S.D.N.Y. 2000) (investment advisor to underwriter did not have duty to conduct independent investigation to uncover alleged material misrepresentations in statements made by underwriter in offering memorandum, when there was nothing obviously suspicious about those statements, in suit relating to alleged securities fraud).

### 3. Barclays' Misleading Representations Concerning the Superiority of Markov's Syntheic Collateral Are Actionable

Defendants argue that their statements about Markov's synthetic collateral are inactionable examples of "puffery" because they were "generalizations" upon which the investing public did not rely.  (Defs. Br. at 24-25.)  Defendants rely on *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), however, the Second Circuit there only found that "generalizations regarding [] business practices" and "routine representations" made by companies are inactionable. *Id.* at 206. Moreover, the defendant had made "generalizations" about its reputation for integrity.  *Id.* at 205-06.  The court considered those statements no more than puffery, holding that no reasonable investor would depend on such statements as a guarantee that the defendant "would never take a step that might adversely affects its reputation." *Id.* at 205.  In stark contrast, the issue here is not general "reputation" but Barclays' representations describing the benefits and superiority of structuring Markov's mostly synthetic collateral.[14]  Barclays'

---

[14]     Defendants' similarly misplace their reliance on *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 1996).  In *Lasker*, the statements at issue were so general that they could have been copied verbatim into the SEC filings of virtually any company and would have been

representations that using synthetic collateral would allow for better selection of collateral and for better collateral to be selected would be among important information looked to by investors.

In effect, Barclays was representing that credit default swaps allowed unlimited access to quality collateral, wherever it was, at mere stroke of a pen (rather than being constrained by which actual "cash" collateral was then available for purchase). In fact, this was not what credit default swap tranches were used for here. First, the collateral included, through credit default swaps, was *systematically* lower-rated than the cash collateral selected. This suggests that a short hand was at work in constructing the portfolio. By selecting lower-rated collateral to short, it was more likely that the short bet would be won. By selecting higher-rated cash collateral, it was made more likely that Markov could actually pay off on such winnings. One hundred percent of the CDOs selected for shorting were *Mezzanine* CDOs. Despite the ability to reference through credit default swaps *any* collateral, there was clear and indisputable design to reference very particular collateral: only Mezzanine CDOs. Again, this evidences a portfolio built by a shorter's hand. Had SSGA truly selected collateral for Markov in good faith, the Markov Chain CDOs were wholly unnecessary: SSGA could have simply referenced existing and safer CDOs. (¶¶ 188-89.) Defendants did not do so and separately created even riskier CDOs so as to expose Markov and its investors to inferior collateral providing the best possible short.

---

applicable without modification. One of the core statements at issue, for instance, was, "[d]iversification will play an important role in the Company's future." *Id.* at 56. Plaintiffs' failure to allege that a specific strategy was false and misleading led the court to find the statements were puffery. In contrast, plaintiff here alleges that Defendants' specific representations to the effect that using synthetic collateral would allow for better selection of collateral and for better collateral to be selected were materially misleading. (*See* ¶ 353 ("[F]lexibility to purchase unfunded synthetic assets" and one of the Markov's advantages is "[t]he use of CDS Assets enables SSGA to design a portfolio from a broader collateral than available in cash.").)

### 4. Barclays' Misleading Representations Concerning Markov's Safety and Structural Protections from Collateral Losses Are Actionable

Contrary to Defendants' assertion, (Defs. Br. at 25), Plaintiff pleads that Defendants provided Plaintiff with statistical modeling that projected performance of Markov's collateral assets in order to demonstrate that Markov's Class B tranche (*i.e.* the AA-rated tranche of Markov notes) would be protected by Markov's structure from collateral losses. (¶¶ 356-71.)   Essentially, Defendants complain that the source of this allegation is not provided.

The PSLRA, however, does not require a plaintiff to plead the sources for all allegations based on information and belief. *See* 78 U.S.C. § 78u-4(b)(1) ("...the complaint shall state with particularity all facts on which th[e] belief is formed."); *see also Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) (paragraph (b)(1) "'requires plaintiffs to plead only facts and makes no mention of the sources of these facts.'"); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478-79 (S.D.N.Y. 2004) (collecting cases). "[A] complaint can meet the new pleading requirement imposed...by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Novak*, 216 F.3d at 314. The Complaint need only "'provide an adequate basis for believing that the [D]efendants' statements were false,'" and give Defendants fair notice of the misconduct alleged. *Id.* at 480 (citation omitted). The Complaint plainly does so. (*See* ¶¶ 20, 356-71, 390-96.)

### B. Plaintiff Has Sufficiently Pled Scienter

"To satisfy the scienter requirement, a complaint must allege facts (1) showing that the defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Borochoff v. GlaxoSmithKline*

20

*PLC*, No. 07 Civ. 5574, 2008 WL 2073421, at *7 (S.D.N.Y. May 9, 2008) (Stanton J.) citing *ATSI*, 493 F.3d at 99 (emphasis added).  Here, Plaintiff satisfies both of these independent prongs.

### 1.      Plaintiff Has Adequately Pled Motive and Opportunity

Barclays had both the motive and opportunity to commit fraud, through its control of the collateral selection process, and the way in which the Markov CDO was structured. (¶ 177.)  The very nature of the CDOs contained in the CDO bucket belie any notion by Barclays that there was no motive on their part. As discussed, Plaintiff has cited ample evidence in support of its allegation that Defendants engaged a clear and systematic design to defraud Plaintiff by building the Markov CDO as one that was built to fail.  *See* discussion *supra* at 13.  When Markov's structure is examined, it is unfathomable that the collateral that comprised Markov was randomly selected.

Examining the collateral portfolio supports Plaintiff's allegations.  Markov *uniformly* took synthetic exposure to lower-rated tranches (giving Barclays a better short) but took cash exposures to higher-rated tranches (giving Markov the ability to liquidate such collateral to raise funds to pay off Barclays' short bets). (¶¶ 149-51, 246, 249-52.)  In selecting lower-rated assets as synthetic collateral, Barclays enhanced the likelihood that the collateral would fail.  Similarly, selecting higher-rated assets as cash collateral enhanced the likelihood that failure of the lower-rated synthetic collateral would cause the  cash assets' liquidation to fund Markov's short payout obligations. *Id.*

This Court's recent decision in *Pinnacle*, denying defendants' motion to dismiss plaintiffs' fraud claims, is dispositive in favor of Plaintiff on this very issue.  Plaintiffs there alleged their "principal was invested not in highly secure 'underlying assets' but in custom-made synthetic CDOs that were at best risky and possibly rigged to fail." 2011 WL 5170293,  at *11 (citations omitted).  The court found that plaintiffs had adequately pled scienter because they pled "what amounts to self-

dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created. The engineered frailty of the CDOs and Morgan Stanley's positions on both sides of the deal adequately alleges motive." *Id.* at *12 (citations omitted); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (self-dealing sufficient to establish motive). Plaintiff alleges just this sort of self-dealing by Barclays here.

Cases cited by Defendants are inapposite. In *Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 Civ. 2594, 2010 WL 1779348, at *5 (S.D.N.Y. Apr. 29, 2010), plaintiffs have not pled "any facts to suggest that the performance or selection process for the allegedly worthless assets for Octonion was materially different from the performance or selection process for the other assets in Octonion's portfolio."[15] Plaintiff in the case at bar, however, has pled with sufficient particularity that the collateral selection for the Markov CDO ran afoul of SSGA's very own guidelines concerning collateral selection (¶¶ 182-84), evidencing that SSGA was not in fact controlling the selection of Markov's collateral portfolio. Further evidence: SSGA did the very same in its role as collateral manager with respect to the Carina CDO. (*See* ¶¶ 137-44.)

Barclays' motive is further evidenced by its own conduct concerning the Corvus CDO. (*See* ¶¶ 124-36.) This near-identical scheme that Barclays perpetrated to defraud investors through the use and creation of synthetic CDOs is relevant and admissible evidence as to Barclays' motive with respect to the Markov CDO. *See, e.g.*, *United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) (evidence

---

[15]     Similarly, in *Footbridge*, 2010 WL 3790810, at *4, the court "note[d] at the outset that this [was] *not* a case where *risky*, subprime mortgage-backed securities *were inserted into a structured investment product without adequate disclosure*. Plaintiffs *acknowledge[d]* that they 'knew, and do not deny, that the loans they purchased were risky.'" (emphasis added) (citations omitted). That case has no application to the polar opposite facts and events that occurred here.

directly relevant to showing motive plainly admissible under Federal Rules of Evidence ("FRE") 404(b)); *United States v. Semak*, 536 F.2d 1142, 1145 (6th Cir. 1976) ("The rationale behind this exception to the rule excluding evidence is that the recurrence of similar acts incrementally reduces the possibility that the given instance of illegal possession is the result of inadvertence, mistake, or other innocent event.").

Moreover, Plaintiff here is not alleging a general, everyday "corporate motive" that every company possesses. (Defs. Br. at 28.) Plaintiff instead alleges a highly technical scheme by Barclays and SSGA deliberately designed to defraud investors. *See, e.g.*, *Pinnacle*, 2011 WL 5170293, at *12 (plaintiffs pled more than just generalized motive when what they pled amounted to self-dealing where bank was betting against, or "shorting," the synthetic CDOs that it had itself created). Nowhere do any cases cited by Defendants state that "the appearance of corporate profitability or the success of an investment" can be achieved by fraudulent means *S. Cherry St. LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Rather, courts have long recognized the probative value of such a motive to profit on a discreet transaction as evidence of fraud, akin to Barclays' motive with respect to the Markov CDO here.[16] Here, Defendants engaged in a zero-sum-game where every dollar lost by Plaintiff was gained by Barclays. Through Markov, Defendants bet *against* Plaintiff, and set up the terms of the bet so that they could not lose. This "transcends a generic corporate desire," *SLM Corp.*, 740 F. Supp. 2d at 558, to profit, and instead, evidences a deceitful plan to cheat

---

[16]     *See Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 92 (D.P.R. 2010) (denying motion to dismiss where investors relied on corporation's desire to inflate the stock price in order to accomplish a specific stock offering as evidence of scienter); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010) (plaintiffs' allegation that defendants stood to benefit from the artificial inflation of share prices to effectuate a merger was sufficient to give rise to the inference of scienter).

innocent investors with the proceeds going straight into Barclays' pockets. *See Pinnacle*, 2011 WL 5170293, at *12.[17]

### 2.    Plaintiff Has Adequately Pled Conscious Misconduct

Wholly independent of motive and opportunity, the Complaint's allegations give rise to a strong inference that Defendants knew, or recklessly disregarded, that the Markov CDO was designed as an instrument to transfer Plaintiff's principal to Defendants. The strong inference alleged in this case could not get any stronger. Plaintiff has throughout its Complaint pointed to particularized facts and detailed evidence in support of its allegations that a hand guided by very specific intentions constructed Markov's portfolio to ensure Markov would fail. The structure of Markov as a built to fail CDO, and the systematic design principles employed by Defendants in achieving that result, reveals Defendants' plan to defraud Plaintiff, and more than satisfies the "strong inference" standard.

Defendants do not and cannot contend that they were required under the Offering Materials to have specially created the bespoke Markov Chain CDOs for use solely in connection with Markov. Through credit default swap technology, Defendants - at the stroke of a pen - could have referenced already extent CDOs that required no work or cost to create. Doing so would have been quicker, easier, and cheaper, but would have eliminated Barclays' ability to tailor the Markov CDO to fail. This is the only plausible and rational explanation of the events that took place. Nor can

---

[17]     Motive is not necessarily required for a finding of scienter. *See In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 266 (S.D.N.Y. 2010) ("[E]ven when motive is lacking, plaintiffs may establish a 'strong' inference of scienter, under Second Circuit case law, by 'alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'") (citations omitted); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490-91 (S.D.N.Y. 2010) (lack of motive not fatal to finding of scienter; finding defendant and corpoartion acted recklessly when defendant falsely spoke positively about company matters despite being aware of significant problems related to such matters).

Defendants explain, in any way other than conscious misconduct, the damning rating/risk disparity between Markov's synthetic collateral (providing the shorts) and its cash collateral.  The assets in Markov that were shorted were lower-rated (riskier) than the assets that were not used to generate short positions.  There is and can be only one explanation for this systemic design: riskier synthetic assets were chosen so that the short bets would be won and safer cash assets to ensure that such would actually pay off.  (*See* ¶¶ 21, 249-52.)

Courts are clear that the "conscious misbehavior" scienter standard is met when plaintiffs have pled that defendants knew of the false or misleading conduct by virtue of their position with respect to the transaction. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (finding scienter where "plaintiffs plead in detail how [defendant], as the underwriter of the CDOs it held, knew the inputs and assumptions that went into creating these assets and thus was in the best position to recognize the threats they faced as the subprime mortgage market deteriorated"); *Shahzad v. Meyers*, No. 95 Civ. 6196, 1997 WL 47817, at *8 (S.D.N.Y. Feb. 6, 1997) ("[A] fair inference can be drawn by the Court that if the Defendants were the underwriter, market maker, and owner, that the Defendants had knowledge that their representations were false.").

Barclays' prior conduct with respect to the Corvus CDO is as relevant in evidencing Barclays' knowledge about the design of the Markov CDO as it is in evidencing motive. *See, e.g.*, *Global Intellicom, Inc. v Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *9 (S.D.N.Y. July 27, 1999) (allegations by the plaintiffs that the defendants had an incentive to short-sell stock due to a favorable conversion ratio, that they could do so without detection, and that they had a long history of orchestrating similar schemes in other companies that they had financed, satisfied the burden for pleading scienter in the Second Circuit). Defendants provide no competing

25

narrative of innocence.  Plaintiff respectfully submits it has adequately pled Barclays' undeniable motive, which, coupled with Barclays' blatant conscious misconduct, is not only sufficient to satisfy the PSLRA's scienter pleading requirements but is in fact, the only inference that can be "rationally drawn from the facts alleged."  *S. Cherry St.*, 573 F.3d at 111 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).[18]

### 3.    SSGA's Scienter

SSGA's scienter was likewise adequately pled and is logically necessary.  (*See* ¶¶ 265-303.) SSGA's abdication of collateral selection responsibilities was not a matter that occurred behind SSGA's back.  The only one not in on it was Plaintiff.  Plaintiff additionally alleges that SSGA knowingly ceded control over the collateral selection process, as that was then the "price of the ticket" to the lucrative collateral manager business.  (*See* ¶ 176.)

SSGA's cooperation with Barclays in carrying out the elaborate scheme to defraud investors was a critical factor in causing Plaintiff's resulting harm.  SSGA's representations concerning its purported CDO collateral management practices and procedures were not harmless or inconsequential representations, as Defendants would lead this Court to believe; rather, those material representations that SSGA's conduct rendered misleading are the very basis that forms SSGA's scienter.  *See, e.g.*, *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2009 WL 3380621, at *12 (S.D.N.Y. Oct. 19, 2009) ("There is considerable authority for the proposition that

---

[18]    Even if this court finds that none of Plaintiff's indicia of scienter taken alone suffices to raise the inference, many cases make clear that all of Plaintiff's allegations are to be taken together to determine whether the totality of allegations might give rise to the inference. *See, e.g. Tellabs*, 551 U.S. at 325 ("[A]llegations must be considered collectively"); *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *4 (S.D.N.Y. Aug. 1, 2005).

a company's failure to follow an internal policy can form the basis of an inference of recklessness.")
(quoting *In re Sadia*, 643 F. Supp. 2d at 532 n.79); *In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63,
77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice
can form the basis for proof of recklessness."); *Novak,* 216 F.3d at 311 (defendants "knowingly
sanctioned procedures that violated the Company's own markdown policy").

Further evidence bolstering SSGA's scienter as collateral manager with respect to the
Markov CDO is SSGA's own prior conduct when it abdicated its purported collateral manager role
with respect to the Carina CDO in November 2006. Just as in Markov, SSGA's represented
collateral manager role in Carina was false: another party, with an adverse interest in the collateral
(it would profit were the collateral to fail) secretly selected Carina's collateral. (¶¶ 66, 137-44, 303.)
Here too, instead of protecting Plaintiff as it had represented it would do, to remain afloat and a
player in those volatile times, SSGA knowingly participated in the fraud, as it had done so in the
past. *See, e.g., Global Intellicom*, 1999 WL 544708, at *9.

### C.   Plaintiff Has Adequately Pled Reliance

Lastly, Defendants argue that Plaintiff has not adequately pled reasonable reliance.  (*See*
Defs. Br. at 34-37.)  As an initial matter, this Court has held that the issue of reliance is "intensely
fact-specific and generally considered inappropriate for determination on a motion to dismiss."
*Maloul v. Berkowitz*, No. 07 Civ. 8525, 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008).[19]  This

---

[19]    *See Jaquith v. Newhard*, No. 91 Civ. 7503, 1993 WL 127212, at *15 (S.D.N.Y. Apr. 20,
1993) ("[T]he reasonableness of the reliance cannot be resolved on a motion to dismiss."); Hume
Ex. B (*China Dev. Bank v. Morgan Stanley & Co. Inc.*, No. 650957/2010, at *11 (N.Y. Sup. Ct. Feb.
28, 2011) (reliance is fact intensive inquiry "not best determined at the pleading stage")).

case is no different.  The reasonableness of Plaintiff's reliance should not be resolved prior to the development of a full record.

In this case, Plaintiff's Analytical Review demonstrates actual reliance.  In its Analytical Review, Plaintiff reiterated many of the misrepresentations and misleading statements that form the basis of the Complaint, thereby directly establishing reliance.  (*See* ¶¶ 377, 379-83, 390-96.)

Defendants have in essence alleged a "truth on the market" defense: specifically, that because Plaintiff "was provided with comprehensive materials concerning the structure of the CDO," Plaintiff's reasonable reliance is purportedly negated.  The case law and the SEC's series of CDO securities fraud suits suggest the law is otherwise.  *See, e.g., M&T Bank Corp.*, 2009 WL 921381, at *11 ("In the absence of specific language…addressing the complaints by Plaintiff with respect to the quality of the collateral and the adequacy of [defendant's] underwriting, the disclaimers in the documents do not negate the reliance factor as a matter of law."); *MBIA*, 700 F. Supp. 2d at 581 (in denying motion to dismiss, court, inter alia, rejected defendants' "truth-on-the-market" argument that plaintiffs knew the truth about the CDO and its collateral and held that the defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint"); *In re Citigroup Bond Litig.*, 723 F. Supp. 2d at 591 (denying motion to dismiss based on "truth on the market" defense where defendants "point to nothing that could allow the Court to find at this stage that sufficiently specific information about [defendants'] CDO holdings was already in the public domain as to defeat plaintiff's claim as a matter of law"); *Ganino*, 228 F.3d at 168 ("Even assuming that [defendants'] disclosures were factually accurate, we cannot decide on the present record whether those disclosures were conveyed with sufficient 'intensity and credibility' as to dispel the false

impression created by [defendants'] alleged misrepresentations."); *see also* Hume Exs. C and D (SEC complaints).

Defendants consistently concealed that: (1) Barclays was selecting the collateral; and (2) Barclays was short the entire time. This was additional, material, information that Plaintiff did not know, and could not have discovered. *See Nathel v. Siegal*, 592 F. Supp. 2d 452, 465-66 (S.D.N.Y. 2008) (investor justified in relying on a misrepresentation where documents not readily available). Defendants' cases are therefore irrelevant.[20]

Moreover, to infer that the burden was on Plaintiff to pore over every minute detail in a case such as this involving highly complex instruments for the remote possibility it would have detected Defendants' fraud is beyond unreasonable. *See, e.g.*, *In re Countrywide.*, 588 F. Supp. 2d at 1160 ("Countrywide's MBS were complex instruments and the prospectuses are very large documents; it is perfectly reasonable to infer that this complexity, coupled with Countrywide's alleged public misrepresentations, would blunt the effect of any disclosures in MBS' prospectuses."). Such an argument should be rejected at the pleading stage.

It follows, therefore, that whether Plaintiff was a sophisticated investor or otherwise is of no consequence given the nature of the fraud alleged. *See Pinnacle*, 2011 WL 5170293, at *14 ("[E]ven a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not

---

[20]     *See, e.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F. 3d 189, 195 (2d Cir. 2003) (plaintiff *had* prior notice of the existence of material facts but did not insist that representation be included in the final written stock purchase agreement); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2004 WL 2072536, at *8 (S.D.N.Y. Sept. 14, 2004) (plaintiff chose not to investigate the information *available to it* prior to its purchase of security).

have known that Morgan Stanley would select inherently risky underlying assets and short them.").[21] Similarly, any analysis of the Markov CDO carried out by Eastern Financial at the time of entering into the transaction was rendered meaningless when the nature of the fraud was revealed. No amount of analysis would have uncovered Defendants' complex fraud.

The patchwork of general disclosures that Defendants cobble together also does not come close to tracking the substance of Defendants' misrepresentations and omissions. *See Caiola*, 295 F.3d at 330 ("A disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation."); *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24, 27 (S.D.N.Y. 2002) (applying New York law, noting that a disclaimer must be sufficiently specific to provide a "clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim").  In fact, a New York court recently rejected a defendant bank's attempt to negate reliance based on similar disclaimers where, like here, a bank had engaged in fraud and "skillfully covered it up."  *See* Hume Ex. B (*China Dev. Bank*, 650957/2010, at 9-10 (rejecting disclaimers which stated that investor: (1) was not relying on Morgan Stanley's statements; (2) assumed the risks for the transaction; and (3) would conduct its own due diligence in connection with its investment)).[22]

---

[21]      In any event, Plaintiff's "sophistication as [an] investor does not presumptively negate a finding of reliance."  *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 599 (S.D.N.Y. 2008). *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) ("[C]hartists of Wall and Bay Streets are also 'reasonable' investors entitled to the same legal protection afforded conservative traders."); *cf. Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 89 F. App'x 287, 294-95 (2d Cir. 2004) ("Sophisticated entities can justifiably rely on fraudulent statements.").

[22]      *See also Caiola*, 295 F.3d at 330 (reliance reasonable despite disclaimers that plaintiff would not rely on defendant's advice or recommendations, that plaintiff would make its own investment decisions, and that defendant was not a fiduciary or advisor); *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, No. 02 Civ. 1212, 2002 WL 31426310, at *6 (S.D.N.Y. Oct. 29,

Consequently, contrary to Defendants' allegations, there was no "unequivocal warning" whatsoever of the real risks involved. *Cf. Feinman v. Schulman Berlin & Davis*, 677 F. Supp. 168, 170-71 (S.D.N.Y. 1988) (investors were "unequivocally warn[ed]…of the risks involved"); *see also Kosovich v. Metro Homes, LLC*, No. 09 Civ. 6992, 2009 WL 5171737, at *4 (S.D.N.Y. Dec. 30, 2009) ("offering materials *unambiguously* demonstrate[d] the *true nature* of the investment") (emphasis added). Indeed, it strains credulity that Plaintiff did not rely on Defendants' failure to disclose that Defendants stacked the Markov CDO to benefit Defendants at Plaintiff's expense. As numerous courts, including the Supreme Court, have observed: "[I]t is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47.

Plaintiff relied on Defendants' misrepresentations that SSGA would select collateral that gave Markov the best chance of succeeding without any knowledge (nor means to obtain it) that in contrary fact collateral was selected by a party other than represented and on the opposite basis than the one represented. Plaintiff's reliance on these misrepresentations caused its loss, as Barclays intended, given that this loss was Barclays' direct gain. Plaintiff therefore submits it has demonstrated reasonable reliance in the circumstances of this case.

### D.     Plaintiff Has Sufficiently Pled Section 20(a) Claims

Plaintiff asserts control person liability claims against Barclays Bank PLC (BBPLC), State Street Bank & Trust Company (SSBTC), and State Street Corporation. (*See* ¶¶ 411-18.) Allegations of control need not be "extremely detailed" to withstand a motion to dismiss. *In re*

---

2002) (reliance reasonable despite disclaimers that neither party was relying on advice of other, that plaintiff was evaluating transaction and was making its own decision to enter into transaction and that defendant was not acting as fiduciary or financial advisor).

*Parmalat Sec. Litig. (Parmalat I),* 383 F. Supp. 2d 616, 627 (S.D.N.Y. 2005) ("While these allegations of control perhaps are not extremely detailed, they do not need to be at this stage."). The control person inquiry is "fact-intensive... and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane,* 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (citation omitted). Plaintiff's allegations are nevertheless sufficient to state a section 20(a) claim against all three defendants.

Control person liability requires that the following elements be satisfied: (a) a primary violation of the securities laws and (b) control by the defendant over the primary violator. *See In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) ("[T]he lack of culpable participation is an affirmative defense to be pleaded and proved by defendants, not an essential element of a plaintiff's *prima facie* case."); *In re WorldCom, Inc. Sec. Litig.,* 294 F. Supp. 2d 392, 415 (S.D.N.Y.2003) ("[P]laintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a).")[23]

Plaintiff has demonstrated a primary violation, *see* section II *supra,* thus the only remaining issue is control.  "To plead control over a primary violator, a plaintiff must allege that the defendant

---

[23]     Defendants citations to *MBIA*, 700 F. Supp. 2d at 598 and *Kalin v. Xanboo, Inc.* 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007) are thus inapposite because the burden is not on Plaintiff to plead culpable participation at the pleading stage (see cases, above). Even if pleading culpable participation is required, Plaintiff has adequately alleged it in the Complaint by alleging that State Street Corporation "should have known" of the fraud by virtue of its position as parent company. *See, e.g.*, *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 190 (S.D.N.Y. 2003) ("Here, plaintiffs have sufficiently pled facts supporting an inference of Hannezo's culpable participation by virtue of his position as CFO and his responsibility for approving Vivendi's false financial statements, when he knew or should have known of facts indicating that these statements were inaccurate and misleading."). Defendants do not raise this issue with respect to BBPLC or SSBTC.

possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 451 (citations omitted).  Plaintiff need only prove that the Defendants had the "potential" to control the primary violator. *Freudenberg v. E\*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 205 (S.D.N.Y. 2010) ("a plaintiff need only plead facts which support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator."); *CompuDyne ,* 453 F. Supp. 2d at 829 ("control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof").

Plaintiff has pled with particularity the "control" of all three Defendants. (*See* ¶¶ 36-38; 411; 416-18.)[24]  Plaintiff has alleged that all three Defendants are liable as control persons by virtue of their positions as parent companies, who undoubtedly have the potential to control subsidiaries, particularly given that they share a common address and have common officers with their subsidiaries. (¶ 36-38.) *See, e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310 n.219 (S.D.N.Y. 2005) (collecting cases where control may be inferred by reference to the position of the control person);[25] *see also In re Indep. Energy Holdings, PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770

---

[24]     If Plaintiff's 10(b) claim is successful, Defendants concede that Plaintiff has adequately alleged section 20(a) control person liability against BBPLC and SSBTC, given Defendants have raised no further issue with respect to section 20(a) liability for these two defendants.

[25]     Even if the Court finds that Plaintiff has not proved actual control, Plaintiff submits it "can develop a record that would support a finding of control." *See In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910, 2005 WL 2990646, at *8 (S.D.N.Y. Nov. 7, 2005); *see also In re Alstom SA*, 406 F. Supp. 2d 433, 503 (S.D.N.Y. 2005) ("[E]ven if the specific facts alleged by plaintiffs, taken alone, would not be enough to establish actual control over the [primary violator], dismissal is improper as long as it is at least plausible that plaintiff could *develop* some sort of facts that would pass muster.") (citations omitted).

(S.D.N.Y. 2001) (finding control based on common management). Plaintiff has thus satisfied the pleading requirements required to allege section 20(a) claims against all three defendants.

### E.    Plaintiff's Exchange Act Claims are Not Time-Barred

Exchange Act claims must be brought within the earlier of two years after the discovery of the facts constituting the violation, or five years after the violation. 28 U.S.C. § 1658(b).  Plaintiff commenced this case within two years of their discovery of the facts necessary to apprise them of their claims here and less than 5 years from the fraud itself, which occurred in 2007.  Defendants argue that Plaintiff should have known of the fraud either at the time they entered into the transaction, or at the latest when Plaintiff suffered a total loss.  (Defs. Br. at 37.)  When Plaintiff purchased the Notes on June 12, 2007, it could not have known Defendants had intentionally misrepresented or omitted information about the collateral selection process for example.  The offering documents and collateral lists given to Plaintiff did not telegraph Defendants' intent to deceive and, "until the Plaintiff has uncovered...enough information about the defendant's knowledge or intent to satisfy [the] pleading standard, he has not 'discovered' the fact of scienter, and the statute of limitations cannot begin to run."  *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).[26]

Defendants' citations to *Brecher v. Citigroup Inc.*,  No. 09 Civ. 7359, 2011 WL 2209145 (S.D.N.Y. June 7, 2011) and *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) are misplaced. In *Brecher*, the court arrived at its conclusion because the very information alleged to have been

---

[26]     *See also Law v. Medco Research Inc.*, 113 F.3d 781, 786 (7th Cir. 1997) ("[T]oo much emphasis on the statute of limitations can precipitate premature and groundless suits, as plaintiffs rush to beat the deadline without being able to obtain good evidence of fraud ... In a fraud case, [the plaintiff] needs to know more: that the defendant has made a statement that was *knowingly* false. When the plaintiff knows or should know this, the statute of limitations begins to run.").

misrepresented or withheld was announced in disclosures sent to the Plaintiff. 2011 WL 2209145, at *9. As previously discussed above, Defendants made numerous misrepresentations about Markov which were not properly disclosed. In stark contrast to *Brecher*, the truths about misrepresentations were nowhere in any of the offering documents or in any further disclosures from the Defendants.

*Armstrong* is inapposite because there, a well-publicized SEC action and a "tortuous [fourteen year] history of the Fund" put plaintiffs on notice of fraud. 699 F.2d at 88. Here, by contrast, Plaintiff contends that the April 2010 SEC action regarding Goldman Sachs' CDO related misconduct is what alerted it to the possibility of Barclays' fraud here – and Plaintiff brought this case about a year from learning of that action. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 592 (2d Cir. 1979) ("[I]n determining whether [Plaintiff] exercised due diligence in his attempt to discover the participation of [Defendant], it is significant that it was not until 1976 that the SEC was able to name these accountants as participants in the fraud....If the SEC with its commendable expertise and specialized investigative teams was unable to discover the complicity of these accountants until shortly before ... September 1, 1976, it cannot be said as a matter of law that [Plaintiff] should have discovered their participation any earlier.").

Defendants argue that the dates of Markov's default and liquidation are relevant to this issue. (Defs. Br. at 37.) However, "because the storm warnings must be 'directly' related to the alleged fraud ... publicized financial pitfalls, on their own, are insufficient to put a reasonable investor on inquiry notice." *In re Polaroid Corp. Sec. Litig.*, 465 F. Supp. 2d 232, 242 (S.D.N.Y. 2006) (citations omitted). A financial loss can occur for legitimate market reasons – as Defendants contend is the case with Markov. (Defs. Br. at 1, 4, 12.) Investors are not on notice of a fraud merely by the occurrence of a loss. Here, the fraud was not a failure to disclose Markov's failure, but rather,

the reason for the failure – *i.e.* that Barclays built Markov to fail. *See Robertson*, 609 F.2d at 591 (denying motion to dismiss, the court observed that an investment's "rapid decline...also might well be attributed to a myriad of other causes, including, but not limited to, embezzlement, unfavorable market conditions, poor management or fraud"); *see also Fujisawa Pharmaceutical Co, Ltd. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997) (facts constituting notice must "sufficiently advanced beyond the stage of a mere suspicion.").

## III.   PLAINTIFF HAS ADEQUATELY PLED STATE LAW CLAIMS

### A.   Fraud Based Claims

Common law fraud claims are governed by Federal Rules of Civil Procedure 9(b). Under Rule 9(b), "plaintiffs are ... required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent" but "scienter need not be alleged with great specificity." *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 619-20 (S.D.N.Y. 2010). Rather, courts are "lenient in allowing scienter issues to withstand [motions to dismiss] based on fairly tenuous inferences." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009); *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 111 (E.D.N.Y. 2009) (*citing DDAVP Direct Purchaser*) (same); *see also In re Vivendi Universal*, *S.A. Sec. Litig.*, No. 02 Civ. 05571, 2004 WL 876050, at *2 (S.D.N.Y. Apr. 22, 2004) ("Plaintiffs' common-law claims, which are not based on violations of the Exchange Act, are not subject to the PSLRA's pleading standards. Allegations of fraud and fraudulent concealment must meet the standards of Rule 9(b); allegations of breach of contract, breach of warranty, unjust enrichment, and negligent misrepresentation need only meet the standards of Rule 8(a).").

Scienter may be established either "(a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307. Here, Plaintiff satisfies both of these independent prongs.

First, as previously described *supra*, section II.B.1, Barclays had both the motive and opportunity to commit fraud through its control of the collateral selection process and the way in which the Markov CDO was structured. (¶¶ 88, 166-67, 177, 199-205.) Markov's basic structure allowed Barclays to create a very large short bet through Markov against Mezzanine CDO risk. (¶¶ 148-55.) The structural composition of the Markov portfolio demonstrates its design for failure. Motive and opportunity is further demonstrated by underlying divergent synthetic/cash collateral selection that operated to choose riskier, lower-rated synthetic collateral (giving Barclays a better short) but safer, higher-rated cash collateral (giving Markov the ability to liquidate such collateral to raise funds to pay off Barclays' short bets). (¶¶ 149-51, 249-52.) *See, e.g.*, *Pinnacle*, 2011 WL 5170293, at *12 (finding motive sufficiently plead for fraud claim where plaintiffs "pled what amounts to self—dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created.").

Second, as detailed *supra,* section II.B.2, the Complaint's allegations give rise to a strong inference that defendants knew, or recklessly disregarded, that the Markov CDO was designed to ensure Markov's failure. The structure of Markov as a built to fail CDO and the systematic design principles Defendants employed in achieving that result reveals Defendants' plan to defraud Plaintiff.

Defendants' assert that Plaintiff's claims fail because of disclaimers in the Offering Documents. (*See* Defs. Br. at 40.) Defendants point to disclaimers stating that the Plaintiff (i) was relying on the offering documents alone not the Defendants' extrinsic statements; (ii) made its own

37

decisions based on its own judgments; and (iii) was sophisticated and understood the transaction. (Defs. Br. at 40.)   These disclosure are not specific enough to show that the Plaintiff had knowingly disclaimed the specific risk underlying the fraud.

As set forth *supra*, section II.A,  these supposed "disclosures" were woefully inadequate. To summarize, Defendants misrepresented: (i) the role of the collateral manager (¶¶ 265-76, 287); (ii) the process that would be used to evaluate collateral (¶¶ 271-89); and (iii) the role of the underwriter, in that the Defendants' statements did not reveal anything regarding control over the collateral selection process and that the underwriter would stay on as the short party in the transaction ( ¶¶ 290-96).

Defendants essentially try to avoid fraud liability by pointing to boilerplate warnings and disclosures.  A general disclaimer, however, will not protect against a fraud claim.  The Second Circuit has stated that a disclaimer must touch the specific representation alleged to be fraudulent. *See Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) ("[T]he mere general recitation that a guarantee is 'absolute and unconditional' is insufficient ...where specificity has been lacking, dismissal of the fraud claim has been ruled inappropriate.") (citations omitted); *see also JPMorgan Chase*, 189 F. Supp. 2d at 27 (applying New York law and noting that a disclaimer must be sufficiently specific to provide a "clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim").[27]

---

[27]    *See also Barneli & Cie S.A. v. Dutch Book Funds, SPC, Ltd.*, No. 600871/2008, 2010 WL 3504780, at *9 (N.Y. Sup. Ct. Aug. 9, 2010) (risk disclosure memorandum held not enforceable as a disclaimer because it did not mention logarithms, which is what was misrepresented); *Eternity Global*, 2002 WL 31426310, at *6 (disclosures that Defendant was not a fiduciary, acting as financial advisor and there was no reliance on Morgan Stanley's advice held to be too general to disclaim against fraud claim based on Morgan's description of the secondary market).

In the CDO context, it has been held that general disclaimers will not overcome fraud claims where "Defendants have proffered nothing to suggest investors 'were placed on guard' about anything approximating the alleged fraud ... even a sophisticated investor armed with a bevy of accountants, financial advisors, and lawyers could not have known that Morgan Stanley would select inherently risky underlying assets and short them." *Pinnacle*, 2011 WL 5170293, at *14; *see also MBIA Ins. Co. v. Royal Bank of Canada,* No. 12238/09, 2010 WL 3294302, at *6, 33 (N.Y. Sup. Ct. Aug. 19, 2010) (denying motion to dismiss fraud claim where plaintiff alleged defendant bank had "superior knowledge and expertise" of the collateral underlying the CDOs that did not warrant CDOs' AAA rating and finding sufficient plaintiff's allegation that RBC possessed "access to crucial loan information" that the plaintiff could only "discover through extraordinary effort or great difficulty).

Nor can disclaimers avoid responsibility for misrepresentations in the offering documents themselves. *See CRT Investments, Ltd. v. Merkin*, 918 N.Y.S.2d 397, at *7 (Sup. Ct. 2010), *aff'd sub nom. CRT Investments, Ltd. v. BDO Seidman, LLP*, 925 N.Y.S.2d 439 (App. Div. 2011) (disclaimer that "the investor, acknowledges that it has made an independent decision to invest in the Fund and that, in making its decision to subscribe...[CRT] has relied solely upon the Fund Documents and independent investigations made by [CRT]' and that it was not relying upon the Fund or [defendant] with respect to the legal, tax and other economic considerations involved in this investment...This disclaimer, however, while it may preclude reliance upon certain oral promises, it will not bar an assertion of fraud premised upon fraudulent misrepresentations in the offering documents themselves") (citations and quotations omitted).

Defendants' reliance on *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419 (N.Y. App. Div. 2011), Defs. Br. at 41, is misplaced because the case notes that the decision turned on misrepresentations regarding the collateral that MBIA was insuring and "the undisputed fact that the information was not exclusively in defendants' possession." *Id.* at 419. As pled in the Complaint, there is no reasonable investigation that could have revealed that SSGA was ceding effective control over the collateral selection process to Barclays. Moreover, in depth information regarding the Markov chain, the particularly fragile collateral whose failure alone could, and did, bring down the entire Markov CDO, was only in Defendants' control. (¶¶ 214-23.)

The *Pinnacle* case is more on point than *MBIA*. There, Judge Sand held that disclosures that made by defendant Morgan Stanley that it *may* be adverse to a CDO's note holders was insufficient where Morgan Stanley was alleged to have built CDO to fail. "'General risk disclosures in the face of specific known risks which boarder on certainties' are not sufficient to defeat securities fraud claim.'" *Pinnacle,* 2011 WL 5170293, at *21 (quoting *In re Prudential Sec. Inc. Ltd. P'ships. Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

In short, Plaintiff's allegations, when viewed in their totality, support the inference that Defendants' Markov scheme was all about betting against Mezzanine CDOs and Mezzanine CDO risk to Plaintiffs' detriment.

### B.    Negligent Misrepresentation

"A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O. Acq. Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007) (citations omitted).

40

1.     **The Relationship between Plaintiff and SSGA Imposed a Duty upon SSGA to Impart Accurate Information to Plaintiff**

a.     **Special Relationship**

"Whether a special relationship exists between two parties is an issue of fact, to be governed by weighing three factors: whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 366 (S.D.N.Y. 2002) (citing *Kimmell v. Schaefer*, 675 N.E.2d 450, 453-54 (N.Y. 1996)).[28]

Plaintiff alleges a special relationship with SSGA. Defendants' representations that SSGA would serve as Markov's collateral manager and as the selector of Markov's collateral portfolio was crucial to investors' understanding of Markov.  Central to the Markov transaction was that Plaintiff surrendered control of its funds to SSGA, who, as collateral manager, had complete and unfettered authority to invest those funds without any input from Plaintiff.  (¶¶ 56-59, 269-73.)  SSGA held, or appeared to hold, special expertise in its role as collateral manager for the Markov CDO. In the

---

[28]     *See also Century Pac., Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258, 2004 WL 868211, at *8 (S.D.N.Y. Apr. 21, 2004) (finding special relationship was adequately pled after recognizing that courts have found a special relationship and duty, for example, where defendants sought to induce plaintiffs into a business transaction by making certain statements or providing specific information with the intent that plaintiffs rely on those statements or information); *Wells Fargo Bank*, 247 F. Supp. 2d at 367 ("Since the determination of whether a special relationship exists is essentially a factual inquiry, we will assume for present purposes that these somewhat sparse allegations suffice, at least at the pleading stage, to survive a motion to dismiss"); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103-04 (2d Cir. 2001) (despite a special relationship of trust being sparsely pled, the Court found that the other two factors in *Kimmell* were alleged strongly enough to overcome a motion to dismiss: that defendants "appeared to possess-and held themselves out as possessing-special knowledge" and that "defendants knew that plaintiffs sought information...to aid their investment decision and defendants supplied it for that purpose").

Offering Documents, SSGA referenced its expertise and record in CDO collateral management and represented that Markov's performance would be "highly dependent on the financial and managerial experience of certain individuals associated with" SSGA. (¶¶ 269-73, 285, 446.)

Defendants also described at length the purported bases for Markov's collateral selection, which boil down to the representation that SSGA would apply considerable rigor, diligence, and expertise so as to select collateral most likely to perform well. (¶¶ 278-86.) Indeed, Defendants' special expertise with respect to complicated derivative transactions such as synthetic CDOs, dwarfs the expertise of the Plaintiff here. *See M&T Bank Corp.*, 2009 WL 921381, at *13 (collateral manager for the assets underlying CDO had sufficient "unique or special expertise" in CDOs to support a claim against it for negligent misrepresentation). Moreover, through the Offering Documents, SSGA made misrepresentations to Plaintiff knowing it was a potential investor in the Markov CDO and that these representations would be material to their investment. (¶ 272-73, 446-50.) *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. N.Y.,* 375 F.3d 168, 187 (2d Cir. 2004) ("There must be knowledge or its equivalent on the defendant's party that the information is desired for a serious purpose, that the plaintiff intends to rely and act upon it, and that if the information if false or erroneous he will suffer injury.") (quotations and citations omitted).

As the existence of a duty is typically a question of fact, the allegation that a defendant with knowledge as to the actual truth purposefully made misrepresentations to induce the plaintiff to take action in reliance thereon is sufficient to survive a motion to dismiss. *Suez Equity Investors*, 250 F.3d at 103-04; *see also EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 280 (S.D.N.Y. 2004) (finding a special relationship and duty exists where defendant sought to induce plaintiff into a business transaction by making certain statements or providing specific information

42

with the intent that plaintiffs rely on those statements or information) and *M&T Bank Corp.*, 2009 WL 921381, at *13 (collateral manager for the assets underlying CDO had sufficient "unique or special expertise" in CDOs to support a claim against it for negligent misrepresentation).

Here, Plaintiff alleges that SSGA not only had  past business experience and expertise like that possessed by the *Kimmell* defendant, but that this record of CDO collateral management and the experience of being the world's largest asset manager were material to investors such as Plaintiff. (¶¶ 269-74, 285-89.) The statements in the Offering Documents were made to Plaintiff as a potential investor in order to reduce reliance and, as SSGA should have expected, Plaintiff relied on these statements and believed that SSGA had unique professional ability or expertise. (¶¶ 379-83.)

### b.    Privity

"Recovery may be had for pecuniary loss arising from negligent representations where there is privity of contract or a relationship so close as to actually approach privity." *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 424 (1989).  Privity will be established between plaintiff and the defendant where defendant has surrendered its professional independence to one in privity with the plaintiff. Plaintiff alleges that SSGA surrendered its independence as collateral manager to Barclays, who actually selected the assets for Markov so as to ensure its failure. *See Bank of Tokyo Trust Co. v. Friedman*, 602 N.Y.S.2d 125, 125 (App. Div. 1993) ("We also note that since the record indicates that defendants were not 'independent' accountants for the company, but were in fact 'internal' accountants/bookkeepers of the company, and as such were de facto employees of said company, thus establishing privity sufficient to support a cause of action for negligent misrepresentation.") (emphasis added) (citations omitted). *Cf. In re Durso Supermarkets, Inc.*, No. 94 Civ. 6035, 1995 WL 739549, at *9 (S.D.N.Y. Dec. 14, 1995) (Stanton, J.) (holding that

43

*Bank of Tokyo*, unlike *Durso,* involved allegations of lack of independence rather than merely allegations of misrepresentations).[29]

## 2.    Incorrect or Incomplete Information

"The second element of a negligent misrepresentation claim requires a plaintiff to demonstrate that a defendant made a false representation that he knew or should have known was incorrect. The representation must be factual, as opposed to promissory." *Henneberry v. Sumitomo Corp. of America*, 532 F. Supp. 2d 523, 541 (S.D.N.Y. 2007) (citations omitted). As set forth *supra* section II.A, SSGA provided incorrect information to Plaintiff about the Markov CDO.

Courts in this District have denied a motion for summary judgment where there were material issues of fact as to whether alleged statements were incorrect or incomplete. *See   Schwarz v. ThinkStrategy Capital Mgmt LLC*, No. 09 Civ. 9346, 2011 WL 2732218, at *5 (S.D.N.Y. July 14, 2011) ("Plaintiffs have adduced evidence from which a reasonable trier of fact might conclude that [defendant's] statements to plaintiffs...regarding its due diligence and investment processes were false when made, that [defendant] knew at the time that they were false, and that [defendant] made

---

[29]    Defendants citations to cases where negligent misrepresentation claims are dismissed are inapposite because none involve a defendant accused of surrendering their professional independence to another when making statements that a plaintiff relied on.  *See 900 Unlimited v. MCI Telecomm'ns Corp.*, 626 N.Y.S.2d 188, 188 (App. Div. 1995); *Silvers v. State*, 893 N.Y.S.2d 12, 14 (App. Div. 2009); *UST Private Equity Investors Fund, Inc. v. Saloman Smith Barney*, 733 N.Y.S.2d 385, 386 (App. Div. 2001).  Here, Defendant SSGA misrepresented who would control the collateral selection process and how the process would occur.  (¶¶ 265-96.) The credit union which was in privity with Barclays believed statements regarding who was selecting collateral, what was the basis of collateral selection, and the quality of the collateral selected.  (¶¶ 57, 59, 265-95.)

the representations not believing or intending that [defendant] would perform due diligence and make its future investment decisions in conformity with those representations.").[30]

The incorrect information provided by SSGA were misrepresentations of material existing facts as to SSGA's role in the collateral selection in the CDO and the philosophy and process in selecting collateral chosen for the Markov CDO. (¶¶ 265-96.) Defendants represented, and Plaintiff believed, that Markov's collateral was selected by SSGA on the basis of adverted diligence, rigor and expertise applied to identify and select collateral most likely to perform. These statements were specifically directed to Plaintiff. (¶¶ 372-73.)  Moreover, even if the Court were to consider these statements promises of future behavior, they were made in order to sell Markov notes with an undisclosed intention of never performing them.[31]

### 3.    Reasonable Reliance

As set forth *supra*, section II.C, Plaintiff reasonably relied on the incorrect information provided by SSGA when making its decision to purchase the notes.  This issue should not be resolved at the pleading stage as it is intensely fact specific.  *See Maloul*, 2008 WL 2876532, at *2.

Actual reliance is demonstrated through Plaintiff's Analytical Review wherein many of SSGA's misrepresentations were reiterated. (¶¶ 377-83.) These misrepresentations include the control SSGA would have over collateral selection in the CDO as well as the philosophy and process

---

[30]     *See also CMMF, LLC v. J.P. Morgan Inv. Mgmt. Inc.*, 915 N.Y.S.2d 2, 6 (App. Div. 2010) (Motion to dismiss denied where plaintiff's complaint alleged numerous specific misrepresentations of fact and questions of fact remained as to whether the information was incorrect and whether plaintiff reasonably relied upon that information).

[31]     *See Elliot v. Nelson*, 301 F. Supp. 2d 284, 287 (S.D.N.Y. 2004) ("Although '[p]romises of future conduct are not actionable as negligent misrepresentations,'  a promise 'made with a preconceived and undisclosed intention of not performing it ... constitutes a misrepresentation of a material existing fact'") (citations omitted).

to be used in selecting such collateral for the Markov CDO. (¶¶ 265-96.)  SSGA made statements specifically directed to Plaintiff in order to sell Markov notes. (¶¶ 265-66, 372-73.)  SSGA understood that Plaintiff would rely on its statements describing itself and its philosophy and process in connection with collateral selection. (¶¶ 273-76.)

Any truth-on-the-market defense fails, as set forth *supra*, section II.C, since SSGA concealed that Barclays was actually selecting the collateral and that Barclays was short throughout. The nature of this fraud was not known to Plaintiff at the time of investment, nor was it discoverable with any amount of investigation.  Plaintiff relied upon SSGA's statements and believed that their role as collateral manager was to give Markov the best chance to succeed. This reliance was reasonable as Plaintiff did not know that Barclays would take control to ensure the exact opposite result.[32]

C.       **Breach of Fiduciary Duty**

To establish a breach of fiduciary duty, plaintiffs must allege: (i) the existence of a fiduciary relationship; (ii) misconduct by defendant; and (iii) damages directly caused by defendant's misconduct.  *See Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (App. Div. 2007).  "The scope of the fiduciary duty is a highly fact-sensitive inquiry that depends on the facts of the case." *Williams v. Deutsche Bank Sec., Inc.*, No. 04 Civ. 7588, 2005 WL 1414435, at *7 (S.D.N.Y. June 13, 2005) (quotations and citations omitted).

---

[32]       Defendants cite *UST Private Equity*, 733 N.Y.S.2d at 386 for the holding that the plaintiff in that case could not have justifiably relied upon misrepresentations when plaintiff could have done further due diligence to verify the accuracy. In the present case, no due diligence would have apprised Plaintiff of the fact that SSGA had ceded its control over collateral selection to Barclays. Likewise, Defendants cite *Eternity Global*, 375 F.3d at 188-90 where, again, the court found that plaintiff had the capacity to conduct due diligence to correct the misrepresentation unlike in the present case.

A fiduciary relationship is grounded in a higher level of trust than normally present in the marketplace between those involved in arms-length business transactions.  *See EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 32 (N.Y. 2005).  However, a fiduciary relationship between commercial parties to a transaction can arise when a party places a level of higher trust in another.[33] *See HF Mgmt. Servs. LLC v. Pistone*, 818 N.Y.S.2d 40, 42 (App. Div. 2006) ("[T]he fiduciary duty we recognize is limited to the underwriter's role as advisor. We do not suggest that underwriters are fiduciaries when they are engaged in activities other than rendering expert advice") (quotations and citation omitted); *EBC I, Inc.*, 832 N.E.2d at 32; ("To the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist."); *Pergament v. Roach*, 838 N.Y.S.2d 591, 593 (App. Div. 2007) (stating that a fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.).  An underwriter can breach its fiduciary duty to a client when the advice it gives its client is for its own benefit and against its client's interests.  *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 399 F. Supp. 2d 375, 385 (S.D.N.Y. 2005).

---

[33]     Defendants cite to cases involving fine art sales (*Rosenblatt v. Christie, Manson, & Woods Ltd.*, No. 04 Civ. 4205,  2005 WL 2649027, at *10 (S.D.N.Y. Oct. 14, 2005) and *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985)), boxing promotions (*Holloway v. King*, 361 F. Supp. 2d 351, 361 (S.D.N.Y. 2005)), real estate partnerships (*Boley v. Pineloch Assocs. Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988)), and hospital reimbursement procedures (*In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002)) to establish that no fiduciary duty is "typically" found in ordinary commercial relationships.  (Defs. Br. at 44.) In none of these cases, however, was the relationship formed solely on the basis that one party would use its superior knowledge to assist the other.  The position of collateral manager was established to prevent the very conflict of interest and self dealing that the underwriter, Barclays, engaged in through SSGA's breach. Collateral managers existed so that CDO investors could repose trust and confidence in the fact that the collateral was selected for their benefit.  (¶¶ 57, 59, 288-95, 455.)

Whether a fiduciary relationship exists between parties is necessarily fact specific, *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.*, 896 N.E.2d 61, 68 (N.Y. 2008). *Talansky v. Schulman*, 770 N.Y.S.2d 48, 53 (App. Div. 2003) (whether party to a business transaction possessed superior expertise and knowledge giving rise to a fiduciary duty raises a triable issue of fact). Factual issue arises when a breach of fiduciary claim alleges that defendants gave advice designed to secure fees. *Bestolife Corp. v. American Amicable Life,* 5 A.D.3d 211, 212 (N.Y. App. Div. 2004) (claim reinstated after allegations that advice was given to advance transaction against client's interest "in order to secure fees for itself and the other defendants").

Here Plaintiff pled that: (i) SSGA held itself to be an expert in control of the selection process (¶¶ 269-89); (ii) SSGA had complete knowledge of and exclusive access to the range of available collateral and the process used to select it (¶¶ 56-66); (iii) SSGA induced Plaintiff to invest through statements regarding its expertise and control over the selections process (¶¶ 265-89); (iv) SSGA surrendered its independence to Barclays and did not use the process it represented in selecting collateral (¶¶ 156-60, 178-79, 182-98); (v) Plaintiff entered the transaction based on the representations that SSGA was expert, independent and would use the collateral selection process it represented (¶¶ 377-83); and (vi) that Plaintiff was harmed as a result (¶¶ 397-400).

### D.    Aiding and Abetting Claims

"A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003).

Because Plaintiff has established primary torts under New York law, defenses based on failure to plead the primary tort must fail. *See Fezzani v. Bear, Stearns & Co. Inc.*, 592 F. Supp. 2d 410, 435 (S.D.N.Y. 2008) (denying motion to dismiss claim for aiding and abetting where "the Plaintiffs have sufficiently pled a primary violation by [defendant]").   Defendant Barclays also challenges the pleading of aiding and abetting liability on the grounds that the Complaint failed to plead Barclays' actual knowledge of the breach.   However, the Complaint alleges that SSGA breached its duty by ceding the collateral selection control to Barclays and that it was Barclays that actually controlled the process. (¶¶ 66, 155-60, 178-79, 265-303.)   Therefore, Barclays was necessarily aware of the breach and the claim should not be dismissed.

### E.   Breach of Contract Harming a Third Party

In New York, "[o]ne who seeks to recover as a third-party beneficiary of a contract must establish that a valid and binding contract exists between other parties, that the contract was intended for his or her benefit, and that the benefit was direct rather than incidental." *Edge Mgmt. Consulting, Inc. v. Blank*, 807 N.Y.S.2d 353, 358 (App. Div. 2006). Plaintiff has satisfied all of these elements against SSGA.  Markov and SSGA were parties to a contract as alleged by Plaintiff in the form of the collateral management agreement. (¶¶ 464-65.) SSGA's role pursuant to that agreement was to "select[] and manag[e] the Collateral Assets." (¶ 272.) SSGA did not in fact select the collateral but instead ceded control to Barclays (¶¶ 267-86), thereby breaching its contract with Markov to the detriment of intended third party beneficiary investors.

Plaintiff has additionally alleged throughout the Complaint facts which clearly evidence that the contract entered into between Markov and SSGA was for the benefit of Markov investors such as Plaintiff. (*See, e.g.*, ¶¶ 56-57.)  The very reason Barclays supposedly retained SSGA was to look

out for investors' best interests, and to ensure no conflict arose between Barclays and investors (*see* ¶ 10), as Defendants themselves represented in the offering documents.  (*See* ¶ 272 ("[T]he performance of the Collateral Assets and Eligible Investments depends heavily on the skills of the Collateral Manager in analyzing, selecting and managing the Collateral Assets and Eligible Investments.").)

In contrast to Defendants' assertions, an "obligation to perform to the third party beneficiary need *not* be expressly stated in the contract" (*Aievoli v. Farley*, 636 N.Y.S.2d 833, 833 (App. Div. 1996)), and surrounding circumstances in the absence of the contract can be properly considered. *Id.* ("In determining third-party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement.").  It thus is immaterial that Plaintiff has not averred to express contractual provisions – which of course Plaintiff does not at this time have access to and are, at least until discovery, in the sole possession of Defendants.[34]  *See Aievoli,* 636 N.Y.S.2d at 833 ("[D]efendant's motion was properly denied [because t]he plaintiffs' opposition to the defendant's motion was sufficient to raise an issue as to whether they were intended third-party beneficiaries of the subject contract."); *Kotchina v. Luna Park Hous. Corp.*, 815 N.Y.S.2d 594, 595 (App. Div. 2006) (Summary judgment denied where defendant "failed to establish, prima facie, as a matter of law, that the plaintiff was not an intended third-party beneficiary of its contract with the building manager").

---

[34]      Defendants' cases *Oanugua v. Pfizer, Inc.*, No. 03 Civ. 5405, 2003 WL 22670842, at *4 (S.D.N.Y. Nov. 7, 2003) and *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 561 (S.D.N.Y. 2001) for the proposition that the parties' intent must appear on the face of the agreement are inapplicable.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: November 18, 2011

Respectfully submitted,

**KIRBY McINERNEY LLP**

By:  ____ /s/ *Daniel Hume* _____
Daniel Hume
David Bishop
Surya Palaniappan
Beverly Tse Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
Facsimile:  (212) 751-2540

*Counsel for Plaintiff*

51