UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                         :

SPACE COAST CREDIT UNION, as successor in   :
interest to EASTERN FINANCIAL FLORIDA         :      11 Civ. 2802 (LLS)
CREDIT UNION,                                     :

                  Plaintiff,                       :

      -against-                                    :

BARCLAYS CAPITAL, INC., BARCLAYS BANK    :
PLC, STATE STREET GLOBAL ADVISORS, STATE :
STREET BANK AND TRUST COMPANY, and       :
STATE STREET CORPORATION,                  :

                  Defendants.                    :
-------------------------------------------------------------------X

 

**JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES .................................................................. ii

PRELIMINARY STATEMENT .............................................................. 1

ARGUMENT ............................................................................. 2

I.  PLAINTIFF'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED .................... 2

    A.    Plaintiff Fails to Plead Any Actionable Misrepresentation ........................... 2

    B.    Plaintiff Fails to Plead Scienter ..................................................... 9

        1.    Plaintiff Fails to Plead Motive to Defraud ........................................ 9

        2.    Plaintiff Fails to Plead Conscious Misconduct ................................. 11

    C.    Plaintiff Fails to Plead Reasonable Reliance ................................................. 13

    D.    Plaintiff's Exchange Act Claims Are Time-Barred ........................................ 16

    E.    Plaintiff's Section 20(a) Claim Should Be Dismissed ..................................... 16

II.  PLAINTIFF'S COMMON LAW CLAIMS SHOULD BE DISMISSED ...................... 17

    A.    Plaintiff's Fraud-Related Claims Against SSgA and Barclays Fail.............. 17

    B.    Plaintiff Fails to Allege Negligent Misrepresentation Against SSgA ........... 17

    C.    Plaintiff Fails to Allege Breach of Fiduciary Duty Against SSgA ............... 19

    D.    Plaintiff Fails to Allege Aiding and Abetting Breach of Fiduciary Duty Against Barclays Capital................................................................. 19

    E.    Plaintiff Fails to Allege Breach of Contract Harming a Third Party Against SSgA ....................................................................................... 20

CONCLUSION............................................................................. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009).............................................................................. 6

Ashcroft v. Iqbal,
    129 S.Ct. 1937 (2009) ................................................................................................... 2

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007)............................................................................................ 5

Bd. of Trs. of City of Ft. Lauderdale Gen'l Emps. Ret. Sys. v. Mechel OAO,
    2011 WL 3502016 (S.D.N.Y. Aug. 9, 2011).............................................................. 12

Brown v. E.F. Hutton Grp., Inc.,
    991 F.2d 1020 (2d Cir. 1993)................................................................................. 14-15

Caiola v. Citibank,
    295 F.3d 312 (2d Cir. 2002)........................................................................................ 16

China Dev. Indus. Bank v. Morgan Stanley & Co. Inc.,
    No. 650957/2010 (N.Y. Sup. Ct. Feb. 25, 2011),
    aff'd, 927 N.Y.S.2d 52 (1st Dep't 2011) ................................................................. 6, 16

Dandong v. Pinnacle Performance Ltd.,
    2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) ......................................................... 7, 9, 17

Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008)......................................................................... 6

EED Holdings v. Palmer Johnson Acquisition Corp.,
    387 F. Supp. 2d 265 (S.D.N.Y. 2004)........................................................................ 18

Emps. Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co. Inc.,
    2011 WL 4526045 (S.D.N.Y. Sept. 30, 2011).......................................................... 5-6

Epirus Capital Mgmt. LLC v. Citigroup Inc.,
    2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)......................................................... 4, 9, 13

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,
    375 F.3d 168 (2d Cir. 2004)................................................................................... 18-19

Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,
    2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002) .......................................................... 16

Feinman v. Shulman Berlin & Davis,
    677 F. Supp. 168 (S.D.N.Y. 1988) ......................................................... 15

Glaser v. The9, Ltd.,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................... 10

Halebian v. Berv,
    644 F.3d 122 (2d Cir. 2011).................................................................... 5

Henneberry v. Sumitomo Corp. of America,
    532 F. Supp. 2d 523 (S.D.N.Y. 2007)..................................................... 18

In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.,
    2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007)......................................... 11

In re Citigroup, Inc.,
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011) ............................................ 13

In re Citigroup Inc. Bond Litig.,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010)..................................................... 7

In re Citigroup Sec. Litig.,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................... 12

In re Countrywide Fin. Corp. Sec. Litig.,
    588 F. Supp. 2d 1132 (C. D. Cal. 2008) ................................................. 7

In re MBIA, Inc. Sec. Litig.,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)..................................................... 7

In re Prudential Sec. Inc. Ltd. P'shps Litig.,
    930 F. Supp. 68 (S.D.N.Y. 1996) ........................................................... 6

JPMorgan Chase Bank v. Liberty Mut. Ins. Co.,
    189 F. Supp. 2d 24 (S.D.N.Y. 2002)....................................................... 16

Kosovich v. Metro Homes, LLC,
    2009 WL 5171737 (S.D.N.Y. Dec. 30, 2009),
    aff'd, 405 Fed.Appx. 540 (2d Cir. 2010) ................................................ 15

Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,
    2011 WL 4495034 (S.D.N.Y. Sept. 28, 2011)......................................... 5, 12

Leykin v. A T & T Corp.,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)..................................................... 2

M & T Bank Corp. v. Gemstone CDO VII, Ltd.,
    2009 WL 921381 (N.Y. Sup. Ct. Apr. 7, 2009), aff'd as modified in part, rev'd in
    part, 891 N.Y.S.2d 578 (4th Dep't 2009) ...............................................................6, 17, 18, 19

Maloul v. Berkowitz,
    2008 WL 2876532 (S.D.N.Y. July 23, 2008) ........................................................ 13

MBIA Ins. Corp. v. Merrill Lynch,
    916 N.Y.S.2d 54 (1st Dep't 2011) ......................................................................... 17

Nathel v. Siegal,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008)..................................................................... 15

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000).................................................................................... 8

Ruskin v. TIG Holdings, Inc.,
    2000 WL 1154278 (S.D.N.Y. Aug. 14, 2000)........................................................ 6

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994)................................................................................... 8

Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.,
    412 F.3d 103 (2d Cir. 2005)................................................................................... 13

Suez Equity Investors, L.P. v. Toronto-Dominion Bank,
    250 F.3d 87 (2d Cir. 2001)..................................................................................... 19

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007)................................................................................................ 2

Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.,
    247 F. Supp. 2d 352 (S.D.N.Y. 2002)................................................................... 18

Wright v. Ernst & Young LLP,
    152 F.3d 169 (2d. Cir. 1998).................................................................................. 8

**Rules and Statutes**

15 U.S.C. §§ 78u-4(b)(1) ................................................................................................. 2

15 U.S.C. §§ 78u-4(b)(2) ................................................................................................. 2

## PRELIMINARY STATEMENT

Plaintiff's Opposition confirms that the Complaint should be dismissed.[1]  Plaintiff

concedes that Defendants accurately summarized Plaintiff's theory of supposed fraud: that

Markov was a "secret" and "disguised" rigged bet because the AA-rated notes were backed by

collateral (Mezzanine CDOs and Markov Chain CDOs) that in turn was backed by "toxic" BBB-

rated nonprime RMBS, and Barclays held the "short" position on the underlying credit default

swaps referencing such assets. Pl. Mem. of Law in Opp. to Def. Motion to Dismiss ("Opp.") at

1, 2. <u>Every aspect of this allegedly "secret" and "disguised" purported fraud was fully disclosed</u>

<u>when Eastern Financial invested</u>: that Barclays would hold the "short" position in the credit

default swaps (and the "long" position in the super senior notes issued by the CDO, something

Plaintiff conveniently forgets); that conflicts of interest could arise from Barclays' role as swap

counterparty; and that collateral would be selected "subject to the consent" of Barclays.  More

fundamentally, Barclays provided Eastern Financial with extensive data about Markov's

collateral, including data expressly disclosing that the assets backing the collateral were

overwhelmingly nonprime RMBS rated BBB+ or lower.  Plaintiff fails to offer a <u>single</u> piece of

evidence supporting its repeated, bald assertion that Barclays somehow "knew" and hid its

supposed knowledge that the underlying RMBS assets would fail.

Defendants' complete transparency—regarding collateral selection, Barclays' role in the

swaps, and exactly which assets backed the Markov collateral—precludes any inference of fraud,

much less the requisite "strong inference."  Plaintiff continues to proffer nothing more than a

series of speculative leaps about who "must have" selected the collateral and for what purpose.

Plaintiff's allegations are supported only by what Eastern Financial fully knew when it invested

---

[1]     Defined terms are the same as those used in Defendants' moving brief ("Def. Br.").

and impermissible fraud-by-hindsight, given that the risks (rather than rewards) of this complex

and highly leveraged product ultimately materialized amidst a global financial crisis.

## ARGUMENT[2]

### I.     Plaintiff's Exchange Act Claims Should Be Dismissed

#### A.     Plaintiff Fails to Plead Any Actionable Misrepresentation

*Collateral Selection.* Plaintiff concedes that an alleged misrepresentation concerning

which party selected the collateral, standing on its own, is immaterial. Plaintiff admits that the

alleged misrepresentation requires a second prong—that Barclays allegedly used its supposed

control over collateral selection to pick "bad assets" it somehow "knew" would fail (in order to

trigger loss payments itself). Opp. at 9-10. With respect to the first prong, Plaintiff concedes

that the Offering Documents expressly disclosed that collateral selection was subject to Barclays'

consent, and thus that Barclays played a role in the selection process. Opp. at 9. Plaintiff's

complaint is nothing more than a baseless quibble that the Offering Documents described a

"consent right" rather than "control" over collateral selection. Plaintiff also reads into the

Offering Documents a guarantee that Barclays "would withhold consent from risky or unwise

collateral selections." Opp. at 9. That is pure fiction. The Offering Documents repeatedly

warned of the highly leveraged nature of RMBS and the risks associated with nonprime

mortgages. Def. Br. at 8-9.

---

[2]     Plaintiff misstates the applicable standard on this motion, citing caselaw that is almost
two decades old and that predates the enactment of the PSLRA. Opp. at 8. Only well-pleaded
facts are accepted as true and only reasonable inferences are drawn in Plaintiff's favor. See
Leykin v. A T & T Corp., 423 F. Supp. 2d 229, 237 (S.D.N.Y. 2006). Plaintiff must plead "all
facts" supporting its allegations and "state with particularity" facts giving rise to a "strong
inference" of fraud. 15 U.S.C. §§ 78u-4(b)(1), (2); see also Tellabs, Inc. v. Makor Issues &
Rights, Ltd., 551 U.S. 308, 324 (2007); cf. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)
(even under more generous Fed. R. Civ. P. 8, "[a] pleading that offers 'labels and conclusions' or
'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint
suffice if it tenders 'naked assertions' devoid of 'further factual enhancement'").

With respect to the necessary second prong, Plaintiff again fails to proffer a single fact in support of its wholly conclusory assertion that Barclays supposedly used its control to pick "bad assets" it somehow "knew" would fail. Having no real response, Plaintiff instead misrepresents Defendants' argument. According to Plaintiff, Defendants argue that "Plaintiff has no basis for alleging that Barclays held the short position," and that there is an issue of fact concerning whether Barclays retained the short position. Opp. at 12-14. Defendants made no such argument. Rather, Defendants pointed out, correctly, that Plaintiff must allege facts demonstrating that Barclays used its supposed control to pick assets it "knew" would fail (not just that Barclays held the "short" position, as fully disclosed)—but Plaintiff points to no such facts and cannot.

Without any facts to support its claim of a misrepresentation concerning collateral selection, Plaintiff simply recycles its allegations about the 35% CDO bucket and SSgA's non-investment in Markov. Opp. at 9-12. These get Plaintiff nowhere. Plaintiff again insists that the bucket—which was fully disclosed, including its contents—was "excessive." Opp. at 10. But Plaintiff fails to bridge the analytical gap between the structure of the bucket and who filled it, and instead assumes that Barclays "must have" created and filled the bucket in order to maximize its ability to trigger credit default swap payments; Plaintiff also fails to plead any facts linking SSgA to this purported scheme. Plaintiff's sheer speculation cannot withstand a dismissal motion.[3] Likewise, it is pure conjecture that SSgA "refused" to invest in Markov

---

[3]     Plaintiff's Opposition also fails even to establish that the bucket was "extreme." The mere fact that buckets in some other Barclays CDOs between 2005 and 2007 were smaller does not render the Markov bucket "excessive." Opp. at 10-11; see ¶ 167 n.14 (conceding that another Barclays CDO had 35% bucket). Likewise, while the Basel Committee on Banking Supervision reported that from 2005 to 2007 a typical High Grade CDO would be composed of about 19% of other CDOs, the Committee nowhere stated that a 35% CDO bucket was "excessive" or unsafe. See Opp. at 10; Decl. of Daniel Hume, Ex. A. Finally, Plaintiff fails to

because it "knew something was wrong in the collateral mix." Opp. at 6, 11. Again, Plaintiff

points to a mere two instances, from 2005, when SSgA invested in a CDO it managed. Id. at 11.[4]

     Finally, Plaintiff's Opposition ignores the most fundamental flaw in its claim of a

misrepresentation regarding collateral selection. As a matter of law, Plaintiff cannot complain of

misrepresentations concerning who supposedly selected the Markov collateral when Eastern

Financial knew precisely which collateral was selected (and precisely which assets backed the

collateral). Eastern Financial received extensive, detailed data about Markov's collateral and the

assets backing it, including spreadsheets detailing the very—supposedly hidden—credit ratings

of the nonprime RMBS assets that backed the Mezzanine CDOs and Markov Chain CDOs

serving as Markov's collateral. Ex. E; compare ¶¶ 14 ("Barclays' solution was to disguise its bet

against BBB-rated RMBS tranches by placing that bet against AAA-rated tranches of Mezzanine

CDOs (collateralized by portfolios of BBB-rated subprime RMBS)."), 15 ("Barclays knew that,

despite Mezzanine CDO tranche ratings of AA or even AAA, the risk was something else

entirely: the risk of the BBB-rated RMBS tranches").

     Faced with this smoking gun document Plaintiff admits Eastern Financial received,

Plaintiff simply asks this Court to turn a blind eye to it at the pleading stage. Binding precedent

---

plead adequately some imaginary departure from SSgA's stated collateral management style. Opp. at 3, 12. SSgA unquestionably managed Markov, thus demonstrating that it did not believe the bucket was excessive, since SSgA's stated policy was that it would not manage CDOs with "excessive" buckets. Def. Br. at 19-20; ¶ 182.

[4]    Plaintiff superficially attempts to distinguish Defendants' cases by stating that, unlike those cases, Plaintiff has "pleaded particularized facts showing falsity." Opp. at 10 n.4. Plaintiff has not alleged any facts, let alone particularized facts, indicating falsity. In Epirus Capital Mgmt. LLC v. Citigroup Inc., 2010 WL 1779348, *5 (S.D.N.Y. Apr. 29, 2010), for example, the plaintiff baldly alleged that Citigroup secretly selected allegedly worthless assets from its own warehouse for the Octonion CDO. The court dismissed plaintiff's fraud claims, noting that the offering circular explicitly disclosed that the underlying assets would be purchased from Citigroup's portfolio, and that the plaintiff was essentially pleading "fraud by hindsight." Id. at *5-6. That is precisely what Plaintiff has done with respect to Markov.

-4-

mandates that the document be considered, given Plaintiff's own pleadings. See Halebian v. Berv, 644 F.3d 122, 131 n.7 (2d Cir. 2011) ("Courts may also properly consider 'matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'"); accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Given the full disclosure about which collateral was actually picked, Plaintiff's quibble with how the Offering Documents described who would handle the collateral selection process—"consent right" vs. "control"—is immaterial and inactionable as a matter of law.

   *Credit Ratings.* Plaintiff does not challenge as false any of the Offering Documents' disclosures that specifically warned against relying on credit ratings as a guarantee of Markov's quality. Ex. B at 48. Likewise, Plaintiff does not dispute that the Offering Documents accurately reported the credit ratings given to Markov's collateral and notes. Plaintiff further admits that Eastern Financial received the rating of every single asset backing the Markov collateral, well in advance of purchasing the Markov notes. See Ex. E.

   Instead, Plaintiff argues that Barclays somehow "knew" that Markov's collateral was not "high-grade" or worthy of its AA/AAA ratings. Opp. at 15. Yet Plaintiff fails to allege any facts, let alone particular facts, supporting the assertion that Barclays somehow knew the accurately-reported ratings were inflated. Courts addressing similar allegations in CDO cases have uniformly found them deficient. See Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 2011 WL 4495034, *4-5  (S.D.N.Y. Sept. 28, 2011) (dismissing where plaintiff did not allege with particularity how defendant "knew" ratings for its CDO assets were inflated); Emps. Ret. Sys. of Gov't of Virgin Islands v. Morgan Stanley & Co. Inc., 2011 WL 4526045, *19 (S.D.N.Y. Sept. 30, 2011) (rejecting allegation that offering materials provided false credit

ratings, where plaintiff failed to allege facts indicating that bank participated in rating process).[5]

Plaintiff cannot escape the fatal effect of (i) the Offering Documents' express warnings about credit ratings, and (ii) the detailed credit rating information actually provided to Eastern Financial. With respect to warnings, the cases on which Plaintiff relies all involved specific evidence of fraud that rendered the warnings meaningless—evidence which is completely lacking here. Opp. at 15.[6]

The detailed credit rating information that Eastern Financial received is even more fatal to Plaintiff's claim. Plaintiff's theory is that Barclays effected a "secret" and "disguised" rigged bet by going "short" against AA/AAA-rated tranches of Mezzanine CDOs and Markov Chain CDOs that in fact were backed by BBB-rated nonprime RMBS. See ¶¶ 14-16, 89, 169, 170, 181, 200, 206, 208-09, 227-28, 240, 312, 322, 334, 344-45, 348, 350, 400, 427. But the ratings of the

---

[5]     The law is clear that an allegedly false credit rating is not actionable unless a plaintiff can show that the entity giving the rating—the rating agency—did not truly believe its opinion. Def. Br. at 23. Plaintiff makes the bizarre claim that this rule applies only to claims brought under Sections 11 and 12 of the Securities Act of 1933, which do not require a showing of fraud. Opp. at 15 n.10. Plaintiff has it backwards. Plaintiff's burden is higher in a fraud case like this one.

[6]     See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc., 651 F. Supp. 2d 155, 178-79 (S.D.N.Y. 2009) (plaintiff alleged that bank possessed information contradicting CDO's high rating, where bank misstated for investors amount of RMBS that would be included in CDO, possessed non-public information about poor health of mortgage lender that underwrote certain CDO assets, and paid rating agency unreasonably large fees); M & T Bank Corp. v. Gemstone CDO VII, Ltd., 2009 WL 921381, *9 (N.Y. Sup. Ct. Apr. 7, 2009) (plaintiff alleged specific statements made by CDO salesman), aff'd as modified in part, rev'd in part, 891 N.Y.S.2d 578 (4th Dep't 2009); China Dev. Indus. Bank v. Morgan Stanley & Co. Inc., No. 650957/2010, Op. at 4-5 (N.Y. Sup. Ct. Feb. 25, 2011) (plaintiff alleged that bank improperly influenced rating agencies to use outdated rating methodologies and paid excessive fees for rating agencies' services), aff'd, 927 N.Y.S.2d 52 (1st Dep't 2011); In re Prudential Sec. Inc. Ltd. P'shps Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (plaintiffs established that experts retained by defendants provided warnings that were directly contradicted by sales materials disseminated by defendants); Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 220 (S.D.N.Y. 2008) (plaintiff cited to risk alert memo received by defendants, demonstrating that defendants were warned about decline of relevant credit market); Ruskin v. TIG Holdings, Inc., 2000 WL 1154278, *1-2 (S.D.N.Y. Aug. 14, 2000) (plaintiffs cited to internal memoranda circulated by defendants that contradicted statements made by defendants in SEC filings).

underlying RMBS assets were <u>fully disclosed</u> to Eastern Financial.  Ex. E.  This fundamental

flaw distinguishes this case from <u>Dandong v. Pinnacle Performance Ltd.</u>, 2011 WL 5170293,

*13 (S.D.N.Y. Oct. 31, 2011), on which Plaintiff heavily relies.  Opp. at 17.  In <u>Dandong</u>, the

court specifically relied on the plaintiff's allegation that the defendants selected as collateral

"extremely risky synthetic CDOs specifically created" for the transaction, rather than following

supposed industry practice of choosing "low-risk" collateral.  Critically, unlike here, the

<u>Dandong</u> plaintiff had <u>not</u> received detailed information about the synthetic collateral and the

assets underlying it; rather, the plaintiff expressly complained that it did <u>not</u> receive the reference

entity portfolios that Eastern Financial unquestionably did receive.  See Complaint ¶¶ 267-68,

<u>Dandong v. Pinnacle Performance Ltd.</u>, No. 10 Civ. 8086 (S.D.N.Y. filed Oct. 25, 2010).[7]

Plaintiff attempts to avoid the preclusive effect of the full disclosure that indisputably

was made to Eastern Financial by insisting that (i) it was not required to read "one million pages

to learn more about the collateral," and (ii) it could not have learned information about the

Markov Chain CDOs, which were "private transactions."  Opp. at 17.  Plaintiff is wrong.  The

very information that Plaintiff claims was missing—the credit ratings of the RMBS that backed

---

[7]      The two SEC complaints on which Plaintiff relies are also readily distinguishable.  Opp.
at 16 n.12.  The SEC pleaded specific facts indicating that a party other than collateral manager
improperly influenced the collateral selection process.  See Complaint ¶¶ 26, 27, 30, 38, <u>SEC v.
Citigroup Global Markets, Inc.</u>, No. 11 Civ. 7387 (S.D.N.Y. filed Oct. 19, 2011) (alleging
specific facts showing that underwriter was actively involved in collateral selection process and
planned to hold its short position even after selling all tranches to investors); Amended
Complaint ¶¶ 2, 37, 38, 39, 42, 44, <u>SEC v. Tourre</u>, No. 10 Civ. 3229 (S.D.N.Y. filed Nov. 22,
2010) (underwriter failed to disclose that third-party hedge fund participated in collateral
selection).  In the remaining cases cited by Plaintiff, unlike here, there was no disclosure of the
very information supposedly hidden about a CDO.  Opp. at 16 n.13, 17; see In re MBIA, Inc.
Sec. Litig., 700 F. Supp. 2d 566, 572 (S.D.N.Y. 2010) (bank disclosed overall CDO exposure
and names of CDOs in portfolios but not specific underlying collateral of CDOs); In re Citigroup
Inc. Bond Litig., 723 F. Supp. 2d 568, 589-90 (S.D.N.Y. 2010) (addressing whether financial
institution fully disclosed extent of its CDO and RMBS exposure to investors); In re
Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1153-54 (C. D. Cal. 2008) (addressing
whether mortgage company made misrepresentations regarding underwriting standards).

the Markov collateral, including the Markov Chain CDOs—was provided, in simple spreadsheets attached to an email sent two months before Eastern Financial's investment. Ex. E.

*Benefits of Markov's Structure.* The Complaint identifies only two limited, allegedly misleading statements regarding the benefits of synthetic assets: that such assets allowed "flexibility to purchase unfunded synthetic assets" and the "design [of] a portfolio from a broader collateral than available in cash." ¶ 353. Plaintiff's Opposition does not dispute or expand on this, nor could it. See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d. Cir. 1998) (plaintiff cannot amend complaint through memorandum of law). Such limited, generalized statements are mere puffery. Contrary to Plaintiff's assertion, the law does not limit the doctrine of puffery to statements of "general reputation." Opp. at 18. Rather, the doctrine provides that broad, general statements that do not amount to a guarantee are immaterial as a matter of law.[8]

*Markov's Safety.* Plaintiff's Complaint fails to allege who made a misrepresentation concerning Markov's safety and ability to withstand collateral losses, what exactly the misrepresentation was, and where, when, and how the alleged misrepresentation was made. Def. Br. at 25. Plaintiff's Opposition fails to remedy these defects (and could not). Plaintiff vaguely references allegedly misleading "statistical modeling," Opp. at 20, without (i) specifying the statements that purportedly were false, (ii) identifying the speaker, and (iii) stating where and when the allegedly false statements were made. Black letter law requires all three to be alleged with specificity, under Fed. R. Civ. P. 9(b) and the PSLRA. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). Citing Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000), Plaintiff insists that it need not plead "the sources" for its allegations based on

---

[8]     Plaintiff also suggests that the two limited representations somehow promised that Defendants would select only the safest or highest quality collateral. Opp. at 19. Again, that is pure fiction. No such representation was made.

information and belief. Opp. at 20. Plaintiff mixes apples and oranges. While a plaintiff need not identify the name of a confidential source who leads the plaintiff to believe that a misrepresentation was made, there is a clear requirement that a plaintiff identify the "who, what, where, and when" of a specific misrepresentation—something Plaintiff plainly failed to do.

**B.**     <u>Plaintiff Fails to Plead Scienter</u>

    **1.**     <u>Plaintiff Fails to Plead Motive to Defraud</u>

Plaintiff's theory of motive is no different than the generalized allegations of corporate motive courts routinely find insufficient. Def. Br. at 27-28. At bottom, Plaintiff rests on the generic, legally insufficient allegation that Barclays structured, offered, and underwrote a CDO from which it wanted to profit. ¶ 259; <u>see</u> <u>Epirus</u>, 2010 WL 1779348, *6 (no adequate motive despite allegation that defendants purposely overvalued assets underlying CDO; "Plaintiffs have not alleged motive that is different from the motives that all corporate officers and directors have—that is, a desire for the company to remain profitable and to profit personally as a result of the company's profitability."). The fact that Plaintiff alleges a "highly technical" scheme does not render its allegations of motive any less generic. Opp. at 23. Likewise, Plaintiff's bald assertion that Markov was "deliberately designed to defraud investors," <u>id.</u> at 23, 37, is nothing more than that. Plaintiff cannot allege motive simply by repeating its conclusory theory.

Again, Plaintiff's reliance on <u>Dandong</u> is entirely misplaced. Opp. at 21. As noted <u>supra</u>, unlike here, <u>Dandong</u> involved no disclosure of the synthetic CDO portfolio. The bank allegedly shorted synthetic CDOs that it itself created—but did not describe for investors—thereby creating a <u>hidden</u> "engineered frailty." 2011 WL 5170293, *12. Nothing here was hidden; Eastern Financial was fully advised that (i) Barclays held the "short" position with respect to synthetic CDOs that had been created for the transaction, and (ii) those synthetic CDOs were backed by BBB-rated nonprime RMBS. Plaintiff would have this Court believe that motive is

-9-

properly pleaded whenever a CDO issuer and underwriter shorts synthetic CDOs created for the transaction. Opp. at 23. That is not the law, nor should it be. Indeed, Plaintiff admits it was "custom" for underwriters to act as CDS counterparty and take the "short" position with respect to synthetic assets. ¶ 9. Neither Dandong, nor any other case, supports the overbroad, baseless principle that motive is properly pleaded simply because synthetic assets were created specifically for a CDO transaction.

Plaintiff's motive theory also rests on the fundamentally flawed premise that Barclays did and would continue to retain the entire "short" position. Def. Br. at 28-29. The Offering Documents disclosed that Barclays would act "as Intermediary for CDS and TRS Assets" and that an expected "[75]%" of those assets would be sold to "CDS Counterparties." Ex. A at 16. At that point, Barclays would not be entitled to reap the purported benefits of a "rigged" short bet, thus extinguishing any motive to create a CDO allegedly "designed to fail." Plaintiff does not, and cannot, allege any facts showing that Barclays departed from its plan to sell off its "short" position. Even more importantly, Plaintiff ignores that Barclays held a "long" position similar to Plaintiff: as super senior note holder, Barclays was responsible to pay for any losses Markov sustained over $400 million (the amount of issued Notes) and up to $1.6 billion. ¶ 153. Barclays did not make "a guaranteed $400 million of profit" as Plaintiff alleges, ¶ 259, but as a result of its super senior position, sustained extensive losses on Markov. Plaintiff does not, and cannot, allege any facts to the contrary. See Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 593 (S.D.N.Y. 2011) ("It defies reason that an entity looking to profit on a fraudulently inflated stock price would hold close to ninety percent of its shares as share prices fell . . . .").[9]

---

[9]      Plaintiff also insists that Barclays' motive is evidenced by its alleged conduct in connection with the separate Corvus CDO. Opp. at 22. Plaintiff fails to plead any facts indicating that there was anything fraudulent about Corvus, or that conduct in Corvus was in any

-10-

Finally, Plaintiff fails to address the lack of any facts indicating that SSgA benefited in any way from the purported scheme. Plaintiff's own allegations expressly concede the opposite, asserting that SSgA "had a long interest, aligned with Markov investors," and thus stood only to gain from Markov's success and lose from its failure. ¶ 186. Because both Barclays' and SSgA's economic interests undermine the inference of any motive, there can be no reasonable inference of fraudulent intent. In re Adelphia Commc'ns Corp. Sec. and Derivative Litig., 2007 WL 2615928, *3 (S.D.N.Y. Sept. 10, 2007) (plaintiffs' theory that defendants "thr[e]w billions of good dollars after bad in the hope that their investments could be propped up, profitably, by concealing a massive fraud," defied economic reason and did not yield a reasonable inference of fraudulent intent). Further, Plaintiff's argument that ceding control to Barclays was the "price of the ticket" for SSgA's entry into the "lucrative collateral management business," Opp. at 26, fails on its own terms. The proposition that SSgA sought to build its CDO management brand by agreeing to lend its name to CDOs allegedly designed to lose investors' money is not a plausible business motive. Def. Br. at 29-30.

### 2.   Plaintiff Fails to Plead Conscious Misconduct

Plaintiff does not dispute that its lengthy Complaint fails to cite a single internal document or confidential witness from Barclays or SSgA, or any other source regarding Markov (other than the Offering Documents). Rather, the Complaint is replete with conclusory assertions of what Barclays supposedly "knew" or "must have known." Def. Br. at 31-32. Plaintiff also does not dispute that such allegations are unquestionably insufficient to plead conscious misbehavior and thus scienter.

---

way related to Markov. More importantly, a separate lawsuit's allegations about motive in another situation cannot be used as evidence of motive here. See Def. Motion to Strike. The same holds true for Plaintiff's references to SSgA's involvement in the Carina CDO.

Moreover, it is beyond dispute that when a plaintiff contends that defendants had access to contrary information—such as that assets backing CDO collateral were purportedly "destined to fail"—the plaintiff "must specifically identify the reports or statements containing this information." Landesbank, 2011 WL 4495034, *4. In Landesbank, as here, the plaintiff alleged that defendants knew about "the toxicity of the mortgages underlying" a CDO that Goldman Sachs issued and underwrote. Id. at *5. The plaintiff pointed only to a single report from a due diligence agency indicating that certain loans backing the CDO collateral were delinquent or in default. Id. at *2, 5. Yet the plaintiff did not allege "who drafted it, who prepared it, or who, if anyone, at Goldman reviewed it." Id. at *5. The court concluded that the "gossamer allegations" concerning the report failed to plead fraud with particularity. Id. The same result applies with even greater force here, where Plaintiff fails to reference any document, witness or other source indicating Barclays knew that the Markov collateral, or the assets backing it, would fail.[10]

Plaintiff instead falls back on three supposed "indicia of fraud." Opp. at 5. First, Plaintiff again points to allegations asserted in litigation against Barclays in connection with the separate Corvus CDO, Opp. at 5, which are improper and must be struck, see Def. Motion to Strike. Second, Plaintiff again points to SSgA's purported "refusal" to invest in Markov, Opp. at 6, with speculative and defective allegations, see supra at 3-4. Third, Plaintiff points to Markov's composition and structure: the allegedly "excessive" CDO bucket, Opp. at 6-7, 10-11, 21, 25; the fact that the Markov Chain CDOs were specially built for this transaction, Opp. at 24;

---

[10]     Plaintiff makes the remarkable assertion that conscious misbehavior is adequately pleaded merely by referencing a financial institution's position with respect to a transaction. Opp. at 25. Not so. Plaintiff's assertion is analogous to the oft-rejected claim that scienter can be imputed to an individual defendant merely by virtue of his corporate position. See Bd. of Trs. of City of Ft. Lauderdale Gen'l Emps. Ret. Sys. v. Mechel OAO, 2011 WL 3502016, *16 (S.D.N.Y. Aug. 9, 2011). The two cases cited by Plaintiff do not support its overbroad and baseless position. Opp. at 25; see In re Citigroup Sec. Litig., 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (detailing number of factors from which to infer bank was aware of risks facing CDOs).

-12-

Case 1:11-cv-02802-LLS   Document 39   Filed 12/23/11   Page 18 of 26

and the fact that lower-rated assets served as synthetic collateral while higher-rated assets served as cash collateral, Opp. at 13, 21, 25, 37. Each of these, however, was fully disclosed to Eastern Financial and is in no way indicative of conscious misbehavior.

At bottom, Plaintiff simply has no response to the complete transparency of Defendants' actions—expressly disclosing Barclays' initial swap counterparty position, warning about conflicts of interest arising from this role, disclosing the complained-about structure of the deal, and providing a list of collateral as well as the ratings for each and every asset backing the collateral—other than to ignore it and falsely assert that Defendants have no "narrative of innocence." Opp. at 25-26. Far from permitting a "strong inference" of fraud, it makes no sense that Defendants would secretly "build something to fail" when doing so would hurt their economic interests and when they were completely transparent about what they were doing. Indeed, if Barclays "knew" the RMBS securities would fail, it could simply have shorted them in the open market. See Epirus, 2010 WL 1779348, *5 ("Plaintiffs cannot sustain a claim for securities fraud based on actions that the defendants specifically said they would take . . . in the Offering Circular . . . .").

## C.    Plaintiff Fails to Plead Reasonable Reliance[11]

Plaintiff does not dispute that Eastern Financial was a sophisticated investor with prior investment experience in CDOs at the time of its investment in Markov, or that Eastern Financial

---

[11]    Plaintiff wrongly insists that reliance cannot be determined at the pleading stage. Opp. at 27-28. Where, as here, a plaintiff was "placed on guard or practically faced with the facts" or "had indisputable access to truth-revealing information," courts will dismiss claims for failure to satisfactorily plead reasonable reliance. Maloul v. Berkowitz, 2008 WL 2876532, *2 (S.D.N.Y. July 23, 2008); accord Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109-10 (2d Cir. 2005) (affirming dismissal of fraud claims because "through minimal diligence, the investor should have discovered the truth"); In re Citigroup, Inc., 2011 WL 744745, *9 (S.D.N.Y. Mar. 1, 2011) (dismissing for lack of reasonable reliance because plaintiffs had access to relevant information "as it was either directly provided to them or otherwise available through minimal diligence").

was provided comprehensive materials detailing Markov's structure, including lists of the

underlying RMBS assets and their BBB ratings, which are the supposed key to the alleged fraud.

See Exs. A, B, and E.  Nor does Plaintiff deny that Eastern Financial represented to Defendants

prior to investing in Markov that it had conducted its own due diligence and would not rely on

any representations made by Defendants with respect to Markov.  See Def. Br. at 36-37.  Instead,

Plaintiff argues that Eastern Financial could not have known that "Barclays was selecting the

collateral" and "was short the entire time."  Opp. at 29.  These assertions are conclusory

speculation, and did not relieve Eastern Financial of its obligation to conduct its own diligence

before buying Markov notes.

Nonetheless, Plaintiff claims that there was no way, even as a sophisticated investor,

Eastern Financial could "have uncovered Defendants' complex fraud."  Opp. 29-30.  Plaintiff

again ignores that the collateral lists provided prior to Eastern Financial's investment contained

all of the information Plaintiff now claims gave rise to the "secret" and "disguised" rigged bet.

Ex. E.  Contrary to Plaintiff's assertion, Eastern Financial did not have to "pore over every

minute detail" of Markov's Offering Documents.  Opp. at 29.  Further, by reviewing the

collateral lists, Eastern Financial also would have known the ratings for all of the cash assets that

were included, and could have seen whether those ratings were higher than the ratings of the

synthetic collateral.  Thus, what Plaintiff calls the "damning rating/risk disparity between

Markov's synthetic collateral . . . and its cash collateral" was not "hidden" from Eastern

Financial, as Plaintiff would try to have the Court believe.  Opp. at 13, 21, 25.  With minimal

diligence, any investor would have understood what Plaintiff now insists was Defendants' fraud.

Caselaw is clear that no actionable fraud exists where, as here, a plaintiff received key

information prior to entering into a transaction.  See Brown v. E.F. Hutton Grp., Inc., 991 F.2d

1020, 1032-33 (2d Cir. 1993) (finding no reasonable reliance on alleged oral misrepresentations regarding suitability of investment in partnership when "[t]he Prospectus . . . indicates that the Partnership could collapse altogether depending on a variety of factors and developments" and provided unsophisticated plaintiffs "with full and objective disclosure of non-misleading factual material"); Nathel v. Siegal, 592 F. Supp. 2d 452, 465-66 (S.D.N.Y. 2008) ("an investor is not justified in relying on a misrepresentation if, through minimal diligence, the investor should have discovered the truth").

Plaintiff also fails in its attempt to minimize the significance of the extensive disclosures and warnings in the Offering Documents, which as a matter of law defeat any claim of reliance. See Kosovich v. Metro Homes, LLC, 2009 WL 5171737, *3 (S.D.N.Y. Dec. 30, 2009) ("[A]ny reliance on the misstatements he alleges was unreasonable as a matter of law, given the innumerable disclaimers in the offering materials."), aff'd, 405 Fed.Appx. 540 (2d Cir. 2010); Feinman v. Shulman Berlin & Davis, 677 F. Supp. 168, 170-71 (S.D.N.Y. 1988) (finding plaintiffs' reliance "wholly unreasonable" because offering memorandum specifically warned of risks associated with transaction). Contrary to Plaintiff's assertions, Markov's warnings were not "general" or "boilerplate." Opp. at 30, 38. Rather, the Offering Documents provided specific disclosures that address all the issues now alleged in the Complaint, including: (1) Barclays' consent right in collateral selection, Ex. B at 53, 124; (2) Barclays' role as the initial synthetic counterparty, Ex. A at 16; Ex. B at 55-57; (3) the limitations of ratings as an indicator of Markov's quality, Ex. B at 47-48; (4) the existence of a 35% CDO bucket, Ex. B at 148; (5) risks specifically associated with synthetic and nonprime RMBS collateral, Ex. A at 62-63; Ex. B. at 35-37, 38-40; and (6) limitations of future projections of Markov's performance, Ex. A at 2. These specific warnings are wholly distinct from those in the cases cited by Plaintiff, where

-15-

disclosures were either too general or failed to track the alleged misrepresentations. Opp. at 30.[12]

### D.    Plaintiff's Exchange Act Claims Are Time-Barred

Plaintiff's Exchange Act claims are also time-barred because Plaintiff failed to bring

those claims within two years after discovering "the facts constituting the violation." Def. Br. at

37-38.  The three "indicia of fraud" claimed by Plaintiff, Opp. at 5, were all known to Eastern

Financial at the time of its 2007 investment or shortly thereafter:  Corvus CDO allegations were

public in 2004 and 2005, Def. Br. at 38; Plaintiff nowhere pleads when it learned of SSgA's

supposed "refusal" to invest in Markov (and cannot plead learning such information after

2007);[13] and the Offering Documents fully described Markov's composition and structure in

2007.  The only later "fact" to which Plaintiff points is the 2010 filing of a lawsuit by the SEC

against a different bank, regarding a different CDO, involving different facts.  Opp. at 35.

Plaintiff cites no case—and Defendants are unaware of any—indicating that a statute of

limitations does not begin to run until the SEC sues a different financial institution concerning an

entirely different matter.

### E.    Plaintiff's Section 20(a) Claim Should Be Dismissed

Plaintiff does not dispute that a primary violation is a requisite element for control person

---

[12]    See Caiola v. Citibank, 295 F.3d 312, 330 (2d Cir. 2002) (disclaimers were too general to
bar plaintiff's reliance on specific oral statements made by defendants); Eternity Global Master
Fund Ltd. v. Morgan Guar. Trust Co. of New York, 2002 WL 31426310, *6 (S.D.N.Y. Oct. 29,
2002) (disclaimers said nothing about existence of availability of secondary market for swaps,
which formed basis of plaintiff's fraud claim); JPMorgan Chase Bank v. Liberty Mut. Ins. Co.,
189 F. Supp. 2d 24, 27-28 (S.D.N.Y. 2002) (disclaimer in bond documents was too broad to
disclaim hidden fraudulent scheme that transformed insurable sales contracts into improper
disguised loans); China Dev. Bank, Op. at 9 (general disclaimers were insufficient to bar reliance
where plaintiff specifically alleged that bank "suborned and corrupted the rating agencies" to
receive high ratings for their securities).

[13]    Plaintiff's decision to omit when it learned that State Street had not invested in Markov is
unsurprising.  Plaintiff learned this in June 2007.  Declaration of Arminda B. Bepko, executed
Dec. 23, 2011, Ex. A at 3.

liability. Because Plaintiff failed to plead a primary violation of Section 10(b), Plaintiff's

Section 20(a) claim fails. Def. Br. at 38.

## II.    Plaintiff's Common Law Claims Should Be Dismissed

### A.    Plaintiff's Fraud-Related Claims Against SSgA and Barclays Fail

Plaintiff does not dispute that, if its Exchange Act claims fail, its common law fraud

claims also fail. As demonstrated supra Point I, because Plaintiff fails to allege an actionable

misstatement, fraudulent intent, and reasonable reliance, its fraud-related claims fail.

Separately, the extensive and specific disclaimers in the Offering Documents bar

Plaintiff's fraud claims. See Def. Br. at 40. These disclaimers are indistinguishable from those

considered in MBIA Ins. Corp. v. Merrill Lynch, 916 N.Y.S.2d 54, 54 (1st Dep't 2011). MBIA

Ins. Corp. cannot be distinguished on the grounds that, in that case, the information relating to

the alleged misrepresentations "was not exclusively in defendants' possession." Id. As

discussed supra, Defendants disclosed Barclays' consent right and role in the collateral selection

process, Ex. B at 53, 124, and Eastern Financial was provided detailed information concerning

Markov's structure, collateral, and the assets backing the collateral.[14]

### B.    Plaintiff Fails to Allege Negligent Misrepresentation Against SSgA

Nothing in the Opposition remedies Plaintiff's inability to plead facts establishing a

special relationship between Plaintiff and SSgA, a key element of Plaintiff's common law

claims. The only authority Plaintiff cites was reversed on this very point. M & T Bank, 891

N.Y.S.2d at 581. The Appellate Division rejected Plaintiff's argument here, namely, that a

---

[14]    Plaintiff's reliance on Dandong is again inapposite. There, the court considered only two
warnings—neither of which was a disclaimer—indicating that the bank's economic interests
"may be" adverse to those of the noteholders and that synthetic CDOs were extremely risky.
2011 WL 5170293, *12.

collateral manager's relative expertise transforms an otherwise arm's-length business

relationship with CDO investors into a special relationship of trust and confidence:

> Essential to each of those causes of action is the existence of a special relationship
> of trust or confidence and there is no such special relationship in this case,
> particularly in light of the facts that the parties had no relationship prior to this
> arms-length [CDO] transaction and that offering circulars contained the various
> limitations and disclaimers. We further note that a party's "unique or special
> expertise" alone is insufficient to create an issue of fact concerning the existence
> of a special relationship.

Id. Moreover, as in M & T Bank, the "limitations and disclaimers" in Markov's Offering

Documents regarding the need to conduct independent due diligence before investing in Markov

further undermine the existence of a special relationship here. See Ex. B at iv, 206-07.

Although Plaintiff argues that factual issues preclude ruling at this stage, the very cases

cited in its Opposition demonstrate that courts routinely dismiss negligent misrepresentation

claims at the pleadings stage. See Opp. at 41-44.[15]  Similarly, Plaintiff's argument that Eastern

Financial reasonably relied on SSgA's alleged misstatements is also undermined by the cases

cited in its Opposition. As in Eternity Global, Eastern Financial was not a party "wholly without

knowledge" seeking assurances from one with "exclusive knowledge," but rather a sophisticated

party familiar with the "hazards" of its investment; as such, its relationship to SSgA was not

"sufficiently special to justify reliance." See Eternity Global, 375 F.3d at 189 (quoting Heard v.

---

[15]   See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168,
189 (2d Cir. 2004) (dismissing negligent misrepresentation claim where plaintiff was
"sophisticated about the credit derivatives transactions it was contemplating, was not dissuaded
from due diligence, and had the capacity to conduct it"); EED Holdings v. Palmer Johnson
Acquisition Corp., 387 F. Supp. 2d 265, 281-82 (S.D.N.Y. 2004) (same, where relationship did
not give rise to special duty to impart information); Henneberry v. Sumitomo Corp. of America,
532 F. Supp. 2d 523, 542 (S.D.N.Y. 2007) (same, where plaintiff failed to support "wholly
conclusory allegations" that alleged misstatements were "incorrect or should have been known
by [defendants] to be incorrect" when made); Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines,
S.A., 247 F.Supp.2d 352, 370-71 (S.D.N.Y. 2002) (same, where disclaimer undermined
plaintiff's reasonable reliance on alleged misstatements).

-18-

City of New York, 83 N.Y.2d 66, 75 (1993)).[16]  Nothing in Plaintiff's Opposition rescues

Plaintiff's claims from a basic failure to plead the requisite elements of a special relationship and

reasonable reliance.

### C.       Plaintiff Fails to Allege Breach of Fiduciary Duty Against SSgA

Plaintiff's Opposition cites several inapposite cases involving underwriters in support of

its claim that SSgA was in a fiduciary relationship with Eastern Financial.  Opp. at 47.  Plaintiff

again fails to address M & T Bank, which confirms that a collateral manager is not in a fiduciary

relationship with CDO investors.  See 891 N.Y.S.2d at 581 (dismissing breach of fiduciary duty

claim for failure to plead fiduciary relationship).  As in M & T Bank, there are no allegations

here of a preexisting relationship between SSgA and Eastern Financial.  Moreover, Markov's

Offering Documents were explicit that SSgA would not act as a fiduciary to Markov's investors.

Def. Br. at 45.  Eastern Financial represented that it was a sophisticated, qualified institutional

investor eligible to invest in Markov, and agreed that it was not relying on SSgA as a fiduciary.

It should not be released from those commitments now.

### D.       Plaintiff Fails to Allege Aiding and Abetting Breach of Fiduciary Duty Against Barclays Capital

Plaintiff does not dispute that its aiding and abetting claim fails if its breach of fiduciary

duty claim is dismissed.  Separately, the aiding and abetting claim fails because Plaintiff has not

pleaded Barclays' actual knowledge of any alleged breach.  Def. Br. at 45-46.  Plaintiff insists

Barclays "knew" that SSgA breached its fiduciary duty by purportedly ceding to Barclays

---

[16]     Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001), Opp. at 41-42, is easily distinguishable.  There, a negligent misrepresentation claim survived a motion to dismiss because the defendant had affirmatively persuaded the plaintiff to refrain from conducting its own due diligence, urging the plaintiff to rely on the defendant's alleged misstatements instead.  250 F.3d at 103-04.  By contrast, SSgA disclosed the risks of Markov to arm's-length CDO investors and urged them to conduct independent due diligence.

control over collateral selection. Opp. at 49. But any supposed ceding of control is pure conjecture. Plaintiff cannot plead Barclays' actual knowledge of a fact when Plaintiff has failed to adequately plead existence of such fact.

### E. Plaintiff Fails to Allege Breach of Contract Harming a Third Party Against SSgA

Nothing in Plaintiff's Opposition remedies Plaintiff's failure to plead that it was an intended third party beneficiary of SSgA's contract with Markov. SSgA was hired not to benefit Eastern Financial, but to select assets on behalf of the Markov CDO—an independent entity with a range of investors whose interests diverged widely depending, among other things, on whether they were equity investors seeking riskier, higher yielding assets or senior tranche investors seeking stable, low-yield assets. Furthermore, Markov's Offering Documents disclosed that the role of the collateral manager would involve selecting 92.2% of Markov's collateral—subject to Barclays' consent—before the Notes had even been sold to investors.[17] See Ex. B at 53. The disclosures in Markov's Offering Documents make clear that SSgA's duties under the collateral management agreement ran directly to Markov, not Markov's investors or any individual investor. See Ex. B. at 54, 172.

## CONCLUSION

For the reasons set forth above and in Defendants' moving papers, the Complaint should be dismissed in its entirety.

---

[17] Plaintiff's Opposition identifies a statement in the Offering Documents regarding the importance of the collateral manager, but fails to explain how this statement relates to Eastern Financial's third-party beneficiary status. Opp. at 50 ("[T]he performance of the Collateral Assets and Eligible Investments depends heavily on the skills of the Collateral Manager.").

Dated: New York, New York
       December 23, 2011


CLEARY GOTTLIEB STEEN & HAMILTON LLP          ROPES & GRAY LLP


By: _Meredith Kotler_                          By: _Robert Jones by mlc_
    David E. Brodsky                               Robert G. Jones
    Meredith E. Kotler                             Daniel J. Maher
    Joon H. Kim
    Arminda B. Bepko                            Prudential Tower
                                                800 Boylston Street
One Liberty Plaza                               Boston, Massachusetts 02199-3600
New York, New York 10006                        Telephone: (617) 951-7564
Telephone: (212) 225-2000                       Facsimile: (617) 235-045
Facsimile: (212) 225-3999

*Attorneys for Defendants Barclays Capital, Inc., and*          *Attorneys for Defendants State Street*
*Barclays Bank PLC*                                             *Global Advisors, State Street Bank and*
                                                                *Trust Company, and State Street*
                                                                *Corporation*


-21-